## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.

GEORGE and DIANA TERSHAKOVEC,
JACQUES RIMOKH, and HERBERT ALLEY,
individually and on behalf of all others similarly
situated,

**CLASS ACTION**

Plaintiffs,

**JURY TRIAL DEMANDED**

vs.

FORD MOTOR COMPANY,

Defendant.

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    JURISDICTION ................................................................................................4

III.   VENUE ................................................................................................................5

IV.   PARTIES ............................................................................................................5

     A.    Plaintiffs ..................................................................................................5

          1.    Florida Plaintiffs ........................................................................5

               a.    George and Diana Tershakovec ........................................5

          2.    California Plaintiff ......................................................................6

               a.    Jacques Rimokh ...............................................................6

          3.    Texas Plaintiff ............................................................................7

               a.    Herbert Alley ...................................................................7

     B.    Defendant ................................................................................................8

          1.    Ford Motor Company .................................................................8

V.    FACTUAL ALLEGATIONS .............................................................................9

     A.    Track Enthusiasts Share a Passion for Racing Their Vehicles on Closed Tracks ..................................................................................................9

     B.    Specialized Race Tracks Create Safe Conditions for Track Enthusiasts to Pursue Their Passion ..........................................................................10

     C.    "Track-Ready" Vehicles Operate Under Extreme Conditions and Must Meet Certain Basic Safety Features to Operate on a Race Track ...............10

          1.    Transmission Systems in "Track-Ready" Vehicles .......................11

          2.    Differentials in "Track-Ready" Vehicles.....................................11

     D.    The 2016 Shelby GT350 is designed to Operate on Race Tracks ...............12

     E.    The Shelby GT350 Cannot Be Safely Raced on the Track Due to Design and Manufacturing Defects in the Cooling System .....................................14

          1.    The Nature of the Defects and Their Safety Consequences ...........14

          2.    The Economic Consequences Associated with the Defects ...........15

3. Consumer Complaints Document the Scope of the Defects Inherent in the "Track-Ready" Powertrain Systems in Class Vehicles ........................17

F. Ford Markets the Shelby GT350 as "Track-Ready" ......................................21

1. Press Kits Were Created by Ford to Entice Track Enthusiasts to Purchase the Class Vehicles ..........................................................25

2. Ford-Sponsored Track Events to Demonstrate the "Track-Readiness" of Shelby GT350 Mustangs ........................................28

3. Misrepresentations were also made by Ford Executives and Key Ford Employees ...............................................................29

G. Ford Was Aware of the Defects Inherent in the 2016 Shelby GT350 Mustang While Marketing Them as "Track-Ready" ..................................30

1. Ford Concealed the Fact that the "Technology Package" Class Vehicles were not "Track-Ready" ..............................................30

2. Post-Purchase Distribution by Ford of an Owner's Supplement Unilaterally and Unexpectedly Shifted the Cost of Repair onto Owners ......................................................................30

3. Tellingly, Newer Model Years of the Shelby GT350 Have Corrected the Defects .........................................................31

H. Despite Express Warranties, Ford Has Not Fixed the Problems with the "Track-Ready" Powertrain System .......................................32

VI. CLASS ALLEGATIONS .........................................................................35

VII. VIOLATIONS ALLEGED ........................................................................38

A. Claims Brought on Behalf of the Nationwide Class .....................................38

COUNT I  VIOLATION OF MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, et seq.) ...................................................................38

B. Claims Brought on Behalf of the Florida Class .........................................41

COUNT I  VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201, et seq.) .................................41

COUNT II  FRAUDULENT CONCEALMENT (BASED ON FLORIDA LAW) ..........................44

COUNT III  BREACH OF EXPRESS WARRANTY (FLA. STAT. § 672.313).................................48

COUNT V  UNJUST ENRICHMENT (BASED ON FLORIDA LAW)...........................................50

C. Claims Brought on Behalf of the California Class .....................................50

COUNT I  VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, et seq.) ....................................50

COUNT II  VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
(CAL. CIV. CODE § 1750, et seq.) ............................................................................52

COUNT III  VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW (CAL.
BUS. & PROF. CODE § 17500, et seq.) ....................................................................54

COUNT IV  FRAUD BY CONCEALMENT (BASED ON CALIFORNIA LAW) ..........................55

COUNT V  VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT
FOR BREACH OF EXPRESS WARRANTIES (CAL. CIV. CODE §§ 1791.2 &
1793.2(d)).........................................................................................................57

    D.     Claims Brought on Behalf of the Texas Class ..............................................59

COUNT I  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND
CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE § 17.4, *et seq.*) .....................59

COUNT II  FRAUDULENT CONCEALMENT (BASED ON TEXAS LAW).................................63

COUNT III  BREACH OF EXPRESS WARRANTY (TEX. BUS. & COM. CODE ANN.
§ 2.313) ............................................................................................................67

COUNT IV  UNJUST ENRICHMENT (BASED ON TEXAS LAW)...............................................69

REQUEST FOR RELIEF ..................................................................................................70

DEMAND FOR JURY TRIAL ..........................................................................................70

Plaintiffs George and Diana Tershakovec, Jacques Rimokh, and Herbert Alley (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), allege the following:

## I.      INTRODUCTION

1.      "**Track-Ready**."  That is what Ford told potential race-enthusiast customers to entice them to buy its 2016 Shelby GT350 Mustang, as it has for generations.  But some of the Shelby GT350 Mustangs were far from ready for the track; in fact, they proved to be unusable there.  When a driver took Ford's flagship race car to the track, he or she learned that after fifteen minutes or less, the transmission and rear differential would overheat, causing the car to go into "Limp Mode" at drastically reduced speed and power—an obviously dangerous event when surrounded by speeding cars.  The 2016 Shelby GT350 overheats and goes into Limp Mode because, despite its "**Track-Ready**" claims, Ford chose to equip the Shelby GT350 Base and Technology Package models with defective transmissions and rear differentials.  These defects manifest in the "**Track-Ready**" powertrain systems' inability to withstand the demands of race track driving.

2.      There are certain basic rules that all carmakers must follow.  When a carmaker sells a car, it has a duty to ensure that the car functions properly and safely for its advertised use and is free from defects.  When a carmaker discovers a defect, it must disclose the defect and make it right or cease selling the car.  When a carmaker provides a warranty, it must stand by that warranty.  This case arises from defendant Ford Motor Company's ("Ford") breach of these rules.  Ford deceived its customers when it sold or leased the 2016 Shelby GT350 Mustang Base and Technology Package models (the "Class Vehicles") that it promised were "Track-Ready," but were in fact unusable and unsafe for that purpose.

3.      The original Shelby GT350 was introduced in 1965 and established the Mustang's performance credentials.  It was named after Carroll Shelby, the legendary race car driver and automotive designer.  Over the next fifty years, Ford marketed the Shelby GT350 as the race car member of the greater Ford Mustang family.  Millions of consumers came to associate the Shelby GT350 with race track use.  In fact, the Shelby GT350 garnered such an iconic place in the psyche of car enthusiasts that generations of Americans dreamed of one day racing these vehicles and creating heirlooms to pass along to loved ones to also use at the track.  This racing dream, however, came at a premium price.  Shelby GT350 Mustangs are often sold above list price and at double or triple the price of a regular Mustang GT.  Enthusiasts, however, are pleased to pay the premium to own such a distinct piece of automotive history that has specialized racing features that are absent from regular Mustang GTs—like a V8 engine that is capable of producing over 526 horsepower—in order to realize their racing dreams.

4.      At the time of Ford's 2016 model year launch, the Shelby GT350 was introduced as a limited edition, track-capable vehicle.  For instance, one marketing representation made by Ford announced:  "In developing the all-new Shelby GT350 and Shelby GT350R – the most potent track-oriented production Mustangs ever – nothing was left on the table in terms of weight reduction and track-capable performance."[1]  Ford also used the term "Track-Ready Shelby GT350" in its advertising.  For example:[2]

---

[1] *Innovative Engineering*, Ford, available at https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit/innovative-engineering.pdf (last accessed Mar. 22, 2017), at p. 9.

[2] 2016 Ford Mustang brochure, available at http://www.ford.com/services/assets/Brochure?make=Ford&model=Mustang&year=2016&postalCode=11101 (last accessed Mar. 22, 2017), at p. 3.



5.      As Ford intended, Plaintiffs purchased 2016 Shelby GT350 Mustangs for track use.  However, Plaintiffs' vehicles—which were purchased for approximately $57,000—are not fit for track use due to defective transmissions and rear differentials that cannot keep cool enough to function without external transmission and rear differential coolers.  Ford neglected to include these components in the manufacture and design of the vehicle.  These defective components result in the powertrain overheating when used on the track, sending the car into Limp Mode, which is a dangerous condition on a race track full of speeding cars.  In addition to manifesting on the race track, the defect also activates the dangerous Limp Mode in certain non-track driving conditions.

6.      Customer experiences with the Class Vehicles on the track differ dramatically from Ford's promise of a "Track-Ready" vehicle and chronicle the activation of Limp Mode.

Mustang testimonial websites and Ford customer service files are replete with complaints from consumers who reasonably believed that their Class Vehicles would in fact be "Track-Ready," but instead have been put at risk of accident on race tracks and during non-track driving when the defective transmissions and rear differentials overheat, causing the cars to go into Limp Mode at drastically reduced speed and performance.

7.     Ford is aware of the defect and in the 2017 model of the Shelby GT350, it fixed the defective transmissions and rear differentials by installing external coolers on all trim levels. In addition, Ford has belatedly and inconspicuously admitted the defect by advising owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense—in order to actually make them "Track-Ready" as advertised.  Execution of these aftermarket repairs may also represent further violations of the express warranties—a risk any reasonable consumer would hesitate to undertake.

8.     But Ford cannot shift its warranty obligations onto its customers.  If the 2016 Shelby GT350 Mustangs need transmission and rear differential coolers to actually perform as advertised, then Ford should have equipped the cars with these components to its customers. Ford should also not recommend aftermarket repairs if performing such repairs may constitute a violation of the company's express warranties.

9.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the 2016 Base and Technology Package model Shelby GT350 Mustangs.  Plaintiffs seek damages and other equitable relief.

## II.     JURISDICTION

10.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceed $5,000,000, exclusive of costs and interest; and minimal diversity exists.

This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

### III.    VENUE

11.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions and/or misrepresentations giving rise to Plaintiffs' claims occurred in this District.  Plaintiffs George and Diana Tershakovec took delivery of their Class Vehicle in this District and Ford has marketed, advertised, sold, and leased Class Vehicles within this District.

### IV.    PARTIES

**A.    Plaintiffs**

**1.    Florida Plaintiffs**

**a.    George and Diana Tershakovec**

12.     Plaintiffs George and Diana Tershakovec (the "Tershakovec Plaintiffs") reside in Miami, Florida.  The Tershakovec Plaintiffs purchased a 2016 Shelby GT350 Mustang with the Technology Package from an authorized Ford dealer.  The Tershakovec Plaintiffs purchased and still own this vehicle.  Unknown to the Tershakovec Plaintiffs at the time they purchased the vehicle, the vehicle suffered from defects, which has caused them out-of-pocket loss associated with the "Track-Ready" powertrain defect, attempted and future attempted repairs, and diminished value of the vehicle.  Ford knew about these defects but did not disclose the defects to the Tershakovec Plaintiffs, so the Tershakovec Plaintiffs purchased their vehicle on the reasonable but mistaken belief that their vehicle would be safe and reliable and was built (as advertised) for safe use on the race track as well as in other driving conditions and situations.

13.     The Tershakovec Plaintiffs selected and ultimately purchased their vehicle, in part, because the Shelby GT350 was represented to be "Track-Ready" and was marketed as

Ford's iconic race vehicle within the Mustang family.  They reviewed print and online advertisements showing photographs of the 2016 Shelby GT350 on race tracks and read about how various components in all 2016 Shelby GT350 Mustangs were "Track-Ready," such as the suspension, special steering, special brakes, and software settings, which differed from the consumer-oriented Ford Mustang GT.  None of the information reviewed by the Tershakovec Plaintiffs contained any disclosure relating to any defects in the Shelby GT350 or disclosed that not all models of the Shelby GT350 were capable of track use.

14.     The Tershakovec Plaintiffs' Shelby GT350 was equipped with items a reasonable consumer would believe to be present in a vehicle intended for use on a track, including special suspension, special steering, special brakes, and software settings, which included a "Track App" and a heads-up tachometer display used for racing.  If Ford had disclosed to the Tershakovec Plaintiffs that their vehicle transmission suffered from defects that would prevent the full use of their vehicle and pose safety risks, then they would not have purchased their vehicle or would have paid less for it.

### 2.     California Plaintiff

#### a.     Jacques Rimokh

15.     Plaintiff Jacques Rimokh is an individual residing in Los Angeles, California. Mr. Rimokh purchased a 2016 Shelby GT350 Mustang with the Technology Package from an authorized Ford dealer.  Mr. Rimokh researched the 2016 Shelby GT350 Mustang in California and communicated with various dealers while he was in that state; therefore, Mr. Rimokh was exposed to Ford's misrepresentations and/or omissions in that state.  Mr. Rimokh then made arrangements to purchase his vehicle from an authorized Ford dealer.  Mr. Rimokh purchased and still owns this vehicle.  Unknown to Mr. Rimokh at the time he purchased the vehicle, the vehicle suffered from defects, which has caused him out-of-pocket loss associated with the

"Track-Ready" powertrain defect, attempted and future attempted repairs, and diminished value of the vehicle.  Ford knew about these defects but did not disclose the defects to Mr. Rimokh, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable and that the vehicle was intended to be a vehicle that could be used on the track or at high speeds and was capable of safely performing these operations.

16.     Mr. Rimokh selected and ultimately purchased his vehicle, in part, because the Shelby GT350 was represented to be "Track-Ready."  Mr. Rimokh reviewed print and online advertisements showing photographs of the 2016 Shelby GT350 on race tracks and read about how various components in all 2016 Shelby GT350s were "Track-Ready," such as the suspension, special steering, special brakes, and software settings, which differed from the consumer-oriented Ford Mustang GT.  None of the information reviewed by Mr. Rimokh contained any disclosure relating to any defects in the Shelby GT350 or disclosed that not all models of the Shelby GT350 were capable of track use.

17.     Mr. Rimokh's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and software settings, including a "Track App" and a heads-up tachometer display used for racing.  If Ford had disclosed to Mr. Rimokh that his vehicle transmission suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased his vehicle or would have paid less for it.

**3.      Texas Plaintiff**

**a.      Herbert Alley**

18.     Plaintiff Herbert Alley is an individual residing in Magnolia, Texas.  Mr. Alley purchased a 2016 Shelby GT350 Mustang with the Technology Package from an authorized Ford dealer.  Mr. Alley purchased and still owns this vehicle.  Unknown to Mr. Alley at the time he

purchased the vehicle, the vehicle suffered from defects, which has caused him out-of-pocket loss associated with the "Track-Ready" powertrain defect, attempted and future attempted repairs, and diminished value of the vehicle.  Ford knew about these defects but did not disclose the defects to Mr. Alley, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable and that the vehicle was intended to be a vehicle that could be used on the track or at high speeds and was capable of safely performing these operations.

19.     Mr. Alley selected and ultimately purchased his vehicle, in part, because the Shelby GT350 was represented to be "Track-Ready."  Mr. Alley reviewed print and online advertisements showing photographs of the 2016 Shelby GT350 on race tracks and read about how various components in all 2016 Shelby GT350s were "Track-Ready," such as the suspension, special steering, special brakes, and software settings, which differed from the consumer-oriented Ford Mustang GT.  None of the information reviewed by Mr. Alley contained any disclosure relating to any defects in the Shelby GT350 or disclosed that not all models of the Shelby GT350 were capable of track use.

20.     Mr. Alley's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and software settings, including a "Track App" and a heads-up tachometer display used for racing.  If Ford had disclosed to Mr. Alley that his vehicle transmission suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased his vehicle or would have paid less for it.

**B.     Defendant**

**1.     Ford Motor Company**

21.     Ford Motor Company is a corporation doing business in all 50 states and the District of Columbia, and is organized under the laws of the State of Delaware, with its principal

place of business in Dearborn, Michigan.  At all times relevant to this action, Ford manufactured,

sold, leased, and warranted the Class Vehicles at issue throughout the United States.  Ford and/or

its agents designed, manufactured, and installed the defective "Track-Ready" powertrain systems

in the Class Vehicles.  Ford also developed and disseminated the owner's manuals, supplements,

and warranty booklets, advertisements, and other promotional materials relating to the Class

Vehicles, and provided these to Ford's authorized dealers for the express purpose of having these

dealers pass such materials onto potential purchasers.  Ford also created, designed, and

disseminated information about the "Track-Ready" quality of the Shelby to various agents of

various publications for the express purpose of having that information reach potential

consumers.

## V.    FACTUAL ALLEGATIONS

**A.    Track Enthusiasts Share a Passion for Racing Their Vehicles on Closed Tracks**

22.    There is a segment of car purchasers who buy cars that are designed to be used, in

part, on racing tracks.  Often called "Track Enthusiasts," these car purchasers are passionate

about motorsports and relish a challenging driving experience.  Track Enthusiasts often purchase

vehicles that can be driven on public roads as well as specialized race tracks.  One of these

vehicles, the 2016 Shelby GT350 Mustang, has been heavily advertised as a "Track-Ready"

vehicle.  Ford aggressively markets its Shelby GT350 to track enthusiasts.  In fact, Raj Nair

(Ford group Vice President, Global Product Development) explained the ideal vehicle uses for

Track Enthusiasts during the 2016 Shelby GT350 Mustang launch event:  "When we started

working on [the Shelby GT350 Mustang], we wanted to build the best possible Mustang for the

places we most love to drive – challenging back roads with a variety of corners and elevation

changes, and at the track on weekends."[3]  Many Track Enthusiasts agreed and came out in droves to purchase these new "Track-Ready" Mustangs, in most instances above the Manufacturers' Suggested Retail Price.

**B.      Specialized Race Tracks Create Safe Conditions for Track Enthusiasts to Pursue Their Passion**

23.      Track Enthusiasts purchase race vehicles to drive on a closed race track.  There are dozens of race tracks across the United States where Track Enthusiasts are allowed to bring their "Track-Ready" vehicles and operate them at very high speeds on closed tracks sealed off from all other highways and roads.  Typically, these race tracks provide a safe and welcoming environment for participants to explore the capabilities and limits of their high-performance sports cars, while improving their driving skills.  Race tracks can also provide instruction and coaching for drivers of all skill levels.  The main priority for both Track Enthusiasts and Race Track operators, however, is always vehicle safety—both for track drivers and others who may be physically located near the race track.  As such, speed and vehicle distance is closely monitored and specialized etiquette mores—or rules of the road—must be adhered to at all times.

**C.      "Track-Ready" Vehicles Operate Under Extreme Conditions and Must Meet Certain Basic Safety Features to Operate on a Race Track**

24.      "Track-Ready" vehicles routinely reach speeds in excess of 125 mph on specialized race tracks and operate under conditions that place an extreme amount of stress on vehicle systems.  To keep track drivers and others safe, "Track-Ready" vehicles are not equipped in the same way as typical consumer vehicles.  Two of these important differences relate to the transmission system and rear differentials in "Track-Ready" vehicles.

---

[3] *Ford Shelby GT350 Mustang Raises the Bar for Handling*, Ford (May 6, 2015), https://media.ford.com/content/fordmedia-mobile/fna/us/en/news/2015/05/06/ford-shelby-gt350-mustang-raises-the-bar-for-handling.html.

### 1. Transmission Systems in "Track-Ready" Vehicles

25.     In the context of motor vehicles, a transmission system takes the power generated by a vehicle's engine and applies that power to calibrate the speed and torque of the wheels. This process is accomplished by the driver shifting through different gears.  Slower, or lower, gears are used to slow down the output speed of the engine and increase torque.  Higher gears increase the output speed and decrease torque.  Further, race track conditions often require drivers to change gears extremely quickly—usually in a tiny fraction of a second.  As such, the transmission system for "Track-Ready" vehicles must come equipped with certain features, such as transmission coolers, to cope with the high engine speeds and the fast, frequent gear shifts consistent with the rigors of track use.  Without these features, the transmission systems in Shelby GT350s for example, will overheat, going into Limp Mode.  As explained in more detail below, Limp Mode refers to a scenario where, to prevent damage, a "Track-Ready" vehicle automatically regresses to a lower RPM (revolutions per minute) with a drastically slower speed, much to the surprise of the individual driver and those driving nearby.

### 2. Differentials in "Track-Ready" Vehicles

26.     A rear differential is a component in all cars and is designed to compensate for the difference in distance the inner wheels and outer wheels travel as the car goes around a corner. For track drivers—who routinely turn corners while pressing on the gas in a powerful car—poor rear differentials can cause the inside wheel to start to over-spin, leading to less grip and traction. The driver then loses the ability to properly maneuver the outside wheel and can potentially lose control of the vehicle.  This can result in erratic driving and an increased risk for collisions.

27.     Owners of "Track-Ready" vehicles therefore must ensure that their rear differentials remain fully operational by allowing for the application of a specialized cooler.

### D.       The 2016 Shelby GT350 is designed to Operate on Race Tracks

28.     The 2016 Shelby GT350 came in the following packages:[4]



———————————

[4] Ford Shelby GT350 model overview, available at http://horsepowerkings.com/ford-will-price-2016-gt350-47870-gt350r-at-61370/ (last accessed Mar. 22, 2017).

29.     Ford designed the 2016 Shelby GT350 Mustang with three trim levels: Base, Track Package, and Technology Package.[5]  The Technology Package has special suspension, steering, brakes, dashboard controls, and software settings, such as the Track App and a special heads-up display that are designed to be used exclusively on race tracks.  This package also provided special settings for tires and fluid for track conditions.  The Technology Package was also the most expensive trim level and Ford added a significant premium of $7,500 for the upgrade, on top of the substantially higher MSRP.

30.     The final reported sales numbers for the 2016 Shelby GT350 Mustang demonstrate the extent to which Ford manipulated Track Enthusiasts with false assurances of the vehicle's suitability for racing.  Of the 5,643 Base, Technology Package, or Track Package Shelby GT350 Mustangs built by Ford, 3,991 (70.7%) were the Base or Technology Package models.  In contrast, only 1,652 (29.3%) were equipped with the Track Package.[6]  Ford was thus not only aware that the Technology Package was being purchased by the vast majority of Track Enthusiasts—who wanted a "Track-Ready" car with added comforts such as navigation and voice recognition—but also that only a small minority of the vehicles being sold as "Track-Ready" could realistically be operated safely on a racetrack.  The price of a Technology Package vehicle was approximately $57,000.

---

[5] Consumers could also upgrade to a 2016 Shelby GT350 "R" model and add an additional Electronic Package.  Of the 6,169 GT350 Mustangs made, only 526 vehicles were made with the "R" package.  The 2016 GT350 "R" models are not included in the proposed class.  *2016 GT350/R Final Production Numbers*, Mustang6G.com (Feb. 8, 2017), http://www.mustang6g.com/?p=10779.

[6] *Id.*

**E.** **The Shelby GT350 Cannot Be Safely Raced on the Track Due to Design and Manufacturing Defects in the Cooling System**

**1.** **The Nature of the Defects and Their Safety Consequences**

31.     To Track Enthusiasts, the performance of a car on the track is a material factor in the decision to purchase a given model.

32.     The Class Vehicles cannot be used on the track due to a design defect that affects the cooling system of the vehicles at issue.  The Class Vehicles are equipped with a "Track-Ready" powertrain system, but this system is defective as it lacks a transmission cooler and a rear differential cooler.  As a result, the engine will overheat if it operates on the track, which causes the vehicle to go into Limp Mode to prevent permanent damage.  Typically, vehicles in Limp Mode can immediately go from well over 100 mph to a substantially lower speed and lose power.  As a result, the driver can become disoriented and lose control of the vehicle, increasing the risk of an accident.  This scenario is also extremely dangerous for other drivers operating at high speeds nearby who do not expect the car racing in front of them to essentially freeze on the track, thereby putting them at risk for accidents as well.

33.     The Class Vehicles also contain a manufacturing defect in that unexpected overheating of a powertrain system can damage other essential operations of the vehicle, such as the clutch, rear end, and others.  Coolers are required not only for Class Vehicles that will be used on a race track, but for all non-racing Class Vehicles as well, as coolers are required for the purpose of preventing premature failure of the transmission and rear differential because of routine high temperatures not experienced in cars with coolers.  According to Ford:  "Rather than develop individual systems to perform well independently, every component and shape is

optimized to work in concert; balance is the key."[7]  Thus, Track Enthusiasts are faced with an impossible choice: (1) allow for overheating events to occur at unexpected times, thereby causing increased safety risks as well as damage to other parts of the Class Vehicle; or (2) take a gamble by modifying their car with aftermarket repairs that were not initially envisioned by Ford GT350 engineers and cross their fingers that such modifications will not affect the performance or long-term reliability of their Class Vehicle, let alone the future enforcement of their express warranties.  Under either of these scenarios, Track Enthusiasts are not getting what they bargained for.

34.     Frighteningly, the same Limp Mode can also unexpectedly occur on the road, during non-track conditions.  If Limp Mode occurs on a public highway, for example, it presents a completely distinct safety issue due to material differences in speed, number of vehicles, vehicle performance, and the skill set of drivers on public roadways as compared to drivers on closed race tracks.  Nevertheless, one thing is clear: even with the inherent differences of highway driving, a vehicle rapidly decelerating on a highway is dangerous and can result in a high-speed collision.  This defect is unacceptable for customers who own this vehicle.

### 2.     The Economic Consequences Associated with the Defects

35.     In addition to the increased safety risks associated with the defects contained in the Class Vehicles, Plaintiffs have also suffered economic harm as a result of Ford's fraudulent conduct.  First, Plaintiffs estimate that a repair to adequately correct the defects in the Class Vehicles to make them "Track-Ready" vehicles usable at high speeds would cost approximately $7,000, including parts and labor to resolve the transmission issue only.  No cost has yet been

---

[7] *2016 GT350/GT350R Press Kit*, Ford, available at https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit.pdf (last accessed Mar. 22, 2017), at p. 2.

determined for a rear differential cooler repair—Ford has admitted to Plaintiffs that the company is unable to repair this defect as it has not yet been able to provide a solution that can be properly integrated with the engine's control module. Plaintiffs and Class members are required to pay this amount out-of-pocket as the addition of a cooling system to the transmission and rear differentials is not covered under any of Ford's warranties. Second, Plaintiffs and other Class members who choose not to make these aftermarket repairs lose the ability to operate their "Track-Ready" vehicles on a race track and risk permanent damage to transmission and rear differentials. Third, the repairs suggested by Ford may constitute aftermarket modifications that risk violating enforcement of the express warranties of the Class Vehicles. Thus, they have not received that for which they have bargained.

36. Plaintiffs have also suffered a diminution of value due to the fact that prospective owners are now aware that if they want to actually drive safely—and conform to the rules and safety habits mandated by virtually all race track organizations—they would need to pay thousands of dollars to get the same mandatory safety features that are now standard on 2017 Shelby GT 350 Mustangs. This additional repair, or the inability to use this "Track-Ready" vehicle on a race track, will factor into the purchase price and decision of prospective buyers. As a result, owners of the Class Vehicles will receive less for their vehicles on the secondary market.

### 3. Consumer Complaints Document the Scope of the Defects Inherent in the "Track-Ready" Powertrain Systems in Class Vehicles

37.     Ford Mustang forums are replete with the frustrations of owners over the "Track-Ready" powertrain system defects—a widespread problem affecting more than two-thirds of all 2016 Shelby GT350 owners.  Consumers are also rightly critical of the lack of a fix and the harm the defects are doing to values.  For example, users of the Ford Shelby 350 forum posted the following:[8]

> **Apndx:**
>
> Posted: 16 July 2016 - 08:23 AM
>
> Good morning all, I have received information from 3 reliable sources that a kit has been developed and we the owners will get a letter within the month telling us about it, I am also told it will be available for purchase and installation about the same time we get the letter. I could not get any more details other than what Ford Customer Service, Shelby, and local service manager told me, and this is after months of being told that it was being evaluated but nothing beyond that. This latest info is very different than what we all heard before. So watch your mail! This is also very different then being told might need to change out the tranny.
>
> Posted 22 January 2017 - 07:55 AM
>
> The track is a hard core track car, the tech was to be track able but isn't and can't be modified easily or cost effectively and no one really knew how critical the coolers were even for short track runs, and Ford for 2017 fixed that, leaving no viable fixes for the 2016, this diminishes the value of the car and it's utility, that's the issue
>
> Posted 22 January 2017 - 06:09 PM
>
> You are clearly not the only one disappointed that this car does not live up to its hype and can be out performed by a standard Mustang GT. Limp mode stinks. This is a great car but it is not the most track capable Mustang ever. At least after 15 minutes its not.

---

[8] KenPShelbyGT350, *Aftermarket or OEM Transmission, Oil, and Differential Coolers*, FORDSHELBYGT350FORUM.COM (Mar. 14, 2016), http://fordshelbygt350forum.com/topic/2716-aftermarket-or-oem-transmission-oil-and-differential-coolers/.

**2016VooDoo:**

Posted 04 May 2016 - 09:26 AM

I had this issue at a track event last weekend after about 15 minutes on the track.  Ford says this is "normal" as the Tech pack cars were not intended for Track use.  I think this is a BS answer.  If this were the case, why does the car have 530 horsepower, huge 6 piston front brakes, spoilers, strut tower brace, Track Apps in the menu system including lap timers, etc.  This car was marketed as the most capable track cars Ford has ever built.

Ford knows they made a mistake here and they are correcting it for MY17.  If anyone from Ford is reading this forum I have a request...  When you do come out with a cooler kit for the trans and differential, please offer it to those of us who spent money on the MY15 and MY16 cars without huge Ford + Dealer markup.  Current owners are your best ambassadors for the car and for the brand and it would be a shame to have Ford put the burden of fixing these cars on the owners.

Had I known my car wouldn't be able to finish a lapping session, I wouldn't have bought it.

You can all imagine the conversations around the track when the brand new GT350 couldn't finish 25 minutes on the track.  Embarrassing.

On the positive side, before the car went into limp mode, it was a BEAST!

**Copyless:**

Posted 04 May 2016 - 12:10 PM

I agree 100 percent with everything you stated and if Ford stands behind the "not meant for track use" BS, then I think that they should really take a dive in sales and profits for the '17 year, and I really hate to say something like that because I have been a Ford person forever and I love Ford, but right is right and this should have been addressed before the first gt350 was  put together as a production car.

I hope they have the cooler kits available soon and would like it even more (but it probably won't happen) if they would actually take the time to pull the names of every base and Teck Pckg car sold and send them letters a week or so before the kit is available and let us know that it is coming out and give us our special price

for the kit. They could do this easily if they wanted to, and this would show that they really cared for their customers, and this would show that, more than anything else that they normally do and then say this is their appreciation. I mean they send out the supplement packages, so they already have every owners name and address and the options on the car, so it would not be that hard to contact them and make this kit available to them before hand and at a reduced price, this move would produce a marketing effect that even their high paid marketers could not add, as it would hit forums and I would not be surprised if it even made it into an article or two.

Anyway, I can dream if I want to, it's up to you, FORD, to make my dream a reality.

Again 2016voodoo, I hope Ford is reading this, because I want my dream, which I believe may also be a dream of yours, to become real, because I believe this is the dream of many owners and because I still believe in Ford.

**Springer:**

Posted 20 May 2016 - 10:57 PM

It is only a matter of time before legal action is filed against Ford regarding the non functionality of the Tech cars when tracked and not performing as advertised and marketed as the most capable track car ever.  This is so "slam dunk" that I'm surprised a class action suit hasn't already been made against Ford.

**2016VooDoo:**

Posted 12 July 2016 - 10:59 AM

Has anyone heard any more on this from Ford SVT?  I was at Road America again this weekend as a spectator at a track day and every GT350 without Track package went into Limp Mode.  Owners were PISSED OFF.

I hope Ford is listening and will consider a reasonable fix to a condition that should never be occurring on a car with Track Apps and Lap Timers built into the electronics!

**jsderikson:**

Posted 12 July 2016 - 11:24 PM

I had the same problem.  Did a track day at Thunder Hill 5 mile.
First session no problem because I didn't yet know the track.
Second session 70 degree ambient and went into limp mode after
about 12 minutes in.  Took it to dealer, had them read the codes
and they confirmed transmission overheat.  Got same story ... need
a track pack.  By-the-way, I was never told this when I bought the
car and they certainly didn't give me the manual until after the sale.
I reported to Ford Customer Service (Spoke with regional
Customer Service Manager for San Francisco Region) and they
acted as if they hadn't heard about it.  I sent them a link to this post
and some others and they claim that it wasn't being reported to
them and that they couldn't respond to blog posts.  I recommend
that everyone who has experienced this shout really loud to Ford or
they are not going to respond.  I am sure they know about it but it
might not be a priority for such a low volume car.  I Couldn't get a
confirmation out of them that they were working on anything but I
think they probably are.

The final outcome was she recommended that I continue working
with my local dealer so that they can assist once a fix does come
out.  Will continue to wait for a while.

**Maag:**

10-09-2016, 04:15 PM

**Ford Call To Action - Fix Limp Mode!**

Anyone who owns a 2015 or 2016 GT350 (non track option)
should read this thread and contact Ford!

I own a 2016 Tech Pack. I specifically asked the salesman before I
bought the car if it had the track package and I was told that the
Tech pack included the Track pack options. As you can expect, I'm
not very happy to find out that my car doesn't have the diff and
trans coolers it needs to even last a 20 min track session without
going into limp mode. I'm at 4500+ above sea level and planned on
tracking the car often. I am very disappointed that Ford marketed
this car as a track car, but I can't even use it as such. I've submitted
a claim to Ford and received the following unacceptable response.
FRUSTRATED!! I would expect Ford to rectify this situation and
stand by the GT350 marketing as it being a track car.

Response from Ford:

Subject: Ford Motor Company CAS-10612011-Y3R2F7
CRM:09632000001005

Hello Clifford,

My name is Sharonica, I am from Ford`s Customer Relationship Center (CRC). I have reviewed your email inquiring about your 2016 Ford Mustang.

I can see why this would concern you. Please be assured that any time a customer writes to us, it is appreciated. Every customer is of the highest value to Ford, and we make every effort to assist anyone who writes, e-mails, or calls us regarding any situation. After reviewing my resources, there are no recalls or customer satisfaction program that would indicate a problem with your vehicle. The 2016 Shelby GT350 Mustang is a thoroughbred capable of tackling the world's most challenging roads and race tracks. The new GT350 draws its credentials from its legendary racing roots at Shelby and the Ford Performance Team, building on Carroll Shelby's idea of transforming a great everyday car into a dominant road racer. If your vehicle experiences any issues, we recommend that your vehicle be inspected by a Ford dealership to determine the cause of any symptoms your vehicle may be experiencing. Your local Ford dealership has factory-trained technicians and the most current Ford service information, and the specialized equipment required to resolve your vehicle concerns.

We understand the circumstances which caused you to write and hope that you will continue to enjoy our products. We have documented your feedback and will share it with the appropriate department.

Thank you for contacting Ford Motor Company. …

## F.    Ford Markets the Shelby GT350 as "Track-Ready"

38.    Ford heavily marketed the Class Vehicles as being "Track-Ready."  For example, the 2016 Ford Mustang brochure included the following:[9]

---

[9] 2016 Ford Mustang brochure, available at http://www.ford.com/services/assets/Brochure?make=Ford&model=Mustang&year=2016&postalCode=11101 (last accessed Mar. 22, 2017), at p. 4.

## VENOMOUS 5.2L BEAST.

Every member of the Mustang family makes a powerful impression. Starting with the most potent of them all – the head-turning, heart-pounding, Shelby GT350® This race-tuned monster is powered by a 5.2L Ti-VCT V8 with a flat-plane crank, engineered to propel you into the winner's circle. A TREMEC® TR-3160 6-speed manual transmission gives you ultimate control over its 526 hp and 429 lb.-ft. of torque.

39.     Ford also advertised pictures of the Shelby on a race track:[10]



---

[10] *See, e.g.*, *id.* at pp. 14-15.



40.     Importantly, Ford never distinguished between trim levels when representing that

all Shelby GT350 Mustangs were "Track-Ready":[11]

### Shelby GT350 Mustang: The Legend Returns

- All-new Shelby® GT350 Mustang is a thoroughbred capable
  of tackling the world's most challenging roads and racetracks

- GT350 is powered by a unique, high-revving flat-plane
  crankshaft 5.2-liter V8 engine, which produces 526 horsepower
  and 429 lb.-ft. of torque, the most powerful naturally aspirated
  Ford production engine ever

- Advanced materials, MagneRide dampers, aggressive brakes
  and finely tuned aerodynamics push the performance of
  Mustang to previously unmatched levels

One of the most iconic performance Mustang nameplates of all
time has returned, the all-new Shelby® GT350 Mustang.

The original Shelby GT350 introduced in 1965 established the
Mustang's performance credentials. The all-new Shelby GT350
Mustang, featuring the most powerful naturally aspirated Ford

---

[11] *Shelby GT350 Mustang: The Legend Returns*, Ford (Aug. 25, 2015),
https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit.html.

production engine ever, is a world-class performance vehicle, designed to tackle the planet's most challenging roads – an all-day track car that's also street legal.

The new GT350 builds on Carroll Shelby's original idea – transforming a great every-day car into a dominant road racer – by taking advantage of a dramatically improved sixth-generation Mustang to create a truly special driving experience.  Driving enthusiasts behind the wheel of a Shelby GT350 can expect to be treated to the most balanced, nimble and exhilarating production Mustang yet.

Ford engineers took an innovative approach with GT350. Rather than develop individual systems to perform well independently, every component and shape is optimized to work in concert; balance is the key.  While paying rigorous attention to detail, the team pushed the envelope with cutting-edge materials and technologies.

"When we started working on this car, we wanted to build the best possible Mustang for the places we most love to drive – challenging back roads with a variety of corners and elevation changes, and the track on weekends," said Raj Nair, Ford group vice president, Global Product Development. "Every change we made to this car was driven by the functional requirements of a powerful, responsive powerplant – nimble, precise handling, and massive stopping power."

**Track-tuned driveline**

Early in the development of the GT350, it was decided that a high-revving, naturally aspirated V8 engine would best suit a track-focused Mustang. "The final product is essentially an all-new powerplant unique to GT350 – "and one that takes true advantage of the new chassis dynamics of the Mustang platform," said Jamal Hameedi, chief engineer, Ford Global Performance Vehicles.

The new 5.2-liter V8 engine is the first-ever production V8 from Ford with a flat-plane crankshaft, an architecture typically found only in racing applications or exotic European sports cars. Unlike a traditional V8, where the connecting rods are attached to the crankshaft at 90-degree intervals, this design evenly spaces all crank pins at 180-degrees intervals.

The 180-degree, flat-plane layout permits a cylinder firing order that alternates between cylinder banks, reducing the overlap of exhaust pressure pulses. When combined with cylinder-head and

- 24 -

valvetrain advancements, this permits better cylinder breathing, further extending the performance envelope of the V8.

The result is the most powerful naturally aspirated production Ford engine ever, at 526 horsepower, with a torque peak of 429 lb.-ft. The track capability is enhanced by the output characteristics of the engine – the 5.2-liter V8 features an exceptionally broad torque curve. Combined with its high-revving ability, the flat-plane 5.2-liter V8 gives drivers an enormous amount of performance and flexibility within each gear of the lightweight six-speed manual transmission. A standard Ford-tuned Torsen limited-slip differential optimizes cornering grip and straight-line traction. "Make no mistake, this is an American interpretation of a flat-plane crankshaft V8, and the 5.2-liter produces a distinctive, throaty howl from its four exhaust tips," Hameedi said.

1.     **Press Kits Were Created by Ford to Entice Track Enthusiasts to Purchase the Class Vehicles**

41.     Ford also made available online different Press Kits outlining the unique features of the 2016 Shelby GT350 Mustang.  These kits provided a substantial amount of detail on the Class Vehicles as well as several specific misrepresentations that the Class Vehicles were designed to be used on a race track.  Again, no distinction was made regarding various trim levels or that the Base or Technology Package models could not be safely operated on a race track.

42.     For example, one Ford Press Kit on "Innovative Engineering" advertised:[12]

**New Six-Speed Shelby GT350 Mustang Manual Transmission Channels Flat-Plane V8 Power via Lighter, Stouter Gearbox**

- Sole transmission offering in the all-new Shelby GT350® Mustang is a unique Tremec six-speed manual designed to deliver precision shifts and positive shift engagement

- ***Transmission for Shelby GT350 Mustang developed with all-day track capability and high-rpm capability at the forefront***

---

[12] *Innovative Engineering*, Ford, available at https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit/innovative-engineering.pdf (last accessed Mar. 22, 2017), at pp. 1-3, 9 (emphasis added).

- Extreme measures taken to ensure positive feel and durability include power-honed gears, air-to-oil transmission cooler and carbon-bronze triple-cone synchronizers

*In developing the all-new Shelby GT350® and Shelby® GT350R – the most potent track-oriented production Mustangs ever – nothing was left on the table in terms of weight reduction and track-capable performance*.  This whole-vehicle philosophy extends to the sole transmission offering – a Tremec six-speed manual, with nearly every component receiving special attention to ensure durability and improved shifting performance.

Both cars were developed with the most powerful naturally aspirated production engine ever developed by Ford – *a racing-inspired*, 5.2-liter flat-plane crankshaft V8 with 526 horsepower and 429 lb.-ft. of torque and an impressive 8,250-rpm redline. "Any transmission backing this engine requires a certain amount of high-power, high-rpm capability," notes Jeff Albers, powertrain engineering supervisor with Ford.

**Harder, faster, better**

The high-revving 5.2-liter engine is paired with the much-lauded Tremec TR-3160 six-speed manual transmission. ***The unit has been heavily revised for Shelby GT350 to cope with high engine speeds and the rigors of track duty, and to provide the kind of precision engagement, smoothness, and reduction in weight and rotating inertia demanded by Ford Performance***.

\* \* \*

**Ford Shelby GT350 Gets Racing-Inspired Customizable Shift Light Indicator to Help Drivers Optimize Track Time**

- Shelby GT350® Mustang features Performance Shift Light Indicator display with Track, Tach and Drag mode

- Performance Shift Light Indicator provides the benefits of a shift light while allowing drivers to ***keep their eyes on the track at all times***

- Heads-up shift light was developed by reimagining existing hardware and is standard on all-new Shelby GT350 and Shelby® GT350R

\* \* \*

- 26 -

**Ford Shelby GT350 Mustang Raises the Bar for Handling** [. . .]

**Suspension tuned for *maximum performance on road and track***

Handling is the performance playground of Shelby GT350, and the car's suspension is heavily *revised to maximize cornering performance*. [. . .]

**Most powerful brakes ever fitted to a Production Mustang**

Reducing unsprung mass is key to improving responsiveness, but a balance must be struck between taking mass out of a suspension and delivering truly capable braking performance. ***Shelby GT350 features the most track-credible brake system ever offered on a production Mustang***, consisting of two-piece cross-drilled iron rotors with aluminum hats – the largest rotors Ford has ever put on a production Mustang. Massive 394-millimeter front rotors and 380-millimeter rear rotors are a floating-type and are pin-driven to the aluminum hats to greatly reduce heat transfer to the bearings. These rotors are clamped by six-piston fixed Brembo calipers with integrated caliper bridges at the front and four-piston units at the rear. Dedicated ducting assists in cooling the brakes front and rear for maximum performance.

"***These cars can be driven by any driver on any track in the world – with virtually no fade***," remarks Brent Clark, suspension and vehicle dynamics technical specialist

**Wheels and tires *fit for the track***

Shelby GT350 makes use of extra-stiff 19.0-inch cast aluminum-alloy wheels – 10.5 inches wide in front, 11.0 inches in the rear – clad in Michelin Pilot Super Sport tires with GT350-specific sidewall construction, tread face and compound. ***The custom tires are designed to deliver maximum grip on the road or for weekend track days***.

43.     The *2016 GT350/GT350R Press Kit* advertised:[13]

[The] All-new Shelby® GT350 Mustang is a thoroughbred capable of ***tackling the world's most challenging roads and race tracks***[.]

_____

[13] *2016 GT350/GT350R Press Kit*, Ford, available at https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit.pdf (last accessed Mar. 22, 2017), at pp. 1-2 (emphasis added).

* * *

> The all-new Shelby GT350 Mustang, featuring the most powerful
> naturally aspirated Ford production engine ever, is a world-class
> performance vehicle, designed to tackle the planet's most
> challenging roads – ***an all-day track car that's also street legal***.

**2.      Ford-Sponsored Track Events to Demonstrate the "Track-Readiness" of
Shelby GT350 Mustangs**

44.      Ford also sponsored several track events where the 2016 Shelby GT350 Mustang

was prominently featured and marketed to Track Enthusiasts, including the North American

GT350 Track Tour.  The North American GT350 Track Tour visited several road courses

throughout the United States and offered invitees the opportunity to experience a ride in a Shelby

GT350.

45.      Track Enthusiasts were also offered exclusive invitations to participate in the

GT350 Track Attack program, which provided "a complimentary one-day track/classroom

experience" as s a standard perk "included with the purchase of every 2015 or 2016 Shelby

GT350 or GT350R."[14]  The two-day event featured "on-track instruction by the Ford

Performance Racing School" to "learn braking and cornering techniques on track" as well as

classroom activities "[f]or owners of the new 2015 & 2016 Shelby GT350."[15]  Ford touted the

program in a press release, saying "the program is designed to help drivers at all skill levels

understand the nuances of ***their*** car's performance and handling in a safe environment under

professional supervision."[16]  According to Dan McKeever (President of Ford Performance

Racing School):  "Regardless of a person's driving ability, this will be an unbelievable

---

[14] *GT350 North American Track Tour*, Ford, available at https://web.archive.org/web/
20160812055748/http://gt350trackattack.com/ (last accessed Mar. 22, 2017).

[15] *Id.*

[16] *Standard Equipment, Going Fast: Shelby GT350 Mustang Owners Get Complimentary
Performance Driving School*, Ford (Mar. 9, 2016), https://media.ford.com/content/fordmedia-
mobile/fna/us/en/news/2016/03/09/shelby-gt350-mustang-owners.html (emphasis added).

- 28 -

experience . . . .  From the weekend track warrior to the car collector, this program provides the skills needed to really enjoy Shelby GT350 Mustang *in the environment for which it is designed*."[17]

### 3.   Misrepresentations were also made by Ford Executives and Key Ford Employees

46.     Ford executives also made detailed statements about how Ford had envisioned that all Class Vehicles would be able to perform under track conditions.  None of these statements ever differentiated between the various trim levels or disclosed that some trim levels, such as the Base or Technology Package models, were unfit for race track use—despite the "race track" price.  Here are but a few examples:

- In a November 17, 2014 press release, Jamal Hameedi (Chief Engineer, Ford Global Performance Vehicles) boasted:  "We took the best Ford Mustang yet and massaged every aspect of the car that affects the performance driving experience . . . .  We tested endlessly on the most challenging roads and tracks in the world, and we believe serious drivers will love the Shelby GT350 Mustang."[18]

- In a May 6, 2015 press release, Raj Nair (Ford group Vice President, Global Product Development) noted:  "When we started working on [the Shelby 350GT], we wanted to build the best possible Mustang for the places we most love to drive – challenging back roads with a variety of corners and elevation changes, and at the track on weekends."[19]

---

[17] *Id.*

[18] *Shelby GT350 Mustang: The Legend Returns*, Ford (Nov. 17, 2014), available at https://media.ford.com/content/fordmedia/fna/us/en/news/2014/11/17/shelby-gt350-mustang-the-legend-returns.pdf.

[19] *Ford Shelby GT350 Mustang Raises the Bar for Handling*, Ford (May 6, 2015), https://media.ford.com/content/fordmedia-mobile/fna/us/en/news/2015/05/06/ford-shelby-gt350-mustang-raises-the-bar-for-handling.html.

- In the same May 6, 2015 press release, Brent Clark (Vehicle Dynamics Supervisor) stated: "These cars can be driven by any driver on any track in the world – with virtually no fade."[20]

- In a March 9, 2016 press release, Jim Owens (Ford Performance Market Manager) explained: "GT350 is a car that needs to be experienced on a closed road course . . . ."[21]

**G.    Ford Was Aware of the Defects Inherent in the 2016 Shelby GT350 Mustang While Marketing Them as "Track-Ready"**

**1.    Ford Concealed the Fact that the "Technology Package" Class Vehicles were not "Track-Ready"**

47.    In the first half of 2015, Ford continued to make repeated false statements that 2016 Shelby GT350 Mustangs were "Track-Ready" and "the most track-capable car" ever produced while knowing that the Base or Technology Package GT350s were unsafe for race track use.  Ford refused to disclose to the public the "Track-Ready" powertrain system defects and that the Base or Technology Package GT350s were unsafe for race track use during this time, or that the Class Vehicles would enter the dangerous Limp Mode if taken onto a race track and operated at high speeds.

**2.    Post-Purchase Distribution by Ford of an Owner's Supplement Unilaterally and Unexpectedly Shifted the Cost of Repair onto Owners**

48.    Only in July 2015, through a subsequent Owner's Supplement, did Ford provide the following notification to *existing* owners of the Shelby GT350 Mustang:  "Your vehicle is capable of sustained high speeds and track day driving if equipped with powertrain coolers

---

[20] *Id.*

[21] *Standard Equipment, Going Fast: Shelby GT350 Mustang Owners Get Complimentary Performance Driving School*, Ford (Mar. 9, 2016), https://media.ford.com/content/fordmedia-mobile/fna/us/en/news/2016/03/09/shelby-gt350-mustang-owners.html.

(Track, R model)."[22]  For those with the Base or Technology Package models, Ford "recommend[ed] that transmission and differential coolers [be] added" for "sustained high speeds or track day use."[23]  This is an admission by Ford that these Class Vehicles were not track-worthy as sold.

49.     This supplement was not provided to Plaintiffs or Class members prior to or during the time of purchase.  At no point in 2015 or 2016 did Ford change its messaging to the public to clarify that Shelby GT350 Mustangs were not intended for track use[24] or require dealerships to disclose this information to prospective buyers.

### 3. Tellingly, Newer Model Years of the Shelby GT350 Have Corrected the Defects

50.     Starting in the summer of 2016, Ford and announced that one of the biggest changes for the 2017 Shelby GT350 was that the 2015 Track Package would now come standard on every new Shelby GT350.  As such, all 2017 Shelby GT350 models, regardless of trim level, now include both the rear differential cooler and a transmission cooler and all of the associated engineering and parts needed to make these coolers integrate with the rest of the design.  This is another admission by Ford that the 2016 Class Vehicles were not track-worthy as sold.

---

[22] *Shelby GT350 Mustang Supplement*, Ford (July 2015), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2015-2016-Mustang-Shelby-GT350-Supplement-version-1_su_EN-US_07_2015.pdf, at p. 25.

[23] *Id.*

[24] *See, e.g.*, *Standard Equipment, Going Fast: Shelby GT350 Mustang Owners Get Complimentary Performance Driving School*, Ford (Mar. 9, 2016), https://media.ford.com/content/fordmedia-mobile/fna/us/en/news/2016/03/09/shelby-gt350-mustang-owners.html; *2016 GT350/GT350R Press Kit*, Ford, available at https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit.pdf (last accessed Mar. 22, 2017).

**H.** **Despite Express Warranties, Ford Has Not Fixed the Problems with the "Track-Ready" Powertrain System**

51.     In connection with the sale (by purchase or lease) of each one of its new vehicles, Ford provides an express limited warranty on each vehicle.  In those warranties, Ford promises to repair any defect or malfunction that arises in the vehicle during a defined period of time. This warranty is provided by Ford to the vehicle owner in writing and regardless of what state the customer purchased his or her vehicle in.  Ford specifically states that "the GT350 carries the same warranty as other Ford Mustang models."[25]

52.     Each Plaintiff was provided a warranty and it was the basis of their purchase of their vehicles.

53.     In its Limited Warranty and in advertisements, brochures, press kits, and other statements in the media, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  The following uniform language appears in all 2016 Ford Mustang Warranty Guides:[26]

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights.  You may have other rights that vary from state to state.  Under your New Vehicle Limited Warranty if . . . your Ford vehicle is properly operated and maintained, and . . . was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

---

[25] *Shelby GT350 Mustang Supplement*, Ford (July 2015), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2015-2016-Mustang-Shelby-GT350-Supplement-version-1_su_EN-US_07_2015.pdf, at p. 46.

[26] *2016 Model Year Ford Warranty Guide*, Ford (Oct. 2015), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2016-Car-Lt-Truck-Warranty-version-3_frdwa_EN-US_10_2015.pdf, at p. 14.

54.     With regard to Ford vehicles, the duration of the limited warranty for bumper-to-bumper protection is three years or 36,000 miles, whichever comes first.  The powertrain warranty is five years or 56,000 miles, whichever comes first.  The Warranty Start Date is "the day you take delivery of your new vehicle or the day it was first put into service (for example, as a dealer demonstrator), whichever occurs first."[27]  These terms were identical for all Class Vehicles.

55.     All Plaintiffs and members of the Class experienced defects in their "Track-Ready" powertrain systems within the warranty period.  However, despite the existence of the express warranties provided to Plaintiffs and Class members, Ford has failed to honor the terms of the warranties by failing to "without charge, repair, replace, or adjust all parts on [the] vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."[28]

56.     All Plaintiffs have contacted Ford, a Ford-authorized dealership, or a subsidiary providing notice of their concerns and requesting follow-up to resolve the defects.  In response, Ford has offered two main solutions for owners of Class Vehicles. The first solution requires changing the entire transmission system and adding a cooling unit.  The cost of this estimated repair is over $7,000.  The second solution is to add a cooling unit to the transmission system in addition to a third-party pump, which is not manufactured or recommended by Ford.  Both solutions necessarily involve adding aftermarket modifications, which Ford does not ordinarily recommend and could potentially void the terms of the New Vehicle Limited Warranty.

---

[27] *Id.* at p. 7.

[28] *Id.* at p. 9.

57.     Per Ford's 2016 Model Year Ford Warranty Guide:  "Aftermarket parts or components, sometimes installed by Ford Motor Company or an authorized Ford dealership, may not be covered by the New Vehicle Limited Warranty.  Any damage caused to Ford components due to the failure of aftermarket parts (other than a certified emissions part) is not covered."[29] Per Ford's Shelby GT350 Mustang Supplement:  "We do not recommend modifying or racing (for competition or time) Ford Performance vehicles, as they are designed and built to be driven as delivered from the factory."[30]  As such, these solutions fail to adequately repair or replace the "Track-Ready" powertrain system defects and Ford is in ongoing breach of the express warranties.

58.     Importantly, neither of these aftermarket solutions applies to the rear differential cooling problem, as Ford has not created a rear differential cooler that can be read by the computer that operates the features included in the Technology Package.  As of the date of this Complaint, no aftermarket solution is available and, as a result, this system will inevitably continue to overheat, resulting in premature failure of the transmission, clutch, differential, and rear end.  As such, these solutions fail to adequately repair or replace the differential cooling defects within the "Track-Ready" powertrain system and Ford is in ongoing breach of the express warranties.

---

[29] *Id.* at 15.

[30] *Shelby GT350 Mustang Supplement*, Ford (July 2015), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2015-2016-Mustang-Shelby-GT350-Supplement-version-1_su_EN-US_07_2015.pdf, at p. 46.

## VI.    CLASS ALLEGATIONS

59.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes:[31]

**Nationwide Class**

All persons or entities in the United States who are current or former owners and/or lessees of a Ford 2016 Shelby GT350 Mustang with a Base or Technology Package (the "Nationwide Class").

**Florida Class**

All persons or entities who purchased or leased a Ford 2016 Shelby GT350 Mustang with a Base or Technology Package in the State of Florida (the "Florida Class").

**California Class**

All persons or entities who purchased or leased a Ford 2016 Shelby GT350 Mustang with a Base or Technology Package in the State of California (the "California Class").

**Texas Class**

All persons or entities who purchased or leased a Ford 2016 Shelby GT350 Mustang with a Base or Technology Package in the State of Texas (the "Texas Class").

60.    Excluded from the Class are individuals who have personal injury claims resulting from the operation of a Ford 2016 Shelby GT350 Mustang.  Also excluded from the Class are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.  Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

---

[31] Collectively, the "Class," unless otherwise noted.

61.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

62.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

63.     <u>Numerosity</u>.  Federal Rule of Civil Procedure 23(a)(1):  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are not less than thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from Ford's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, email, Internet postings, and/or published notice.

64.     <u>Commonality and Predominance</u>:  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      a)     Whether Ford engaged in the conduct alleged herein;

      b)     Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

      c)     Whether the Ford 2016 Shelby GT350 Mustang contains defects;

      d)     Whether such defects cause the Class Vehicles to malfunction;

      e)     Whether Ford knew about the defects and, if so, how long Ford has known of the defects;

      f)     Whether Ford designed, manufactured, marketed, and distributed Class Vehicles with a defective "Track-Ready" powertrain system;

g)      Whether Ford's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

h)      Whether Ford knew or should have known that the defects existed with regard to the Class Vehicles;

i)      Whether Ford knew or reasonably should have known of the defects in the Class Vehicles before it sold or leased them to Class members;

j)      Whether Plaintiffs and the other Class members overpaid for their Class Vehicles as a result of the defects alleged herein;

k)      Whether Plaintiffs and the other Class members are entitled to equitable relief; and

l)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

65.     <u>Typicality</u>:  Federal Rule of Civil Procedure 23(a)(3):  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

66.     <u>Adequacy</u>:  Federal Rule of Civil Procedure 23(a)(4):  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes each respectively seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

67.     <u>Declaratory and Injunctive Relief</u>:  Federal Rule of Civil Procedure 23(b)(2):  Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

68.     <u>Superiority</u>:  Federal Rule of Civil Procedure 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no

unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for Nationwide, Florida, California, and Texas Class members to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   VIOLATIONS ALLEGED

**A.   Claims Brought on Behalf of the Nationwide Class**

### COUNT I

### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

69.     Plaintiffs George and Diana Tershakovec, Jacques Rimokh, and Herbert Alley ("Plaintiffs" for purposes of this Count) incorporate by reference all preceding allegations as though fully set forth herein.

70.     Plaintiffs bring this Count on behalf of the Nationwide Class.

71.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

72.     Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

73.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

74.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

75.    Ford's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

76.    Ford breached these warranties as described in more detail above.  Without limitation, the Class Vehicles are equipped with a defective "Track-Ready" powertrain system.  The Class Vehicles share a common design defect in that the system fails to operate as represented by Ford.

77.    Plaintiffs and the other Nationwide Class members have had sufficient direct dealings with either Ford or its agents to establish privity of contract between Ford on one hand and Plaintiffs and each of the other Class members on the other hand.  Ford-authorized dealerships and technical support organizations operating under contract to Ford are agents of Ford.  Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Ford and its dealers.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

78.    Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  Indeed, Plaintiffs have already done so and Ford has failed, after numerous attempts, to cure the defects.  As explained above, any solution offered by Ford must be exclusively paid for by Plaintiffs and Nationwide Class members, which is a

violation of Ford's promise to repair and replace without charge.  All solutions offered by Ford are also aftermarket alterations and therefore undertaking these repairs may represent a new violation of the express warranties on the part of Plaintiffs and Nationwide Class members.  At the time of sale or lease of each Class Vehicle, Ford knew, should have known, or was reckless in not knowing, of its omissions and/or misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

79.     Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them.  Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Nationwide Class members have not re-accepted their Class Vehicles by retaining them.

80.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

81.     Plaintiffs, individually and on behalf of the other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Class Vehicles and/or loss of the benefit of the bargain, in an amount to be proven at trial.

**B.**     **Claims Brought on Behalf of the Florida Class**

### COUNT I

### VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201, *et seq.*)

82.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

83.     Plaintiffs George and Diana Tershakovec ("Plaintiffs" for purposes of all Florida Class Counts) bring this Count on behalf of themselves and the Florida Class.

84.     Plaintiffs and Class members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

85.     Ford engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

86.     The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

87.     In the course of business, Ford willfully failed to disclose and actively concealed the "Track-Ready" powertrain system defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

88.     By failing to disclose that the defective "Track-Ready" powertrain system, by marketing Ford vehicles as safe, reliable, and of high quality, and by presenting Ford as a

reputable manufacturer that valued safety and stood behind their vehicles after they were sold, Ford engaged in deceptive business practices in violation of the FUDTPA.

89.     Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Florida Class members, about the true performance of the Ford, the devaluing of safety and performance at Ford, and the true value of the Class Vehicles.

90.     Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Florida Class.

91.     Ford knew or should have known that their conduct violated the FUDTPA.

92.     As alleged above, Ford made material statements about the safety and performance of the Class Vehicles and the Ford brand that were either false or misleading.

93.     Ford owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, because Ford:

> a.     Possessed exclusive knowledge that they were selling and distributing vehicles throughout the United States that did not perform as advertised;
>
> b.     Intentionally concealed the foregoing from and the Florida Class; and/or
>
> c.     Made incomplete representations about the safety and performance of the Class Vehicles generally, and the Base and Technology Package models in particular, while purposefully withholding material facts from Plaintiffs and the Florida Class that contradicted these representations.

94.     Because Ford fraudulently concealed the defective "Track-Ready" powertrain system and the Class Vehicles' inability to be used safely on a race track, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

95.     Ford's omissions and/or misrepresentations about the track performance and safety concerns of the Class Vehicles are material to Plaintiffs and the Florida Class.

96.     Plaintiffs and Florida Class members suffered ascertainable loss caused by Ford's misrepresentations and their concealment of and failure to disclose material information. Plaintiffs and Florida Class members who purchased Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the FUDTPA.

97.     Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the FUDTPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

98.     Ford's violations present a continuing risk to Plaintiffs as well as to the general public.  Ford's unlawful acts and practices complained of herein affect the public interest.

99.     As a direct and proximate result of Ford's violations of the FUDTPA, Plaintiffs and the Florida Class have suffered injury-in-fact and/or actual damage.

100.    Plaintiffs and Florida Class members are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

101.    Plaintiffs also seek an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON FLORIDA LAW)

102.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

103.    Plaintiffs bring this claim on behalf of the Florida Class.

104.    Ford intentionally concealed the defects contained in the "Track-Ready" powertrain systems that render Class Vehicles unfit for track use, in that the transmissions of these vehicles would overheat when placed under Track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby racing vehicles.  Ford concealed the fact that the only way for Class Vehicles to become "Track-Ready" as advertised is for Ford owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

105.    Ford further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Class Vehicles it was selling had no significant defects that all Class Vehicles were "Track-Ready."

106.    Ford knew about the defects in the "Track-Ready" powertrain system when these representations were made.

107.    The Class Vehicles purchased by Plaintiffs and the other Florida Class members contained a defective "Track-Ready" powertrain system.

108. Ford had a duty to disclose that the "Track-Ready" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiffs and the other Florida Class members relied on Ford's material representations.

109. As alleged herein, at all relevant times, Ford has held out the Class Vehicles to be free from defects such as the defects related to the "Track-Ready" powertrain system. Ford touted and continues to tout the many benefits and advantages of the "Track-Ready" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Florida Class members would be required to make additional aftermarket modifications to adequately achieve "Track-Ready" performance, and that these modifications may violate their express warranties. This made Ford's other disclosures about the "Track-Ready" powertrain system deceptive.

110. The truth about the defective "Track-Ready" powertrain system was known only to Ford; Plaintiffs and the other Florida Class members did not know of these facts and Ford actively concealed these facts from Plaintiffs and the other Florida Class members.

111. Plaintiffs and the other Florida Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Florida Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiffs and the other Florida Class members by concealing the true facts about the Class Vehicles' "Track-Ready" powertrain systems.

112. Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Class Vehicles that played a

significant role in the value of the vehicles and forced Florida Class members to make additional expenditures to ensure proper safety at the race track.

113.   Ford had a duty to disclose the defects inherent in the "Track-Ready" powertrain system and violations with respect to the Class Vehicles because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiffs or Florida Class members.

114.   Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Class Vehicles, without telling consumers that the defective "Track-Ready" powertrain system would affect the safety, quality, and performance of the vehicle.

115.   Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "Track-Ready" powertrain system as set forth herein.  These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased by Plaintiffs and the other Florida Class members.

116.   Ford has still not made full and adequate disclosures and continues to defraud Plaintiffs and the other Florida Class members by concealing material information regarding the defects in the "Track-Ready" powertrain system.

117.   Plaintiffs and the other Florida Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of

the information concealed from them.  Plaintiffs' and the other Florida Class members' actions were justified.  Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Florida Class members.

118.    Because of the concealment and/or suppression of facts, Plaintiffs and the other Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of Ford's concealment of the true quality of those vehicles' "Track-Ready" powertrain systems.  Had Plaintiffs and the other Florida Class members been aware of the defects in the "Track-Ready" powertrain systems installed in the Class Vehicles, and the company's disregard for the truth, Plaintiffs and the other Florida Class members who purchased a Class Vehicle would have paid less for their vehicles or would not have purchased them at all.

119.    The value of Plaintiffs' and the other Florida Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the defective "Track-Ready" powertrain system of the Class Vehicles, which has made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

120.    Accordingly, Ford is liable to Plaintiffs and the other Florida Class members for damages in an amount to be proven at trial.

121.    Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Florida Class members' rights and the representations that Ford made to them, in order to enrich Ford.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF EXPRESS WARRANTY
### (FLA. STAT. § 672.313)

122.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

123.   Plaintiffs bring this claim on behalf of the Florida Class.

124.   Plaintiffs were at all relevant times a "buyer" as defined by FLA. STAT. § 672.103.

125.   Ford was at all relevant times a "merchant" as defined by FLA. STAT. § 672.104.

126.   The Class Vehicles are and were at all relevant times "goods" as defined by FLA. STAT. § 672.105.

127.   Ford marketed the Class Vehicles as Track Ready.  Such representations formed the basis of the bargain in Plaintiffs' and the other Florida Class members' decisions to purchase Class Vehicles.

128.   In connection with the purchase or lease of each of the Class Vehicles, Ford provided warranty coverage for the Class Vehicles for three years or 36,000 miles, which obliges Ford to repair or replace any part that is defective under normal use.  Ford additionally provided warranty coverage for the powertrain system for five years or 56,000 miles.

129.   Ford's warranty formed the basis of the bargain that was reached when Plaintiffs and other Florida Class members purchased their Class Vehicles.

130.   Plaintiffs and the other Florida Class members owned Class Vehicles with defective "Track-Ready" powertrain systems within the warranty period but had no knowledge of the existence of the defects, which was known and concealed by Ford.

131.   Despite the existence of the warranty, Ford wrongfully transferred the costs of repair or replacement to Plaintiffs and other Class members.

132.   Ford breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts they supplied.

133.   Ford knew about the defects in the "Track-Ready" powertrain systems, allowing Ford to cure their breach of its warranty if it chose.

134.   However, Ford concealed the defects and, on information and belief, has refused to repair or replace the "Track-Ready" powertrain systems free of charge outside of the warranty periods despite the existence of the defects at the time of sale or lease of the Class Vehicles.

135.   Any attempt by Ford to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here.  Specifically, Ford's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defects.  The time limits contained in Ford's warranty periods were also unconscionable and inadequate to protect Plaintiffs and the other Florida Class members. Among other things, Plaintiffs and the other Florida Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford.  A gross disparity in bargaining power existed between Ford and other Florida Class members, and Ford knew that the "Track-Ready" powertrain systems were defective at the time of sale.

136.   Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and other Florida Class members whole because the solutions proposed by Ford must be paid in their entirety by Plaintiffs and Florida Class members and are potential violations of the express warranties.  Thus, affording Ford further opportunity to cure the breach of written warranties would be unnecessary and futile.

137.    Accordingly, Ford is liable to Plaintiffs and the other Florida Class members for damages in an amount to be proven at trial, including but not limited to diminution of value.

**COUNT IV**

**UNJUST ENRICHMENT
(BASED ON FLORIDA LAW)**

138.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

139.    Plaintiffs bring this claim on behalf of the Florida Class.

140.    Ford has benefitted and been enriched by the conduct alleged herein.  Ford has generated substantial revenue from the unlawful conduct described herein.  Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Florida Class members.

141.    Ford has voluntarily accepted and retained this benefit.

142.    The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Florida Class members.

143.    Plaintiffs and the other Florida Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**C.    Claims Brought on Behalf of the California Class**

**COUNT I**

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200, *et seq.*)**

144.    Plaintiff Jacques Rimokh ("Plaintiff" for purposes of all California Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

145.     Plaintiff brings this Count on behalf of the California Class.

146.     California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

147.     Ford's conduct, as described herein, was and is in violation of the UCL.  Ford's conduct violates the UCL in at least the following ways:

  i.  By knowingly and intentionally concealing from Plaintiff and the other California Class members that the Class Vehicles suffer from defects while obtaining money from Plaintiffs and California Class members;

  ii.  By marketing Class Vehicles as being useable on a track;

  iii.  By failing to disclose that the Class Vehicles' "Track-Ready" powertrain system is defective as it is not equipped with a transmission cooler and rear differential cooler, leading to overheating of the powertrain system and the vehicles unexpectedly going into Limp Mode—a dangerous scenario that significantly increases the likelihood of collisions both on the race track and on public highways;

  iv.  By refusing or otherwise failing to repair and/or replace defective Class Vehicles;

  v.  By violating federal laws, including the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; and

  vi.  By violating other California laws, including CAL. CIV. CODE §§ 1709, 1710, and 1750, *et seq.*, and CAL. COM. CODE § 2313.

148.     Ford's omissions and/or misrepresentations alleged herein caused Plaintiff and the other California Class members to make their purchases or leases of their Class Vehicles. Absent those omissions and/or misrepresentations, Plaintiff and the other California Class members would not have purchased or leased these Class Vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that clearly indicated that they were not for track use.

149.     Accordingly, Plaintiff and the other California Class members have suffered injury in fact, including lost money or property, as a result of Ford's misrepresentations and omissions.

150.     Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Ford under CAL. BUS. & PROF. CODE § 17200.

151.     Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and members of the California Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief set forth below.

## COUNT II

### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *et seq.*)

152.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

153.     Plaintiff brings this Count on behalf of the California Class.

154.     California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

155.     The Class Vehicles are "goods" as defined in CAL. CIV. CODE § 1761(a).

156.     Plaintiff and the other California class members are "consumers" as defined in CAL. CIV. CODE § 1761(d), and Plaintiff, the other California Class members, and Ford are "persons" as defined in CAL. CIV. CODE § 1761(c).

157.     In purchasing or leasing the Class Vehicles, Plaintiff and the other California Class members were deceived by Ford's failure to disclose that the Class Vehicles' "Track-Ready" powertrain systems are defective as they are not equipped with a transmission cooler and rear differential cooler, leading to overheating of the powertrain system and the vehicles unexpectedly going into Limp Mode—a dangerous scenario that significantly increases the likelihood of collisions both on the race track and on public highways.

158.     Ford's conduct, as described hereinabove, was and is in violation of the CLRA. Ford's conduct violates at least CAL. CIV. CODE § 1770(a)(16) (representing that goods have been supplied in accordance with a previous representation when they have not).

159.     Plaintiff and the other California Class members have suffered injury in fact and actual damages resulting from Ford's material omissions and/or misrepresentations because they paid an inflated purchase or lease price for the Class Vehicles.

160.     Ford knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the Class Vehicles and that the Class Vehicles were not suitable for their intended use.

161.     The facts concealed and omitted by Ford to Plaintiff and the other California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price.  Had Plaintiff and the other California Class members known about the defective nature of the Class Vehicles and their inability to operate these vehicles safety on a race track, they would not have purchased or leased the Class Vehicles or would not have paid the prices they paid in fact.

162.     Plaintiff has provided Ford with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a).  The notice was transmitted to Ford on March 21, 2017.

163.    Plaintiff's and the other California Class members' injuries were proximately caused by Ford's fraudulent and deceptive business practices.

164.    Therefore, Plaintiff and the other California Class members are entitled to equitable relief and will amend this action and seek monetary relief under the CLRA.

### COUNT III

### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
(CAL. BUS. & PROF. CODE § 17500, *et seq.*)

165.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

166.    Plaintiff brings this Count on behalf of the California Class.

167.    CAL. BUS. & PROF. CODE § 17500 states:  "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

168.    Ford has violated CAL. BUS. & PROF. CODE § 17500 because the omissions and/or misrepresentations regarding the safety, reliability, and functionality of its Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

169.    Plaintiff and the other California Class members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiff and the other California Class members relied on the omissions and/or misrepresentations of Ford with respect to the safety and

reliability of the Class Vehicles.  Ford's representations turned out not to be true because the Class Vehicles have "Track-Ready" powertrain systems that are defective as they are not equipped with a transmission cooler and rear differential cooler, leading to overheating of the powertrain system and the vehicles unexpectedly going into Limp Mode—a dangerous scenario that significantly increases the likelihood of collisions both on the race track and on public highways.  Had Plaintiff and the other California Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiff and the other California Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

170.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.  Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

171.    Plaintiff, individually and on behalf of the other California Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other California Class members any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT IV

### FRAUD BY CONCEALMENT
### (BASED ON CALIFORNIA LAW)

172.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

173.    Plaintiff brings this Count on behalf of the California Class.

174.    As set forth above, Ford concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of their Class Vehicles.

175.    Ford had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed their Class Vehicles as safe and proclaimed that safety is one of Ford's highest corporate priorities.  Once Ford made representations to the public about safety, quality, functionality, and reliability, Ford was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated.  One who volunteers information must be truthful and the telling of a half-truth calculated to deceive is fraud.

176.    In addition, Ford had a duty to disclose these omitted material facts because they were known and/or accessible only to Ford which has superior and/or exclusive knowledge and access to the facts, and Ford knew they were not known to or reasonably discoverable by Plaintiff and the other California Class members.  These omitted facts were material because they directly impact the safety, quality, functionality, use, and reliability of the Class Vehicles.

177.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the other California Class members to purchase or lease Class Vehicles at a higher price for the Class Vehicles, which did not match the Class Vehicles' true value.

178.    Ford still has not made full and adequate disclosure and continues to defraud Plaintiffs and the other California Class members.

179.    Plaintiff and the other California Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the other California Class members' actions were justified.

Ford was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or the California Class.

180.    As a result of the concealment and/or suppression of the facts, Plaintiff and the other California Class members sustained damage.

181.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other California Class members' rights and well-being to enrich Ford.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES
#### (CAL. CIV. CODE §§ 1791.2 & 1793.2(d))

182.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

183.    Plaintiff brings this Count on behalf of the California Class.

184.    Plaintiff and the other California Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

185.    The Class Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

186.    Ford is a "manufacturer" of the Class Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

187.    Plaintiff and the other California Class members bought/leased new motor vehicles manufactured by Ford.

188.    Ford made express warranties to Plaintiff and the other California Class members within the meaning of CAL. CIV. CODE §§ 1791.2 and 1793.2, as described above.

189.    In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  For example, the following language appears in all Class Vehicles' Warranty Guides:

> Under your New Vehicle Limited Warranty if:
>
> -your Ford vehicle is properly operated and maintained, and
>
> -was taken to a Ford dealership for a warranted repair during the warranty period,
>
> then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

190.    As set forth above in detail, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' "Track-Ready" powertrain systems as they are not equipped with a transmission cooler and rear differential cooler, leading to overheating of the powertrain system, damage to other systems within the vehicle, and vehicles unexpectedly going into Limp Mode—a dangerous scenario that significantly increases the likelihood of collisions both on the race track and on public highways.  These defects were and continue to be covered by Ford's express warranties, and these defects substantially impair the use, value, and safety of Ford's Class Vehicles to reasonable consumers like Plaintiff and the other California Class members.

191.    Plaintiff notified Ford and/or its agents of the need for repairs prior to starting this lawsuit.

192.    Ford did not promptly replace or buy back the Class Vehicles of Plaintiff and the other California Class members.

193.    As a result of Ford's breach of its express warranties, Plaintiff and the other California Class members received goods whose dangerous condition substantially impairs their value to Plaintiff and the other California Class members.  Plaintiff and the other California Class members have been damaged as a result of the diminished value of Ford's products, the products' malfunctioning, and the nonuse of their Class Vehicles.

194.    Pursuant to CAL. CIV. CODE §§ 1793.2 & 1794, Plaintiff and the other California Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles.

195.    Pursuant to CAL. CIV. CODE § 1794, Plaintiff and the other California Class members are entitled to costs and attorneys' fees.

**D.    Claims Brought on Behalf of the Texas Class**

**COUNT I**

**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE § 17.4, *et seq.*)**[32]

196.    Plaintiff  Herbert Alley ("Plaintiff" for purposes of Texas Class Counts) incorporates by reference all paragraphs as though fully set forth herein.

197.    Plaintiff brings this Count on behalf of the Texas Class.

198.    Plaintiff and the Texas Class are individuals with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets).  *See* TEX. BUS. & COM. CODE § 17.41.

---

[32] Pursuant to TEX. BUS. & COM. CODE § 17.505(b), Plaintiff will provide written notice to defendant within 60 business days of service of this complaint.

199.     The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading, or deceptive act or practice specifically enumerated in TEX. BUS. & COM. CODE § 17.46(b); or (ii) "an unconscionable action or course of action by any person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3). The Texas DTPA declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(9) advertising goods or services with intent not to sell them as advertised." An "unconscionable action or course of action," means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5). As detailed herein, Ford has engaged in an unconscionable action or course of action and thereby caused economic damages to the Texas Class.

200.     In the course of business, Ford willfully failed to disclose and actively concealed the "Track-Ready" powertrain system defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

201.     By failing to disclose that the defective "Track-Ready" powertrain system, by marketing Ford vehicles as safe, reliable, and of high quality, and by presenting Ford as a

reputable manufacturer that valued safety and stood behind their vehicles after they were sold, Ford engaged in deceptive business practices in violation of the Texas DTPA.

202.    Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Texas Class members, about the true performance of the Class Vehicles, the devaluing of safety and performance at Ford, and the true value of the Class Vehicles.

203.    Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Texas Class.

204.    Ford knew or should have known that their conduct violated the Texas DTPA.

205.    As alleged above, Ford made material statements about the safety and performance of the Class Vehicles and the Ford brand that were either false or misleading.

206.    Ford owed Plaintiff and Texas Class members a duty to disclose the true safety, performance, and reliability of the Class Vehicles, because Ford:

> a.    Possessed exclusive knowledge that they were selling and distributing vehicles throughout the United States that did not perform as advertised;
>
> b.    Intentionally concealed the foregoing from Plaintiff and the Texas Class; and/or
>
> c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the Base and Technology Package models in particular, while purposefully withholding material facts from Plaintiff and the Texas Class that contradicted these representations.

207.    Because Ford fraudulently concealed the defective "Track-Ready" powertrain system, and the Class Vehicles' inability to be used safely on a race track, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

208.    Ford's omissions and/or misrepresentations about the track performance and safety concerns of the Class Vehicles were material to Plaintiff and the Texas Class.

209.    Plaintiff and the Texas Class suffered ascertainable loss caused by Ford's misrepresentations and their concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Texas DTPA.

210.    Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Texas DTPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

211.    Ford's violations present a continuing risk to Plaintiff as well as to the general public.  Ford's unlawful acts and practices complained of herein affect the public interest.

212.    As a direct and proximate result of Ford's violations of the Texas DTPA, Plaintiff and the Texas Class have suffered injury-in-fact and/or actual damage.

213.    Pursuant to TEX. BUS. & COM. CODE § 17.50(a)(1) and (b), Plaintiff seeks monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages for Ford's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

214.    Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), Plaintiff  is also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

## COUNT II

## FRAUDULENT CONCEALMENT
### (BASED ON TEXAS LAW)

215.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

216.    Plaintiff brings this claim on behalf of the Texas Class.

217.    Ford intentionally concealed that the defects contained in the "Track-Ready" powertrain system render Class Vehicles unfit for track use, in that the transmissions of these vehicles would overheat when placed under track conditions and unexpectedly go into Limp Mode after less than 15 minutes, creating a dangerous hazard not only to the drivers also to nearby racing vehicles.  Ford concealed the fact the only way for the Class Vehicles to become "Track-Ready" as advertised, Ford owners would have to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

218.    Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Class Vehicles it was selling had no significant defects, that all Class Vehicles were "Track-Ready."

219.    Ford knew about the defect in the "Track-Ready" powertrain system when these representations were made.

220.    The Class Vehicles purchased by Plaintiff and the other Class members contained a defective "Track-Ready" powertrain system.

221.    Ford had a duty to disclose that the "Track-Ready" powertrain system contained defects as alleged herein and that these defects created a safety hazard.  Plaintiff and the other Texas Class members relied on Ford's material representations.

222.    As alleged herein, at all relevant times, Ford has held out the Class Vehicles to be free from defects such as the defects related to the "Track-Ready" powertrain system.  Ford touted and continues to tout the many benefits and advantages of the "Track-Ready" powertrain system, but nonetheless failed to disclose important facts related to the defect and that Texas Class members would be required to make additional aftermarket modifications to adequately achieve "Track-Ready" performance, and that these modifications may violate their express warranties.  This made Ford's other disclosures about the "Track-Ready" powertrain system deceptive.

223.    The truth about the defective "Track-Ready" powertrain system was known only to Ford; Plaintiff and the other Texas Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and the other Texas Class members.

224.    Plaintiff and the other Texas Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete.  As consumers, Plaintiff and the other Texas Class members did not, and could not, unravel Ford's deception on their own.  Rather, Ford intended to deceive Plaintiff and the other Texas Class members by concealing the true facts about the Class Vehicles' "Track-Ready" powertrain systems.

225.    Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Class Vehicles that played a

significant role in the value of the vehicles and forced Texas Class members to make additional expenditures to ensure proper safety at the race track.

226.    Ford had a duty to disclose the defects inherent in the "Track-Ready" powertrain system and violations with respect to the Class Vehicles because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or Texas Class members.

227.    Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Class Vehicles, without telling consumers that the defective "Track-Ready" powertrain system would affect the safety, quality, and performance of the vehicle.

228.    Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "Track-Ready" powertrain system as set forth herein.  These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased by Plaintiff and the other Texas Class members.

229.    Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Texas Class members by concealing material information regarding the defects in the "Track-Ready" powertrain system.

230.    Plaintiff and the other Texas Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of

the information concealed from them.  Plaintiff' and the other Texas Class members' actions were justified.  Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or Texas Class members.

231.    Because of the concealment and/or suppression of facts, Plaintiff and the other Texas Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of Ford's concealment of the true quality of those vehicles' "Track-Ready" powertrain systems.  Had Plaintiff and the other Texas Class members been aware of the defects in the "Track-Ready" powertrain systems installed in the Class Vehicles, and the company's disregard for the truth, Plaintiff and the other Texas Class members who purchased a Class Vehicle would have paid less for their vehicles or would not have purchased them at all.

232.    The value of Plaintiff' and the other Texas Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the defective "Track-Ready" powertrain system of the Class Vehicles, which has made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

233.    Accordingly, Ford is liable to Plaintiff and the other Texas Class members for damages in an amount to be proven at trial.

234.    Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff' and the other Texas Class members' rights and the representations that Ford made to them, in order to enrich Ford.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF EXPRESS WARRANTY
### (Tex. Bus. & Com. Code Ann. § 2.313)

235.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

236.    Plaintiff brings this claim on behalf of the Texas Class.

237.    Plaintiff was at all relevant times a "buyer" as defined by Tex. Bus. & Com. Code Ann. § 2.103.

238.    Ford was at all relevant times a "merchant" of motor vehicles as defined by Tex. Bus. & Com. Code Ann. § 2.104.

239.    The Class Vehicles are and were at all relevant times goods as defined by Tex. Bus. & Com. Code Ann. § 2.105.

240.    Ford marketed the Class Vehicles as safe and "Track-Ready" vehicles that could be safely operated on a race track.  Such representations formed the basis of the bargain in Plaintiff's and the other Texas Class members' decisions to purchase Class Vehicles.

241.    In connection with the purchase or lease of each of the Class Vehicles, Ford provided warranty coverage for the Class Vehicles for three years or 36,000 miles, which obliges Ford to repair or replace any part that is defective under normal use.  Ford additionally provided warranty coverage for the powertrain system for five years or 56,000 miles.

242.    Ford's warranty formed a basis of the bargain that was reached when Plaintiff and other Texas Class members purchased their Class Vehicles.

243.    Plaintiff and the other Texas Class members owned Class Vehicles with defective "Track-Ready" powertrain systems within the warranty period but had no knowledge of the existence of the defects, which was known and concealed by Ford.

244.     Despite the existence of the warranty, Ford wrongfully transferred the costs of repair or replacement to Plaintiff and other Texas Class members.

245.     Ford breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts they supplied.

246.     Ford knew about the defects in the "Track-Ready" powertrain systems, allowing Ford to cure their breach of its warranty if it chose.

247.     However, Ford concealed the defects and, on information and belief, has refused to repair or replace the "Track-Ready" powertrain systems free of charge outside of the warranty periods despite the existence of the defects at the time of sale or lease of the Class Vehicles.

248.     Any attempt by Ford to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here.  Specifically, Ford's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defects.  The time limits contained in Ford's warranty periods were also unconscionable and inadequate to protect Plaintiff and the other Texas Class members.  Among other things, Plaintiff and the other Texas Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford.  A gross disparity in bargaining power existed between Ford and other Texas Class members and Ford knew that the "Track-Ready" powertrain systems were defective at the time of sale.

249.     Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and other Texas Class members whole because the solutions proposed by Ford must be paid in their entirety by Plaintiff and Texas Class members, and are potential violations of the

express warranties.  Thus, affording Ford further opportunity to cure the breach of written

warranties therefore would be unnecessary and futile.

250.    Accordingly, Ford is liable to Plaintiff and the other Texas Class members for

damages in an amount to be proven at trial, including but not limited to diminution of value.

## COUNT IV

## UNJUST ENRICHMENT
## (BASED ON TEXAS LAW)

251.    Plaintiff incorporates by reference all preceding allegations as though fully set

forth herein.

252.    Plaintiff brings this claim on behalf of the Texas Class.

253.    Ford has benefitted and been enriched by the conduct alleged herein.  Ford has

generated substantial revenue from the unlawful conduct described herein.  Ford has knowledge

and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff

and the other Texas Class members.

254.    Ford has voluntarily accepted and retained this benefit.

255.    The circumstances, as described herein, are such that it would be inequitable for

Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other

Texas Class members.

256.    Plaintiff and the other Texas Class members are entitled to the amount of Ford's

ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable

conduct as alleged herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide and State Classes, respectfully request that the Court enter judgment in their favor and against Ford Motor Company, as follows:

A.      Certification of the proposed Nationwide Class and State Law Classes, including appointment of Plaintiffs' counsel as Class Counsel;

B.      An order temporarily and permanently enjoining Ford Motor Company from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Injunctive relief in the form of a recall or free replacement program;

D.      Injunctive relief in the form of a buy back;

E.      Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

F.      An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

G.      An award of costs and attorneys' fees; and

H.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated:  March 22, 2017

GROSSMAN ROTH YAFFA COHEN

By: */s/ Stuart Z. Grossman*
Stuart Z. Grossman
Fla. Bar No.:  156113
Rachel Furst
Fla. Bar No.:  045155
2525 Ponce de Leon, Suite 1150
Coral Gables, FL 33134
Telephone: (888) 296-1681
Facsimile: (305) 285-1668
Email: szg@grossmanroth.com
Email: rwf@grossmanroth.com

Steve W. Berman (pending *pro hac vice* admission)
Catherine Y.N. Gannon (pending *pro hac vice* admission)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: catherineg@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*