## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:17-cv-21087-FAM

|  |  |
|---|---|
| GEORGE TERSHAKOVEC, DIANA TERSHAKOVEC, JOHN AUBREY, BYRON HARPER, RICHARD KOWALCHIK, HERBERT ALLEY, MICHAEL DELAGARZA, ERIC KAMPERMAN, TRAVIS MCRAE, TODD NEWTON, ERIC EVANS, ATTILA GONDAN, MARK HOCHSPRUNG, JACQUES RIMOKH, MICHAEL MCCURRY, GREG ROBERTS, and JOSE CRUZ, individually and on behalf of all others similarly situated, | **CLASS ACTION**  **JURY TRIAL DEMANDED** |
| Plaintiffs, |  |
| vs. |  |
| FORD MOTOR COMPANY, |  |
| Defendant. |  |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION ....................................................................................................5

III.   VENUE ..................................................................................................................5

IV.    PARTIES ...............................................................................................................6

    A.     Plaintiffs ....................................................................................................6

        1.     Florida Plaintiffs .............................................................................6

            a.     George and Diana Tershakovec ...........................................6

            b.     John Aubrey ...........................................................................9

            c.     Byron Harper ........................................................................13

            d.     Richard Kowalchik ...............................................................16

        2.     Texas Plaintiffs ..............................................................................20

            a.     Herbert Alley .......................................................................20

            b.     Michael DeLaGarza ............................................................23

            c.     Eric Kamperman ...................................................................26

            d.     Travis McRae .......................................................................29

            e.     Todd Newton .......................................................................33

        3.     Washington Plaintiff ......................................................................36

            a.     Eric Evans ...........................................................................36

         4.     Tennessee Plaintiff .........................................................................40

            a.     Attila Gondan ......................................................................40

         5.     Illinois Plaintiff ..............................................................................43

            a.     Mark Hochsprung .................................................................43

        6.     California Plaintiff ..........................................................................46

            a.     Jacques Rimokh ...................................................................46

        7.     Missouri Plaintiff ...........................................................................49

|  |  | a. | Michael McCurry ................................................. | 49 |
|  |  | b. | Greg Roberts ...................................................... | 52 |
|  | 8. |  | Pennsylvania Plaintiff ............................................ | 55 |
|  |  | a. | Jose Cruz ........................................................... | 55 |
| B. |  |  | Defendant .................................................................. | 58 |

| V. | FACTUAL ALLEGATIONS .......................................................... | 59 |

| A. | Track Enthusiasts Share a Passion for Testing Their High-Performance Vehicles on Closed Tracks....................................................... | 59 |
| B. | Specialized Race Tracks and Track Days Create Safe Conditions for Track Enthusiasts to Pursue Their Passion ............................................. | 59 |
| C. | Track-Ready Vehicles Operate Under Extreme Conditions and Must Meet Certain Basic Safety Features to Operate on a Race Track ...................... | 60 |
|  | 1. | Transmission Systems in Track-Ready Vehicles............................ | 61 |
|  | 2. | Differentials in Track-Ready Vehicles ..................................... | 62 |
| D. | Ford Marketed the Shelby as a "Track Car," as "Track Tuned," and as "Track Oriented" Because It Knew "Track-Capability" Was Material to Prospective Consumers................................................................ | 62 |
|  | 1. | Press Kits Were Created by Ford to Entice Track Enthusiasts to Purchase Shelbys ........................................................ | 66 |
|  | 2. | Ford Sponsored Track Events to Demonstrate the Track-Readiness of Shelby Mustangs.................................................... | 71 |
|  | 3. | Ford Executives and Key Ford Employees Promoted Shelbys as Track-Ready.......................................................... | 73 |
|  | 4. | Ford Represented to All Shelby Owners That the Base Model and Technology Package Shelbys Can "Certainly" Be Used on Race Tracks............................................................. | 74 |
| E. | Ford Knew That Less Than 30% of All Shelbys Produced Were Equipped with the Track Package, Yet It Promoted All Shelbys, Regardless of Trim Level, as Capable of Track Use ............................................... | 76 |
| F. | The Shelby Cannot Be Safely Driven on the Track Due to Design and Manufacturing Defects.................................................... | 78 |
|  | 1. | The Nature of the Defects and Their Safety Consequences ............... | 78 |
|  | 2. | The Economic Consequences Associated with the Defects ............... | 81 |

3.    Consumer Complaints Document the Scope of the Defects Inherent in the Track-Ready Powertrain Systems in Shelbys ..............................................83

G.    Ford Was Aware of the Defects Inherent in the 2016 Shelby Mustangs While Promoting Them as Track-Ready ....................................................................87

1.    Ford Concealed That the "Technology Package" Shelbys Were Not Track-Ready....................................................................................................87

2.    Tellingly, Newer Model Years of the Shelby Have Corrected the Defects ..................................................................................................................88

H.    Despite Express Warranties, Ford Has Not Fixed the Problems with the Track-Ready Powertrain System ..........................................................................88

1.    Ford Provided Multiple Express Warranties Associated with the Shelbys That Promised to Fix Both Design and Manufacturing Defects .......88

2.    Post-Purchase Distribution by Ford of an Owner's Supplement Unilaterally and Unexpectedly Shifted the Cost of Repair onto Owners .......91

3.    The Expensive Aftermarket Modifications Recommended by Ford Do Not Resolve All the Defects and Execution of these Modifications Can Violate the Terms of Ford's Express Warranties..............................................95

VI.    CLASS ALLEGATIONS .......................................................................................97

VII.    CLAIMS FOR RELIEF ......................................................................................105

COUNT ONE VIOLATION OF MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301 *ET SEQ.*) ...................................................................................................105

COUNT TWO VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201 *ET SEQ.*)........................................108

COUNT THREE FRAUDULENT CONCEALMENT (BASED ON FLORIDA LAW)................111

COUNT FOUR BREACH OF EXPRESS WARRANTY (FLA. STAT. § 672.313) .......................114

COUNT FIVE UNJUST ENRICHMENT (BASED ON FLORIDA LAW)....................................118

COUNT SIX VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE § 17.4 *ET SEQ.*)...........118

COUNT SEVEN FRAUD BY CONCEALMENT (BASED ON TEXAS LAW)...........................122

COUNT EIGHT BREACH OF EXPRESS WARRANTY (TEX. BUS & COM. CODE ANN. §2-313) ..............................................................................................................126

COUNT NINE UNJUST ENRICHMENT (BASED ON TEXAS LAW)......................................129

COUNT TEN VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010 *ET SEQ.*)...........................................130

010678-11 958612 V1

COUNT ELEVEN FRAUD BY CONCEALMENT (BASED ON WASHINGTON LAW) ..........130

COUNT TWELVE BREACH OF EXPRESS WARRANTY (REV. CODE WASH. § 62A.2-313) ...........................................................................................................................134

COUNT THIRTEEN UNJUST ENRICHMENT (BASED ON WASHINGTON LAW) ...............137

COUNT FOURTEEN VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT (TENN. CODE ANN. § 47-18-101 *ET SEQ.*) ...............................................138

COUNT FIFTEEN FRAUD BY CONCEALMENT (BASED ON TENNESSEE LAW) ..............139

COUNT SIXTEEN BREACH OF EXPRESS WARRANTY (TENN. CODE ANN. § 47-2-313) ...........................................................................................................................142

COUNT SEVENTEEN UNJUST ENRICHMENT (BASED ON TENNESSEE LAW) ...............146

COUNT EIGHTEEN VIOLATION OF THE ILLINOIS CONSUMER FRAUD  AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 *ET SEQ.* AND 720 ILCS 295/1A) ................................................................................................................146

COUNT NINETEEN FRAUD BY CONCEALMENT (BASED ON ILLINOIS LAW) ................147

COUNT TWENTY BREACH OF EXPRESS WARRANTY (810 ILCS 5/2-313) .........................151

COUNT TWENTY-ONE UNJUST ENRICHMENT (BASED ON ILLINOIS LAW) ...................154

COUNT TWENTY-TWO VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*) .......................................155

COUNT TWENTY-THREE FRAUD BY CONCEALMENT (BASED ON CALIFORNIA LAW) ...........................................................................................................................157

COUNT TWENTY-FOUR VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*) .......................................160

COUNT TWENTY-FIVE VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750 *ET SEQ.*) .......................................162

COUNT TWENTY-SIX UNJUST ENRICHMENT (BASED ON CALIFORNIA LAW) ..............164

COUNT TWENTY-SEVEN VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*) .................................164

COUNT TWENTY-EIGHT FRAUD BY CONCEALMENT (BASED ON MISSOURI LAW) ...........................................................................................................................165

COUNT TWENTY-NINE BREACH OF EXPRESS WARRANTY (MO. REV. STAT. § 400.2-313.1) ........................................................................................................169

COUNT THIRTY UNJUST ENRICHMENT (BASED ON MISSOURI LAW) ...........................172

COUNT THIRTY-ONE VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES  AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET SEQ.*).........173

COUNT THIRTY-TWO FRAUD BY CONCEALMENT (BASED ON PENNSYLVANIA LAW) ...................................................................................................174

COUNT THIRTY-THREE BREACH OF EXPRESS WARRANTY (13 PA. CONS. STAT. ANN. § 2103 ).........................................................................................177

COUNT THIRTY-FOUR UNJUST ENRICHMENT (BASED ON PENNSYLVANIA LAW) ...................................................................................................181

VIII.     FRAUDULENT CONCEALMENT CLAIMS....................................................181

COUNT THIRTY-FIVE FRAUD BY CONCEALMENT FOR REMAINING STATES .............181

IX.       STATUTORY CLAIMS....................................................................................185

COUNT THIRTY-SIX VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-19-1 *ET SEQ.*).......................................186

COUNT THIRTY-SEVEN VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES  AND CONSUMER PROTECTION ACT (ALASKA STAT. ANN. § 45.50.471 *ET SEQ.*) ....................................................................................187

COUNT THIRTY-EIGHT VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT (ARIZ. REV. STAT. § 44-1521 *ET SEQ.*) ...............................................188

COUNT THIRTY-NINE VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ.*)...........................189

COUNT FORTY VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *ET SEQ.*) ...............................................190

COUNT FORTY-ONE VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. § 42-110A *ET SEQ.*)...........................191

COUNT FORTY-TWO VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT (DEL. CODE ANN. TIT. 6, § 2513 *ET SEQ.*) ....................................192

COUNT FORTY-THREE VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*) ...............................193

COUNT FORTY-FOUR VIOLATION OF THE GEORGIA UNIFORM  DECEPTIVE TRADE PRACTICES ACT (GA. CODE ANN. § 10-1-370 *ET SEQ.*)...............................194

COUNT FORTY-FIVE VIOLATION OF THE HAWAII ACT § 480-2(A) (HAW. REV. STAT. § 480 *ET SEQ.*) ....................................................................194

COUNT FORTY-SIX VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT (IDAHO CODE ANN. § 48-601 *ET SEQ.*) ....................................195

COUNT FORTY-SEVEN VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3).......................................................197

COUNT FORTY-EIGHT VIOLATION OF THE IOWA PRIVATE RIGHT  OF ACTION FOR CONSUMER FRAUDS ACT (IOWA CODE § 714H.1 *ET SEQ.*) ..............................198

COUNT FORTY-NINE VIOLATION OF THE KANSAS CONSUMER PROTECTION
ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*) ....................................................199

COUNT FIFTY VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
(KY. REV. STAT. ANN. § 367.110 *ET SEQ.*) ........................................200

COUNT FIFTY-ONE VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW (LA. REV. STAT. ANN. § 51:1401 *ET
SEQ.*)..........................................................................................................200

COUNT FIFTY-TWO VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES
ACT (ME. REV. STAT. ANN. TIT. 5, § 205-A *ET SEQ.*)......................................201

COUNT FIFTY-THREE VIOLATION OF THE MARYLAND CONSUMER
PROTECTION ACT (MD. CODE ANN., COM. LAW § 13-101 *ET SEQ.*) ....................202

COUNT FIFTY-FOUR VIOLATION OF THE MASSACHUSETTS GENERAL LAW
CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1 *ET SEQ.*) ......................................203

COUNT FIFTY-FIVE VIOLATION OF THE MICHIGAN CONSUMER PROTECTION
ACT (MICH. COMP. LAWS § 445.903 *ET SEQ.*)......................................................204

COUNT FIFTY-SIX VIOLATION OF THE MINNESOTA PREVENTION OF
CONSUMER FRAUD ACT (MINN. STAT. § 325F.68 *ET SEQ.*) ....................................205

COUNT FIFTY-SEVEN VIOLATION OF THE MINNESOTA DECEPTIVE TRADE
PRACTICES ACT (MINN. STAT. § 325D.43-48 *ET SEQ.*) ................................206

COUNT FIFTY-EIGHT VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION
ACT (MISS. CODE ANN. § 75-24-1 *ET SEQ.*) ....................................................207

COUNT FIFTY-NINE VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT OF 1973 (MONT. CODE ANN. § 30-14-
101 *ET SEQ.*) ..........................................................................................207

COUNT SIXTY VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
(NEB. REV. STAT. § 59-1601 *ET SEQ.*)..............................................................208

COUNT SIXTY-ONE VIOLATION OF THE NEVADA DECEPTIVE TRADE
PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*) ..............................................209

COUNT SIXTY-TWO VIOLATION OF THE NEW HAMPSHIRE  CONSUMER
PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1 *ET SEQ.*) ................................210

COUNT SIXTY-THREE VIOLATION OF THE NEW JERSEY CONSUMER FRAUD
ACT (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*) .........................................................211

COUNT SIXTY-FOUR VIOLATION OF THE NEW MEXICO UNFAIR TRADE
PRACTICES ACT (N.M. STAT. ANN. §§ 57-12-1 *ET SEQ.*)..........................................211

COUNT SIXTY-FIVE VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
§§ 349-350 (N.Y. GEN. BUS. LAW §§ 349-350) ..................................................212

COUNT SIXTY-SIX VIOLATION OF THE NORTH CAROLINA UNFAIR AND
DECEPTIVE ACTS  AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1 *ET SEQ.*)
...................................................................................................................................213

COUNT SIXTY-SEVEN VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD
ACT (N.D. CENT. CODE § 51-15-02)......................................................................214

COUNT SIXTY-EIGHT VIOLATION OF THE OHIO CONSUMER SALES PRACTICES
ACT (OHIO REV. CODE ANN. § 1345.01 *ET SEQ.*) .............................................215

COUNT SIXTY-NINE VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION
ACT (OKLA. STAT. TIT. 15, § 751 *ET SEQ.*).......................................................215

COUNT SEVENTY VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES
ACT (OR. REV. STAT. §§ 646.605 *ET SEQ.*) .........................................................217

COUNT SEVENTY-ONE VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION ACT (R.I. GEN. LAWS § 6-13.1
*ET SEQ.*) ...............................................................................................................218

COUNT SEVENTY-TWO VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE
PRACTICES ACT (S.C. CODE ANN. § 39-5-10 *ET SEQ.*) ...................................219

COUNT SEVENTY-THREE VIOLATION OF THE SOUTH DAKOTA DECEPTIVE
TRADE PRACTICES  AND CONSUMER PROTECTION LAW (S.D. CODIFIED
LAWS § 37-24-6) .....................................................................................................220

COUNT SEVENTY-FOUR VIOLATION OF THE UTAH CONSUMER SALE
PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*)...............................221

COUNT SEVENTY-FIVE VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
(VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*).........................................................222

COUNT SEVENTY-SIX VIOLATION OF THE VIRGINIA CONSUMER PROTECTION
ACT (VA. CODE ANN. §§ 59.1-196 *ET SEQ.*) .....................................................222

COUNT SEVENTY-SEVEN VIOLATION OF THE WEST VIRGINIA CONSUMER
CREDIT  AND PROTECTION ACT (W. VA. CODE § 46A-1-101 *ET SEQ.*)..................223

COUNT SEVENTY-EIGHT VIOLATION OF THE WISCONSIN DECEPTIVE TRADE
PRACTICES ACT (WIS. STAT. § 110.18)................................................................225

COUNT SEVENTY-NINE VIOLATION OF THE WYOMING CONSUMER
PROTECTION ACT (WYO. STAT. §§ 40-12-105 *ET SEQ.*).................................226

X.      UNJUST ENRICHMENT CLAIMS .......................................................................226

COUNT EIGHTY UNJUST ENRICHMENT (BASED ON ALABAMA LAW)..........................226

COUNT EIGHTY-ONE UNJUST ENRICHMENT (BASED ON ALASKA LAW) .....................227

COUNT EIGHTY-TWO UNJUST ENRICHMENT (BASED ON ARIZONA LAW)....................228

COUNT EIGHTY-THREE UNJUST ENRICHMENT (BASED ON ARKANSAS LAW) ...........228

COUNT EIGHTY-FOUR UNJUST ENRICHMENT (BASED ON COLORADO LAW)..............229

COUNT EIGHTY-FIVE UNJUST ENRICHMENT (BASED ON CONNECTICUT LAW)..........230

COUNT EIGHTY-SIX UNJUST ENRICHMENT (BASED ON DELAWARE LAW).................231

COUNT EIGHTY-SEVEN UNJUST ENRICHMENT (BASED ON GEORGIA LAW)...............231

COUNT EIGHTY-EIGHT UNJUST ENRICHMENT (BASED ON HAWAII LAW)..................232

COUNT EIGHTY-NINE UNJUST ENRICHMENT (BASED ON IDAHO LAW) .......................233

COUNT NINETY UNJUST ENRICHMENT (BASED ON INDIANA LAW)...............................233

COUNT NINETY-ONE UNJUST ENRICHMENT (BASED ON IOWA LAW)..........................234

COUNT NINETY-TWO UNJUST ENRICHMENT (BASED ON KANSAS LAW).....................235

COUNT NINETY-THREE UNJUST ENRICHMENT (BASED ON KENTUCKY LAW)............236

COUNT NINETY-FOUR UNJUST ENRICHMENT (BASED ON LOUISIANA LAW) .............236

COUNT NINETY-FIVE UNJUST ENRICHMENT (BASED ON MAINE LAW)........................237

COUNT NINETY-SIX UNJUST ENRICHMENT (BASED ON MARYLAND LAW) ................238

COUNT NINETY-SEVEN UNJUST ENRICHMENT (BASED ON MASSACHUSETTS LAW)...................................................................................................................................238

COUNT NINETY-EIGHT UNJUST ENRICHMENT (BASED ON MICHIGAN LAW) .............239

COUNT NINETY-NINE UNJUST ENRICHMENT (BASED ON MINNESOTA LAW)..............240

COUNT ONE HUNDRED UNJUST ENRICHMENT (BASED ON MISSISSIPPI LAW)............241

COUNT ONE HUNDRED ONE UNJUST ENRICHMENT (BASED ON MONTANA LAW)...................................................................................................................................241

COUNT ONE HUNDRED TWO UNJUST ENRICHMENT (BASED ON NEBRASKA LAW)...................................................................................................................................242

COUNT ONE HUNDRED THREE UNJUST ENRICHMENT (BASED ON NEVADA LAW)...................................................................................................................................243

COUNT ONE HUNDRED FOUR UNJUST ENRICHMENT (BASED ON NEW HAMPSHIRE LAW)..............................................................................................................243

COUNT ONE HUNDRED FIVE UNJUST ENRICHMENT (BASED ON NEW JERSEY LAW)...................................................................................................................................244

COUNT ONE HUNDRED SIX UNJUST ENRICHMENT (BASED ON NEW MEXICO LAW)...................................................................................................................................245

010678-11 958612 V1

COUNT ONE HUNDRED SEVEN UNJUST ENRICHMENT (BASED ON NEW YORK LAW) ............................................................................................................246

COUNT ONE HUNDRED EIGHT UNJUST ENRICHMENT (BASED ON NORTH CAROLINA LAW) ....................................................................................................246

COUNT ONE HUNDRED NINE UNJUST ENRICHMENT (BASED ON NORTH DAKOTA LAW) .........................................................................................................247

COUNT ONE HUNDRED TEN UNJUST ENRICHMENT (BASED ON OHIO LAW) .............248

COUNT ONE HUNDRED ELEVEN UNJUST ENRICHMENT (BASED ON OKLAHOMA LAW) ............................................................................................................248

COUNT ONE HUNDRED TWELVE UNJUST ENRICHMENT (BASED ON OREGON LAW) ............................................................................................................249

COUNT ONE HUNDRED THIRTEEN UNJUST ENRICHMENT (BASED ON RHODE ISLAND LAW) ......................................................................................................250

COUNT ONE HUNDRED FOURTEEN UNJUST ENRICHMENT (BASED ON SOUTH CAROLINA LAW) ....................................................................................................251

COUNT ONE HUNDRED FIFTEEN UNJUST ENRICHMENT (BASED ON SOUTH DAKOTA LAW) .........................................................................................................251

COUNT ONE HUNDRED SIXTEEN UNJUST ENRICHMENT (BASED ON UTAH LAW) ............................................................................................................252

COUNT ONE HUNDRED SEVENTEEN UNJUST ENRICHMENT (BASED ON VERMONT LAW) ......................................................................................................253

COUNT ONE HUNDRED EIGHTEEN UNJUST ENRICHMENT (BASED ON VIRGINIA LAW) ............................................................................................................253

COUNT ONE HUNDRED NINETEEN UNJUST ENRICHMENT (BASED ON WEST VIRGINIA LAW) .......................................................................................................254

COUNT ONE HUNDRED TWENTY UNJUST ENRICHMENT (BASED ON WISCONSIN LAW) ............................................................................................................255

COUNT ONE HUNDRED TWENTY-ONE UNJUST ENRICHMENT (BASED ON WYOMING LAW) ........................................................................................................256

XI.     EXPRESS WARRANTY CLAIMS ......................................................................256

COUNT ONE HUNDRED TWENTY-TWO VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT  FOR BREACH OF EXPRESS WARRANTIES (CAL. CIV. CODE §§ 1791.2 & 1793.2(D)) ........................................................256

REQUEST FOR RELIEF ........................................................................................259

DEMAND FOR JURY TRIAL ..................................................................................259

- ix -

Plaintiffs George Tershakovec, Diana Tershakovec, John Aubrey, Byron Harper, Richard Kowalchik, Herbert Alley, Michael DeLaGarza, Eric Kamperman, Travis McRae, Todd Newton, Eric Evans, Attila Gondan, Mark Hochsprung, Jacques Rimokh, Michael McCurry, Greg Roberts, and Jose Cruz (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), allege the following:

## I.       INTRODUCTION

1.       **"Track-Capable Performance." "An All-Day Track Car That's Also Street Legal."** This is what Ford told potential track-enthusiast customers to entice them to buy its 2016 Shelby GT350 Mustang. But Shelby GT350 Mustangs were far from the "all-day track cars" that Ford promised. In fact, for more than 70% of all owners, they proved to be unusable on the track. When a Shelby GT350 Mustang driver took Ford's flagship track-capable car to the track, he or she learned that in fifteen minutes or less, the transmission and rear differential would overheat, causing the car to go into Limp Mode at drastically reduced speed and power—an obviously dangerous event when surrounded by speeding cars. The Shelby overheats and goes into Limp Mode, without warning, because, despite its Track-Ready claims, Ford chose to equip the Shelby GT350 Base and Technology Package models with defective powertrain systems that have inadequate transmission and rear differentials. These defects manifest not only in the Track-Ready powertrain systems' inability to withstand the high-performance demands of race track use, but also create dangerous conditions on public roadways when the Shelby GT350s are being operated under normal driving conditions.

2.       There are certain basic rules that all carmakers must follow. When a carmaker sells a car, it has a duty to ensure that the car functions properly and safely for its advertised use and is free from defects. When a carmaker discovers a defect, it must disclose the defect and make it right or cease selling the car. When a carmaker provides a warranty, it must stand by that

- 1 -

warranty. This case arises from defendant Ford Motor Company's ("Ford") breach of these rules. Ford deceived its customers when it sold the 2016 Shelby GT350 Mustang Base and Technology Package models (the "Shelbys") with the promise that they were Track-Ready; they were, in fact, unusable and unsafe for that purpose.

3.      The original Shelby was introduced in 1965 and established the Mustang's high-performance track credentials. It was named after Carroll Shelby, the legendary race car driver and automotive designer. When it was reintroduced in 2014, Ford marketed the Shelby as a "track-capable" car in the tradition of the original Shelby. Consumers, through Ford's marketing, came to associate the Shelby with race track use. In fact, the Shelby garnered such an iconic place in the psyche of high-performance driving enthusiasts that generations of such individuals dreamed of one day driving these vehicles and owning heirlooms to pass along to loved ones to also use at the track. This track-ready dream, however, came at a premium price. Many Shelbys were sold tens of thousands of dollars above the list price—and double or triple the price of a regular Mustang GT. Enthusiasts, however, were willing to pay the premium to own such a distinct piece of automotive history and to realize their dream of owning a high-performance vehicle.

4.      At the time of Ford's 2016 model year launch, the Shelby was introduced as a limited edition, track-capable car. For instance, one marketing representation made by Ford announced: "In developing the all-new Shelby GT350 Mustang and GT350R – the most potent track-oriented production Mustangs ever – nothing was left on the table in terms of weight

reduction and track-capable performance."[1] Ford also used the term "track-ready Shelby" in its advertising. For example:[2]



5.      Ford also described the track performance capability of the Shelby with various

terms, including but not limited to "Track-Ready," "track capable," "track tuned," "track car,"

---

[1] Ford, *Innovative Engineering*, available at https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit/innovative-engineering.pdf (last accessed Mar. 22, 2017), at p. 9.

[2] 2016 Ford Mustang brochure, available at http://www.ford.com/services/assets/Brochure?make=Ford&model=Mustang&year=2016&postalCode=11101 (last accessed Mar. 22, 2017), at p. 3.

- 3 -

"track tested," "track-oriented," and the "Most Capable Production Mustang Ever." At times in this Complaint, Ford's promises will be referred to as "Track-Ready."

6.      As Ford intended, Plaintiffs purchased 2016 Shelby Mustangs in part for track use. However, these vehicles are not fit for track use due to powertrain systems that cause the transmission and rear differentials to overheat prematurely and provide no ability for the driver to monitor transmission and differential temperatures. This overheating sends the car into Limp Mode, without any sort of warning or explanation of the deceleration—a dangerous condition on a race track full of speeding cars. In addition to manifesting on the track, the defect also activates the dangerous Limp Mode—again without any warning or explanation of the deceleration—on public roadways when operating the vehicle under normal conditions. The defect also degrades the 2016 Shelby over time. As a result, the Track-Ready powertrain system that Ford promised is defective. One solution for this overheating problem is the addition of transmission and differential coolers. However, Ford chose not to include these components in the manufacture and design of the 2016 Shelby.

7.      Customer experiences with the Shelby on the track differ dramatically from Ford's promise of a Track-Ready vehicle and chronicle the activation of Limp Mode. Shelby testimonial websites and Ford customer service files are replete with complaints from consumers who reasonably believed that their Shelby would in fact be Track-Ready, but instead they have been put at risk of collisions on race tracks and public roadways when the defective transmissions and rear differentials overheat, causing the cars to go into Limp Mode without warning at drastically reduced speed and performance.

8.      Ford is aware of the defect and in the 2017 model of the Shelby, it fixed the defective Track-Ready powertrain system by installing coolers for all trim levels. In addition,

- 4 -

Ford has belatedly and inconspicuously admitted the defect by advising owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense—in order to actually make them Track-Ready as advertised. But this advisement is untrue. The overheating issues cannot simply be fixed by the installation of inexpensive coolers, as Ford's recommendation would suggest. Further, Ford has admitted that the execution of these recommended aftermarket repairs may also represent further violations of the express warranties—a risk any reasonable consumer would hesitate to undertake.

9.    But Ford cannot shift its warranty obligations onto its customers. If the Shelbys need transmission and rear differential coolers to actually perform as advertised, then Ford should have equipped the cars with these components to its customers. Ford should also not recommend aftermarket repairs if performing such repairs may constitute a violation of the company's express warranties.

10.    Plaintiffs bring this action individually and on behalf of all other current and former owners of the 2016 Base and Technology Package model Shelby Mustangs. Plaintiffs seek damages and other equitable relief.

## II.    JURISDICTION

11.    This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceed $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## III.    VENUE

12.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions and/or misrepresentations giving rise to Plaintiffs' claims occurred in

this District. Plaintiffs George and Diana Tershakovec took delivery of their Shelby in this District and Ford has marketed, advertised, and sold Shelbys within this District.

### IV.     PARTIES

**A.     Plaintiffs**

    **1.     Florida Plaintiffs**

        **a.     George and Diana Tershakovec**

13.     Plaintiffs George and Diana Tershakovec (the "Tershakovec Plaintiffs") are citizens of the State of Florida and reside in Miami, Florida.

14.     The Tershakovec Plaintiffs share a passion for high-performance vehicles. The 2016 Shelby represented the car of their dreams and the Tershakovec Plaintiffs were excited to finally make this dream a reality. In February 2016, the Tershakovec Plaintiffs purchased a 2016 Shelby Mustang with the Technology Package from Maxwell Ford, an authorized Ford dealer. The Tershakovec Plaintiffs were interested in purchasing a Shelby that was capable of occasional track use and conducted most of their Shelby research from their home in Florida. The Tershakovec Plaintiffs also communicated with various dealers and were exposed to Ford's misrepresentations and/or omissions in that state and made their purchase decision there.

15.     The Tershakovec Plaintiffs purchased and still own this Shelby. Unknown to the Tershakovec Plaintiffs at the time they purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused them out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at the time of purchase but did not disclose the defects to the Tershakovec Plaintiffs. So the Tershakovec Plaintiffs purchased their Shelby on the reasonable but mistaken belief that their Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

- 6 -

16.     The Tershakovec Plaintiffs selected and ultimately purchased their Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic high-performance vehicle within the Mustang family. During their Shelby research, the Tershakovec Plaintiffs reviewed print and online advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

17.     Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including Flat-Plane Crank engine, which is designed specifically for very high revolutions. The Tershakovec Plaintiffs also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

18.     The Tershakovec Plaintiffs recall reviewing the Ford website for the 2016 Shelby in detail. The Tershakovec Plaintiffs also spoke with Ford salespeople at Maxwell Ford, Saw Grass Ford, Ford (Broward), Elder Ford Tampa, Metro Ford Miami, Greenway Ford Orlando, and Midway Ford Miami about their intent to use the Technology Model 2016 Shelby for occasional track use and were not informed that they would be unable to do so. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumers.

19.     None of the information reviewed by the Tershakovec Plaintiffs contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. None of the salespeople at the various Ford dealerships disclosed this information either. If Ford had disclosed to the Tershakovec Plaintiffs that their Shelby suffered from defects that would prevent the full use of their Shelby and pose safety risks, then they would not have purchased their Shelby or would have paid less for it.

20.     The Tershakovec Plaintiffs took delivery of their Shelby in February 2016. Around May or June 2016, the Tershakovec Plaintiffs learned of the defects in their Shelby when reading about other 2016 Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes while on the track. They also read on the forums and elsewhere that their Shelby could also experience Limp Mode while driving on public roadways. After learning about the safety implications inherent with a Shelby going into Limp Mode, the Tershakovec Plaintiffs decided not to take their Shelby to the track.

21.     In December 2016, the Tershakovec Plaintiffs contacted Ford to express their concerns and seek relief. They had multiple telephone conversations with Ford customer service agents and a Ford regional manager for the Southeast. Additionally, in the fall of 2016, the Tershakovec Plaintiffs emailed Mark Fields, Chief Executive Officer of Ford, to express their concerns and seek relief. The Tershakovec Plaintiffs also contacted Bradley Gayton, Group Vice President and General Counsel for Ford, via email. At no point during these telephone or email conversations did Ford provide any resolution to address their concerns or provide satisfactory relief.

22.     After conducting research into the diminished resale value of 2016 Shelbys, the Tershakovec Plaintiffs estimate that due to the Track-Ready powertrain defects, they would incur a loss of $20,000 if they tried to sell their Shelby—in addition to the $10,000 premium they paid over MSRP.

23.     To date, the Tershakovec Plaintiffs have never received any notification from Ford about any potential repair or after-market modification that would repair the overheating issue and render their Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

24.     While the Tershakovec Plaintiffs were aware at the time of purchase that their Shelby came with express warranties, they were not aware that executing any of the after-market repairs specifically recommended by Ford, such as the addition of transmission or differential coolers, could void the express warranties for the entire Shelby.

25.     The Tershakovec Plaintiffs have not yet completed any repairs relating to the defective Track-Ready powertrain system.

26.     The Tershakovec Plaintiffs paid the full MSRP, in addition to a $10,000 premium, for their Shelby.

27.     Due to Ford's failure to disclose the Track-Ready and track-capable defects, Plaintiffs were denied the benefit of the bargain at the time of sale, and paid a premium for the car that they would have not have. Plaintiffs have also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

### b.     John Aubrey

28.     Plaintiff John Aubrey is citizen of the State of Florida and resides in Parkland, Florida.

- 9 -

29.     A long time Ford customer, Mr. Aubrey was delighted to finally purchase his dream car. On November 10, 2015, Mr. Aubrey ordered a 2016 Shelby Mustang with the Base Package from Gilbert Ford, an authorized Ford dealer. Mr. Aubrey was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research from his home in Florida. Mr. Aubrey also communicated with various dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

30.     Mr. Aubrey purchased and still owns this Shelby. Unknown to Mr. Aubrey at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at the time of Mr. Aubrey's purchase but did not disclose the defects to Mr. Aubrey. So Mr. Aubrey purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

31.     Mr. Aubrey selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready or track-capable and was marketed as Ford's iconic track vehicle within the Mustang family. During his Shelby research, Mr. Aubrey reviewed print and online advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

32.     Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. Aubrey

- 10 -

also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

33.     Mr. Aubrey reviewed the website for the 2016 Shelby in detail. He specifically recalls the following statement from the Ford website, which helped lead him to believe that the Base Model Shelby could be driven on a track: "All-new Shelby Mustang is a thoroughbred capable of tackling the world's most challenging roads and racetracks." Mr. Aubrey also spoke with Ford salespeople at Gilbert Ford about his intent to use the Base Model 2016 Shelby for occasional track use and was not informed that he would be unable to do so. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

34.     None of the information reviewed by Mr. Aubrey contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. Nor did the sales people at Gilbert Ford disclose this information. If Ford had disclosed to Mr. Aubrey that his Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

35.     Mr. Aubrey took delivery of his Shelby in December 2015. On February 14, 2016, Mr. Aubrey participated in a High Performance Driving Education ("HPDE") event at Palm Beach International Raceway with his Shelby. He was accompanied by a driving instructor at all times. After approximately 12 minutes, Mr. Aubrey's car went into Limp Mode. Mr.

- 11 -

Aubrey became very concerned that he was potentially damaging his Shelby and stopped his track activities for the day. When Mr. Aubrey began to research the issue, he found dozens more examples of individuals with Base and Technology Package Shelbys experiencing Limp Mode both at the track and during normal highway use.

36.     Mr. Aubrey contacted both his dealership and Ford to express his concerns, but they were unable to provide any meaningful aid, nor could they direct him to a recommended repair.

37.     In March 2016, Mr. Aubrey contacted Ford via written letter to express his concerns and seek relief. In the letter, he specifically requested permission to install a Tremec TR-3160 6-speed transmission with built-in cooler in his Shelby or, as an alternative, have an aftermarket cooler installed and warranted by Ford.

38.     Around April 2016, Ford responded to Mr. Aubrey as per the following: "You have asked us to authorize your dealer to install a Tremec TR-3160 6 speed transmission with built in cooler or an after-market cooler. We must decline your request. Your Ford warranty states that we will perform repairs necessary to correct any manufacturer's defects. . . . Ford Motor Company does not recommend changes to our products. Only changes that have been thoroughly tested and approved by Ford Engineering should be considered. In this case, Ford part numbers will be issued and parts made available for purchase through our dealers. The installation or use of any after-market product will not necessary void the New Vehicle Limited Warranty ("NVLW" or "Limited Warranty"). However, if the aftermarket product fails or causes a Ford part to fail, the cost of the repair and any related damage(s) will not be covered by your Ford warranty." As such, Ford failed to provide any resolution to address his concerns or provide satisfactory relief.

- 12 -

39.     To date, Mr. Aubrey has not received any other notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

40.     Mr. Aubrey has not yet completed any repairs relating to the defective Track-Ready powertrain system.

41.     Due to safety concerns and the Shelby's inability to be used for its intended purpose, Mr. Aubrey no longer drives his vehicle on the track.

42.     While Mr. Aubrey was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs recommended by Ford, such as the addition of transmission or differential coolers, could void the express warranties for the entire Shelby.

43.     Mr. Aubrey paid the full MSRP, in addition to a $4,000 premium, for his Shelby.

44.     Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. Aubrey was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

### c.     Byron Harper

45.     Plaintiff Byron Harper is a citizen of the State of Florida. Mr. Harper is currently serving as a member of the U.S. Department of Defense in Europe.

46.     Mr. Harper first contacted the dealer about purchasing the new Shelby in 2014. In June 2015, when the dealer was granted allocations by Ford, Mr. Harper was so excited to purchase a 2016 Shelby that he put forth a $500 deposit to enter a special raffle where 29 military members could qualify for special rates and promotions. Mr. Harper was thrilled to learn

- 13 -

that he was successful in the raffle and immediately provided the additional $2,000 the dealer required to begin the ordering process. In August 2015, Military Auto Source submitted Mr. Harper's order for a 2016 Shelby Mustang with the Technology Package. Mr. Harper was interested in purchasing a Shelby that was capable of occasional track use.

47.     Mr. Harper purchased and still owns this Shelby. Unknown to Mr. Harper at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at the time of Mr. Harper's purchase but did not disclose the defects to Mr. Harper. So, Mr. Harper purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

48.     Mr. Harper selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic race vehicle within the Mustang family. During his Shelby research, Mr. Harper reviewed print and online advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

49.     Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. Harper also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable

- 14 -

software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

50.     Mr. Harper also recalls reviewing the Ford website for the 2016 Shelby in detail. Mr. Harper also interacted with the Ford-authorized Military Auto Source dealer who led him to believe that the Technology Package would be sufficient for occasional track use and that the transmission and differential coolers were only required for serious tracking. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

51.     None of the information reviewed by Mr. Harper contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. None of the representatives through the Military Auto Source program disclosed this information either. If Ford had disclosed to Mr. Harper that his Shelby transmission suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

52.     Mr. Harper took delivery of his Shelby in April 2016. Subsequently, a friend stated that he had experienced Limp Mode while driving a 2016 Shelby on the Autobahn in Germany. As Mr. Harper continued to conduct online research, he learned of other 2016 Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes while on the track. He also read on the forums and elsewhere that his Shelby could also experience Limp Mode while driving on public roadways, which was consistent with what his friend had

- 15 -

experienced. After learning about the safety implications inherent with a Shelby going into Limp Mode, Mr. Harper decided not to take his Shelby to the track.

53.     In the summer of 2016, Mr. Harper called Ford several times and exchanged emails to express his concerns and seek relief. The representative indicated to Mr. Harper that a "fix" was going to be provided, but Ford failed to provide any resolution to address his concerns or provide satisfactory relief.

54.     Mr. Harper has not yet completed any repairs relating to the defective Track-Ready powertrain system.

55.     To date, Mr. Harper has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with express warranty.

56.     While Mr. Harper was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as a new transmission or cooler kit, can void the express warranties for the entire Shelby.

57.     Mr. Harper paid the full Military Auto Sales price for his Shelby.

58.     Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. Harper was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

   **d.     Richard Kowalchik**

59.     Plaintiff Richard Kowalchik is a citizen of the State of Florida and resides in Merritt Island, Florida.

- 16 -

60.    Mr. Kowalchik has been purchasing Ford vehicles almost exclusively for the past 40 years. It came as no surprise, then, that in September 2015, Mr. Kowalchik ordered a 2016 Shelby Mustang with the Technology Package from Paradise Ford, an authorized Ford dealer. Mr. Kowalchik was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research from his home in Florida. Mr. Kowalchik also communicated with multiple dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

61.    Mr. Kowalchik purchased and still owns this Shelby. Unknown to Mr. Kowalchik at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of Mr. Kowalchik's purchase but did not disclose the defects to Mr. Kowalchik. So, Mr. Kowalchik purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

62.    Mr. Kowalchik selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic high-performance vehicle within the Mustang family. During his Shelby research, Mr. Kowalchik reviewed print and online advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

63.    Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including

- 17 -

a Flat-Plane Crank engine, which is designed specifically for very high revolutions.

Mr. Kowalchik also noted other tracking features in the 2016 Shelby, such as the MagneRide

suspension tuned for the track, enhanced electric steering, performance braking system, and

specific driver tunable software settings, including a setting specifically marked for Track Use

Only. There are also "Track Apps" and a heads-up tachometer display.

64.     Mr. Kowalchik also recalls reviewing the Ford website for the 2016 Shelby in

detail. Mr. Kowalchik also spoke with Ford salespeople at Paradise Ford about his intent to use

the Technology Model 2016 Shelby for occasional track use and was not informed that he would

be unable to do so. The sales representatives conveyed information about the Shelby's track

readiness and package options that flowed directly from the same information Ford had provided

to all dealerships and which Ford expected to be passed to consumer.

65.     None of the information reviewed by Mr. Kowalchik prior to purchase contained

any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not

all models of the Shelby were capable of safe driving on public roadways or occasional track

use. Nor did Ford direct the salespeople at Paradise Ford to disclose this information. If Ford had

disclosed to Mr. Kowalchik that his Shelby suffered from defects that would prevent the full use

of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have

paid less for it.

66.     Mr. Kowalchik took delivery of his Shelby in January 2016. Three months after

taking delivery, Mr. Kowalchik learned that Ford would be making the Track Package standard

on all new 2017 vehicles.

67.     In September 2016, Mr. Kowalchik attended a Track Attack event in Utah

organized by Ford. While attending this event Mr. Kowalchik recalls a statement from Mr. Dave

Pericak, Global Director of Ford Performance, in a video message congratulating the attending class on purchasing "the most track-ready Mustang ever built." While attending this event, Mr. Kowalchik also spoke with one of the other participants who told him his Technology Package GT350 went into Limp Mode while driving on a public expressway.

68.     When Mr. Kowalchik returned home, he started searching various internet forums and finding stories of others who experienced Limp Mode. Many of the articles were related to track day events where, within a matter of minutes while on the track, the Shelby experienced Limp Mode.

69.     To date, Mr. Kowalchik has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

70.     Mr. Kowalchik has not yet completed any repairs relating to the defective Track-Ready powertrain system.

71.     Mr. Kowalchik paid the full MSRP, in addition to a $5,000 premium, for his Shelby.

72.     Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. Kowalchik was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

010678-11 958612 V1

2.      **Texas Plaintiffs**

a.      **Herbert Alley**

73.      Plaintiff Herbert Alley is a citizen of the State of Texas and resides in Magnolia,
Texas.

74.      Plaintiff Alley first became interested in sports cars and tracking in 1984, when he
purchased a used 1983 Mustang GT. In February 2016, Mr. Alley purchased a 2016 Shelby
Mustang with the Technology Package from Spikes Ford, an authorized Ford dealer. Mr. Alley
was interested in purchasing a Shelby that was capable of occasional track use and conducted
most of his Shelby research from his home in Texas. Mr. Alley also communicated with various
dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his
purchase decision there.

75.      Mr. Alley purchased and still owns this Shelby. Unknown to Mr. Alley at the time
he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system,
which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished
value of the Shelby. Ford knew about these defects at the time of Mr. Alley's purchase but did
not disclose the defects to Mr. Alley. So Mr. Alley purchased his Shelby on the reasonable but
mistaken belief that his Shelby would be safe and reliable on public roadways and that the
Shelby was capable of occasional track use.

76.      Mr. Alley selected and ultimately purchased his Shelby, in part, because the
Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic
high-performance vehicle within the Mustang family. During his Shelby research, Mr. Alley
reviewed print and online advertisements similar to those included in this First Amended
Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly

- 20 -

stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

77.     Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. Alley also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

78.     Mr. Alley recalls reviewing the Ford website for the 2016 Shelby in detail. Mr. Alley also spoke with Ford salespeople at Spikes Ford about his intent to use the Technology Model 2016 Shelby for occasional track use and was not informed that he would be unable to do so. He also spent an entire day at Spikes Ford at the time of purchase learning from Ford salespeople, based on information provided by Ford, on how to use the package options and track features that came with his Shelby. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

79.     None of the information reviewed by Mr. Alley contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. None of the salespeople at Spikes Ford disclosed this information either. If Ford had disclosed to Mr. Alley that his Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

- 21 -

80.     Mr. Alley took delivery of his Shelby in February 2016. In mid-2016, Mr. Alley learned of the defects in his Shelby when reading about other 2016 Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes while on the track. He also read on the forums and elsewhere that his Shelby could also experience Limp Mode while driving on public roadways. After learning about the safety implications inherent with a Shelby going into Limp Mode, Mr. Alley decided not to take his Shelby to the track.

81.     In October 2016, Mr. Alley contacted Ford to raise his concerns and seek relief. Ford failed to provide any resolution to address his concerns or provide satisfactory relief.

82.     To date, Mr. Alley has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

83.     While Mr. Alley was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as a new transmission or cooler kit, can void the express warranties for the entire Shelby.

84.     Mr. Alley has not yet completed any repairs relating to the defective Track-Ready powertrain system.

85.     Mr. Alley paid the full MSRP, in addition to a $5000 premium, for his Shelby GT350.

86.     Due to Ford's failure to disclose the Track-Ready and track-capable defects, the Shelby vehicles were not only sold as not Track-Ready, but they could also be unsafe on the road. As such, Mr. Alley was denied the benefit of the bargain at the time of sale and paid a

- 22 -

premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

        **b.**    **Michael DeLaGarza**

87.     Plaintiff Michael DeLaGarza is a citizen of the State of Texas and resides in Driftwood, Texas.

88.     Mr. DeLaGarza's passion for tracking goes back decades. In May 2016, Mr. DeLaGarza purchased a 2016 Shelby Mustang with the Technology Package from Gaudin Ford, an authorized Ford dealer. Mr. DeLaGarza was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research from his home in Texas. Mr. DeLaGarza also communicated with various dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

89.     Mr. DeLaGarza purchased and still owns this Shelby. Unknown to Mr. DeLaGarza at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of Mr. DeLaGarza's purchase but did not disclose the defects to Mr. DeLaGarza. So, Mr. DeLaGarza purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

90.     Mr. DeLaGarza selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic high-performance vehicle within the Mustang family. During his Shelby research, Mr. DeLaGarza reviewed print and online advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race s and

clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

91.     Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. DeLaGarza also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

92.     Mr. DeLaGarza also recalls reviewing the Ford website for the 2016 Shelby in detail. Mr. DeLaGarza also spoke with Ford salespeople at Gaudin Ford about his intent to use the Technology Model 2016 Shelby for occasional track use and was not informed that he would be unable to do so. The salesperson at the dealership went through all the specifications with Mr. DeLaGarza relating to the different package options. The salesperson at the dealership also stated that his Shelby would be "absolutely ready to go" for the track. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

93.     None of the information reviewed by Mr. DeLaGarza contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. Nor did the sales people at Gaudin Ford disclose this information. If Ford had disclosed to Mr. DeLaGarza

- 24 -

that his Shelby suffered from defects that would prevent the full use of his Shelby and pose

safety risks, then he would not have purchased his Shelby or would have paid less for it.

94.     Mr. DeLaGarza took delivery of his Shelby in May 2016. Soon after taking

delivery, Mr. DeLaGarza learned of the defects in his Shelby when reading about other 2016

Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes

while on the track. He also read on the forums and elsewhere that his Shelby could also

experience Limp Mode while driving on public roadways. After learning about the safety

implications inherent with a Shelby going into Limp Mode, Mr. DeLaGarza decided not to make

plans to take his Shelby to the track.

95.     In January 2017, Mr. DeLaGarza contacted Gaudin Ford to raise his concerns and

seek relief. The dealership offered him a trade-in to purchase a GT350R. Mr. DeLaGarza also

noted that according to fellow owners who regularly posted on internet forums, Ford was

working on a fix. So he waited to hear news of Ford's suggested repairs and did not trade in his

Shelby at this time. Ford failed to provide any resolution to address his concerns or provide

satisfactory relief.

96.     To date, Mr. DeLaGarza has not received any notification from Ford about any

potential repair or after-market modification that would render his Shelby safe to drive on public

roadways, or during occasional track use, that would also be compliant with Ford's express

warranties.

97.     Mr. DeLaGarza has not yet completed any repairs relating to the defective Track-

Ready powertrain system.

98.     Due to safety concerns on public roadways and the Shelby's inability to be used

for its intended purpose, Mr. DeLaGarza essentially no longer drives his vehicle.

- 25 -

99.     While Mr. DeLaGarza was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as a new transmission or cooler kit, can void the express warranties for the entire Shelby.

100.    Mr. DeLaGarza paid the full MSRP, in addition to a $20,000 premium, for his Shelby.

101.    Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. DeLaGarza was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

### c.    Eric Kamperman

102.    Plaintiff Eric Kamperman is a citizen of the State of Texas and resides in Mesquite, Texas.

103.    Mr. Kamperman is a performance car enthusiast. In November 2015, Mr. Kamperman began a search to purchase a Shelby Mustang. In December 2015, Mr. Kamperman purchased the Shelby with the Technology Package from Town East Ford, an authorized Ford dealer. Mr. Kamperman was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research from his home in Texas. Mr. Kamperman also communicated with various dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

104.    Mr. Kamperman purchased and still owns this Shelby. Unknown to Mr. Kamperman at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future

- 26 -

attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of

Mr. Kamperman's purchase but did not disclose the defects to Mr. Kamperman. So,

Mr. Kamperman purchased his Shelby on the reasonable but mistaken belief that his Shelby

would be safe and reliable on public roadways and that the Shelby was capable of occasional

track use.

105.    Mr. Kamperman selected and ultimately purchased his Shelby, in part, because

the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's

iconic race Shelby within the Mustang family. During his vehicle research, Mr. Kamperman

reviewed print and online advertisements similar to those included in this First Amended

Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly

stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that

these Shelbys offered many track-specific features.

106.    Some of the features included in the 2016 Shelby were items that a reasonable

consumer would believe to be present in a Shelby equipped for occasional track use—including a

Flat-Plane Crank engine, which is designed specifically for very high revolutions.

Mr. Kamperman also noted other tracking features in the 2016 Shelby, such as the MagneRide

suspension tuned for the track, enhanced electric steering, performance braking system, and

specific driver tunable software settings, including a setting specifically marked for Track Use

Only. There are also "Track Apps" and a heads-up tachometer display.

107.    Mr. Kamperman also recalls reviewing the Ford website for the 2016 Shelby in

detail. Mr. Kamperman also spoke with Ford salespeople at Town East Ford about his intent to

use the Technology Model 2016 Shelby for occasional track use and was not informed that he

would be unable to do so. The sales representatives conveyed information about the Shelby's

track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

108.    None of the information reviewed by Mr. Kamperman contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. Nor did the sales people at Town East Ford disclose this information. If Ford had disclosed to Mr. Kamperman that his Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

109.    Mr. Kamperman took delivery of his Shelby in December 2015. Within two to three months of taking delivery, Mr. Kamperman learned of the defects in his Shelby when reading about other 2016 Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes while on the track. He also read on the forums and elsewhere that his Shelby could also experience Limp Mode while driving on public roadways. After learning about the safety implications inherent with a Shelby going into Limp Mode, Mr. Kamperman cancelled his pre-existing reservation to participate in a track day and has no plans to take his Shelby to the track.

110.    Approximately two months after purchase, Mr. Kamperman returned to the dealer to raise his concerns and seek relief. The salesmen and sales manager told him that they had not heard of any potential issues and failed to provide any resolution to address his concerns or provide satisfactory relief.

111.    To date, Mr. Kamperman has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public

- 28 -

roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

112.   Mr. Kamperman has not yet completed any repairs relating to the defective Track-Ready powertrain system.

113.   While Mr. Kamperman was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as a new transmission or cooler kit, can void the express warranties for the entire Shelby.

114.   Mr. Kamperman paid the full MSRP, in addition to a $10,000 premium, for his Shelby.

115.   Due to Ford's failure to disclose the Track-Ready and track-capable defects, the Shelby vehicles were not only sold as not Track-Ready, but they could also be unsafe on the road. As such, Mr. Kamperman was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

### d.   Travis McRae

116.   Plaintiff Travis McRae is a citizen of the State of Texas and resides in Kerrville, Texas.

117.   Mr. McRae has wanted a Shelby since he was approximately 10 years old. He saved for years to be able to afford such a performance vehicle and was thrilled to learn that Ford was re-introducing the Mustang Shelby to consumers. In February 2016, Mr. McRae ordered a 2016 Shelby Mustang with the Technology Package from Ken Stopel Ford, an authorized Ford dealer. Mr. McRae was interested in purchasing a Shelby that was capable of occasional track

- 29 -

use and conducted most of his Shelby research from his home in Texas. Mr. McRae also communicated with various dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

118.    Mr. McRae purchased and still owns this Shelby. Unknown to Mr. McRae at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of Mr. McRae's purchase but did not disclose the defects to Mr. McRae. So, Mr. McRae purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

119.    Mr. McRae selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic high-performance vehicle within the Mustang family. During his Shelby research, Mr. McRae reviewed print and online advertisements similar to those included in this First Amended Complaint These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

120.    Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. McRae also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable

- 30 -

software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

121.    Mr. McRae also recalls reviewing the Ford website for the 2016 Shelby in detail. Mr. McRae also spoke with Ford salespeople at Ken Stopel Ford about his intent to use the Technology Model 2016 Shelby for occasional track use and was not informed that he would be unable to do so. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

122.    None of the information reviewed by Mr. McRae contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. Nor did anyone from Ken Stopel Ford disclose this information. If Ford or a Ford dealership had disclosed to Mr. McRae that his Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

123.    Mr. McRae took delivery of his Shelby in February 2016. He learned of the defects in his Shelby in June 2016 when he first experienced Limp Mode during his first track event. Mr. McRae was driving his Shelby on the track and a track instructor was riding with him as a passenger. He experienced Limp Mode during the first session and his Shelby never fully recovered. Mr. McRae has not brought his Shelby back to the track after that day. Mr. McRae has also experienced Limp Mode while legally driving on public roadways.

124.    In July 2016, Mr. McRae contacted Ken Stopel Ford to express his concerns and request relief. He was told, based on the same information Ford provided to all dealerships, that

- 31 -

his vehicle was not equipped with the appropriate equipment for track use and Ford refused to provide any resolution to address his concerns or provide satisfactory relief.

125.    In July 2016, Mr. McRae started researching a repair that would resolve the defects associated with the Track-Ready powertrain issue. Some of the suggested repairs involved adding an external cooler, but this would entail moving other parts of the car around to make room for the cooler. Mr. McRae found this to be an unsatisfactory as it was unclear whether this repair would violate Ford's express warranties.

126.    To date, Mr. McRae has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

127.    While Mr. McRae was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as a new transmission or cooler kit, can void the express warranties for the entire Shelby.

128.    Mr. McRae installed a transmission cooler in August 2016 and differential cooler in February 2017.

129.    Mr. McRae paid the full MSRP, in addition to a $7,500 premium, for his Shelby.

130.    Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. McRae was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate, as a reasonable consumer would have expected.

- 32 -

### e.    Todd Newton

131.    Plaintiff Todd Newton is a citizen of the State of Texas and resides in San Antonio, Texas.

132.    Mr. Newton has been a "Mustang Nut" since he was 20 years old, and is the owner of several Mustang vehicles. In the spring of 2015, Mr. Newton ordered a 2016 Shelby Mustang with the Technology Package from Jordan Ford, an authorized Ford dealer. Mr. Newton was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research from his home in Texas. Mr. Newton also communicated with various dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

133.    Mr. Newton purchased and still owns this Shelby. Unknown to Mr. Newton at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of Mr. Newton's purchase but did not disclose the defects to Mr. Newton. So, Mr. Newton purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was operational for occasional track use.

134.    Mr. Newton selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic high-performance vehicle within the Mustang family. During his Shelby research, Mr. Newton reviewed print and online advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

- 33 -

135.     Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. Newton also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

136.     Mr. Newton also recalls reviewing the Ford website for the 2016 Shelby in detail and even "built" his dream model on that website. Prior to ordering his 2016 Shelby, Mr. Newton contacted Ford via phone and communicated his desire to buy a car that was capable of occasional track use. He also wanted to confirm with Ford that he did not require the Track Package for occasional events and open track days. When Mr. Newton specifically asked about the difference between the Track and Technology packages, the representative at Ford confirmed on the phone that the Technology Package would be "perfect" for open track days, due to the special MagneRide suspension included in Technology Package Shelbys. The Ford representative also indicated that Mr. Newton would not be required to purchase an "R" model or Track Package model unless he planned to do extended track sessions. The Ford representatives conveyed information about the Shelby's track readiness and package options that flowed directly from Ford and which Ford expected to be passed to consumer.

137.     As part of his research, Mr. Newton also communicated with Ford salespeople at Jordan Ford about his intent to use the Technology Package Shelby for occasional track use and was not informed he would be unable to do so. The sales representatives at the dealership conveyed information about the Shelby's track readiness and package options that flowed

- 34 -

directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

138.    None of the information reviewed by Mr. Newton contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. Nor did anyone from Ford or Jordan Ford disclose this information. If Ford or a Ford dealership had disclosed to Mr. Newton that his Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

139.    Mr. Newton took delivery of his Shelby in December 2015. He learned of the defects in his Shelby in April 2016 when he first experienced Limp Mode twice during his first track event. Mr. Newton has not brought his Shelby back to the track after that day.

140.    In April 2016, Mr. Newton contacted Ford to express his concerns and request relief. He was told that a fix was coming by the end of the summer. However, it was not until the fall of 2016 that Mr. Newton learned of two potential repair options. He could get a new transmission at a cost of $5,900 (plus labor) and coolers for $1,200 (plus labor). Another option was to install a cooler kit for $2,900. However, when Mr. Newton spoke to Jordan Ford, the dealership informed him that they would be unable to perform the labor required for the installation as Ford was refusing to pay them for the labor costs.

141.    In March 2017, the Jordan Ford dealership also offered Mr. Newton approximately $46,000 to $47,000 for his Shelby as a trade-in if he purchased a 2017 Shelby. The dealership noted the trade-in value was much lower than anticipated because of the engine oil cooler recall, the Track-Ready and track-capable defects, and the associated lawsuit. The

response from Ford in April 2016 as well as from the dealership in March 2017 failed to provide any resolution to address his concerns or provide satisfactory relief.

142.    To date, Mr. Newton has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

143.    While Mr. Newton was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as a new transmission or cooler kit, can void the express warranties for the entire Shelby.

144.    Mr. Newton has not yet completed any repairs relating to the defective Track-Ready powertrain system.

145.    Mr. Newton paid the full MSRP, in addition to a $10,000 premium, for his Shelby.

146.    Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. Newton was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

3.    **Washington Plaintiff**

a.    **Eric Evans**

147.    Plaintiff Eric Evans is a citizen of the State of Washington and resides in Silverdale, Washington.

- 36 -

148.    Mr. Evans has been fascinated with high-performance vehicles since he was a teenager. In June 2015, Mr. Evans ordered a 2016 Shelby Mustang with the Technology Package from West Hills Ford, an authorized Ford dealer. Mr. Evans was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research from his home in Washington. Mr. Evans was therefore exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

149.    Mr. Evans purchased and still owns this Shelby. Unknown to Mr. Evans at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of Mr. Evans's purchase but did not disclose the defects to Mr. Evans. So, Mr. Evans purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

150.    Mr. Evans selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic high-performance vehicle within the Mustang family. During his Shelby research, Mr. Evans reviewed print and online advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

151.    Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. Evans

also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

152.   Mr. Evans also recalls reviewing the Ford website for the 2016 Shelby. Mr. Evans also spoke with Ford salespeople at West Hills Ford about his intent to use the Technology Model 2016 Shelby for occasional track use and was not informed that he would be unable to do so. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

153.   None of the information reviewed by Mr. Evans contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. Nor did the sales people at West Hills Ford disclose this information. If Ford had disclosed to Mr. Evans that his Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

154.   Mr. Evans took delivery of his Shelby in February 2016. Shortly after taking delivery, Mr. Evans learned of the defects in his Shelby when reading about other 2016 Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes while on the track. He also read on the forums and elsewhere that his Shelby could also experience Limp Mode while driving on public roadways. After learning about the safety implications inherent with a Shelby going into Limp Mode, Mr. Evans decided not to take his Shelby to the track.

- 38 -

155.    In August 2016, Mr. Evans spoke to a representative for Ford Performance Racing School to raise his concerns and seek relief. The representative indicated to Mr. Evans that they were aware of the Limp Mode defect and that "something was being worked on" but nothing ever materialized. As such, Ford failed to provide any resolution to address his concerns or provide satisfactory relief.

156.    To date, Mr. Evans has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

157.    While Mr. Evans was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as a new transmission or cooler kit, can void the express warranties for the entire Shelby.

158.    Mr. Evans has not yet completed any repairs relating to the defective Track-Ready powertrain system.

159.     Mr. Evans paid the full MSRP, in addition to a $1,995 premium, for his Shelby.

160.    Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. Evans was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

### 4.      Tennessee Plaintiff

####     a.      Attila Gondan

161.     Plaintiff Attila Gondan is a citizen of the State of Tennessee and resides in Germantown, Tennessee.

162.     Mr. Gondan was looking forward to purchasing his fourth Mustang. In August 2015, Mr. Gondan ordered a 2016 Shelby Mustang with the Technology Package from Landers Ford, an authorized Ford dealer. Mr. Gondan was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research from his home in Tennessee. Mr. Gondan also communicated with various dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

163.     Mr. Gondan purchased and still owns this Shelby. Unknown to Mr. Gondan at the time he purchased his Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of Mr. Gondan's purchase but did not disclose the defects to Mr. Gondan. So, Mr. Gondan purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

164.     Mr. Gondan selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic high-performance vehicle within the Mustang family. During his vehicle research, Mr. Gondan reviewed print and online advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

165.     Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. Gondan also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

166.     Mr. Gondan also recalls reviewing the Ford website for the 2016 Shelby in detail. Mr. Gondan also spoke with Ford salespeople at Landers Ford about his intent to use the Technology Model 2016 Shelby for occasional track use and was not informed that he would be unable to do so. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

167.     None of the information reviewed by Mr. Gondan contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. Nor did the sales people at Landers Ford disclose this information. If Ford had disclosed to Mr. Gondan that his Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

168.     Mr. Gondan took delivery of his Shelby in April 2016. He first experienced Limp Mode when he took his car to the NOLA race track in Louisiana. In his third session, he unexpectedly went into Limp Mode on the track. He decided to end his track day to prevent any damage to his vehicle. He has not taken it to the track since.

169.    Mr. Gondan also conducted research relating to the defects in his Shelby when reading about other 2016 Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes while on the track.

170.    Mr. Gondan called Landers Ford to raise his concerns and seek relief. The service representative at Landers Ford said they would install the transmission cooler and differential cooler at a cost $695 for the transmission and $2,295 for the differential cooler, plus labor costs and an additional external pump (valued between $500 and $600). The Transmission with internal pump was $4,800. The dealership did not indicate whether these repairs would violate Ford's express warranties associated with Mr. Gondan's Shelby. As such, Ford failed to provide any resolution to address his concerns or provide satisfactory relief.

171.    To date, Mr. Gondan has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

172.    While Mr. Gondan was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as a new transmission or cooler kit, can void the express warranties for the entire Shelby.

173.    Mr. Gondan has not yet completed any repairs relating to the defective Track-Ready powertrain system.

174.    Mr. Gondan paid the full MSRP, in addition to a $5,000 premium, for his Shelby.

175.    Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. Gondan was denied the benefit of the bargain at the time of sale and paid a premium for the

car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

  **5.  Illinois Plaintiff**

    **a.  Mark Hochsprung**

  176.  Plaintiff Mark Hochsprung is a citizen of the State of Illinois and resides in Oak Lawn, Illinois.

  177.  Mr. Hochsprung has been highly interested in cars his entire life and was really excited when he learned that Ford was offering once again a Shelby Mustang to consumers. In October 2015, Mr. Hochsprung ordered a 2016 Shelby Mustang with the Base Package from Warrensburg Ford, an authorized Ford dealer. Mr. Hochsprung was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research from his home in Illinois. Mr. Hochsprung also communicated with various dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

  178.  Mr. Hochsprung purchased and still owns this Shelby. Unknown to Mr. Hochsprung at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of Mr. Hochsprung's purchase but did not disclose the defects to Mr. Hochsprung. So, Mr. Hochsprung purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

  179.  Mr. Hochsprung selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's

iconic high-performance vehicle within the Mustang family. During his Shelby research,

Mr. Hochsprung reviewed print and online advertisements similar to those included in this First

Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks

and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-

capable, and that these Shelbys offered many track-specific features.

180.    Some of the features included in the 2016 Shelby were items that a reasonable

consumer would believe to be present in a Shelby equipped for occasional track use, including a

Flat-Plane Crank engine, which is designed specifically for very high revolutions.

Mr. Hochsprung also noted other tracking features in the 2016 Shelby, such as the MagneRide

suspension tuned for the track, enhanced electric steering, performance braking system, and

specific driver tunable software settings, including a setting specifically marked for Track Use

Only. There are also "Track Apps" and a heads-up tachometer display.

181.    Mr. Hochsprung also recalls reviewing the Ford website for the 2016 Shelby in

detail. Mr. Hochsprung also spoke with Ford salespeople at Warrensburg Ford about his intent to

use the Base Model 2016 Shelby for occasional track use and was not informed that he would be

unable to do so. The sales representatives conveyed information about the Shelby's track

readiness and package options that flowed directly from the same information Ford had provided

to all dealerships and which Ford expected to be passed to consumer.

182.    None of the information reviewed by Mr. Hochsprung contained any disclosure

relating to any defects in the Track-Ready powertrain system or disclosed that not all models of

the Shelby were capable of safe driving on public roadways or occasional track use. Nor did the

sales people at Warrensburg Ford disclose this information. If Ford had disclosed to

Mr. Hochsprung that his Shelby suffered from defects that would prevent the full use of his

Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

183.    Mr. Hochsprung took delivery of his Shelby in January 2016. After taking delivery, he soon learned of the defects in his Shelby when reading about other 2016 Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes while on the track. He also read on the forums and elsewhere that his Shelby could also experience Limp Mode while driving on public roadways. After learning about the safety implications inherent with a Shelby going into Limp Mode, Mr. Hochsprung decided not to take his Shelby to the track. Mr. Hochsprung had made a reservation to attend one of Ford's Track Attack events, but drove a Ford performance loaner vehicle instead of his own.

184.    To date, Mr. Hochsprung has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

185.    While Mr. Hochsprung was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as the addition of transmission or differential coolers, can void the express warranties for the entire Shelby.

186.    Mr. Hochsprung has not yet completed any repairs relating to the defective Track-Ready powertrain system.

187.    Mr. Hochsprung paid the full MSRP, in addition to a $5,000 premium, for his Shelby.

188.    Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. Hochsprung was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

### 6.    California Plaintiff

#### a.    Jacques Rimokh

189.    Plaintiff Jacques Rimokh is a citizen of the state of California and resides in Burbank, California.

190.    In September 2015, Mr. Rimokh ordered a 2016 Shelby Mustang with the Technology Package from Saginaw Valley Ford, an authorized Ford dealer. Mr. Rimokh was interested in purchasing a Shelby that was capable of occasional track use and conducted all of his Shelby research from his home in California. Mr. Rimokh also communicated with various dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

191.    Mr. Rimokh purchased and still owns this Shelby. Unknown to Mr. Rimokh at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at the time of Mr. Rimokh's purchase but did not disclose the defects to Mr. Rimokh. So Mr. Rimokh purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable for use on occasional track days.

192.    Mr. Rimokh selected and ultimately purchased his Shelby because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic high-

- 46 -

performance vehicle within the Mustang family. During his Shelby research, Mr. Rimokh reviewed print, online, and television advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

193.    Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a vehicle equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. Rimokh also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

194.    Mr. Rimokh recalls reviewing the Ford website for the 2016 Shelby. Mr. Rimokh also spoke with Ford salespeople at Saginaw Valley Ford about his intent to use the Technology Model 2016 Shelby for occasional track use and was not informed that he would be unable to do so. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

195.    None of the information reviewed by Mr. Rimokh contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. None of the salespeople at Saginaw Valley Ford disclosed this information either. If Ford had disclosed to Mr. Rimokh that his Shelby suffered from defects that would prevent the full use of his Shelby

- 47 -

and pose safety risks, then he would not have purchased his Shelby and would have purchased another track capable car.

196.    Mr. Rimokh took delivery of his Shelby in December 2015. In March 2016, Mr. Rimokh decided to take his car to the track and experienced the Limp Mode during all three track sessions.

197.    Mr. Rimokh contacted Ford on at least two occasions in 2016 to raise his concerns and seek relief. Ford indicated to Mr. Rimokh that a "fix" might be provided, but Ford failed to provide any resolution to address his concerns or provide satisfactory relief.

198.    To date, Mr. Rimokh has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, and for occasional track use, that would also be compliant with Ford's express warranties.

199.    While Mr. Rimokh was aware at the time of purchase that his Shelby Mustang came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as the addition of transmission or differential coolers, could void the express warranties for the entire Shelby.

200.    Mr. Rimokh has not yet completed any repairs relating to the defective Track-Ready powertrain system.

201.    Due to safety concerns and the Shelby's inability to be used for its intended purpose, Mr. Rimokh does not attempt to drive his Shelby on the track.

202.    Mr. Rimokh paid the full MSRP for his Shelby.

203.    Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. Rimokh was denied the benefit of the bargain at the time of sale and paid a premium for the

car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

### 7. Missouri Plaintiff

#### a. Michael McCurry

204.    Plaintiff Michael McCurry is a citizen of the State of Missouri and resides in Bolivar, Missouri.

205.    Mr. McCurry has known of the legend of the Mustang Shelby since he was 7 years old. In November 2015, Mr. McCurry purchased a 2016 Shelby Mustang with the Technology Package from Republic Ford, an authorized Ford dealer. Mr. McCurry was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research from his home in Missouri. Mr. McCurry also communicated with various dealers and was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

206.    Mr. McCurry purchased and still owns this Shelby. Unknown to Mr. McCurry at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of Mr. McCurry's purchase but did not disclose the defects to Mr. McCurry. So, Mr. McCurry purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

207.    Mr. McCurry selected and ultimately purchased his Shelby, in part, because the Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic race Shelby within the Mustang family. During his Shelby research, Mr. McCurry reviewed print

- 49 -

and online advertisements similar to those included in this First Amended Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that these Shelbys offered many track-specific features.

208.    Some of the features included in the 2016 Shelby were items that a reasonable consumer would believe to be present in a Shelby equipped for occasional track use—including a Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. McCurry also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for the track, enhanced electric steering, performance braking system, and specific driver tunable software settings, including a setting specifically marked for Track Use Only. There are also "Track Apps" and a heads-up tachometer display.

209.    Mr. McCurry also recalls reviewing the Ford website for the 2016 Shelby in detail. Mr. McCurry also spoke with Ford salespeople at Republic Ford about his intent to use the 2016 Shelby for occasional track use and was not informed he would be unable to do so. The sales representatives conveyed information about the Shelby's track readiness and package options that flowed directly from the same information Ford had provided to all dealerships and which Ford expected to be passed to consumer.

210.    None of the information reviewed by Mr. McCurry contained any disclosure relating to any defects in the Track-Ready powertrain system or disclosed that not all models of the Shelby were capable of safe driving on public roadways or occasional track use. Nor did the sales people at Republic Ford disclose this information. If Ford had disclosed to Mr. McCurry that his Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

211.    Mr. McCurry took delivery of his Shelby in November 2015. Mr. McCurry learned of the defects in his Shelby in the summer of 2016 when reading about other 2016 Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes while on the track. He also read on the forums and elsewhere that his Shelby could also experience Limp Mode while driving on public roadways. After learning about the safety implications inherent with a Shelby going into Limp Mode, Mr. McCurry decided not to take his Shelby to the track and essentially stopped driving the Shelby altogether.

212.    In late summer or early fall of 2016, after learning of the defects inherent in his 2016 Shelby, Mr. McCurry decided to try selling his Shelby. He listed the Shelby for around $55,000 on the resale market. During a phone call with a prospective buyer, the prospective buyer indicated that the reason he was offering $42,000 instead of the listing price was due to the Limp Mode issue and that the 2017 Shelby would be equipped with the missing coolers.

213.    To date, Mr. McCurry has not received any notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

214.    While Mr. McCurry was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as the addition of transmission or differential coolers, could void the express warranties for the entire Shelby.

215.    Mr. McCurry has not yet completed any repairs relating to the defective Track-Ready powertrain system.

216.    Due to safety concerns and the Shelby's inability to be used for its intended purpose, Mr. McCurry essentially no longer drives his vehicle.

217.    Mr. McCurry paid the full MSRP, in addition to a $10,000 premium, for his Shelby.

218.    Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. McCurry was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

### b.    Greg Roberts

219.    Plaintiff Greg Roberts is a citizen of the State of Missouri and resides in Springfield, Missouri.

220.    In the fall of 2016, Mr. Roberts purchased a 2016 Shelby Mustang with the Technology Package from Friendly Ford, an authorized Ford dealer. Mr. Roberts was interested in purchasing a Shelby that was capable of occasional track use and conducted most of his Shelby research in Missouri. As such, he was exposed to Ford's misrepresentations and/or omissions in that state and made his purchase decision there.

221.    Mr. Roberts purchased and still owns this Shelby. Unknown to Mr. Roberts at the time he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system, which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished value of the Shelby. Ford knew about these defects at time of Mr. Roberts' purchase but did not disclose the defects to Mr. Roberts. So, Mr. Roberts purchased his Shelby on the reasonable but mistaken belief that his Shelby would be safe and reliable on public roadways and that the Shelby was capable of occasional track use.

222.     Mr. Roberts selected and ultimately purchased his Shelby, in part, because the

Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic

high-performance vehicle within the Mustang family. During his Shelby research,

Mr. Roberts reviewed print and online advertisements similar to those in this First Amended

Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly

stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that

these Shelbys offered many track-specific features.

223.     Some of the features included in the 2016 Shelby were items that a reasonable

consumer would believe to be present in a Shelby equipped for occasional track use, including a

Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. Roberts

also noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned

for the track, enhanced electric steering, performance braking system, and specific driver tunable

software settings, including a setting specifically marked for Track Use Only. There are also

"Track Apps" and a heads-up tachometer display.

224.     Mr. Roberts also recalls reviewing the Ford website for the 2016 Shelby in detail.

Mr. Roberts also spoke with Ford salespeople at Friendly Ford about his intent to use the

Technology Model 2016 Shelby for occasional track use and was not informed that he would be

unable to do so. The sales representatives conveyed information about the Shelby's track

readiness and package options that flowed directly from the same information Ford had provided

to all dealerships and which Ford expected to be passed to consumer.

225.     None of the information reviewed by Mr. Roberts contained any disclosure

relating to any defects in the Track-Ready powertrain system or disclosed that not all models of

the Shelby were capable of safe driving on public roadways or occasional track use. Nor did the

sales people at Friendly Ford disclose this information. If Ford had disclosed to Mr. Roberts that his Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

226.    Mr. Roberts took delivery of his Shelby in October 2016. A few months later, Mr. Roberts learned of the defects in his Shelby when reading about other 2016 Shelby owners on various internet forums who experienced Limp Mode in a matter of minutes while on the track. He also read on the forums and elsewhere that his Shelby could also experience Limp Mode while driving on public roadways.

227.    Mr. Roberts also conducted research online and learned that while after-market installations were available at the owner's cost, installing these modifications may violate Ford's express warranties.

228.    To date, Mr. Roberts has not received any other notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

229.    While Mr. Roberts was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as the addition of transmission or differential coolers, could void the express warranties for the entire Shelby.

230.    Mr. Roberts has not yet completed any repairs relating to the defective Track-Ready powertrain system.

231.    Mr. Roberts paid the full MSRP for his Shelby.

232.    Due to Ford's failure to disclose the Track-Ready and track-capable defects,

Mr. Roberts was denied the benefit of the bargain at the time of sale and paid a premium for the

car that he otherwise would have not have. Plaintiff has also suffered additional damage relating

to the cost of repair needed to make the car operate as a reasonable consumer would have

expected.

### 8.    Pennsylvania Plaintiff

#### a.    Jose Cruz

233.    Plaintiff Jose Cruz is a citizen of the State of Pennsylvania and resides in

Honesdale, Pennsylvania.

234.    Mr. Cruz has been a track enthusiast for the last six years. In August 2015,

Mr. Cruz ordered a 2016 Shelby Mustang with the Technology Package from Phil's Ford of Port

Jervis, an authorized Ford dealer. Mr. Cruz was interested in purchasing a Shelby that was

capable of occasional track use and conducted most of his Shelby research from his home in

Pennsylvania. Mr. Cruz also communicated with various dealers and was exposed to Ford's

misrepresentations and/or omissions in that state and made his purchase decision there.

235.    Mr. Cruz purchased and still owns this Shelby. Unknown to Mr. Cruz at the time

he purchased the Shelby, the Shelby suffered from a defective Track-Ready powertrain system,

which has caused him out-of-pocket loss, attempted and future attempted repairs, and diminished

value of the Shelby. Ford knew about these defects at time of Mr. Cruz's purchase but did not

disclose the defects to Mr. Cruz. So, Mr. Cruz purchased his Shelby on the reasonable but

mistaken belief that his Shelby would be safe and reliable on public roadways and that the

Shelby was capable of occasional track use.

236.    Mr. Cruz selected and ultimately purchased his Shelby, in part, because the

Shelby was represented to be Track-Ready and track-capable and was marketed as Ford's iconic

high-performance vehicle within the Mustang family. During his Shelby research,

Mr. Cruz reviewed print and online advertisements similar to those in this First Amended

Complaint. These advertisements contained images of the 2016 Shelby on race tracks and clearly

stated how various components in all 2016 Shelbys were Track-Ready, or track-capable, and that

these Shelbys offered many track-specific features.

237.    Some of the features included in the 2016 Shelby were items that a reasonable

consumer would believe to be present in a Shelby equipped for occasional track use, including a

Flat-Plane Crank engine, which is designed specifically for very high revolutions. Mr. Cruz also

noted other tracking features in the 2016 Shelby, such as the MagneRide suspension tuned for

the track, enhanced electric steering, performance braking system, and specific driver tunable

software settings, including a setting specifically marked for Track Use Only. There are also

"Track Apps" and a heads-up tachometer display.

238.    Mr. Cruz also recalls reviewing the Ford website for the 2016 Shelby in detail.

Mr. Cruz also spoke with Ford salespeople at Phil's Ford about the different features and his

intent to use the Technology Model 2016 Shelby for occasional track use and was not informed

that he would be unable to do so. The sales representatives conveyed information about the

Shelby's track readiness and package options that flowed directly from the same information

Ford had provided to all dealerships and which Ford expected to be passed to consumer.

239.    None of the information reviewed by Mr. Cruz contained any disclosure relating

to any defects in the Track-Ready powertrain system or disclosed that not all models of the

Shelby were capable of safe driving on public roadways or occasional track use. Nor did the

sales people at Phil's Ford disclose this information. If Ford had disclosed to Mr. Cruz that his

Shelby suffered from defects that would prevent the full use of his Shelby and pose safety risks, then he would not have purchased his Shelby or would have paid less for it.

240.    Mr. Cruz took delivery of his Shelby in April 2016. About a month after taking delivery, Mr. Cruz experienced Limp Mode while on a public road under normal driving conditions. A few months later, he experienced another Limp Mode manifestation while driving on Route 209 in Pennsylvania under normal driving conditions.

241.    Mr. Cruz raised his concerns about the Limp Mode manifestation and requested relief with the service representatives at Phil's Ford and at Gibbon's Ford. The service representatives told Mr. Cruz they were unaware of any issues with the Shelby and was unable to provide Mr. Cruz with any assistance or resolution to address his concerns or provide satisfactory relief.

242.    In April 2017, Mr. Cruz also contacted Ford to raise his concerns about Limp Mode and request relief. Ford recommended the purchase of a Ford-branded cooler kit and an external pump manufactured by a third party, but also indicated they would not cover the cost of the repair for the transmission cooler. Ford recommended the purchase of a Ford-branded cooler kit and a third party external electric pump. Ford indicated they would not cover the cost of the repair for the transmission cooler. Ford also indicated that as of April 2017, they had no repair or any other type of solution for the differential cooler. Ford also did not clarify with Plaintiff whether the proposed installation would violate any of Ford's express warranties. As such, Ford failed to provide any resolution to address his concerns or provide satisfactory relief.

243.    To date, Mr. Cruz has not received any other notification from Ford about any potential repair or after-market modification that would render his Shelby safe to drive on public

- 57 -

roadways, or during occasional track use, that would also be compliant with Ford's express warranties.

244.    While Mr. Cruz was aware at the time of purchase that his Shelby came with express warranties, he was not aware that executing any of the after-market repairs specifically recommended by Ford, such as the addition of transmission or differential coolers, could void the express warranties for the entire Shelby.

245.    Mr. Cruz has not yet completed any repairs relating to the defective Track-Ready powertrain system.

246.    Mr. Cruz paid $53,000 for his Shelby.

247.    Due to Ford's failure to disclose the Track-Ready and track-capable defects, Mr. Cruz was denied the benefit of the bargain at the time of sale and paid a premium for the car that he otherwise would have not have. Plaintiff has also suffered additional damage relating to the cost of repair needed to make the car operate as a reasonable consumer would have expected.

**B.    Defendant**

248.    Ford Motor Company is a corporation doing business in all 50 states and the District of Columbia, and is organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan. At all times relevant to this action, Ford manufactured, sold, and warranted the Shelbys at issue throughout the United States. Ford and/or its agents, divisions, or subsidiaries designed, manufactured, and installed the defective Track-Ready powertrain systems in the Shelbys. Ford also developed and disseminated the owner's manuals, supplements, and warranty booklets, advertisements, and other promotional materials relating to the Shelbys, and Ford provided these to its authorized dealers for the express purpose of having these dealers pass such materials onto potential purchasers. Ford also created, designed, and disseminated information about the Track-Ready quality of the Shelby to various agents of

various publications for the express purpose of having that information reach potential consumers.

## V.      FACTUAL ALLEGATIONS

**A.      Track Enthusiasts Share a Passion for Testing Their High-Performance Vehicles on Closed Tracks**

249.     There is a segment of car purchasers who buy cars with the intention of using them in high-performance environments such as closed race tracks. Often called "Track Enthusiasts," these car purchasers are passionate about motorsports and relish a challenging driving experience. Track Enthusiasts often purchase their performance vehicle so that they can drive on public roads as well as specialized race tracks during Track Days and HPDE events. The Shelby Mustang has been heavily advertised as Track-Ready. Ford aggressively markets its Shelby to Track Enthusiasts. In fact, Raj Nair (Ford group Vice President, Global Product Development) explained the ideal vehicle uses for Track Enthusiasts during the 2016 Shelby Mustang launch event: "When we started working on [the Shelby Mustang], we wanted to build the best possible Mustang for the places we most love to drive – challenging back roads with a variety of corners and elevation changes, and at the track on weekends."[3] Many Track Enthusiasts agreed and came out in droves to purchase these new Track-Ready Shelbys, in most instances above the Manufacturers' Suggested Retail Price.

**B.      Specialized Race Tracks and Track Days Create Safe Conditions for Track Enthusiasts to Pursue Their Passion**

250.     Track Enthusiasts purchase high-performance vehicles to drive on closed race tracks during what is colloquially known as a "Track Day." During a Track Day, Track

---

[3] Ford, *Ford Shelby Mustang Raises the Bar for Handling* (May 6, 2015), https://media.ford.com/content/fordmedia-mobile/fna/us/en/news/2015/05/06/ford-shelby-gt350-mustang-raises-the-bar-for-handling.html.

Enthusiasts are invited to bring their Track-Ready Shelbys and operate them at high-performance intervals on closed tracks sealed off from all other highways and roads. Typically, a Track Day consists of four limited time sessions, which must be paid for in advance. Track Days provide a safe and welcoming environment for participants to explore the capabilities and limits of their high-performance sports cars, while improving their driving skills. Track Days can also provide instruction and coaching for drivers of all skill levels during HPDE events. Track Days and HPDE events are *not* considered forms of racing. Cars on the track operate under strict rules meant to minimize the likelihood of dangerous encounters with other cars. For instance, passing among participants is permitted only within defined "passing zones," and then only with clear hand signals and instructor confirmation. Any Time Trials require advance permission and are also conducted under strict rules which maximize safety.

The main priority for both Track Enthusiasts and track operators during Track Days and HPDE events, however, is always vehicle safety—both for track drivers and others who may be physically located near the race track. As such, speed and distance is closely monitored and specialized etiquette mores—or rules of the road—must be adhered to at all times. Many Track Enthusiasts, including several Plaintiffs, also incur out-of-pocket costs to travel to different race tracks to attend Track Days and HPDE events. Ford also hosts special "Track Attack" Track Day and HPDE events at their driving school in Utah.

## C.   Track-Ready Vehicles Operate Under Extreme Conditions and Must Meet Certain Basic Safety Features to Operate on a Race Track

251.    The majority of Track Enthusiasts utilizes a performance vehicle during Track Days and HPDE events as they are supposed to withstand the additional stress of tracking and can satisfy certain elevated safety requirements.

1.      **Transmission Systems in Track-Ready Vehicles**

252.     In the context of motor vehicles, a transmission system takes the power generated by a vehicle's engine and applies that power to calibrate the speed and torque of the wheels. This process is accomplished by the driver shifting through different gears. Slower, or lower, gears are used to slow down the output speed of the engine and increase torque. Higher gears increase the output speed and decrease torque. Further, track conditions often require drivers to change gears extremely quickly—usually in a tiny fraction of a second. As such, the transmission system for Track-Ready Shelbys must be able to cope with the high engine speeds and the fast, frequent gear shifts consistent with the rigors of track use. This type of driving behavior can cause transmission systems to overheat. If a transmission system overheats in one of the 2016 Shelbys, the system will force the car to shut down or go into Limp Mode unexpectedly. As explained in more detail below, Limp Mode refers to a scenario where, to prevent damage, a Track-Ready Shelby automatically regresses to a lower RPM (revolutions per minute) with a drastically slower speed, much to the surprise of the individual driver and those driving nearby. Not only does Limp Mode occur without any advance warning, but once in Limp Mode, the car's display does not provide any explanation or warning as to what has happened or that the transmission or differential is overheated. This creates additional confusion and puts the driver and those around him or her in additional danger.

253.     Owners of Track-Ready Shelbys are expected to keep their transmissions fully operational by keeping the transmission system below a certain temperature while driving. If the transmission system goes above a certain temperature, on the track or during regular driving conditions, then Limp Mode will unexpectedly occur.

## 2.   Differentials in Track-Ready Vehicles

254.   A rear differential is a component in all cars and is designed to compensate for the difference in distance the inner wheels and outer wheels travel as the car goes around a corner. For track drivers—who routinely turn corners while pressing on the gas in a powerful car—poor rear differentials that overheat can cause the inside wheel to start to over-spin, leading to less grip and traction. The driver then loses the ability to properly maneuver the outside wheel and can potentially lose control of the vehicle. This can result in erratic driving and an increased risk for collisions.

255.   Owners of Track-Ready Shelbys therefore are expected to keep their rear differentials operational by keeping the differentials below a certain temperature. If the differential system goes above a certain temperature, then Limp Mode will unexpectedly occur.

## D.   Ford Marketed the Shelby as a "Track Car," as "Track Tuned," and as "Track Oriented" Because It Knew "Track-Capability" Was Material to Prospective Consumers

256.   Ford heavily marketed the Shelby as being "Track-Ready" or a "Track Car," and it did so because it knew such representations were material to those in the market it was attempting to attract—Track Enthusiasts. For example, the 2016 Ford Mustang brochure included the following:[4]

---

[4] 2016 Ford Mustang brochure, available at http://www.ford.com/services/assets/Brochure?make=Ford&model=Mustang&year=2016&postalCode=11101 (last accessed Mar. 22, 2017), at p. 4.

# VENOMOUS 5.2L BEAST.

Every member of the Mustang family makes a powerful impression. Starting with the most potent of them all — the head-turning, heart-pounding, Shelby GT350.® This race-tuned monster is powered by a 5.2L Ti-VCT V8 with a flat-plane crank, engineered to propel you into the winner's circle. A TREMEC® TR-3160 6-speed manual transmission gives you ultimate control over its 526 hp and 429 lb.-ft. of torque. The Shelby exclusive interior features an aluminum instrument panel and other unique touches including a steering wheel wrapped in both Alcantara® and leather. RECARO® sport seats trimmed in a unique mix of Carbon Weave cloth and Miko® sueded cloth help keep you in your place — turn after turn.

257. Ford also produced videos of the Shelby on a race track:[5]



---

[5] Deautos Agea, *GT350 Running HD mpr*, YouTube (Nov. 21, 2014), https://www.youtube.com/watch?v=UrllVK_OPeg; Ford, *All New Shelby GT350 and GT350R Mustang* (June 2, 2015), https://media.ford.com/content/fordmedia/fna/us/en/asset.html/content/dam/fordmedia/North%20America/US/2015/06/01/All-New-Shelby-GT350-and-GT350R-Mustang.mp4.html.

010678-11 958612 V1



258.   Importantly, Ford never distinguished between trim levels when representing that

all Shelby Mustangs were Track-Ready:[6]

**<u>Shelby Mustang: The Legend Returns</u>**

- **All-new Shelby® GT350 Mustang is a thoroughbred capable of tackling the world's most challenging roads and racetracks**

- GT350 is powered by a unique, high-revving flat-plane crankshaft 5.2-liter V8 engine, which produces 526 horsepower and 429 lb.-ft. of torque, the most powerful naturally aspirated Ford production engine ever

- Advanced materials, MagneRide dampers, aggressive brakes and finely tuned aerodynamics push the performance of Mustang to previously unmatched levels

One of the most iconic performance Mustang nameplates of all time has returned, the all-new Shelby® GT350 Mustang.

The original Shelby introduced in 1965 established the Mustang's performance credentials. The all-new Shelby Mustang, featuring the most powerful naturally aspirated Ford production engine ever, is a world-class performance Shelby, designed to tackle the planet's most challenging roads – **an all-day track car that's also street legal.**

---

[6] Ford, *Shelby Mustang: The Legend Returns* (Aug. 25, 2015), https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit.html.

The new GT350 builds on Carroll Shelby's original idea – transforming a great every-day car into a dominant road racer – by taking advantage of a dramatically improved sixth-generation Mustang to create a truly special driving experience. Driving enthusiasts behind the wheel of a Shelby can expect to be treated to the most balanced, nimble and exhilarating production Mustang yet.

"When we started working on this car, we wanted to build the best possible Mustang for the places we most love to drive – challenging back roads with a variety of corners and elevation changes, and the track on weekends," said Raj Nair, Ford group vice president, Global Product Development. "Every change we made to this car was driven by the functional requirements of a powerful, responsive powerplant – nimble, precise handling, and massive stopping power."

**Track-tuned driveline**

Early in the development of the GT350, it was decided that a high-revving, naturally aspirated V8 engine **would best suit a track-focused Mustang.** "The final product is essentially an all-new powerplant unique to GT350 – "and one that takes true advantage of the new chassis dynamics of the Mustang platform," said Jamal Hameedi, chief engineer, Ford Global Performance Vehicles.

The new 5.2-liter V8 engine is the first-ever production V8 from Ford with a flat-plane crankshaft, an architecture typically found only in racing applications or exotic European sports cars. Unlike a traditional V8, where the connecting rods are attached to the crankshaft at 90-degree intervals, this design evenly spaces all crank pins at 180-degrees intervals.

The 180-degree, flat-plane layout permits a cylinder firing order that alternates between cylinder banks, reducing the overlap of exhaust pressure pulses. When combined with cylinder-head and valvetrain advancements, this permits better cylinder breathing, further extending the performance envelope of the V8.

The result is the most powerful naturally aspirated production Ford engine ever, at 526 horsepower, with a torque peak of 429 lb.-ft. **The track capability is enhanced by the output characteristics of the engine – the 5.2-liter V8 features an exceptionally broad torque curve.** Combined with its high-revving ability, the flat-plane 5.2-liter V8 gives drivers an enormous amount of performance and flexibility within each gear of the lightweight six-speed manual transmission. A standard Ford-tuned Torsen limited-

slip differential optimizes cornering grip and straight-line traction.
"Make no mistake, this is an American interpretation of a flat-
plane crankshaft V8, and the 5.2-liter produces a distinctive,
throaty howl from its four exhaust tips," Hameedi said.

**1.  Press Kits Were Created by Ford to Entice Track Enthusiasts to Purchase Shelbys**

259.    Ford also made available online different Press Kits outlining the unique features

of the Shelby. These kits provided a substantial amount of detail on the Shelby as well as several

specific misrepresentations that the Shelbys were designed to be used on a race track. But no

distinction was made regarding various trim levels or that the Base or Technology Package

models could not be safely operated on a race track without the installation of aftermarket parts.

260.    For example, one Ford Press Kit on "Innovative Engineering" advertised:[7]

**New Six-Speed Shelby Mustang Manual Transmission
Channels Flat-Plane V8 Power via Lighter, Stouter Gearbox**

- Sole transmission offering in the all-new Shelby® Mustang is a
  unique Tremec six-speed manual designed to deliver precision
  shifts and positive shift engagement

- ***Transmission for Shelby Mustang developed with all-day
  track capability and high-rpm capability at the forefront***

- Extreme measures taken to ensure positive feel and durability
  include power-honed gears, air-to-oil transmission cooler and
  carbon-bronze triple-cone synchronizers

***In developing the all-new Shelby® and Shelby® GT350R – the
most potent track-oriented production Mustangs ever – nothing
was left on the table in terms of weight reduction and track-
capable performance***. This whole-Shelby philosophy extends to
the sole transmission offering – a Tremec six-speed manual, with
nearly every component receiving special attention to ensure
durability and improved shifting performance.

---

[7] Ford, *Innovative Engineering*, available at https://media.ford.com/content/fordmedia/
fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit/innovative-engineering.pdf (last
accessed Mar. 22, 2017), at pp. 1-3, 9 (emphasis added).

Both cars were developed with the most powerful naturally aspirated production engine ever developed by Ford – *a racing-inspired*, 5.2-liter flat-plane crankshaft V8 with 526 horsepower and 429 lb.-ft. of torque and an impressive 8,250-rpm redline. "Any transmission backing this engine requires a certain amount of high-power, high-rpm capability," notes Jeff Albers, powertrain engineering supervisor with Ford.

**Harder, faster, better**

The high-revving 5.2-liter engine is paired with the much-lauded Tremec TR-3160 six-speed manual transmission. *The unit has been heavily revised for Shelby to cope with high engine speeds and the rigors of track duty, and to provide the kind of precision engagement, smoothness, and reduction in weight and rotating inertia demanded by Ford Performance.*

\* \* \*

**Ford Shelby Gets Racing-Inspired Customizable Shift Light Indicator to Help Drivers Optimize Track Time**

- Shelby® Mustang features Performance Shift Light Indicator display with Track, Tach and Drag mode

- Performance Shift Light Indicator provides the benefits of a shift light while allowing drivers to *keep their eyes on the track at all times*

- Heads-up shift light was developed by reimagining existing hardware and is standard on all-new Shelby and Shelby® GT350R

\* \* \*

**Ford Shelby Mustang Raises the Bar for Handling** [. . .]

**Suspension tuned for *maximum performance on road and track***

Handling is the performance playground of Shelby, and the car's suspension is heavily *revised to maximize cornering performance*. [. . .]

**Most powerful brakes ever fitted to a Production Mustang**

Reducing unsprung mass is key to improving responsiveness, but a balance must be struck between taking mass out of a suspension

and delivering truly capable braking performance. ***Shelby features the most track-credible brake system ever offered on a production Mustang***, consisting of two-piece cross-drilled iron rotors with aluminum hats – the largest rotors Ford has ever put on a production Mustang. Massive 394-millimeter front rotors and 380-millimeter rear rotors are a floating-type and are pin-driven to the aluminum hats to greatly reduce heat transfer to the bearings. These rotors are clamped by six-piston fixed Brembo calipers with integrated caliper bridges at the front and four-piston units at the rear. Dedicated ducting assists in cooling the brakes front and rear for maximum performance.

"***These cars can be driven by any driver on any track in the world – with virtually no fade***," remarks Brent Clark, suspension and Shelby dynamics technical specialist

**Wheels and tires *fit for the track***

Shelby makes use of extra-stiff 19.0-inch cast aluminum-alloy wheels – 10.5 inches wide in front, 11.0 inches in the rear – clad in Michelin Pilot Super Sport tires with GT350-specific sidewall construction, tread face and compound. ***The custom tires are designed to deliver maximum grip on the road or for weekend track days***.

261.   The 2016 GT350/GT350R Press Kit advertised:[8]

[The] All-new Shelby® GT350 Mustang is a thoroughbred capable of ***tackling the world's most challenging roads and racetracks***[.]

\* \* \*

The all-new Shelby Mustang, featuring the most powerful naturally aspirated Ford production engine ever, is a world-class performance Shelby, designed to tackle the planet's most challenging roads – ***an all-day track car that's also street legal***.

262.   Another Press Kit proclaimed the Shelby's ability to handle race tracks:

---

[8] Ford, *2016 GT350/GT350R Press Kit*, available at https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit.pdf (last accessed Mar. 22, 2017), at pp. 1-2 (emphasis added).

# 2016 GT350/GT350R Press Kit



## Overview And Multimedia

## Shelby GT350 Mustang: The Legend Returns

- All-new Shelby® GT350 Mustang is a thoroughbred capable of tackling the world's most challenging roads and racetracks

- GT350 is powered by a unique, high-revving flat-plane crankshaft 5.2-liter V8 engine, which produces 526 horsepower and 429 lb.-ft. of torque, the most powerful naturally aspirated Ford production engine ever

- Advanced materials, MagneRide dampers, aggressive brakes and finely tuned aerodynamics push the performance of Mustang to previously unmatched levels

One of the most iconic performance Mustang nameplates of all time has returned, the all-new Shelby® GT350 Mustang.

263.    And this Press Kit called the Shelby "Track tuned":

**Track-Tuned Driveline**

Early in the development of the GT350, it was decided that a high-revving, naturally aspirated V8 engine would best suit a track-focused Mustang. "The final product is essentially an all-new powerplant unique to GT350 – "and one that takes true advantage of the new chassis dynamics of the Mustang platform," said Jamal Hameedi, chief engineer, Ford Global Performance Vehicles.

The new 5.2-liter V8 engine is the first-ever production V8 from Ford with a flat-plane crankshaft, an architecture typically found only in racing applications or exotic European sports cars. Unlike a traditional V8, where the connecting rods are attached to the crankshaft at 90-degree intervals, this design evenly spaces all crank pins at 180-degrees intervals.

The 180-degree, flat-plane layout permits a cylinder firing order that alternates between cylinder banks, reducing the overlap of exhaust pressure pulses. When combined with cylinder-head and valvetrain advancements, this permits better cylinder breathing, further extending the performance envelope of the V8.

The result is the most powerful naturally aspirated production Ford engine ever, at 526 horsepower, with a torque peak of 429 lb.-ft. The track capability is enhanced by the output characteristics of the engine – the 5.2-liter V8 features an exceptionally broad torque curve. Combined with its high-revving ability, the flat-plane 5.2-liter V8 gives drivers an enormous amount of performance and flexibility within each gear of the lightweight six-speed manual transmission. A standard Ford-tuned Torsen limited-slip differential optimizes cornering grip and straight-line traction. "Make no mistake, this is an American interpretation of a flat-plane crankshaft V8, and the 5.2-liter produces a distinctive, throaty howl from its four exhaust tips," Hameedi said.

264.    And it proclaimed that prior to introduction the Shelby had been "tested endlessly":

**Focus-Driven Cockpit Changes**

Like everything else about GT350, the interior has been optimized for driving, beginning with the specially designed Recaro sport seats with a unique cloth. Hundreds of hours and many prototypes went into a seat that is both comfortable in daily driving and capable on the track. A flat-bottom steering wheel makes it easier for the driver to get in and out and more ergonomic on the racetrack. Gauges are upgraded to reflect the enormous performance capability of the car. Chrome and bright finishes have been reduced or eliminated to prevent any sun glare that may distract the driver.

The advanced technology inherent to Mustang has been deployed for duty in the Shelby. An all-new integrated driver control system allows selection of five unique modes that tailor ABS, stability control, traction control, steering effort, throttle mapping, MagneRide tuning and exhaust settings depending on driver preference to achieve maximum performance. Drivers are invited to test them all.

Drivers interested in comfort, convenience and entertainment upgrades may select the Technology Package, which includes power leather-trimmed seats, Shaker Audio, 8-inch SYNC® with MyFord Touch LCD touch screen, and dual zone electronic temperature control to name a few features.

"We took the best Ford Mustang yet and massaged every aspect of the car that affects the performance driving experience," said Hameedi. **"We tested endlessly on the most challenging roads and tracks in the world, and we believe serious drivers will love the Shelby Mustang."**

Shelby Mustang is the latest in an all-new line of Mustangs including Mustang EcoBoost, Mustang GT, and the specially designed 50th Anniversary Edition Mustang.

2. **Ford Sponsored Track Events to Demonstrate the Track-Readiness of Shelby Mustangs**

265. Ford also sponsored several track events where the 2016 Shelby Mustang was prominently featured and marketed to Track Enthusiasts, including the North American GT350 Track Tour. The North American GT350 Track Tour visited several road courses throughout the United States and offered invitees the opportunity to experience a ride in a Shelby.

- 71 -

266.     Track Enthusiasts were also offered exclusive invitations to participate in the GT350 Track Attack program, which provided "a complimentary one-day track/classroom experience" as a standard perk "included with the purchase of every 2015 or 2016 Shelby or GT350R."[9] The two-day event featured "on-track instruction by the Ford Performance Racing School" to "learn braking and cornering techniques on track" as well as classroom activities "[f]or owners of the new 2015 & 2016 Shelby."[10] Ford touted the program in a press release, saying "the program is designed to help drivers at all skill levels understand the nuances of *their* car's performance and handling in a safe environment under professional supervision."[11] According to Dan McKeever, President of Ford Performance Racing School: "Regardless of a person's driving ability, this will be an unbelievable experience . . . . From the weekend track warrior to the car collector, this program provides the skills needed to really enjoy Shelby Mustang *in the environment for which it is designed*."[12]

267.     Ford distributes a questionnaire to all Track Attack participants, regardless of which trim level they purchased, to learn more about the participant's personal experience with their Shelby. One of the questions asked by Ford to *all* participants, regardless of trim level, is "Do you take your Ford Performance vehicle to the track." This is also evidence that Ford marketed all trim levels as capable of track use.

---

[9] Ford, *GT350 North American Track Tour*, available at https://web.archive.org/web/20160812055748/http://gt350trackattack.com/ (last accessed Mar. 22, 2017).

[10] *Id.*

[11] Ford, *Standard Equipment, Going Fast: Shelby Mustang Owners Get Complimentary Performance Driving School* (Mar. 9, 2016), https://media.ford.com/content/fordmedia-mobile/fna/us/en/news/2016/03/09/shelby-gt350-mustang-owners.html (emphasis added).

[12] *Id.*

### 3. Ford Executives and Key Ford Employees Promoted Shelbys as Track-Ready

268. Ford executives also made detailed statements about how Ford had envisioned that all Shelbys would be able to perform under track conditions. None of these statements ever differentiated between the various trim levels or disclosed that some trim levels, such as the Base or Technology Package models, were unfit for race track use—despite the "race track" price. Here are but a few examples:

- In a November 17, 2014 press release, Jamal Hameedi (Chief Engineer, Ford Global Performance Vehicles) boasted: "We took the best Ford Mustang yet and massaged every aspect of the car that affects the performance driving experience . . . . We tested endlessly on the most challenging roads and tracks in the world, and we believe serious drivers will love the Shelby Mustang."[13]

- In a May 6, 2015 press release, Raj Nair (Ford group Vice President, Global Product Development) noted: "When we started working on [the Shelby 350GT], we wanted to build the best possible Mustang for the places we most love to drive – challenging back roads with a variety of corners and elevation changes, and at the track on weekends."[14]

- In the same May 6, 2015 press release, Brent Clark (Vehicle Dynamics Supervisor) stated: "These cars can be driven by any driver on any track in the world – with virtually no fade."[15]

- In a March 9, 2016 press release, Jim Owens (Ford Performance Market Manager) explained: "GT350 is a car

---

[13] Ford, *Shelby Mustang: The Legend Returns* (Nov. 17, 2014), available at https://media.ford.com/content/fordmedia/fna/us/en/news/2014/11/17/shelby-gt350-mustang-the-legend-returns.pdf.

[14] Ford, *Ford Shelby Mustang Raises the Bar for Handling* (May 6, 2015), https://media.ford.com/content/fordmedia-mobile/fna/us/en/news/2015/05/06/ford-shelby-gt350-mustang-raises-the-bar-for-handling.html.

[15] *Id.*

that needs to be experienced on a closed road
course . . . ."[16]

- On June 21, 2016, Mark Schaller, a Mustang Marketing
Manager at Ford, stated to a consumer that: "The Track
Package was set up for those customers that planned to take
their Shelby to the racetrack often and participate in track
days. The Technology Package was developed for those
customers that would be driving their cars mainly on the
streets *with an occasional track experience*" (emphasis
added). Mr. Schaller also noted: "If you plan to use your
GT350 with the Technology Package on the racetrack for
*sustained lap sessions*, we would still recommend that you
purchase coolers for the transmission and differential"
(emphasis added).

### 4. Ford Represented to All Shelby Owners That the Base Model and Technology Package Shelbys Can "Certainly" Be Used on Race Tracks

269.     Ford distributed a pamphlet to all *existing* Shelby owners entitled "Shelby GT 350

Track Tips." This pamphlet states the following: "[w]ith oil coolers for the engine, transmission

and differential, the GT350 Track Package and the GT350 R models are best equipped for

extended on-track lapping at speed. The standard GT350 and GT350 Electronic Package

certainly can be used on racetracks, but longer runs should be avoided." Nowhere in the

pamphlet does Ford explain that the Base Model and Technology Package Shelbys would enter

Limp Mode, without warning, within minutes of a particular track session, or that Limp Mode

could also occur on public roadways under normal driving conditions.

270.     While the pamphlet also states that Ford **recommends** to **existing owners** about

adding aftermarket transmission and differential coolers, and that Shelbys are "equipped with

electronic controls that, if required, reduces power and limits RPMs in order to control

powertrain temperatures", nowhere does Ford disclose that: (1) the addition of coolers is required

---

[16] Ford, *Standard Equipment, Going Fast: Shelby Mustang Owners Get Complimentary Performance Driving School* (Mar. 9, 2016), https://media.ford.com/content/fordmedia-mobile/fna/us/en/news/2016/03/09/shelby-gt350-mustang-owners.html.

for the Shelbys to safely perform for any length of time on a race track; (2) without these coolers, Base Model and Technology Package Shelbys, as designed, will enter Limp Mode unexpectedly and without any warning thereby creating a serious safety hazard; (3) an explanation of what Limp Mode is or how it would manifest while driving; (4) due to the lack of a visible temperature gauge on the display reflecting transmission and differential temperatures, there is no way to foresee or estimate if one is close to entering Limp Mode foreclosing on any ability of the driver to mitigate the safety consequences of the Track-Ready powertrain defects; (5) that drivers could experience Limp Mode while operating their 2016 Shelby on public roadways and under normal driving conditions; and (6) any aftermarket modifications, even the modification recommended by Ford in the 2015 Owner's Supplement can void existing express warranties for the rest of the vehicle.

010678-11 958612 V1

E.   **Ford Knew That Less Than 30% of All Shelbys Produced Were Equipped with the Track Package, Yet It Promoted All Shelbys, Regardless of Trim Level, as Capable of Track Use**

271.   The 2016 Shelby came in the following packages:[17]



---

[17] Ford Shelby model overview, available at http://horsepowerkings.com/ford-will-price-2016-gt350-47870-gt350r-at-61370/ (last accessed Mar. 22, 2017).

272.    Ford sold the 2016 Shelby with three trim levels: Base, Track Package, and Technology Package.[18] The Technology Package has special suspension, steering, brakes, dashboard controls, and software settings, such as the Track App and a special heads-up display that are designed to be used exclusively on race tracks. This package also provided special settings for tires and fluid for track conditions. The Technology Package was also the most expensive trim level and Ford added a significant premium of $7,500 for the upgrade, on top of the already high MSRP.

273.    The Shelbys are equipped with dozens of features that would suggest to a reasonable person that the vehicles were built with the intention of occasional track use. Some of these features included the following: a Flat-Plane Crank engine, which is designed specifically for very high revolutions; and the MagneRide suspension, which does not wear out like traditional suspensions systems and is designed for a highly adaptive ride. The Shelbys also come with a "track mode," which adjusts the throttle, suspension, and software settings for track use, and other specific software settings designed for track use, including a lap timer, the Track App, a linelock and a heads-up tachometer display. Even the leather seats were outlined with fabric to mitigate against passengers from slipping and sliding in their seats while taking corners at high speeds.

274.    The final reported sales numbers for the Shelby Mustang demonstrate the extent to which Ford manipulated Track Enthusiasts with false assurances of the Shelby's suitability for track use. Of the 5,643 Base, Technology Package, or Track Package Shelby Mustangs built by

---

[18] Consumers could also upgrade to a 2016 Shelby "R" model and add an additional Electronic Package. Of the 6,169 GT350 Mustangs made, only 526 Shelbys were made with the "R" package. The 2016 GT350 "R" models are not included in the proposed class. *See 2016 GT350/R Final Production Numbers*, Mustang6G.com (Feb. 8, 2017), http://www.mustang6g.com/?p=10779.

Ford, 3,991 (70.7%) were the Base or Technology Package models. In contrast, only 1,652 (29.3%) were equipped with the Track Package.[19] Ford was thus not only aware that the Technology Package was being purchased by the vast majority of Track Enthusiasts—who wanted a Track-Ready car with added comforts such as navigation and voice recognition—but also that only a small minority of the Shelbys being sold as Track-Ready could realistically be operated safely on a race track. The price of a Technology Package Shelby was approximately $57,000.

275.   These sales numbers are consistent with the experiences of most Plaintiffs. Most Plaintiffs were not given a meaningful choice between Technology and Track Package vehicles as the dealerships they were working with would often only have the Technology Package Shelbys available for purchase, as the Technology Package represented 70% of all Shelbys produced. It was also made clear by Ford to Plaintiffs that they could not equip their vehicles with both the Technology and Track Packages.

**F.   The Shelby Cannot Be Safely Driven on the Track Due to Design and Manufacturing Defects**

**1.   The Nature of the Defects and Their Safety Consequences**

276.   To Track Enthusiasts, the performance of a car on the track, and the ability for a vehicle to successfully complete a Track Day or HPDE event, is a material factor in the decision to purchase a given model.

277.   The Shelbys cannot complete Track Days or HPDE event due to design defects that affect the Track-Ready powertrain system. The Track-Ready powertrain system is designed defectively in that it will overheat prematurely and enter Limp Mode without providing any warning or communication to the driver. There is also no way for the driver to monitor the

---

[19] *Id.*

temperature of the transmission or differential systems to mitigate against an unexpected Limp

Mode manifestation. In a track environment, Shelbys entering Limp Mode go from well over 100

mph to a substantially lower speed and lose power in a matter of seconds. As a result, the driver

can become disoriented and lose control of the Shelby, increasing the risk of an accident. This

scenario is also extremely dangerous for other drivers operating at high speeds nearby who do

not expect the car in front of them to essentially freeze on the track, thereby putting them at risk

for accidents as well.

278.    Unlike the Track Package Shelbys, the GT350R models, or the 2017 Shelby

models, the 2016 Base and Technology Package Shelbys do not come equipped with differential

or transmission coolers that can resolve the overheating issue referenced above. Also unlike the

Track Package Shelbys, the GT350R models, or the 2017 Shelby models, the 2016 Base and

Technology Package Shelbys at issue also do not come equipped with a temperature sensor

visible on the dashboard. The safety consequence of these design decisions is that the car will

overheat at unexpected times and there is no way for owners of the Base Model and Technology

Package-equipped Shelby to monitor or adjust the temperatures of the transmission and

differentials. As such, these owners have no notice of when their Shelbys' defective Track-

Ready powertrain system will overheat and enter into Limp Mode.

279.    The Shelbys also cannot complete Track Days or HPDE events due to

manufacturing defects that affect the Track-Ready powertrain system.[20] The extreme, prolonged

transmission and differential temperatures that the Shelbys experience both on a race track and

on public roads can cause other parts of the vehicle to degrade prematurely. These defects can,

---

[20] Defects associated with the defective Track-Ready powertrain system will also be referred to in this First Amended Complaint as Track-Ready and track-capable defects.

over time, damage other essential operations of the vehicle, such as the clutch, rear end, and others.

280.     Frighteningly, the same Limp Mode can also unexpectedly occur on public roadways when drivers are operating their vehicles under normal driving conditions. If Limp Mode occurs on a public highway, for example, it presents an additional issue due to material differences in speed, vehicle type, and the skill set of drivers on public roadways as compared to drivers on closed race tracks. Nevertheless, one thing is clear: even with the inherent differences of highway driving, a Shelby rapidly decelerating on a highway is dangerous and can result in a high-speed collision. This defect is unacceptable for customers who own this Shelby.

281.     The presence of Limp Mode on public roadways is not an esoteric, obscure safety issue. Not only have some Plaintiffs herein alleged that they have experienced Limp Mode while on public roadways, established publications have also reported the manifestation. For instance, on March 24, 2017, Motor Authority published an article regarding the overheating issue affecting 2016 Mustang Shelbys and noted that this lawsuit was filed in the Southern District of Florida. In a "note to readers," Motor Authority disclosed the following:[21]

> Motor Authority actually ran across this issue and it appeared to be related to the transmission. During our 2016 Best Car To Buy testing, I exercised the GT350 on a twisty southern California road. After about 15 minutes of switchbacks that required few gear shifts and had me running mostly in second gear, the car went into Limp Mode and the transmission temperature was sky high. After I limped back to base and let it cool down, it was fine. It wasn't the deciding factor that gave the win to the 2016 Chevrolet Camaro SS because we didn't know if it was an isolated incident or a real problem, but it didn't help.

---

[21] Kirk Bell, *2016 Mustang Shelby GT350 Owners Suing Ford, Say 'Track-Ready' Cars Overheat Too Quickly*, Motor Authority (Mar. 24, 2017), http://www.motorauthority.com/news/ 1109557_2016-mustang-shelby-gt350-owners-suing-ford-say-track-ready-cars-overheat-too-quickly.

282.     Thus, Track Enthusiasts are faced with an impossible choice: (1) allow for overheating events to occur at unexpected times, thereby causing increased safety risks as well as damage to the transmission, differential, and other parts of the Shelby; or (2) take a gamble by modifying their car with expensive aftermarket repairs that were not initially envisioned by Ford engineers and cross their fingers that such modifications will not affect the performance or long-term reliability of their Shelby, let alone the future enforcement of their express warranties. Under either of these scenarios, Track Enthusiasts are not getting what they bargained for.

**2.     The Economic Consequences Associated with the Defects**

283.     In addition to the increased safety risks associated with the defects contained in the Shelbys, Plaintiffs have also suffered economic harm as a result of Ford's fraudulent conduct.

284.     Plaintiffs estimate that a repair to adequately correct the defects associated with the transmission would cost approximately $7,000. Appropriate aftermarket transmission modifications that would resolve the Track-Ready powertrain defects are not of the straightforward "plug in and play" variety that Ford insinuates in its Owners Supplement. Rather, due to the integrated and highly sophisticated nature of these high-performance vehicles, owners seeking satisfactory relief would be required to replace the transmission, adding a cooler which could result in moving other parts, and reprogramming the engine's control model. These are very expensive and complicated modifications that can implicate different systems within the Shelby vehicle.

285.     No cost has yet been determined for the second modification that would address the defects associated with the rear differential system. This is because Ford has admitted to Plaintiffs as late as April 2017 that it is unable to repair this defect as it has not yet been able to provide a solution that can be properly integrated with the engine's control module and would therefore not be able to properly communicate temperature findings to the driver.

286.     In addition, these types of modifications recommended by Ford may also violate the terms of Ford's express warranties, even if Plaintiffs and Class members used Ford-certified components and labor. Thus, Plaintiffs and Class members have not received the benefit of their bargain.

287.     Plaintiffs have also suffered a diminution of value due to the fact that prospective owners are now aware that if they want to actually drive safely—and conform to the rules and safety habits mandated by virtually all race track organizations—they would need to pay thousands of dollars to get the same mandatory safety features that are now standard on 2017 Shelby GT 350 Mustangs. This additional repair, or the inability to use this Track-Ready Shelby on a race track, will factor into the purchase price and decision of prospective buyers. As a result, owners of the Shelbys will receive less for their vehicles on the secondary market.

288.     Plaintiffs have also suffered out-of-pocket damages, including but not limited to pre-paid track sessions that went unused due to the Track-Ready powertrain defects and time spent at the dealership seeking relief and product costs associated with different repair options.

289.     Finally, most Plaintiffs have also paid considerable sums of money above the MSRP for a 2016 Shelby. These premiums ranged from $1,000 to more than $20,000 on top of the list price and represent further economic loss experienced by Plaintiffs and Class members.

3.      **Consumer Complaints Document the Scope of the Defects Inherent in the Track-Ready Powertrain Systems in Shelbys**

290.     Ford Mustang forums are replete with the frustrations of owners over the Track-Ready powertrain system defects—a widespread problem affecting more than two-thirds of all 2016 Shelby owners. Consumers are also rightly critical of the lack of a fix and the harm the defects are doing to values. For example, users of the Ford Shelby 350 forum posted the following:[22]

> **Apndx:**
>
> Posted: 16 July 2016 - 08:23 AM
>
> Good morning all, I have received information from 3 reliable sources that a kit has been developed and we the owners will get a letter within the month telling us about it, I am also told it will be available for purchase and installation about the same time we get the letter. I could not get any more details other than what Ford Customer Service, Shelby, and local service manager told me, and this is after months of being told that it was being evaluated but nothing beyond that. This latest info is very different than what we all heard before. So watch your mail! This is also very different then being told might need to change out the tranny.
>
> Posted 22 January 2017 - 07:55 AM
>
> The track is a hard core track car, the tech was to be track able but isn't and can't be modified easily or cost effectively and no one really knew how critical the coolers were even for short track runs, and Ford for 2017 fixed that, leaving no viable fixes for the 2016, this diminishes the value of the car and it's utility, that's the issue
>
> Posted 22 January 2017 - 06:09 PM
>
> You are clearly not the only one disappointed that this car does not live up to its hype and can be out performed by a standard Mustang GT. Limp mode stinks. This is a great car but it is not the most track capable Mustang ever. At least after 15 minutes its not.

---

[22] KenPShelbyGT350, *Aftermarket or OEM Transmission, Oil, and Differential Coolers*, FORDSHELBYGT350FORUM.COM (Mar. 14, 2016), http://fordshelbygt350forum.com/topic/2716-aftermarket-or-oem-transmission-oil-and-differential-coolers/.

**2016VooDoo:**

Posted 04 May 2016 - 09:26 AM

I had this issue at a track event last weekend after about 15 minutes on the track. Ford says this is "normal" as the Technology Package cars were not intended for Track use. I think this is a BS answer. If this were the case, why does the car have 530 horsepower, huge 6 piston front brakes, spoilers, strut tower brace, Track Apps in the menu system including lap timers, etc. This car was marketed as the most capable track cars Ford has ever built.

Ford knows they made a mistake here and they are correcting it for MY17. If anyone from Ford is reading this forum I have a request... When you do come out with a cooler kit for the trans and differential, please offer it to those of us who spent money on the MY15 and MY16 cars without huge Ford + Dealer markup. Current owners are your best ambassadors for the car and for the brand and it would be a shame to have Ford put the burden of fixing these cars on the owners.

Had I known my car wouldn't be able to finish a lapping session, I wouldn't have bought it.

You can all imagine the conversations around the track when the brand new GT350 couldn't finish 25 minutes on the track. Embarrassing.

On the positive side, before the car went into limp mode, it was a BEAST!

**Copyless:**

Posted 04 May 2016 - 12:10 PM

I agree 100 percent with everything you stated and if Ford stands behind the "not meant for track use" BS, then I think that they should really take a dive in sales and profits for the '17 year, and I really hate to say something like that because I have been a Ford person forever and I love Ford, but right is right and this should have been addressed before the first gt350 was put together as a production car.

I hope they have the cooler kits available soon and would like it even more (but it probably won't happen) if they would actually take the time to pull the names of every base and Teck Pckg car sold and send them letters a week or so before the kit is available and let us know that it is coming out and give us our special price

for the kit. They could do this easily if they wanted to, and this would show that they really cared for their customers, and this would show that, more than anything else that they normally do and then say this is their appreciation. I mean they send out the supplement packages, so they already have every owners name and address and the options on the car, so it would not be that hard to contact them and make this kit available to them before hand and at a reduced price, this move would produce a marketing effect that even their high paid marketers could not add, as it would hit forums and I would not be surprised if it even made it into an article or two.

Anyway, I can dream if I want to, it's up to you, FORD, to make my dream a reality.

Again 2016voodoo, I hope Ford is reading this, because I want my dream, which I believe may also be a dream of yours, to become real, because I believe this is the dream of many owners and because I still believe in Ford.

**Springer:**

Posted 20 May 2016 - 10:57 PM

It is only a matter of time before legal action is filed against Ford regarding the non functionality of the Tech cars when tracked and not performing as advertised and marketed as the most capable track car ever. This is so "slam dunk" that I'm surprised a class action suit hasn't already been made against Ford.

**2016VooDoo:**

Posted 12 July 2016 - 10:59 AM

Has anyone heard any more on this from Ford SVT? I was at Road America again this weekend as a spectator at a track day and every GT350 without Track Package went into Limp Mode. Owners were PISSED OFF.

I hope Ford is listening and will consider a reasonable fix to a condition that should never be occurring on a car with Track Apps and Lap Timers built into the electronics!

**jsderikson:**

Posted 12 July 2016 - 11:24 PM

I had the same problem. Did a track day at Thunder Hill 5 mile. First session no problem because I didn't yet know the track. Second session 70 degree ambient and went into limp mode after about 12 minutes in. Took it to dealer, had them read the codes and they confirmed transmission overheat. Got same story ... need a Track Package. By-the-way, I was never told this when I bought the car and they certainly didn't give me the manual until after the sale. I reported to Ford Customer Service (Spoke with regional Customer Service Manager for San Francisco Region) and they acted as if they hadn't heard about it. I sent them a link to this post and some others and they claim that it wasn't being reported to them and that they couldn't respond to blog posts. I recommend that everyone who has experienced this shout really loud to Ford or they are not going to respond. I am sure they know about it but it might not be a priority for such a low volume car. I Couldn't get a confirmation out of them that they were working on anything but I think they probably are.

The final outcome was she recommended that I continue working with my local dealer so that they can assist once a fix does come out. Will continue to wait for a while.

**Maag:**

10-09-2016, 04:15 PM

**Ford Call To Action - Fix Limp Mode!**

Anyone who owns a 2015 or 2016 GT350 (non track option) should read this thread and contact Ford!

I own a 2016 Technology Package. I specifically asked the salesman before I bought the car if it had the Track Package and I was told that the Technology Package included the Track Package options. As you can expect, I'm not very happy to find out that my car doesn't have the diff and trans coolers it needs to even last a 20 min track session without going into limp mode. I'm at 4500+ above sea level and planned on tracking the car often. I am very disappointed that Ford marketed this car as a track car, but I can't even use it as such. I've submitted a claim to Ford and received the following unacceptable response. FRUSTRATED!! I would expect Ford to rectify this situation and stand by the GT350 marketing as it being a track car.

- 86 -

Response from Ford:

Subject: Ford Motor Company CAS-10612011-Y3R2F7
CRM:09632000001005

Hello Clifford,

My name is Sharonica, I am from Ford`s Customer Relationship
Center (CRC). I have reviewed your email inquiring about your
2016 Ford Mustang.

I can see why this would concern you. Please be assured that any
time a customer writes to us, it is appreciated. Every customer is of
the highest value to Ford, and we make every effort to assist
anyone who writes, e-mails, or calls us regarding any situation.
After reviewing my resources, there are no recalls or customer
satisfaction program that would indicate a problem with your
Shelby. The 2016 Shelby Mustang is a thoroughbred capable of
tackling the world's most challenging roads and racetracks. The
new GT350 draws its credentials from its legendary racing roots at
Shelby and the Ford Performance Team, building on Carroll
Shelby's idea of transforming a great everyday car into a dominant
road racer. If your Shelby experiences any issues, we recommend
that your Shelby be inspected by a Ford dealership to determine
the cause of any symptoms your Shelby may be experiencing.
Your local Ford dealership has factory-trained technicians and the
most current Ford service information, and the specialized
equipment required to resolve your Shelby concerns.

We understand the circumstances which caused you to write and
hope that you will continue to enjoy our products. We have
documented your feedback and will share it with the appropriate
department.

Thank you for contacting Ford Motor Company. …

**G.   Ford Was Aware of the Defects Inherent in the 2016 Shelby Mustangs While
Promoting Them as Track-Ready**

   **1.   Ford Concealed That the "Technology Package" Shelbys Were Not Track-
   Ready**

291.   In the first half of 2015, Ford continued to make repeated false statements that

2016 Shelby Mustangs were Track-Ready and "the most track-capable car" ever produced while

knowing that the Base or Technology Package GT350s were unsafe for race track use. Further, it

- 87 -

is not possible that Ford suddenly learned of this defect as manufacturers spend a year or more testing new models. Ford had been testing Shelbys on the track prior to introduction to the market and during this testing discovered the defects. For example, in an August 25, 2015 press release, Ford proclaimed that it had extensively tested the Shelby prior to introduction, for "hundreds of hours." Indeed, Ford's testing was so frequent that Auto Evolution reported in 2014 that "the supped up Mustang has become one of the Nurburgrings (a race track) favorite children lately, running lap after lap of testing." Testing was also conducted pre-launch at the Grattan Raceway. Ford refused to disclose to the public the Track-Ready powertrain system defects and that the Base or Technology Package GT350s were unsafe for race track use during this time, or that the Shelbys would enter the dangerous Limp Mode if taken onto a race track and operated at high speeds.

### 2. Tellingly, Newer Model Years of the Shelby Have Corrected the Defects

292.    In April 2016, Ford announced that one of the biggest changes for the 2017 Shelby was that the 2016 Track Package would now come standard on every new Shelby. As such, all 2017 Shelby models, regardless of trim level, now include both the rear differential cooler and a transmission cooler, and all of the associated engineering and parts needed to make these coolers integrate with the rest of the design. This is another admission by Ford that the 2016 Shelbys were not track-worthy as sold. The 2017 Shelby, complete with the appropriate coolers and fixes, is being sold for approximately $3,000 more than the cost of the 2016 Shelbys.

### H.    Despite Express Warranties, Ford Has Not Fixed the Problems with the Track-Ready Powertrain System

#### 1.    Ford Provided Multiple Express Warranties Associated with the Shelbys That Promised to Fix Both Design and Manufacturing Defects

293.    In connection with the sale of each one of its new Shelbys, Ford provides express limited warranties on each Shelby, such as the New Vehicle Limited Warranty and the

Powertrain Warranty. In those warranties, Ford promises to repair any defect or malfunction that arises in the Shelby during a defined period of time. These warranties are provided by Ford to the Shelby owner in writing and regardless of what state the customer purchased his or her Shelby in. Ford specifically states that "the GT350 carries the same warranty as other Ford Mustang models."[23]

294.    Each Plaintiff was provided a warranty and it was the basis of their purchase of a Shelby.

295.    In its New Vehicle Limited Warranty and in advertisements, brochures, press kits, and other statements in the media, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period. Ford also expressly warranted that it would remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period. The following uniform language appears in all 2016 Ford Mustang Warranty Guides:[24]

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if . . . your Ford Shelby is properly operated and maintained, and . . . was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your Shelby that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.
>
> This warranty does not mean that each Ford vehicle is defect free. ***Defects may be unintentionally introduced into vehicles during***

---

[23] Ford, *Shelby Mustang Supplement* (July 2015), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2015-2016-Mustang-Shelby-GT350-Supplement-version-1_su_EN-US_07_2015.pdf, at p. 46.

[24] Ford, *2016 Model Year Ford Warranty Guide* (Oct. 2015), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2016-Car-Lt-Truck-Warranty-version-3_frdwa_EN-US_10_2015.pdf, at p. 14 (emphasis added).

- 89 -

*the design and manufacturing processes and such defects could result in the need for repairs.* For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy any such defects that result in vehicle part malfunction or failure during the warranty period.

296.    With regard to Ford Shelbys, the duration of the NVLW for bumper-to- bumper protection is three years or 36,000 miles, whichever comes first. The powertrain warranty is five years or 56,000 miles, whichever comes first. The Warranty Start Date is "the day you take delivery of your new Shelby or the day it was first put into service (for example, as a dealer demonstrator), whichever occurs first."[25] These terms were identical for all Shelbys.

297.    All Plaintiffs and members of the Class experienced defects in their Track-Ready powertrain systems within the warranty period. However, despite the existence of the express warranties provided to Plaintiffs and Class members, Ford has failed to honor the terms of the warranties by failing to "without charge, repair, replace, or adjust all parts on [the] Shelby that malfunction or fail during normal use during the applicable coverage period."[26]

298.    Most Plaintiffs have contacted Ford, a Ford-authorized dealership, or a subsidiary providing notice of their concerns and requesting follow-up to resolve the defects. Originally, Ford indicated that a fix would be made available in March 2016; instead, Ford announced in April 2016 that the 2017 Shelby vehicles would have the transmission and differential coolers as standard features. Ford or its agents continued to promise that a fix would be made available sometime in 2016 that would resolve the Track-Ready powertrain system and honor the New Vehicle Limited Warranty, but to date no such fix has been made available. Other Plaintiffs

---

[25] *Id.* at p. 7.

[26] *Id.* at p. 9.

believed such correspondence was futile as Ford made it clear that after-market repairs could threaten their express warranties.

## 2. Post-Purchase Distribution by Ford of an Owner's Supplement Unilaterally and Unexpectedly Shifted the Cost of Repair onto Owners

299.    Only in July 2015, through a subsequent Owner's Supplement, did Ford provide the following notification to ***existing*** owners of the Shelby Mustang: "Your Shelby is capable of sustained high speeds and track day driving if equipped with powertrain coolers (Track, R model)."[27] For those with the Base or Technology Package models, Ford "recommend[ed] that transmission and differential coolers [be] added" for "sustained high speeds or track day use."[28] This is an admission by Ford that these Shelbys were not track-worthy as sold.

300.    This supplement was not provided to Plaintiffs or Class members prior to or during the time of purchase. At no point in 2015 or 2016 did Ford change its messaging to ***prospective buyers*** to clarify that Shelby Mustangs were not capable for track use[29] or require dealerships or other Ford agents to disclose this information to prospective buyers.

301.    The recommendation in the 2015 Owner's Supplement was also ignored in later press releases and promotional literature that Ford released, which again proclaimed that the Shelby is "Track Tuned" and capable of safely performing on race tracks.

---

[27] Ford, *Shelby Mustang Supplement* (July 2015), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2015-2016-Mustang-Shelby-GT350-Supplement-version-1_su_EN-US_07_2015.pdf, at p. 25.

[28] *Id.*

[29] *See, e.g.*, Ford. *Standard Equipment, Going Fast: Shelby Mustang Owners Get Complimentary Performance Driving School* (Mar. 9, 2016), https://media.ford.com/content/fordmedia-mobile/fna/us/en/news/2016/03/09/shelby-gt350-mustang-owners.html; Ford, *2016 GT350/GT350R Press Kit*, available at https://media.ford.com/content/fordmedia/fna/us/en/products/cars/mustang/2016-gt350-350r-press-kit.pdf (last accessed Mar. 22, 2017).

## OVERVIEW AND MULTIMEDIA

## SHELBY MUSTANG: THE LEGEND RETURNS

All-new Shelby® GT350 Mustang is a thoroughbred capable of tackling the world's most challenging roads ***and racetracks.***

## Track-tuned driveline

Early in the development of the GT350, it was decided that a high-revving, naturally aspirated V8 engine would best suit a track-focused Mustang. "The final product is essentially an all-new powerplant unique to GT350 – "and one that takes true advantage of the new chassis dynamics of the Mustang platform," said Jamal Hameedi, chief engineer, Ford Global Performance Vehicles.

The new 5.2-liter V8 engine is the first-ever production V8 from Ford with a flat-plane crankshaft, an architecture typically found only in racing applications or exotic European sports cars. Unlike a traditional V8, where the connecting rods are attached to the crankshaft at 90-degree intervals, this design evenly spaces all crank pins at 180-degrees intervals.

The 180-degree, flat-plane layout permits a cylinder firing order that alternates between cylinder banks, reducing the overlap of exhaust pressure pulses. When combined with cylinder-head and valvetrain advancements, this permits better cylinder breathing, further extending the performance envelope of the V8.

The result is the most powerful naturally aspirated production Ford engine ever, at 526 horsepower, with a torque peak of 429 lb.-ft. The track capability is enhanced by the output characteristics of the engine – the 5.2-liter V8 features an exceptionally broad torque curve. Combined with its high-revving ability, the flat-plane 5.2-liter V8 gives drivers an enormous amount of performance and flexibility within each gear of the lightweight six-speed manual transmission. A standard Ford-tuned Torsen limited-slip differential optimizes cornering grip and straight-line traction. "Make no mistake, this is an American interpretation of a flat-plane crankshaft V8, and the 5.2-liter produces a distinctive, throaty howl from its four exhaust tips," Hameedi said.

**Obsession to detail**

"Everything we changed on GT350 is purely functional-driven design, with the goal of improving the overall performance of the car," said Chris Svensson, Ford design director, The Americas. "We optimized the aero shape of the car, and then fine-tuned what

- 92 -

was left to increase downforce and cooling airflow." All bodywork from the windshield forward is unique to this high-performance model, and up to two inches lower than Mustang GT.

The new aluminum hood has been lowered and sloped, compared to the base Mustang, tightly wrapped around the engine for the smallest possible aerodynamic signature. Front and rear aero elements have been balanced to work together on the track. The fascia has been resculpted to provide the aggressive lower front splitter with maximum pressure and a ducted belly pan delivers significant downforce. The hood outlet acts as a heat extractor while also reducing underhood lift at high speed. At the rear, much of the engineering was focused on creating an aggressive functional diffuser doing double duty to increase downforce and provide cooling air to the optional differential cooler, and a subtle lip spoiler across the trailing edge of the decklid increases downforce without adding excess drag.

**Focus-driven cockpit changes**

Like everything else about GT350, the interior has been optimized for driving, beginning with the specially designed Recaro sport seats with a unique cloth. Hundreds of hours and many prototypes went into a seat that is both comfortable in daily driving and capable on the track. A flat-bottom steering wheel makes it easier for the driver to get in and out and more ergonomic on the racetrack. Gauges are upgraded to reflect the enormous performance capability of the car. Chrome and bright finishes have been reduced or eliminated to prevent any sun glare that may distract the driver.

(Emphasis added.)

302.    Indeed, the August 25, 2015 release brags about "Staying Cool," recognizing that

overheating was a possible material issue:

**Staying cool**

Every aspect of Shelby is built for track capability, and the transmission is no exception. Managing temperatures and ensuring sufficient lubrication is key to real-world track durability. The GT350 Track Package and GT350R have a unique oil-to-air transmission cooler that is fed by a gerotor pump integrated into the housing of the transmission. This arrangement ensures the transmission stays cool and properly lubricated, but it also brings the added benefit of keeping transmission heat out of the coolant

circuit. The result is an engine radiator dedicated to engine cooling, and a smaller, lighter design.

The air-to-oil transmission cooler is mounted directly behind the front fascia with its own dedicated ducting. Significant aerodynamic work was done to perfect the cooler angle and duct shape to ensure airflow is distributed over the entire face of the cooler for maximum efficiency. Finally, a sensor is included in the transmission to warn the driver via the gauge cluster of an overheat condition, in the very unlikely event a driver might overwhelm the cooling capacity of the transmission.

(Emphasis added.)

303.    At no point after the publication of the Owners Supplement did Ford ever revise its language or require its dealerships and other agents to explain the following to prospective buyers or existing owners: (1) the addition of coolers is required for the Shelbys to safely perform for any length of time on a race track; (2) without these coolers, Base Model and Technology Package Shelbys, as designed, will enter Limp Mode unexpectedly and without any warning thereby creating a serious safety hazard; (3) an explanation of what Limp Mode is or how it would manifest while driving; (4) due to the lack of a visible temperature gauge on the display reflecting transmission and differential temperatures, there is no way to foresee or estimate if one is close to entering Limp Mode, foreclosing on any ability of the driver to mitigate the safety consequences of the Track-Ready powertrain defects; (5) that drivers could experience Limp Mode while operating their 2016 Shelby on public roadways and under normal driving conditions; and (6) any aftermarket modifications, even the modification recommended by Ford in the 2015 Owner's Supplement can void existing express warranties for the rest of the vehicle.

- 94 -

**3.     The Expensive Aftermarket Modifications Recommended by Ford Do Not Resolve All the Defects and Execution of these Modifications Can Violate the Terms of Ford's Express Warranties**

304.     As discussed above, Ford began to recommend to *existing* owners of the Base and Technology Package that they install transmission and differential coolers if they wanted to take their vehicles on a track. However Ford does not indicate how expensive and complex these aftermarket modifications are to execute.

305.     For example, there are two modifications available to address the defects associated with transmission overheating. The first modification requires changing the entire transmission system and adding a cooling unit. But appropriate aftermarket transmission modifications that would resolve these defects are not of the straightforward "plug in and play" variety that Ford insinuates in its Owners Supplement. Rather, due to the integrated and highly sophisticated nature of these high-performance vehicles, owners seeking satisfactory relief would be required to replace the transmission, adding a cooler which could result in moving other parts, and reprogram the engine's control model. These are very expensive and complicated modifications that can implicate different systems within the Shelby vehicle. As such, the cost of this estimated repair is over $7,000.

306.     The second modification is to add a cooling unit to the transmission system in addition to a third-party pump and other items at a cost of approximately $3,000. The pumps are not manufactured by Ford.

307.     Importantly, neither of these modifications address the fact that it is impossible for a driver of a 2016 Shelby to monitor the temperature of the transmission as there is no temperature gauge in the cockpit display area—a stark contrast to the Track Package Shelbys, the GT350R, and the 2017 Shelby models. As such, even after these aftermarket modifications, 2016 Shelby drivers will continue to be unable to foresee or estimate a Limp Mode situation

before it occurs and take mitigating action to protect the safety of the driver and those around him or her.

308.   In spite of Ford's recommendation that owners add an aftermarket differential cooler, Ford fails to disclose that this modification is unavailable to 2016 Shelby owners. Ford has admitted as recently as April 2017 that no differential cooler exists that can be read by the computer that operates the features included in the Technology Package. As a result, the differentials will inevitably continue to overheat, resulting in premature failure of the rear end. Nor does Ford provide any ability for the 2016 Shelby drivers to monitor differential temperature via a gauge on the cockpit display so that they can foresee a potential Limp Mode manifestation.

309.   Finally, owners attempting to execute any of Ford's recommended aftermarket modifications may be violating the terms of Ford's express warranties.

310.   Per Ford's 2016 Model Year Ford Warranty Guide: "Aftermarket parts or components, sometimes installed by Ford Motor Company or an authorized Ford dealership, may not be covered by the New Vehicle Limited Warranty. Any damage caused to Ford components due to the failure of aftermarket parts (other than a certified emissions part) is not covered."[30]

311.   Per Ford's Shelby Mustang Supplement: "We do not recommend modifying or racing (for competition or time) Ford Performance Shelbys, as they are designed and built to be driven as delivered from the factory."[31] As such, these Ford-recommended aftermarket modifications fail to adequately repair or replace the Track-Ready powertrain system defects and Ford is in ongoing breach of the express warranties.

---

[30] *Id.* at 15.

[31] Ford, *Shelby Mustang Supplement* (July 2015), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2015-2016-Mustang-Shelby-GT350-Supplement-version-1_su_EN-US_07_2015.pdf, at p. 46.

312.    This is consistent with correspondence sent to Plaintiff Aubrey, where Plaintiff

Aubrey asks Ford for permission to install a built-in cooler, or after-market cooler—as per the

specific recommendations outlined in the 2015 Owners Supplement.[32] In denying Plaintiff

Aubrey's request, Ford admits the following: "Ford Motor Company does not recommend

changes to our products. Only changes that have been thoroughly tested and approved by Ford

Engineering should be considered. In this case, Ford part numbers will be issued and parts made

available for purchase through our dealers." Unfortunately, to this day, neither Plaintiff Aubrey

nor any other Class member has yet to be notified of any Ford part number or parts available for

purchase through the dealership network that would fix the defects and honor the NVLW.

313.    Thus, it is impossible for owners to seek relief, even at their own expense, and

still maintain the validity of their express warranties. As such, Ford has failed to adequately

repair or replace the differential cooling defects within the Track-Ready powertrain system and

Ford is in ongoing breach of the express warranties; therefore, Plaintiffs and Class members have

not received the benefit of their bargain.

## VI.    CLASS ALLEGATIONS

314.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant

to the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on

behalf of the following classes:[33]

---

[32] The 2015 Owner's Supplement states: "Your Shelby is capable of sustained high speeds and track day driving if equipped with powertrain coolers (Track, R model)." For those with the Base or Technology Package models, Ford "recommend[ed] that transmission and differential coolers [be] added" for "sustained high speeds or track day use." This is an admission by Ford that the Shelbys were not track-worthy as sold.

[33] Collectively, the "Class," unless otherwise noted.

**Nationwide Class**

All persons or entities in the United States who are current or former owners of a Ford 2016 Shelby Mustang with a Base or Technology Package (the "Nationwide Class").

**Florida Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Florida (the "Florida Class").

**Alabama Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Alabama (the "Alabama Class").

**Alaska Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Alaska (the "Alaska Class").

**Arizona Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Arizona (the "Arizona Class").

**California Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of California (the "California Class").

**Colorado Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Colorado (the "Colorado Class").

**Connecticut Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Connecticut (the "Connecticut Class").

**Delaware Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Delaware (the "Delaware Class").

**Georgia Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Georgia (the "Georgia Class").

**Hawaii Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Hawaii (the "Hawaii Class").

**Idaho Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Idaho (the "Idaho Class").

**Illinois Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Illinois (the "Illinois Class").

**Indiana Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Indiana (the "Indiana Class").

**Iowa Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Iowa (the "Iowa Class").

**Kansas Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Kansas (the "Kansas Class").

**Kentucky Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Kentucky (the "Kentucky Class").

**Louisiana Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Louisiana (the "Louisiana Class").

**Maine Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Maine (the "Maine Class").

**Maryland Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Maryland (the "Maryland Class").

**Massachusetts Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Massachusetts (the "Massachusetts Class").

**Michigan Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Michigan (the "Michigan Class").

**Minnesota Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Minnesota (the "Minnesota Class").

**Mississippi Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Mississippi (the "Mississippi Class").

**Missouri Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Missouri (the "Missouri Class").

**Montana Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Montana (the "Montana Class").

**Nebraska Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Nebraska (the "Nebraska Class").

**Nevada Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Nevada (the "Nevada Class").

**New Hampshire Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of New Hampshire (the "New Hampshire Class").

**New Jersey Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of New Jersey (the "New Jersey Class").

**New Mexico Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of New Mexico (the "New Mexico Class").

**New York Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of New York (the "New York Class").

**North Carolina Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of North Carolina (the "North Carolina Class").

**North Dakota Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of North Dakota (the "North Dakota Class").

**Ohio Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Ohio (the "Ohio Class").

**Oklahoma Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Oklahoma (the "Oklahoma Class").

**Oregon Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Oregon (the "Oregon Class").

**Pennsylvania Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Pennsylvania (the "Pennsylvania Class").

**Rhode Island Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Rhode Island (the "Rhode Island Class").

**South Carolina Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Florida (the "South Carolina Class").

010678-11 958612 V1

**South Dakota Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of South Dakota (the "South Dakota Class").

**Tennessee Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Tennessee (the "Tennessee Class").

**Texas Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Texas (the "Texas Class").

**Utah Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Utah (the "Utah Class").

**Vermont Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Vermont (the "Vermont Class").

**Virginia Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Virginia (the "Virginia Class").

**Washington Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Washington (the "Washington Class").

**West Virginia Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of West Virginia (the "West Virginia Class").

**Wisconsin Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Wisconsin (the "Wisconsin Class").

**Wyoming Class**

All persons or entities who purchased a Ford 2016 Shelby Mustang with a Base or Technology Package in the State of Wyoming (the "Wyoming Class").

010678-11 958612 V1

315.     Excluded from the Class are individuals who have personal injury claims resulting from the operation of a Ford 2016 Shelby Mustang. Also excluded from the Class are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

316.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

317.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

318.     <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are over four thousand members of the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from Ford's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, email, Internet postings, and/or published notice.

319.     <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

        a)     Whether Ford engaged in the conduct alleged herein;

        b)     Whether Ford designed, advertised, marketed, distributed, sold, or otherwise placed Shelbys into the stream of commerce in the United States;

c)      Whether the Ford 2016 Shelby Mustang contains defects;

d)      Whether such defects cause the Shelbys to malfunction;

e)      Whether Ford knew about the defects and, if so, how long Ford has known of the defects;

f)      Whether Ford designed, manufactured, marketed, and distributed Shelbys with a defective Track-Ready powertrain system;

g)      Whether Ford's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

h)      Whether Ford knew or should have known that the defects existed with regard to the Shelbys;

i)      Whether Ford knew or reasonably should have known of the defects in the Shelbys before it sold them to Class members;

j)      Whether Plaintiffs and the other Class members overpaid for their Shelbys as a result of the defects alleged herein;

k)      Whether Plaintiffs and the other Class members are entitled to equitable relief; and

l)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

320.    Typicality: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

321.    Adequacy: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes each respectively seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

322.   <u>Declaratory and Injunctive Relief</u>: Federal Rule of Civil Procedure 23(b)(2): Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

323.   <u>Superiority</u>: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for Class members to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CLAIMS FOR RELIEF

## COUNT ONE

## VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301 *ET SEQ.*)

324.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

325.   Plaintiffs bring this Count individually and on behalf of the Nationwide Class.

- 105 -

326.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

327.     Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4), (5).

328.     The Shelbys are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

329.     15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

330.     Ford's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

331.     Ford breached these warranties as described in more detail above. Without limitation, the Shelbys are equipped with a defective Track-Ready powertrain system. The Shelbys share a common design defect in that the system fails to operate as represented by Ford.

332.     Plaintiffs and the other Nationwide Class members have had sufficient direct dealings with either Ford or its agents to establish privity of contract between Ford on one hand and Plaintiffs and each of the other Class members on the other hand. Ford-authorized dealerships, divisions, and technical support organizations operating under contract to Ford are agents of Ford. Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Ford and its dealers. The dealers were not intended to be the ultimate consumers of the Shelbys and have no rights under the warranty agreements provided with the Shelbys; the warranty agreements were designed for and intended to benefit the consumers only.

333.     Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Plaintiffs have already done so and Ford has failed to cure the defects within a reasonable amount of time. As explained above, any solution offered by Ford must be exclusively paid for by Plaintiffs and Nationwide Class members, which is a violation of Ford's promise to repair and replace without charge. All solutions offered by Ford are also aftermarket alterations and therefore undertaking these repairs may represent a new violation of the express warranties on the part of Plaintiffs and Nationwide Class members. At the time of sale of each Shelby, Ford knew, should have known, or was reckless in not knowing, of its omissions and/or misrepresentations concerning the Shelby's inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

334.     Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Shelbys but did not receive the return of all payments made by them. Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Nationwide Class members have not re-accepted their Shelbys by retaining them.

335.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

- 107 -

336.     Plaintiffs, individually and on behalf of the other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Shelbys and/or loss of the benefit of the bargain, in an amount to be proven at trial.

## COUNT TWO

### VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201 *ET SEQ.*)

337.     Plaintiffs George and Diana Tershakovec, John Aubrey, Byron Harper, and Richard Kowalchik ("Plaintiffs" for purposes of all Florida Class Counts) incorporate by reference all preceding allegations as though fully set forth herein.

338.     Plaintiffs bring this Count on behalf of the Florida Class.

339.     The Florida Unfair and Deceptive Trade Practices Act ("FUDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

340.     Plaintiffs and Florida Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

341.     Ford engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

342.     In the course of business, Ford willfully failed to disclose and actively concealed the Track-Ready powertrain system defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission in connection with the sale of Shelbys.

- 108 -

343.    By failing to disclose that the defective Track-Ready powertrain system, by marketing Ford Shelbys as safe, reliable, and of high quality, and by presenting Ford as a reputable manufacturer that valued safety and stood behind their Shelbys after they were sold, Ford engaged in deceptive business practices in violation of the FUDTPA.

344.    Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Florida Class members, about the true performance of the Shelbys, the devaluing of safety and performance at Ford, and the true value of the Shelbys.

345.    Ford intentionally and knowingly misrepresented material facts regarding the Shelbys with intent to mislead Plaintiffs and the Florida Class.

346.    Ford knew or should have known that their conduct violated the FUDTPA.

347.    As alleged above, Ford made material statements about the safety and performance of the Shelbys and the Ford brand that were either false or misleading.

348.    Ford owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Shelbys, because Ford:

> a.    Possessed exclusive knowledge that they were selling and distributing Shelbys throughout the United States that did not perform as advertised;
>
> b.    Intentionally concealed the foregoing from Plaintiffs and the Florida Class; and/or
>
> c.    Made incomplete representations about the safety and performance of the Shelbys generally, and the Base and Technology Package models in particular, while purposefully withholding material facts from Plaintiffs and the Florida Class that contradicted these representations.

349.    Because Ford fraudulently concealed the defective Track-Ready powertrain system and the Shelby's inability to be used safely on a race track, Plaintiffs were deprived of the

- 109 -

benefit of the bargain and the value of the Shelbys has greatly diminished. In light of the stigma attached to those Shelbys by Ford's conduct, they are now worth significantly less than they otherwise would be.

350.    Ford's omissions and/or misrepresentations about the track performance and safety concerns of the Shelbys are material to Plaintiffs and the Florida Class.

351.    Plaintiffs and Florida Class members suffered ascertainable loss caused by Ford's misrepresentations and their concealment of and failure to disclose material information. Plaintiffs and Florida Class members who purchased Shelbys either would have paid less for their Shelbys or would not have purchased them at all but for Ford's violations of the FUDTPA.

352.    Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the FUDTPA. All owners of Shelbys suffered ascertainable loss in the form of diminished value of their Shelbys as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

353.    Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

354.    As a direct and proximate result of Ford's violations of the FUDTPA, Plaintiffs and the Florida Class have suffered injury-in-fact and/or actual damage.

355.    Plaintiffs and Florida Class members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

356.    Plaintiffs also seek an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the FUDTPA.

- 110 -

## COUNT THREE

### FRAUDULENT CONCEALMENT
### (BASED ON FLORIDA LAW)

357.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

358.    Plaintiffs bring this Count on behalf of the Florida Class.

359.    Ford intentionally concealed the defects contained in the Track-Ready powertrain systems that render Shelbys unfit for track use, in that the transmissions of these Shelbys would overheat when placed under Track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby vehicles. Ford concealed the fact that for the Shelbys to become Track-Ready as advertised is for Ford owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

360.    Ford further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Shelbys it was selling had no significant defects and that all Shelbys were Track-Ready.

361.    Ford knew that these representations were false when made.

362.    The Shelbys purchased by Plaintiffs and the other Florida Class members contained a defective Track-Ready powertrain system.

363.    Ford had a duty to disclose that the Track-Ready powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiffs and the other Florida Class members relied on Ford's material representations.

364.     As alleged herein, at all relevant times, Ford has held out the Shelbys to be free from defects such as the defects related to the Track-Ready powertrain system. Ford touted and continues to tout the many benefits and advantages of the Track-Ready powertrain system, but nonetheless failed to disclose important facts related to the defects and that Florida Class members would be required to make additional aftermarket modifications to adequately achieve Track-Ready performance, and that these modifications may violate their express warranties. This made Ford's other disclosures about the Track-Ready powertrain system deceptive.

365.     The truth about the defective Track-Ready powertrain system was known only to Ford; Plaintiffs and the other Florida Class members did not know of these facts and Ford actively concealed these facts from Plaintiffs and the other Florida Class members.

366.     Plaintiffs and the other Florida Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Florida Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiffs and the other Florida Class members by concealing the true facts about the Shelby's Track-Ready powertrain systems.

367.     Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Shelbys that played a significant role in the value of the Shelbys and forced Florida Class members to make additional expenditures to ensure proper safety at the race track.

368.     Ford had a duty to disclose the defects inherent in the Track-Ready powertrain system and violations with respect to the Shelbys because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such

- 112 -

facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiffs or Florida Class members.

369.     Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Shelbys, without telling consumers that the defective Track-Ready powertrain system would affect the safety, quality, and performance of the Shelby.

370.     Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the Track-Ready powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Shelbys purchased by Plaintiffs and the other Florida Class members.

371.     Ford has still not made full and adequate disclosures and continues to defraud Plaintiffs and the other Florida Class members by concealing material information regarding the defects in the Track-Ready powertrain system.

372.     Plaintiffs and the other Florida Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the other Florida Class members' actions were justified. Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Florida Class members.

373.     Because of the concealment and/or suppression of facts, Plaintiffs and the other Florida Class members sustained damage because they own(ed) Shelbys that are diminished in

value as a result of Ford's concealment of the true quality of those Shelby's Track-Ready powertrain systems. Had Plaintiffs and the other Florida Class members been aware of the defects in the Track-Ready powertrain systems installed in the Shelbys, and the company's disregard for the truth, Plaintiffs and the other Florida Class members who purchased a Shelby would have paid less for their Shelbys or would not have purchased them at all.

374.　Plaintiffs have been deprived of the benefit of the bargain and the value of Plaintiffs' and the other Florida Class members' Shelbys has diminished as a result of Ford's fraudulent concealment of the defective Track-Ready powertrain system of the Shelbys, which has made any reasonable consumer reluctant to purchase any of the Shelbys, let alone pay what otherwise would have been fair market value for the Shelbys.

375.　Accordingly, Ford is liable to Plaintiffs and the other Florida Class members for damages in an amount to be proven at trial.

376.　Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Florida Class members' rights and the representations that Ford made to them, in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FOUR

## BREACH OF EXPRESS WARRANTY
## (FLA. STAT. § 672.313)

377.　Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

378.　Plaintiffs bring this Count on behalf of the Florida Class.

379.    Plaintiffs were each at all relevant times a "buyer" as defined by Fla. Stat. § 672.103.

380.    Ford was at all relevant times a "merchant" as defined by Fla. Stat. § 672.104.

381.    The Shelbys are and were at all relevant times "goods" as defined by Fla. Stat. § 672.105.

382.    As an express warrantor and manufacturer and merchant, Ford had certain obligations under Fla. Stat. § 672.313 to conform the Shelbys to the express warranties.

383.    When Plaintiffs and the other Florida Class members purchased their Shelbys, Ford expressly warranted in writing that the Shelbys were covered by a Limited Warranty and that the NVLW formed the basis of the bargain. As set forth herein, Ford expressly warranted that it would (1) repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period, and (2) remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period. Also, as set forth herein, Ford breached its warranty obligations by selling inherently defective Shelbys and refusing to repair the defects or replace the defective parts.

384.    The defects at issue in this litigation were present at the time of sale to Plaintiffs and members of the Florida Class.

385.    Ford breached the NVLW to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford as Ford has been unable to repair or adjust the Shelby's materials and workmanship defects.

386.    Furthermore, the Limited Warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and

the other Florida Class members whole and because Ford has failed and/or refused to adequately provide the promised remedies within a reasonable time.

387.    Pursuant to the express warranties, Ford was obligated to pay for or reimburse Plaintiffs and the other Florida Class members for costs incurred in purchasing after-market coolers for the transmission and differential systems and other costs associated with bringing their Shelbys to the dealership for futile repair efforts. Ford was also obligated to repair the defects.

388.    Accordingly, recovery by Plaintiffs and the other Florida Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs and the other Florida Class members seek all remedies as allowed by law.

389.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the Shelbys, and while knowing that the Shelbys did not conform to Ford's Limited Warranty and were inherently defective, Ford wrongfully and fraudulently concealed material facts regarding the Shelbys. Plaintiffs and the other Florida Class members were therefore induced to purchase the Shelbys under false and/or fraudulent pretenses.

390.    Ford and its agent dealers have failed and refused to conform the Shelbys to the express warranties and Ford's conduct and has voided any attempt on its part to disclaim liability for its actions.

391.    Moreover, many of the damages flowing from the Shelbys cannot be resolved through the limited remedy of "replacement or adjustments" as those incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a

reasonable time, and any limitation on Plaintiffs' and the other Florida Class members' remedies would be insufficient to make Plaintiffs and the other Florida Class members whole.

392.    Ford received timely notice regarding the problems at issue in this litigation (indeed Ford knew of the defects prior to offering the Shelbys for sale or lease). Ford was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. Ford has received, on information and belief, many complaints from Florida Class members advising them of the defects at issue in this litigation.

393.    Plaintiffs have performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

394.    Plaintiffs have had sufficient dealings with either Ford or its agents (dealerships, Ford Performance, or other divisions or subsidiaries) to establish privity of contract. Privity is not required in this case because Plaintiffs and the other Florida Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's express warranties and these warranties were advertised to Plaintiffs and the other Florida Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Shelbys and have no rights under the warranty agreements provided with the Shelbys; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

395.    As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and the other Florida Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value and benefit of the bargain damages.

010678-11 958612 V1

## COUNT FIVE

### UNJUST ENRICHMENT
### (BASED ON FLORIDA LAW)

396.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

397.    Plaintiffs bring this Count on behalf of the Florida Class.

398.    Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Florida Class members.

399.    Ford has voluntarily accepted and retained this benefit.

400.    The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Florida Class members.

401.    Plaintiffs and the other Florida Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT SIX

### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
### PRACTICES AND CONSUMER PROTECTION ACT
### (TEX. BUS. & COM. CODE § 17.4 *ET SEQ.*)

402.    Plaintiffs Herbert Alley, Michael DeLaGarza, Eric Kamperman, Travis McRae, and Todd Newton ("Plaintiffs" for purposes of all Texas Class Counts) incorporate by reference all preceding allegations as though fully set forth herein.

403.    Plaintiffs bring this Count on behalf of the Texas Class.

- 118 -

404.    Plaintiffs and members of the Texas Class are individuals with assets of less than

$25 million (or are controlled by corporations or entities with less than $25 million in assets).

*See* Tex. Bus. & Com. Code § 17.41.

405.    The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA")

provides a private right of action to a consumer where the consumer suffers economic damage as

the result of either (i) the use of false, misleading, or deceptive act or practice specifically

enumerated in Tex. Bus. & Com. Code § 17.46(b); or (ii) "an unconscionable action or course of

action by any person." Tex. Bus. & Com. Code § 17.50(a)(2) & (3). The Texas DTPA declares

several specific actions to be unlawful, including: "(5) Representing that goods or services have.

sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not

have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or

that goods are of a particular style or model, if they are of another," and "(9) advertising goods or

services with intent not to sell them as advertised." An "unconscionable action or course of

action" means "an act or practice which, to a consumer's detriment, takes advantage of the lack

of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex.

Bus. & Com. Code § 17.45(5). As detailed herein, Ford has engaged in an unconscionable action

or course of action and thereby caused economic damages to the Texas Class.

406.    In the course of business, Ford willfully failed to disclose and actively concealed

the Track-Ready powertrain system defects discussed herein and otherwise engaged in activities

with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by

employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment,

suppression, or omission of any material fact with intent that others rely upon such concealment,

suppression, or omission in connection with the sale of Shelbys.

407.     By failing to disclose that the defective Track-Ready powertrain system, by marketing Ford Shelbys as safe, reliable, and of high quality, and by presenting Ford as a reputable manufacturer that valued safety and stood behind their Shelbys after they were sold, Ford engaged in deceptive business practices in violation of the Texas DTPA.

408.     Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Texas Class members, about the true performance of the Shelbys, the devaluing of safety and performance at Ford, and the true value of the Shelbys.

409.     Ford intentionally and knowingly misrepresented material facts regarding the Shelbys with intent to mislead Plaintiffs and the Texas Class.

410.     Ford knew or should have known that their conduct violated the Texas DTPA.

411.     As alleged above, Ford made material statements about the safety and performance of the Shelbys and the Ford brand that were either false or misleading.

412.     Ford owed Plaintiffs and Texas Class members a duty to disclose the true safety, performance, and reliability of the Shelbys, because Ford:

    a.     Possessed exclusive knowledge that they were selling and distributing Shelbys throughout the United States that did not perform as advertised;

    b.     Intentionally concealed the foregoing from Plaintiffs and the Texas Class; and/or

    c.     Made incomplete representations about the safety and performance of the Shelbys generally, and the Base and Technology Package models in particular, while purposefully withholding material facts from Plaintiffs and the Texas Class that contradicted these representations.

413.     Because Ford fraudulently concealed the defective Track-Ready powertrain system and the Shelby's inability to be used safely on a race track, the value of the Shelbys has

- 120 -

greatly diminished. In light of the stigma attached to those Shelbys by Ford's conduct, they are now worth significantly less than they otherwise would be.

414.    Ford's omissions and/or misrepresentations about the track performance and safety concerns of the Shelbys were material to Plaintiffs and the Texas Class.

415.    Plaintiffs and members of the Texas Class suffered ascertainable loss caused by Ford's misrepresentations and their concealment of and failure to disclose material information. Texas Class members who purchased the Shelbys either would have paid less for their Shelbys or would not have purchased them at all but for Ford's violations of the Texas DTPA.

416.    Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Texas DTPA. All owners of Shelbys suffered ascertainable loss in the form of diminished value of their Shelbys as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

417.    Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

418.    As a direct and proximate result of Ford's violations of the Texas DTPA, Plaintiffs and the Texas Class have suffered injury-in-fact and/or actual damage.

419.    Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), Plaintiffs seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages for Ford's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

420.    Alternatively, or additionally, pursuant to Tex. Bus. & Com. Code § 17.50(b)(3) & (4), Plaintiffs are also entitled to disgorgement or to rescission or to any other relief necessary

- 121 -

to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

421.    Plaintiffs gave written notice prior to filing suit as required by Tex. Bus. & Com. Code § 17.505(a). The notice was sent to Ford on March 21, 2017.

## COUNT SEVEN

## FRAUD BY CONCEALMENT
### (BASED ON TEXAS LAW)

422.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

423.    Plaintiffs bring this Count on behalf of the Texas Class.

424.    Ford intentionally concealed that the defects contained in the Track-Ready powertrain system render Shelbys unfit for track use in that the transmissions and differentials of these vehicles would overheat when placed under track conditions and unexpectedly go into Limp Mode after less than 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby vehicles. Ford concealed these facts to consumers.

425.    Ford further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Shelby it was selling had no significant defects and that all Shelbys were Track-Ready.

426.    Ford knew that these representations were false when made.

427.    The Shelbys purchased by Plaintiffs and the other Texas Class members contained a defective Track-Ready powertrain system.

428.    Ford had a duty to disclose that the Track-Ready powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiffs and the other Texas Class members relied on Ford's material representations.

429.    As alleged herein, at all relevant times, Ford has held out the Shelbys to be free from defects such as the defect related to the Track-Ready powertrain system. Ford touted and continues to tout the many benefits and advantages of the Track-Ready powertrain system, but nonetheless failed to disclose important facts related to the defect and that Plaintiffs and other Texas Class members would be required to make additional aftermarket modifications to adequately achieve Track-Ready performance, and that these modifications may violate their express warranties. This made Ford's other disclosures about the Track-Ready powertrain system deceptive.

430.    The truth about the defective Track-Ready powertrain system was known only to Ford; Plaintiffs and the other Texas Class members did not know of these facts and Ford actively concealed these facts from Plaintiffs and the other Texas Class members.

431.    Plaintiffs and the other Texas Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Texas Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiffs and the other Texas Class members by concealing the true facts about the Shelby's Track-Ready powertrain systems.

432.    Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Shelbys that played a significant

- 123 -

role in the value of the vehicles and forced Plaintiffs and the other Texas Class members to make additional expenditures to ensure proper safety at the race track.

433.    Ford had a duty to disclose the defects inherent in the Track-Ready powertrain system and violations with respect to the Shelbys because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiffs or the other Texas Class members.

434.    Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Shelbys, without telling consumers that the defective Track-Ready powertrain system would affect the safety, quality, and performance of the vehicle.

435.    Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the Track-Ready powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Shelbys purchased by Plaintiffs and the other Texas Class members.

436.    Ford has still not made full and adequate disclosures and continues to defraud Plaintiffs and the other Texas Class members by concealing material information regarding the defects in the Track-Ready powertrain system.

437.    Plaintiffs and the other Texas Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of

- 124 -

the information concealed from them. Plaintiffs' and the other Texas Class members' actions

were justified. Ford was in exclusive and/or superior control of the material facts, and such facts

were not generally known to the public, Plaintiffs, or other Texas Class members.

438.     Because of the concealment and/or suppression of facts, Plaintiffs and the other

Texas Class members sustained damage because they own(ed) vehicles that are diminished in

value as a result of Ford's concealment of the true quality of those vehicles' Track-Ready

powertrain systems. Had Plaintiffs and the other Texas Class members been aware of the defects

in the Track-Ready powertrain systems installed in the Shelbys, and the company's disregard for

the truth, Plaintiffs and the other Texas Class members who purchased a Shelby would have paid

less for their vehicles or would not have purchased them at all.

439.     The value of Plaintiffs' and the other Texas Class members' vehicles has

diminished as a result of Ford's fraudulent concealment of the defective Track-Ready powertrain

system of the Shelbys, which has made any reasonable consumer reluctant to purchase any of the

Shelbys, let alone pay what otherwise would have been fair market value for the vehicles.

440.     Accordingly, Ford is liable to Plaintiffs and the other Texas Class members for

damages in an amount to be proven at trial.

441.     Ford's acts were done wantonly, maliciously, oppressively, deliberately, with

intent to defraud, and in reckless disregard of Plaintiffs' and other Texas Class members' rights

and the representations that Ford made to them, in order to enrich Ford. Ford's conduct warrants

an assessment of punitive damages in an amount sufficient to deter such conduct in the future,

which amount is to be determined according to proof.

## COUNT EIGHT

## BREACH OF EXPRESS WARRANTY
## (TEX. BUS & COM. CODE ANN. §2-313)

442.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

443.    Plaintiffs bring this Count on behalf of the Texas Class.

444.    Plaintiffs were each at all relevant times a "buyer" as defined by Tex. Bus. & Com. Code Ann. § 1-201(9).

445.    Ford was at all relevant times a "merchant" as defined by Tex. Bus. & Com. Code Ann. § 2-104.

446.    The Shelbys are and were at all relevant times "goods" as defined by Tex. Bus. & Com. Code Ann. § 2105.

447.    As an express warrantor and manufacturer and merchant, Ford had certain obligations under Tex. Bus & Com. Code Ann. § 2-313 to conform the Shelbys to the express warranties.

448.    When Plaintiffs and the other Texas Class members purchased their Shelbys, Ford expressly warranted in writing that the Shelbys were covered by the NVLW and that the NVLW formed the basis of the bargain. As set forth herein, Ford expressly warranted that it would (1) repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period, and (2) remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period. Also, as set forth herein, Ford breached its warranty obligations by selling inherently defective Shelbys and refusing to repair the defects or replace the defective parts.

449.    The defects at issue in this litigation were present at the time of sale to Plaintiffs and members of the Texas Class.

450.    Ford breached the Limited Warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford as Ford has been unable to repair or adjust the Shelby's materials and workmanship defects.

451.    Furthermore, the Limited Warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Texas Class members whole and because Ford has failed and/or refused to adequately provide the promised remedies within a reasonable time.

452.    Pursuant to the express warranties, Ford was obligated to pay for or reimburse Plaintiffs and the other Texas Class members for costs incurred in purchasing after-market coolers for the transmission and differential systems and other costs associated with bringing their Shelbys to the dealership for futile repair efforts. Ford was also obligated to repair the defects.

453.    Accordingly, recovery by Plaintiffs and the other Texas Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs and the other Texas Class members seek all remedies as allowed by law.

454.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the Shelbys, and while knowing that the Shelbys did not conform to Ford's Limited Warranty and were inherently defective, Ford wrongfully and fraudulently concealed material facts regarding the Shelbys. Plaintiffs and the other Texas Class members were therefore induced to purchase the Shelbys under false and/or fraudulent pretenses.

- 127 -

455.    Ford and its agent dealers have failed and refused to conform the Shelbys to the express warranties and Ford's conduct and has voided any attempt on its part to disclaim liability for its actions.

456.    Moreover, many of the damages flowing from the Shelbys cannot be resolved through the limited remedy of "replacement or adjustments" as those incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Texas Class members' remedies would be insufficient to make Plaintiffs and the other Texas Class members whole.

457.    Ford received timely notice regarding the problems at issue in this litigation (indeed Ford knew of the defects prior to offering the Shelbys for sale or lease). Ford was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. Ford has received, on information and belief, many complaints from Texas Class members advising them of the defects at issue in this litigation.

458.    Plaintiffs have performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

459.    Plaintiffs have had sufficient dealings with either Ford or its agents (dealerships and/or Ford Performance) to establish privity of contract. Privity is not required in this case because Plaintiffs and the other Texas Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's express warranties and these warranties were advertised to Plaintiffs and the other Texas Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers

- 128 -

of the Shelbys and have no rights under the warranty agreements provided with the Shelbys; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

460.    As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and the other Texas Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value and benefit of the bargain damages.

## COUNT NINE

## UNJUST ENRICHMENT
## (BASED ON TEXAS LAW)

461.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

462.    Plaintiffs bring this Count on behalf of the Texas Class.

463.    Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Texas Class members.

464.    Ford has voluntarily accepted and retained this benefit.

465.    The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Texas Class members.

466.    Plaintiffs and the other Texas Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT TEN

## VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
### (WASH. REV. CODE ANN. § 19.86.010 *ET SEQ.*)

467.    Plaintiff Eric Evans ("Plaintiff" for purposes of all Washington Class Counts)

incorporates by reference all preceding allegations as though fully set forth herein.

468.    Plaintiff brings this Count on behalf of the Washington Class.

469.    The Washington Consumer Protection Act ("Washington CPA") broadly prohibits

"[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any

trade or commerce." Wash. Rev. Code Ann. § 19.96.010.

470.    Ford committed the acts complained of herein in the course of "trade" or

"commerce" within the meaning of Wash. Rev. Code Ann. § 19.96.010.

471.    Ford is liable to Plaintiff for damages in amounts to be proven at trial, including

attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem

appropriate under Wash. Rev. Code Ann. § 19.86.090.

## COUNT ELEVEN

## FRAUD BY CONCEALMENT
### (BASED ON WASHINGTON LAW)

472.    Plaintiff incorporates by reference all preceding allegations as though fully set

forth herein.

473.    Plaintiff brings this Count on behalf of the Washington Class.

474.    Ford intentionally concealed that the defects contained in the Track-Ready

powertrain system render Shelbys unfit for track use in that the transmissions of these vehicles

would overheat when placed under track conditions and unexpectedly go into Limp Mode after

less than 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby

vehicles. Ford concealed these facts to consumers.

- 130 -

475.     Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Shelby it was selling had no significant defects and that all Shelbys were Track-Ready.

476.     Ford knew that these representations were false when made.

477.     The Shelbys purchased by Plaintiff and the other Washington Class members contained a defective Track-Ready powertrain system.

478.     Ford had a duty to disclose that the Track-Ready powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Washington Class members relied on Ford's material representations.

479.     As alleged herein, at all relevant times, Ford has held out the Shelbys to be free from defects such as the defect related to the Track-Ready powertrain system. Ford touted and continues to tout the many benefits and advantages of the Track-Ready powertrain system, but nonetheless failed to disclose important facts related to the defect and that Plaintiff and other Washington Class members would be required to make additional aftermarket modifications to adequately achieve Track-Ready performance, and that these modifications may violate their express warranties. This made Ford's other disclosures about the Track-Ready powertrain system deceptive.

480.     The truth about the defective Track-Ready powertrain system was known only to Ford; Plaintiff and the other Washington Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and the other Washington Class members.

481.     Plaintiff and the other Washington Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or

- 131 -

incomplete. As consumers, Plaintiff and the other Washington Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and the other Washington Class members by concealing the true facts about the Shelby's Track-Ready powertrain systems.

482.    Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Shelbys that played a significant role in the value of the vehicles and forced Plaintiff and the other Washington Class members to make additional expenditures to ensure proper safety at the race track.

483.    Ford had a duty to disclose the defects inherent in the Track-Ready powertrain system and violations with respect to the Shelbys because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or the other Washington Class members.

484.    Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Shelbys, without telling consumers that the defective Track-Ready powertrain system would affect the safety, quality, and performance of the vehicle.

485.    Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the Track-Ready powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Shelbys purchased by Plaintiff and the other Washington Class members.

486.    Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Washington Class members by concealing material information regarding the defects in the Track-Ready powertrain system.

487.    Plaintiff and the other Washington Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Washington Class members' actions were justified. Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or other Washington Class members.

488.    Because of the concealment and/or suppression of facts, Plaintiff and the other Washington Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of Ford's concealment of the true quality of those vehicles' Track-Ready powertrain systems. Had Plaintiff and the other Washington Class members been aware of the defects in the Track-Ready powertrain systems installed in the Shelbys, and the company's disregard for the truth, Plaintiff and the other Washington Class members who purchased a Shelby would have paid less for their vehicles or would not have purchased them at all.

489.    The value of Plaintiff's and the other Washington Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the defective Track-Ready powertrain system of the Shelbys, which has made any reasonable consumer reluctant to purchase any of the Shelbys, let alone pay what otherwise would have been fair market value for the vehicles.

490.    Accordingly, Ford is liable to Plaintiff and the other Washington Class members for damages in an amount to be proven at trial.

- 133 -

491.     Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other Washington Class members' rights and the representations that Ford made to them, in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TWELVE

## BREACH OF EXPRESS WARRANTY
### (REV. CODE WASH. § 62A.2-313)

492.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

493.     Plaintiff brings this Count on behalf of the Washington Class.

494.     Plaintiff was at all relevant times a "buyer" as defined by Rev. Code Wash. § 62A.1-201(9).

495.     Ford was at all relevant times a "merchant" as defined by Rev. Code Wash. § 62A.2-104.

496.     The Shelbys are and were at all relevant times "goods" as defined by Rev. Code Wash. § 62A.2-105.

497.     As an express warrantor and manufacturer and merchant, Ford had certain obligations under Rev. Code Wash. § 62A.2-313 to conform the Shelbys to the express warranties.

498.     When Plaintiff and the other Washington Class members purchased their Shelbys, Ford expressly warranted in writing that the Shelbys were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. As set forth herein, Ford expressly warranted that it would (1) repair or replace defects in material or workmanship free of charge if

- 134 -

they became apparent during the warranty period, and (2) remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period. Also, as set forth herein, Ford breached its warranty obligations by selling inherently defective Shelbys and refusing to repair the defects or replace the defective parts.

499.   The defects at issue in this litigation were present at the time of sale to Plaintiff and members of the Washington Class.

500.   Ford breached the Limited Warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford as Ford has been unable to repair or adjust the Shelby's materials and workmanship defects.

501.   Furthermore, the Limited Warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Washington Class members whole and because Ford has failed and/or refused to adequately provide the promised remedies within a reasonable time.

502.   Pursuant to the express warranties, Ford was obligated to pay for or reimburse Plaintiff and the other Washington Class members for costs incurred in purchasing after-market coolers for the transmission and differential systems and other costs associated with bringing their Shelbys to the dealership for futile repair efforts. Ford was also obligated to repair the defects.

503.   Accordingly, recovery by the Plaintiff and the other Washington Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Washington Class members seek all remedies as allowed by law.

504. Also, as alleged in more detail herein, at the time that Ford warranted and sold the Shelbys, and while knowing that the Shelbys did not conform to Ford's Limited Warranty and were inherently defective, Ford wrongfully and fraudulently concealed material facts regarding the Shelbys. Plaintiff and the other Washington Class members were therefore induced to purchase the Shelbys under false and/or fraudulent pretenses.

505. Ford and its agent dealers have failed and refused to conform the Shelbys to the express warranties and Ford's conduct has voided any attempt on its part to disclaim liability for its actions.

506. Moreover, many of the damages flowing from the Shelbys cannot be resolved through the limited remedy of "replacement or adjustments" as those incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Washington Class members' remedies would be insufficient to make Plaintiff and the other Washington Class members whole.

507. Ford received timely notice regarding the problems at issue in this litigation (indeed Ford knew of the defects prior to offering the Shelbys for sale or lease). Ford was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. Ford has received, on information and belief, many complaints from Washington Class members advising them of the defects at issue in this litigation.

508. Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

- 136 -

509.    Plaintiff has had sufficient dealings with either Ford or its agents (dealerships and/or Ford Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Washington Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's express warranties and these warranties were advertised to Plaintiff and the other Washington Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Shelbys and have no rights under the warranty agreements provided with the Shelbys; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

510.    As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the other Washington Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value and benefit of the bargain damages.

## COUNT THIRTEEN

### UNJUST ENRICHMENT
### (BASED ON WASHINGTON LAW)

511.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

512.    Plaintiff brings this Count on behalf of the Washington Class.

513.    Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Washington Class members.

514.    Ford has voluntarily accepted and retained this benefit.

515.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Washington Class members.

516.   Plaintiff and the other Washington Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT FOURTEEN

## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT (TENN. CODE ANN. § 47-18-101 *ET SEQ.*)

517.   Plaintiff Attila Gondan ("Plaintiff" for purposes of all Tennessee Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

518.   Plaintiff brings this Count on behalf of the Tennessee Class.

519.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions." Tenn. Code Ann. § 47-18-104.

520.   Plaintiff and Tennessee Class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

521.   Ford is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

522.   Ford's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

523.   Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiff seeks monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages

as a result of Ford's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT FIFTEEN

### FRAUD BY CONCEALMENT
### (BASED ON TENNESSEE LAW)

524.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

525.    Plaintiff brings this Count on behalf of the Tennessee Class.

526.    Ford intentionally concealed that the defects contained in the Track-Ready powertrain system render Shelbys unfit for track use in that the transmissions of these vehicles would overheat when placed under track conditions and unexpectedly go into Limp Mode after less than 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby vehicles. Ford concealed these facts to consumers.

527.    Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Shelby it was selling had no significant defects and that all Shelbys were Track-Ready.

528.    Ford knew that these representations were false when made.

529.    The Shelbys purchased by Plaintiff and the other Tennessee Class members contained a defective Track-Ready powertrain system.

530.    Ford had a duty to disclose that the Track-Ready powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Tennessee Class members relied on Ford's material representations.

531.    As alleged herein, at all relevant times, Ford has held out the Shelbys to be free from defects such as the defect related to the Track-Ready powertrain system. Ford touted and continues to tout the many benefits and advantages of the Track-Ready powertrain system, but nonetheless failed to disclose important facts related to the defect and that Plaintiff and other Tennessee Class members would be required to make additional aftermarket modifications to adequately achieve Track-Ready performance, and that these modifications may violate their express warranties. This made Ford's other disclosures about the Track-Ready powertrain system deceptive.

532.    The truth about the defective Track-Ready powertrain system was known only to Ford; Plaintiff and the other Tennessee Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and the other Tennessee Class members.

533.    Plaintiff and the other Tennessee Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Tennessee Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and the other Tennessee Class members by concealing the true facts about the Shelby's Track-Ready powertrain systems.

534.    Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Shelbys that played a significant role in the value of the vehicles and forced Plaintiff and the other Tennessee Class members to make additional expenditures to ensure proper safety at the race track.

535.    Ford had a duty to disclose the defects inherent in the Track-Ready powertrain system and violations with respect to the Shelbys because details of the true facts were known

- 140 -

and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or the other Tennessee Class members.

536.    Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Shelbys, without telling consumers that the defective Track-Ready powertrain system would affect the safety, quality, and performance of the vehicle.

537.    Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the Track-Ready powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Shelbys purchased by Plaintiff and the other Tennessee Class members.

538.    Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Tennessee Class members by concealing material information regarding the defects in the Track-Ready powertrain system.

539.    Plaintiff and the other Tennessee Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Tennessee Class members' actions were justified. Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or other Tennessee Class members.

540.     Because of the concealment and/or suppression of facts, Plaintiff and the other Tennessee Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of Ford's concealment of the true quality of those vehicles' Track-Ready powertrain systems. Had Plaintiff and the other Tennessee Class members been aware of the defects in the Track-Ready powertrain systems installed in the Shelbys, and the company's disregard for the truth, Plaintiff and the other Tennessee Class members who purchased a Shelby would have paid less for their vehicles or would not have purchased them at all.

541.     The value of Plaintiff's and the other Tennessee Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the defective Track-Ready powertrain system of the Shelbys, which has made any reasonable consumer reluctant to purchase any of the Shelbys, let alone pay what otherwise would have been fair market value for the vehicles.

542.     Accordingly, Ford is liable to Plaintiff and the other Tennessee Class members for damages in an amount to be proven at trial.

543.     Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other Tennessee Class members' rights and the representations that Ford made to them, in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT SIXTEEN

### BREACH OF EXPRESS WARRANTY
### (TENN. CODE ANN. § 47-2-313)

544.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

545.     Plaintiff brings this Count on behalf of the Tennessee Class.

- 142 -

546.     Plaintiff was at all relevant times a "buyer" as defined by Tenn. Code Ann. § 47-1-201(9).

547.     Ford was at all relevant times a "merchant" as defined by Tenn. Code Ann. § 47-2-104.

548.     The Shelbys are and were at all relevant times "goods" as defined by Tenn. Code Ann. § 47-2-105.

549.     As an express warrantor and manufacturer and merchant, Ford had certain obligations under Tenn. Code Ann. § 47-2-313 to conform the Shelbys to the express warranties.

550.     When Plaintiff and the other Tennessee Class members purchased their Shelbys, Ford expressly warranted in writing that the Shelbys were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. As set forth herein, Ford expressly warranted that it would (1) repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period, and (2) remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period. Also, as set forth herein, Ford breached its warranty obligations by selling inherently defective Shelbys and refusing to repair the defects or replace the defective parts.

551.     The defects at issue in this litigation were present at the time of sale to Plaintiff and members of the Tennessee Class.

552.     Ford breached the Limited Warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford as Ford has been unable to repair or adjust the Shelby's materials and workmanship defects.

553.     Furthermore, the Limited Warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff

- 143 -

and the other Tennessee Class members whole and because Ford has failed and/or refused to adequately provide the promised remedies within a reasonable time.

554. Pursuant to the express warranties, Ford was obligated to pay for or reimburse Plaintiff and the other Tennessee Class members for costs incurred in purchasing after-market coolers for the transmission and differential systems and other costs associated with bringing their Shelbys to the dealership for futile repair efforts. Ford was also obligated to repair the defects.

555. Accordingly, recovery by the Plaintiff and the other Tennessee Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Tennessee Class members seek all remedies as allowed by law.

556. Also, as alleged in more detail herein, at the time that Ford warranted and sold the Shelbys, and while knowing that the Shelbys did not conform to Ford's Limited Warranty and were inherently defective, Ford wrongfully and fraudulently concealed material facts regarding the Shelbys. Plaintiff and the other Tennessee Class members were therefore induced to purchase the Shelbys under false and/or fraudulent pretenses.

557. Ford and its agent dealers have failed and refused to conform the Shelbys to the express warranties and Ford's conduct and has voided any attempt on its part to disclaim liability for its actions.

558. Moreover, many of the damages flowing from the Shelbys cannot be resolved through the limited remedy of "replacement or adjustments" as those incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a

- 144 -

reasonable time, and any limitation on Plaintiff's and the other Tennessee Class members' remedies would be insufficient to make Plaintiff and the other Tennessee Class members whole.

559.    Ford received timely notice regarding the problems at issue in this litigation (indeed Ford knew of the defects prior to offering the Shelbys for sale or lease). Ford was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. Ford has received, on information and belief, many complaints from Tennessee Class members advising them of the defects at issue in this litigation.

560.    Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

561.    Plaintiff has had sufficient dealings with either Ford or its agents (dealerships and/or Ford Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Tennessee Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's express warranties and these warranties were advertised to Plaintiff and the other Tennessee Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Shelbys and have no rights under the warranty agreements provided with the Shelbys; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

562.    As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the other Tennessee Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value and benefit of the bargain damages.

## COUNT SEVENTEEN

## UNJUST ENRICHMENT
### (BASED ON TENNESSEE LAW)

563.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

564.     Plaintiff brings this Count on behalf of the Tennessee Class.

565.     Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Tennessee Class members.

566.     Ford has voluntarily accepted and retained this benefit.

567.     The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Tennessee Class members.

568.     Plaintiff and the other Tennessee Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT EIGHTEEN

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505/1 *ET SEQ.* AND 720 ILCS 295/1A)

569.     Plaintiff Mark Hochsprung ("Plaintiff" for purposes of all Illinois Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

570.     Plaintiff brings this Count on behalf of the Illinois Class.

- 146 -

571.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, tales promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 ILCS 505/2.

572.     Ford is a "person" as that term is defined in 815 ILCS 505/1(c).

573.     Plaintiff and Illinois Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

574.     Pursuant to 815 ILCS 505/10a(a), Plaintiff seeks monetary relief against Ford in the amount of actual damages as well as punitive damages because Ford acted with fraud and/or malice and/or was grossly negligent.

575.     Plaintiff also seeks an order enjoining Ford's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 ILCS 505/1 *et seq.*

**COUNT NINETEEN**

**FRAUD BY CONCEALMENT**
**(BASED ON ILLINOIS LAW)**

576.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

577.     Plaintiff brings this Count on behalf of the Illinois Class.

578.     Ford intentionally concealed that the defects contained in the Track-Ready powertrain system render Shelbys unfit for track use in that the transmissions of these vehicles

- 147 -

would overheat when placed under track conditions and unexpectedly go into Limp Mode after

less than 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby

vehicles. Ford concealed these facts to consumers.

579.    Ford further affirmatively misrepresented to Plaintiff in advertising and other

forms of communication, including standard and uniform material provided with each car and on

its website, that the Shelby it was selling had no significant defects and that all Shelbys were

Track-Ready.

580.    Ford knew that these representations were false when made.

581.    The Shelbys purchased by Plaintiff and the other Illinois Class members

contained a defective Track-Ready powertrain system.

582.    Ford had a duty to disclose that the Track-Ready powertrain system contained

defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other

Illinois Class members relied on Ford's material representations.

583.    As alleged herein, at all relevant times, Ford has held out the Shelbys to be free

from defects such as the defect related to the Track-Ready powertrain system. Ford touted and

continues to tout the many benefits and advantages of the Track-Ready powertrain system, but

nonetheless failed to disclose important facts related to the defect and that Plaintiff and other

Illinois Class members would be required to make additional aftermarket modifications to

adequately achieve Track-Ready performance, and that these modifications may violate their

express warranties. This made Ford's other disclosures about the Track-Ready powertrain system

deceptive.

584.    The truth about the defective Track-Ready powertrain system was known only to Ford; Plaintiff and the other Illinois Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and the other Illinois Class members.

585.    Plaintiff and the other Illinois Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Illinois Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and the other Illinois Class members by concealing the true facts about the Shelby's Track-Ready powertrain systems.

586.    Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Shelbys that played a significant role in the value of the vehicles and forced Plaintiff and the other Illinois Class members to make additional expenditures to ensure proper safety at the race track.

587.    Ford had a duty to disclose the defects inherent in the Track-Ready powertrain system and violations with respect to the Shelbys because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or the other Illinois Class members.

588.    Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Shelbys, without telling consumers that the defective Track-Ready powertrain system would affect the safety, quality, and performance of the vehicle.

589.    Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the Track-Ready powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Shelbys purchased by Plaintiff and the other Illinois Class members.

590.    Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Illinois Class members by concealing material information regarding the defects in the Track-Ready powertrain system.

591.    Plaintiff and the other Illinois Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Illinois Class members' actions were justified. Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or other Illinois Class members.

592.    Because of the concealment and/or suppression of facts, Plaintiff and the other Illinois Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of Ford's concealment of the true quality of those vehicles' Track-Ready powertrain systems. Had Plaintiff and the other Illinois Class members been aware of the defects in the Track-Ready powertrain systems installed in the Shelbys, and the company's disregard for the truth, Plaintiff and the other Illinois Class members who purchased a Shelby would have paid less for their vehicles or would not have purchased them at all.

- 150 -

593.   The value of Plaintiff's and the other Illinois Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the defective Track-Ready powertrain system of the Shelbys, which has made any reasonable consumer reluctant to purchase any of the Shelbys, let alone pay what otherwise would have been fair market value for the vehicles.

594.   Accordingly, Ford is liable to Plaintiff and the other Illinois Class members for damages in an amount to be proven at trial.

595.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other Illinois Class members' rights and the representations that Ford made to them, in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TWENTY

### BREACH OF EXPRESS WARRANTY
### (810 ILCS 5/2-313)

596.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

597.   Plaintiff brings this Count on behalf of the Illinois Class.

598.   Plaintiff was at all relevant times a "buyer" as defined by 810 ILCS 5/1-201(9).

599.   Ford was at all relevant times a "merchant" as defined by 810 ILCS 5/2-104.

600.   The Shelbys are and were at all relevant times "goods" as defined by 810 ILCS 5/2-105.

601.   As an express warrantor and manufacturer and merchant, Ford had certain obligations under 810 ILCS 5/2-313 to conform the Shelbys to the express warranties.

- 151 -

602.     When Plaintiff and the other Illinois Class members purchased their Shelbys, Ford expressly warranted in writing that the Shelbys were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. As set forth herein, Ford expressly warranted that it would (1) repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period, and (2) remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period. Also, as set forth herein, Ford breached its warranty obligations by selling inherently defective Shelbys and refusing to repair the defects or replace the defective parts.

603.     The defects at issue in this litigation were present at the time of sale to Plaintiff and members of the Illinois Class.

604.     Ford breached the Limited Warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford as Ford has been unable to repair or adjust the Shelby's materials and workmanship defects.

605.     Furthermore, the Limited Warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Illinois Class members whole and because Ford has failed and/or refused to adequately provide the promised remedies within a reasonable time.

606.     Pursuant to the express warranties, Ford was obligated to pay for or reimburse Plaintiff and the other Illinois Class members for costs incurred in purchasing after-market coolers for the transmission and differential systems and other costs associated with bringing their Shelbys to the dealership for futile repair efforts. Ford was also obligated to repair the defects.

607.   Accordingly, recovery by the Plaintiff and the other Illinois Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Illinois Class members seek all remedies as allowed by law.

608.   Also, as alleged in more detail herein, at the time that Ford warranted and sold the Shelbys, and while knowing that the Shelbys did not conform to Ford's Limited Warranty and were inherently defective, Ford wrongfully and fraudulently concealed material facts regarding the Shelbys. Plaintiff and the other Illinois Class members were therefore induced to purchase the Shelbys under false and/or fraudulent pretenses.

609.   Ford and its agent dealers have failed and refused to conform the Shelbys to the express warranties and Ford's conduct and has voided any attempt on its part to disclaim liability for its actions.

610.   Moreover, many of the damages flowing from the Shelbys cannot be resolved through the limited remedy of "replacement or adjustments" as those incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Illinois Class members' remedies would be insufficient to make Plaintiff and the other Illinois Class members whole.

611.   Ford received timely notice regarding the problems at issue in this litigation (indeed Ford knew of the defects prior to offering the Shelbys for sale or lease). Ford was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. Ford has received, on information and belief, many complaints from Illinois Class members advising them of the defects at issue in this litigation.

- 153 -

612.    Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

613.    Plaintiff has had sufficient dealings with either Ford or its agents (dealerships and/or Ford Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Illinois Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's express warranties and these warranties were advertised to Plaintiff and the other Illinois Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Shelbys and have no rights under the warranty agreements provided with the Shelbys; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

614.    As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the other Illinois Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value and benefit of the bargain damages.

## COUNT TWENTY-ONE

### UNJUST ENRICHMENT
### (BASED ON ILLINOIS LAW)

615.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

616.    Plaintiff brings this Count on behalf of the Illinois Class.

617.    Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Illinois Class members.

- 154 -

618. Ford has voluntarily accepted and retained this benefit.

619. The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Illinois Class members.

620. Plaintiff and the other Illinois Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT TWENTY-TWO

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

621. Plaintiff Jacques Rimokh ("Plaintiff" for purposes of all California Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

622. Plaintiff brings this Count on behalf of the California Class.

623. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

624. Ford's conduct, as described herein, was and is in violation of the UCL. Ford's conduct violates the UCL in at least the following ways:

    i.    By knowingly and intentionally concealing from Plaintiff and the other California Class members that the Shelbys suffer from defects while obtaining money from Plaintiff and California Class members;

    ii.    By marketing Shelbys as being useable on a track;

    iii.    By failing to disclose that the Shelby's Track-Ready powertrain system is defective as it is not equipped with a transmission cooler and rear differential cooler, that in the 2016 Shelbys leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode thereby creating a safety hazard on race tracks and public roadways;

iv.   By refusing or otherwise failing to repair and/or replace defective Shelbys;

v.    By violating federal laws, including the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; and

vi.   By violating other California laws, including Cal. Civ. Code §§ 1709, 1710, and 1750 *et seq.*, and Cal. Com. Code § 2313.

625.   Ford's omissions and/or misrepresentations alleged herein caused Plaintiff and the other California Class members to make their purchases or leases of their Shelbys. Absent those omissions and/or misrepresentations, Plaintiff and the other California Class members would not have purchased these Shelbys, would not have purchased these Shelbys at the prices they paid, and/or would have purchased less expensive alternative Shelbys that clearly indicated that they were not for track use.

626.   Accordingly, Plaintiff and the other California Class members have suffered injury in fact, including lost money or property, as a result of Ford's misrepresentations and omissions.

627.   Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Ford under Cal. Bus. & Prof. Code § 17200.

628.   Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and members of the California Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345; and for such other relief set forth below.

## COUNT TWENTY-THREE

## FRAUD BY CONCEALMENT
### (BASED ON CALIFORNIA LAW)

629.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

630.    Plaintiff brings this Count on behalf of the California Class.

631.    Ford intentionally concealed that the defects contained in the Track-Ready powertrain system render Shelbys unfit for track use in that the transmissions of these vehicles would overheat when placed under track conditions and unexpectedly go into Limp Mode after less than 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby vehicles. Ford concealed these facts to consumers.

632.    Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Shelby it was selling had no significant defects and that all Shelbys were Track-Ready.

633.    Ford knew that these representations were false when made.

634.    The Shelbys purchased by Plaintiff and the other California Class members contained a defective Track-Ready powertrain system.

635.    Ford had a duty to disclose that the Track-Ready powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other California Class members relied on Ford's material representations.

636.    As alleged herein, at all relevant times, Ford has held out the Shelbys to be free from defects such as the defect related to the Track-Ready powertrain system. Ford touted and continues to tout the many benefits and advantages of the Track-Ready powertrain system, but

- 157 -

nonetheless failed to disclose important facts related to the defect and that Plaintiff and other California Class members would be required to make additional aftermarket modifications to adequately achieve Track-Ready performance, and that these modifications may violate their express warranties. This made Ford's other disclosures about the Track-Ready powertrain system deceptive.

637.    The truth about the defective Track-Ready powertrain system was known only to Ford; Plaintiff and the other California Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and the other California Class members.

638.    Plaintiff and the other California Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other California Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and the other California Class members by concealing the true facts about the Shelby's Track-Ready powertrain systems.

639.    Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Shelbys that played a significant role in the value of the vehicles and forced Plaintiff and the other California Class members to make additional expenditures to ensure proper safety at the race track.

640.    Ford had a duty to disclose the defects inherent in the Track-Ready powertrain system and violations with respect to the Shelbys because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or the other California Class members.

641.    Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Shelbys, without telling consumers that the defective Track-Ready powertrain system would affect the safety, quality, and performance of the vehicle.

642.    Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the Track-Ready powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Shelbys purchased by Plaintiff and the other California Class members.

643.    Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and the other California Class members by concealing material information regarding the defects in the Track-Ready powertrain system.

644.    Plaintiff and the other California Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other California Class members' actions were justified. Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or other California Class members.

645.    Because of the concealment and/or suppression of facts, Plaintiff and the other California Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of Ford's concealment of the true quality of those vehicles' Track-Ready powertrain systems. Had Plaintiff and the other California Class members been aware of the

- 159 -

defects in the Track-Ready powertrain systems installed in the Shelbys, and the company's disregard for the truth, Plaintiff and the other California Class members who purchased a Shelby would have paid less for their vehicles or would not have purchased them at all.

646.   The value of Plaintiff's and the other California Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the defective Track-Ready powertrain system of the Shelbys, which has made any reasonable consumer reluctant to purchase any of the Shelbys, let alone pay what otherwise would have been fair market value for the vehicles.

647.   Accordingly, Ford is liable to Plaintiff and the other California Class members for damages in an amount to be proven at trial.

648.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other California Class members' rights and the representations that Ford made to them, in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TWENTY-FOUR

### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)

649.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

650.   Plaintiff brings this Count on behalf of the California Class.

651.   Cal. Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other

- 160 -

publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

652.   Ford has violated Cal. Bus. & Prof. Code § 17500 because the omissions and/or misrepresentations regarding the safety, reliability, and functionality of its Shelbys as set forth in this complaint were material and likely to deceive a reasonable consumer.

653.   Plaintiff and the other California Class members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Shelbys, Plaintiff and the other California Class members relied on the omissions and/or misrepresentations of Ford with respect to the safety and reliability of the Shelbys. Ford's representations turned out not to be true because the Shelbys have Track-Ready powertrain systems that are defective as they are not equipped with a transmission cooler and rear differential cooler, which in the 2016 Shelbys leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode thereby creating a safety hazard on race tracks and public roadways. Had Plaintiff and the other California Class members known this, they would not have purchased their Shelbys and/or paid as much for them. Accordingly, Plaintiff and the other California Class members overpaid for their Shelbys and did not receive the benefit of their bargain.

654.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

655.   Plaintiff, individually and on behalf of the other California Class members, requests that this Court enter such orders or judgments as may be necessary to enjoin Ford from

- 161 -

continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other California Class members any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT TWENTY-FIVE

## VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750 *ET SEQ.*)

656.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

657.    Plaintiff brings this Count on behalf of the California Class.

658.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

659.    The Shelbys are "goods" as defined in Cal. Civ. Code § 1761(a).

660.    Plaintiff and the other California Class members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiff, the other California Class members, and Ford are "persons" as defined in Cal. Civ. Code § 1761(c).

661.    In purchasing or leasing the Shelbys, Plaintiff and the other California Class members were deceived by Ford's failure to disclose that the Shelby's Track-Ready powertrain systems are defective as they are not equipped with a transmission cooler or differential cooler, which in the 2016 Shelbys leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode thereby creating a safety hazard on race tracks and public roadways.

662.     Ford's conduct, as described hereinabove, was and is in violation of the CLRA. Ford's conduct violates at least Cal. Civ. Code § 1770(a)(16) (representing that goods have been supplied in accordance with a previous representation when they have not).

663.     Plaintiff and the other California Class members have suffered injury in fact and actual damages resulting from Ford's material omissions and/or misrepresentations because they paid an inflated purchase or lease price for the Shelbys.

664.     Ford knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the Shelbys and that the Shelbys were not suitable for their intended use.

665.     The facts concealed and omitted by Ford to Plaintiff and the other California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Shelbys or pay a lower price. Had Plaintiff and the other California Class members known about the defective nature of the Shelbys and their inability to operate these Shelbys safety on a race track, they would not have purchased the Shelbys or would not have paid the prices they did.

666.     Plaintiff has provided Ford with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a). The notice was sent to Ford on March 21, 2017.

667.     Plaintiff's and the other California Class members' injuries were proximately caused by Ford's fraudulent and deceptive business practices.

668.     Therefore, Plaintiff and the other California Class members are entitled to equitable relief and will amend this action and seek monetary relief under the CLRA.

## COUNT TWENTY-SIX

### UNJUST ENRICHMENT
### (BASED ON CALIFORNIA LAW)

669.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

670.    Plaintiff brings this Count on behalf of the California Class.

671.    Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other California Class members.

672.    Ford has voluntarily accepted and retained this benefit.

673.    The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other California Class members.

674.    Plaintiff and the other California Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT TWENTY-SEVEN

### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010 *ET SEQ.*)

675.    Plaintiffs Michael McCurry and Greg Roberts ("Plaintiffs" for purposes of all Missouri Class Counts) incorporate by reference all preceding allegations as though fully set forth herein.

676.    Plaintiffs bring this Count on behalf of the Missouri Class.

- 164 -

677.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

678.    Ford, Plaintiffs, and Missouri Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

679.    Ford engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

680.    Ford is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Ford's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT TWENTY-EIGHT

## FRAUD BY CONCEALMENT
## (BASED ON MISSOURI LAW)

681.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

682.    Plaintiffs bring this Count on behalf of the Missouri Class.

683.    Ford intentionally concealed that the defects contained in the Track-Ready powertrain system render Shelbys unfit for track use in that the transmissions of these vehicles would overheat when placed under track conditions and unexpectedly go into Limp Mode after less than 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby vehicles. Ford concealed these facts to consumers.

684.    Ford further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on

- 165 -

its website, that the Shelby it was selling had no significant defects and that all Shelbys were Track-Ready.

685.    Ford knew that these representations were false when made.

686.    The Shelbys purchased by Plaintiffs and the other Missouri Class members contained a defective Track-Ready powertrain system.

687.    Ford had a duty to disclose that the Track-Ready powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiffs and the other Missouri Class members relied on Ford's material representations.

688.    As alleged herein, at all relevant times, Ford has held out the Shelbys to be free from defects such as the defect related to the Track-Ready powertrain system. Ford touted and continues to tout the many benefits and advantages of the Track-Ready powertrain system, but nonetheless failed to disclose important facts related to the defect and that Plaintiffs and other Missouri Class members would be required to make additional aftermarket modifications to adequately achieve Track-Ready performance, and that these modifications may violate their express warranties. This made Ford's other disclosures about the Track-Ready powertrain system deceptive.

689.    The truth about the defective Track-Ready powertrain system was known only to Ford; Plaintiffs and the other Missouri Class members did not know of these facts and Ford actively concealed these facts from Plaintiffs and the other Missouri Class members.

690.    Plaintiffs and the other Missouri Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Missouri Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiffs and the

- 166 -

other Missouri Class members by concealing the true facts about the Shelby's Track-Ready powertrain systems.

691.    Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Shelbys that played a significant role in the value of the vehicles and forced Plaintiffs and the other Missouri Class members to make additional expenditures to ensure proper safety at the race track.

692.    Ford had a duty to disclose the defects inherent in the Track-Ready powertrain system and violations with respect to the Shelbys because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiffs or the other Missouri Class members.

693.    Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Shelbys, without telling consumers that the defective Track-Ready powertrain system would affect the safety, quality, and performance of the vehicle.

694.    Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the Track-Ready powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Shelbys purchased by Plaintiffs and the other Missouri Class members.

695.    Ford has still not made full and adequate disclosures and continues to defraud Plaintiffs and the other Missouri Class members by concealing material information regarding the defects in the Track-Ready powertrain system.

- 167 -

696.    Plaintiffs and the other Missouri Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the other Missouri Class members' actions were justified. Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiffs, or other Missouri Class members.

697.    Because of the concealment and/or suppression of facts, Plaintiffs and the other Missouri Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of Ford's concealment of the true quality of those vehicles' Track-Ready powertrain systems. Had Plaintiffs and the other Missouri Class members been aware of the defects in the Track-Ready powertrain systems installed in the Shelbys, and the company's disregard for the truth, Plaintiffs and the other Missouri Class members who purchased a Shelby would have paid less for their vehicles or would not have purchased them at all.

698.    The value of Plaintiffs' and the other Missouri Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the defective Track-Ready powertrain system of the Shelbys, which has made any reasonable consumer reluctant to purchase any of the Shelbys, let alone pay what otherwise would have been fair market value for the vehicles.

699.    Accordingly, Ford is liable to Plaintiffs and the other Missouri Class members for damages in an amount to be proven at trial.

700.    Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Missouri Class members' rights and the representations that Ford made to them, in order to enrich Ford. Ford's conduct

- 168 -

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TWENTY-NINE

### BREACH OF EXPRESS WARRANTY
### (MO. REV. STAT. § 400.2-313.1)

701.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

702.    Plaintiffs bring this Count on behalf of the Missouri Class.

703.    Plaintiffs were each at all relevant times a "buyer" as defined by Mo. Rev. Stat. § 400.201(9).

704.    Ford was at all relevant times a "merchant" as defined by Mo. Rev. Stat. § 400.2-104.

705.    The Shelbys are and were at all relevant times "goods" as defined by Mo. Rev. Stat. § 400.2-105.

706.    As an express warrantor and manufacturer and merchant, Ford had certain obligations under Mo. Rev. Stat. § 400.2-313.1 to conform the Shelbys to the express warranties.

707.    When Plaintiffs and the other Missouri Class members purchased their Shelbys, Ford expressly warranted in writing that the Shelbys were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. As set forth herein, Ford expressly warranted that it would (1) repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period, and (2) remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period. Also, as set forth herein, Ford breached its warranty obligations by selling inherently defective Shelbys and refusing to repair the defects or replace the defective parts.

- 169 -

708.    The defects at issue in this litigation were present at the time of sale to Plaintiffs and members of the Missouri Class.

709.    Ford breached the Limited Warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford as Ford has been unable to repair or adjust the Shelby's materials and workmanship defects.

710.    Furthermore, the Limited Warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Missouri Class members whole and because Ford has failed and/or refused to adequately provide the promised remedies within a reasonable time.

711.    Pursuant to the express warranties, Ford was obligated to pay for or reimburse Plaintiffs and the other Missouri Class members for costs incurred in purchasing after-market coolers for the transmission and differential systems and other costs associated with bringing their Shelbys to the dealership for futile repair efforts. Ford was also obligated to repair the defects.

712.    Accordingly, recovery by the Plaintiffs and the other Missouri Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs and the other Missouri Class members seek all remedies as allowed by law.

713.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the Shelbys, and while knowing that the Shelbys did not conform to Ford's Limited Warranty and were inherently defective, Ford wrongfully and fraudulently concealed material facts regarding the Shelbys. Plaintiffs and the other Missouri Class members were therefore induced to purchase the Shelbys under false and/or fraudulent pretenses.

- 170 -

714.    Ford and its agent dealers have failed and refused to conform the Shelbys to the express warranties and Ford's conduct and has voided any attempt on its part to disclaim liability for its actions.

715.    Moreover, many of the damages flowing from the Shelbys cannot be resolved through the limited remedy of "replacement or adjustments" as those incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Missouri Class members' remedies would be insufficient to make Plaintiffs and the other Missouri Class members whole.

716.    Ford received timely notice regarding the problems at issue in this litigation (indeed Ford knew of the defects prior to offering the Shelbys for sale or lease). Ford was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. Ford has received, on information and belief, many complaints from Missouri Class members advising them of the defects at issue in this litigation.

717.    Plaintiffs have performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

718.    Plaintiffs have had sufficient dealings with either Ford or its agents (dealerships and/or Ford Performance) to establish privity of contract. Privity is not required in this case because Plaintiffs and the other Missouri Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's express warranties and these warranties were advertised to Plaintiffs and the other Missouri Class members as the ultimate consumers. The dealers were not intended to be the ultimate

consumers of the Shelbys and have no rights under the warranty agreements provided with the Shelbys; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

719.    As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and the other Missouri Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value and benefit of the bargain damages.

## COUNT THIRTY

### UNJUST ENRICHMENT
### (BASED ON MISSOURI LAW)

720.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

721.    Plaintiffs bring this Count on behalf of the Missouri Class.

722.    Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Missouri Class members.

723.    Ford has voluntarily accepted and retained this benefit.

724.    The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Missouri Class members.

725.    Plaintiffs and the other Missouri Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT THIRTY-ONE

## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (73 P.S. § 201-1 *ET SEQ.*)

726.     Plaintiff Jose Cruz ("Plaintiff" for purposes of all Pennsylvania Class Counts)

incorporates by reference all preceding allegations as though fully set forth herein.

727.     Plaintiff brings this Count on behalf of the Pennsylvania Class.

728.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law

(Pennsylvania CPL) prohibits unfair or deceptive acts or practices, including: "[m]aking false or

misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions"; and "[e]ngaging in any other fraudulent or deceptive conduct which creates a

likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4).

729.     Ford, Plaintiff, and Pennsylvania Class members are "persons" within the

meaning of 73 P.S. § 201-2(2).

730.     Plaintiff purchased a Shelby primarily for personal, family, or household purposes

within the meaning of 73 P.S. § 201-9.2.

731.     All of the acts complained of herein were perpetrated by Ford in the course of

trade or commerce within the meaning of 73 P.S. § 201-2(3).

732.     Ford is liable to Plaintiff for treble his actual damages or $100, whichever is

greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff is also entitled to an award

of punitive damages given that Ford's conduct was malicious, wanton, willful, oppressive, or

exhibited a reckless indifference to the rights of others.

## COUNT THIRTY-TWO

## FRAUD BY CONCEALMENT
### (BASED ON PENNSYLVANIA LAW)

733.    Plaintiff incorporates by reference all preceding allegations as though fully set

forth herein.

734.    Plaintiff brings this Count on behalf of the Pennsylvania Class.

735.    Ford intentionally concealed that the defects contained in the Track-Ready

powertrain system render Shelbys unfit for track use in that the transmissions of these vehicles

would overheat when placed under track conditions and unexpectedly go into Limp Mode after

less than 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby

vehicles. Ford concealed these facts to consumers.

736.    Ford further affirmatively misrepresented to Plaintiff in advertising and other

forms of communication, including standard and uniform material provided with each car and on

its website, that the Shelby it was selling had no significant defects and that all Shelbys were

Track-Ready.

737.    Ford knew that these representations were false when made.

738.    The Shelbys purchased by Plaintiff and the other Pennsylvania Class members

contained a defective Track-Ready powertrain system.

739.    Ford had a duty to disclose that the Track-Ready powertrain system contained

defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other

Pennsylvania Class members relied on Ford's material representations.

740.    As alleged herein, at all relevant times, Ford has held out the Shelbys to be free

from defects such as the defect related to the Track-Ready powertrain system. Ford touted and

continues to tout the many benefits and advantages of the Track-Ready powertrain system, but

- 174 -

nonetheless failed to disclose important facts related to the defect and that Plaintiff and other Pennsylvania Class members would be required to make additional aftermarket modifications to adequately achieve Track-Ready performance, and that these modifications may violate their express warranties. This made Ford's other disclosures about the Track-Ready powertrain system deceptive.

741. The truth about the defective Track-Ready powertrain system was known only to Ford; Plaintiff and the other Pennsylvania Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and the other Pennsylvania Class members.

742. Plaintiff and the other Pennsylvania Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Pennsylvania Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and the other Pennsylvania Class members by concealing the true facts about the Shelby's Track-Ready powertrain systems.

743. Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Shelbys that played a significant role in the value of the vehicles and forced Plaintiff and the other Pennsylvania Class members to make additional expenditures to ensure proper safety at the race track.

744. Ford had a duty to disclose the defects inherent in the Track-Ready powertrain system and violations with respect to the Shelbys because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or the other Pennsylvania Class members.

- 175 -

745.    Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Shelbys, without telling consumers that the defective Track-Ready powertrain system would affect the safety, quality, and performance of the vehicle.

746.    Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the Track-Ready powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Shelbys purchased by Plaintiff and the other Pennsylvania Class members.

747.    Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Pennsylvania Class members by concealing material information regarding the defects in the Track-Ready powertrain system.

748.    Plaintiff and the other Pennsylvania Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Pennsylvania Class members' actions were justified. Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or other Pennsylvania Class members.

749.    Because of the concealment and/or suppression of facts, Plaintiff and the other Pennsylvania Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of Ford's concealment of the true quality of those vehicles' Track-

Ready powertrain systems. Had Plaintiff and the other Pennsylvania Class members been aware of the defects in the Track-Ready powertrain systems installed in the Shelbys, and the company's disregard for the truth, Plaintiff and the other Pennsylvania Class members who purchased a Shelby would have paid less for their vehicles or would not have purchased them at all.

750.    The value of Plaintiff's and the other Pennsylvania Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the defective Track-Ready powertrain system of the Shelbys, which has made any reasonable consumer reluctant to purchase any of the Shelbys, let alone pay what otherwise would have been fair market value for the vehicles.

751.    Accordingly, Ford is liable to Plaintiff and the other Pennsylvania Class members for damages in an amount to be proven at trial.

752.    Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other Pennsylvania Class members' rights and the representations that Ford made to them, in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT THIRTY-THREE

### BREACH OF EXPRESS WARRANTY
### (13 PA. CONS. STAT. ANN. § 2103 )

753.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

754.    Plaintiff brings this Count on behalf of the Pennsylvania Class.

755.    Plaintiff was at all relevant times a "buyer" as defined by 13 Pa. Cons. Stat. Ann. § 2103(a).

- 177 -

756.    Ford was at all relevant times a "merchant" as defined by 13 Pa. Cons. Stat. Ann. § 2104.

757.    The Shelbys are and were at all relevant times "goods" as defined by 13 Pa. Cons. Stat. Ann. § 2105.

758.    As an express warrantor and manufacturer and merchant, Ford had certain obligations under 13 Pa. Cons. Stat. Ann. § 2313 to conform the Shelbys to the express warranties.

759.    When Plaintiff and the other Pennsylvania Class members purchased their Shelbys, Ford expressly warranted in writing that the Shelbys were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. As set forth herein, Ford expressly warranted that it would (1) repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period, and (2) remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period. Also, as set forth herein, Ford breached its warranty obligations by selling inherently defective Shelbys and refusing to repair the defects or replace the defective parts.

760.    The defects at issue in this litigation were present at the time of sale to Plaintiff and members of the Pennsylvania Class.

761.    Ford breached the Limited Warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford as Ford has been unable to repair or adjust the Shelby's materials and workmanship defects.

762.    Furthermore, the Limited Warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff

- 178 -

and the other Pennsylvania Class members whole and because Ford has failed and/or refused to adequately provide the promised remedies within a reasonable time.

763.    Pursuant to the express warranties, Ford was obligated to pay for or reimburse Plaintiff and the other Pennsylvania Class members for costs incurred in purchasing after-market coolers for the transmission and differential systems and other costs associated with bringing their Shelbys to the dealership for futile repair efforts. Ford was also obligated to repair the defects.

764.    Accordingly, recovery by the Plaintiff and the other Pennsylvania Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Pennsylvania Class members seek all remedies as allowed by law.

765.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the Shelbys, and while knowing that the Shelbys did not conform to Ford's Limited Warranty and were inherently defective, Ford wrongfully and fraudulently concealed material facts regarding the Shelbys. Plaintiff and the other Pennsylvania Class members were therefore induced to purchase the Shelbys under false and/or fraudulent pretenses.

766.    Ford and its agent dealers have failed and refused to conform the Shelbys to the express warranties and Ford's conduct and has voided any attempt on its part to disclaim liability for its actions.

767.    Moreover, many of the damages flowing from the Shelbys cannot be resolved through the limited remedy of "replacement or adjustments" as those incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a

reasonable time, and any limitation on Plaintiff's and the other Pennsylvania Class members' remedies would be insufficient to make Plaintiff and the other Pennsylvania Class members whole.

768.    Ford received timely notice regarding the problems at issue in this litigation (indeed Ford knew of the defects prior to offering the Shelbys for sale or lease). Ford was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. Ford has received, on information and belief, many complaints from Pennsylvania Class members advising them of the defects at issue in this litigation.

769.    Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

770.    Plaintiff has had sufficient dealings with either Ford or its agents (dealerships and/or Ford Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Pennsylvania Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's express warranties and these warranties were advertised to Plaintiff and the other Pennsylvania Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Shelbys and have no rights under the warranty agreements provided with the Shelbys; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

771.    As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the other Pennsylvania Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value and benefit of the bargain damages.

## COUNT THIRTY-FOURUNJUST ENRICHMENT
## (BASED ON PENNSYLVANIA LAW)

772.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

773.     Plaintiff brings this Count on behalf of the Pennsylvania Class.

774.     Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Pennsylvania Class members.

775.     Ford has voluntarily accepted and retained this benefit.

776.     The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Pennsylvania Class members.

777.     Plaintiff and the other Pennsylvania Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.


## VIII.   FRAUDULENT CONCEALMENT CLAIMS

## COUNT THIRTY-FIVE

## FRAUD BY CONCEALMENT
## FOR REMAINING STATES

778.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

779.     Plaintiffs bring this Count on behalf of residents of the following states:

Alabama                    Montana

- 181 -

| | |
|---|---|
| Alaska | Nebraska |
| Arizona | Nevada |
| Arkansas | New Hampshire |
| Colorado | New Jersey |
| Connecticut | New Mexico |
| Delaware | New York |
| Georgia | North Carolina |
| Hawaii | North Dakota |
| Idaho | Ohio |
| Indiana | Oklahoma |
| Iowa | Oregon |
| Kansas | Rhode Island |
| Kentucky | South Carolina |
| Louisiana | South Dakota |
| Maine | Utah |
| Maryland | Vermont |
| Massachusetts | Virginia |
| Michigan | West Virginia |
| Minnesota | Wisconsin |
| Mississippi | Wyoming |

780.    Ford intentionally concealed that the defects contained in the Track-Ready

powertrain system render Shelbys unfit for track use in that the transmissions of these vehicles

would overheat when placed under track conditions and unexpectedly go into Limp Mode after

less than 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby

vehicles. Ford concealed these facts to consumers.

781.    Ford further affirmatively misrepresented to Plaintiffs in advertising and other

forms of communication, including standard and uniform material provided with each car and on

its website, that the Shelby it was selling had no significant defects and that all Shelbys were

Track-Ready.

782.    Ford knew that these representations were false when made.

783.    The Shelbys purchased by Plaintiffs and the other Class members contained a

defective Track-Ready powertrain system.

- 182 -

784.    Ford had a duty to disclose that the Track-Ready powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiffs and the other Class members relied on Ford's material representations.

785.    As alleged herein, at all relevant times, Ford has held out the Shelbys to be free from defects such as the defect related to the Track-Ready powertrain system. Ford touted and continues to tout the many benefits and advantages of the Track-Ready powertrain system, but nonetheless failed to disclose important facts related to the defect and that Plaintiffs and other Class members would be required to make additional aftermarket modifications to adequately achieve Track-Ready performance, and that these modifications may violate their express warranties. This made Ford's other disclosures about the Track-Ready powertrain system deceptive.

786.    The truth about the defective Track-Ready powertrain system was known only to Ford; Plaintiffs and the other Class members did not know of these facts and Ford actively concealed these facts from Plaintiffs and the other Class members.

787.    Plaintiffs and the other Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiffs and the other Class members by concealing the true facts about the Shelby's Track-Ready powertrain systems.

788.    Ford's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Shelbys that played a significant role in the value of the vehicles and forced Plaintiffs and the other Class members to make additional expenditures to ensure proper safety at the race track.

789.     Ford had a duty to disclose the defects inherent in the Track-Ready powertrain system and violations with respect to the Shelbys because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive and/or superior knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiffs or the other Class members.

790.     Ford also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Shelbys, without telling consumers that the defective Track-Ready powertrain system would affect the safety, quality, and performance of the vehicle.

791.     Ford's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the Track-Ready powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Shelbys purchased by Plaintiffs and the other Class members.

792.     Ford has still not made full and adequate disclosures and continues to defraud Plaintiffs and the other Class members by concealing material information regarding the defects in the Track-Ready powertrain system.

793.     Plaintiffs and the other Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the other Class members' actions were

justified. Ford was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiffs, or other Class members.

794.    Because of the concealment and/or suppression of facts, Plaintiffs and the other Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of Ford's concealment of the true quality of those vehicles' Track-Ready powertrain systems. Had Plaintiffs and the other Class members been aware of the defects in the Track-Ready powertrain systems installed in the Shelbys, and the company's disregard for the truth, Plaintiffs and the other Class members who purchased a Shelby would have paid less for their vehicles or would not have purchased them at all.

795.    The value of Plaintiffs' and the other Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the defective Track-Ready powertrain system of the Shelbys, which has made any reasonable consumer reluctant to purchase any of the Shelbys, let alone pay what otherwise would have been fair market value for the vehicles.

796.    Accordingly, Ford is liable to Plaintiffs and the other Class members for damages in an amount to be proven at trial.

797.    Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Class members' rights and the representations that Ford made to them, in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## IX.    STATUTORY CLAIMS

798.    Plaintiffs assert statutory consumer protection and fraudulent concealment claims on behalf of consumers in other states as follows:

- 185 -

## COUNT THIRTY-SIX

## VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-19-1 *ET SEQ.*)

799.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

800.    Plaintiffs bring this Count on behalf of the Alabama Class.

801.    The Alabama Deceptive Trade Practices Act declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions"; and "(27) engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

802.    Plaintiffs and Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

803.    Plaintiffs, Class members, and Ford are "persons" within the meaning of Ala. Code § 8-19-3(3).

804.    Ford was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

805.    Pursuant to Alabama Code § 8-19-10, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff.

806.    Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code § 8-19-1 *et seq.*

010678-11 958612 V1

807. On May 15, 2017, Plaintiffs sent a letter complying with Ala. Code § 8-19-10(e) to Ford. Because Ford failed to remedy its unlawful conduct within the requisite period, Plaintiffs seek all damages and relief to which they are entitled.

**COUNT THIRTY-SEVEN**

**VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT
(ALASKA STAT. ANN. § 45.50.471 *ET SEQ.*)**

808. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

809. Plaintiffs bring this Count on behalf of the Alaska Class.

810. The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA") declared unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "(10) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." Alaska Stat. Ann. § 45.50.471.

811. Pursuant to Alaska Stat Ann. § 45.50.531, Plaintiffs seek monetary relief against Ford measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each Plaintiff.

812. Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. Ann. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

- 187 -

813.    On May 15, 2017, Plaintiffs sent a letter complying with Alaska Stat. Ann.

§ 45.50.535(b)(1) to Ford.

## COUNT THIRTY-EIGHT

## VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
## (ARIZ. REV. STAT. § 44-1521 *ET SEQ.*)

814.    Plaintiffs incorporate by reference all preceding allegations as though fully set

forth herein.

815.    Plaintiffs bring this Count on behalf of the Arizona Class.

816.    The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use

or employment by any person of any deception, deceptive act or practice, fraud . . . ,

misrepresentation, or concealment, suppression or omission of any material fact with intent that

others rely upon such concealment, suppression or omission, in connection with the sale . . . of

any merchandise whether or not any person has in fact been misled, deceived or damaged

thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

817.    Ford, Plaintiffs, and Class members are "persons" within the meaning of Ariz.

Rev. Stat. § 44-1521(6).

818.    Each Shelby at issue is "merchandise" within the meaning of Ariz. Rev. Stat.

§ 44-1521(5).

819.    Ford conduct, as set forth above, occurred in the conduct of trade or commerce.

820.    Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against Ford in an

amount to be determined at trial. Plaintiffs also seek punitive damages because Ford engaged in

aggravated and outrageous conduct with an evil mind.

821.    Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive

practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

- 188 -

## COUNT THIRTY-NINE

## VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### (ARK. CODE ANN. § 4-88-101 *ET SEQ.*)

822.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

823.    Plaintiffs bring this Count on behalf of the Arkansas Class.

824.    The Arkansas Deceptive Trade Practices Act ("Arkansas DTPA") prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to "[e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." Ark Code Ann. § 4-88-108.

825.    Ford, Plaintiffs, and Class members are "persons" within the meaning of Ark. Code Ann. § 4-88-102(5).

826.    The Shelbys at issue constitute "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

827.    Plaintiffs seek monetary relief against Ford in an amount to be determined at trial. Plaintiffs also seek punitive damages because Ford acted wantonly in causing Plaintiffs' and Class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

828.    Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT FORTY

### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *ET SEQ.*)

829.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

830.    Plaintiffs bring this Count on behalf of the Colorado Class.

831.    The Colorado Consumer Protection Act ("Colorado CPA") prohibits deceptive practices in the course of a person's business, including but not limited to "mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6-1-105.

832.    Ford is a "person" under Colo. Rev. Stat. § 6-1-102(6).

833.    Plaintiffs and Class members are "consumers" for purposes of Colo. Rev. Stat § 6-1-113(1)(a).

834.    Ford's conduct, as set forth above, occurred in the conduct or trade or commerce.

835.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff or Class member.

836.    Plaintiffs also seek an order enjoining Ford's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

## COUNT FORTY-ONE

## VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. § 42-110A *ET SEQ.*)

837.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

838.    Plaintiffs bring this Count on behalf of the Connecticut Class.

839.    The Connecticut Unfair Trade Practices Act provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

840.    Ford is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

841.    Ford's challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

842.    Plaintiffs and Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

843.    Ford acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights, and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

## COUNT FORTY-TWO

## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### (DEL. CODE ANN. TIT. 6, § 2513 *ET SEQ.*)

844.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

845.    Plaintiffs bring this Count on behalf of the Delaware Class.

846.    The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby." Del. Code Ann. tit. 6, § 2513(a).

847.    Ford is a "person" within the meaning of Del. Code Ann. tit. 6, § 2511(7).

848.    Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

849.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Ford's unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980). Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

850.    Ford engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT FORTY-THREE

## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
### (GA. CODE ANN. § 10-1-390 *ET SEQ.*)

851.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

852.    Plaintiffs bring this Count on behalf of the Georgia Class.

853.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 101-393(b), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

854.    Plaintiffs and Class members are "consumers" within the meaning of Ga. Code Ann. § 10-1-393(b).

855.    Ford engaged in "trade or commerce" within the meaning of Ga. Code Ann. § 10-1-393(b).

856.    Plaintiffs are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code Ann. § 10-1-399(a).

857.    Plaintiffs also seek an order enjoining Ford unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code Ann. § 10-1-399.

- 193 -

858.   On May 15, 2017, Plaintiffs sent a letter complying with Ga. Code Ann. § 10-1-399(b) to Ford.

## COUNT FORTY-FOUR

### VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT (GA. CODE ANN. § 10-1-370 *ET SEQ.*)

859.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

860.   Plaintiffs bring this Count on behalf of the Georgia Class.

861.   Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA") prohibits "deceptive trade practices," which include "[m]ak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a).

862.   Ford, Plaintiffs, and Class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

863.   Plaintiffs seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

## COUNT FORTY-FIVE

### VIOLATION OF THE HAWAII ACT § 480-2(A) (HAW. REV. STAT. § 480 *ET SEQ.*)

864.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

865.   Plaintiffs bring this Count on behalf of the Hawaii Class.

866.     Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

867.     Ford is a "person" under Haw. Rev. Stat. § 480-1.

868.     Plaintiffs and Class members are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1, who purchased the vehicle at issue.

869.     Pursuant to Haw. Rev. Stat. § 480-13, Plaintiffs seek monetary relief against Ford measured as the greater of (a) $1000 and (b) threefold actual damages in an amount to be determined at trial.

870.     Under Haw. Rev. Stat. § 480-13.5, Plaintiffs seek an additional award against Ford of up to $10,000 for each violation directed at a Hawaii elder. Ford knew or should have known that its conduct was directed to one or more Plaintiffs who are elders. Ford's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. Plaintiffs who are elders are substantially more vulnerable to Ford's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from Ford's conduct.

## COUNT FORTY-SIX

## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
### (IDAHO CODE ANN. § 48-601 *ET SEQ.*)

871.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

872.     Plaintiffs bring this Count on behalf of the Idaho Class.

- 195 -

873.     The Idaho Consumer Protection Act ("Idaho CPA") prohibits deceptive business practices, including but not limited to "(11) [m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "(17) [e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer"; or "(18) engaging in any unconscionable method, act or practice in the conduct of trade or commerce." Idaho Code Ann. § 48-603.

874.     Ford is a "person" under Idaho Code Ann. § 48-602(1).

875.     Ford's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

876.     Pursuant to Idaho Code § 48-608, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1000 for each Plaintiff.

877.     Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

878.     Plaintiffs also seek punitive damages against Ford because Ford's conduct evidences an extreme deviation from reasonable standards. Ford flagrantly, maliciously, and fraudulently misrepresented the actual capability of the Shelbys' performance both on the race track and under normal driving conditions, as these vehicles were not Track-Ready or track-capable as promised. Ford also concealed that the Shelbys can overheat and unexpectedly go into Limp Mode under both track conditions and under normal conditions. Ford manipulated consumers and jeopardized the safety of Shelby drivers and those around them, all for the sake of increasing revenue through higher prices. Ford's egregious conduct warrants punitive damages.

## COUNT FORTY-SEVEN

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3)

879.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

880.    Plaintiffs bring this Count on behalf of the Indiana Class.

881.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to representations that "a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not." Ind. Code § 24-5-0.5-3(b).

882.    Ford is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2) and a "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

883.    Plaintiffs' payments for Shelbys are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

884.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff, including treble damages up to $1000 for Ford's willfully deceptive acts.

885.    Plaintiffs also seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

886.    On May 15, 2017, Plaintiffs sent a letter complying with Ind. Code § 24-5-0.5-5(a) to Ford. Because Ford failed to remedy its unlawful conduct within the requisite period, Plaintiffs seek all damages and relief to which they are entitled.

- 197 -

## COUNT FORTY-EIGHT

## VIOLATION OF THE IOWA PRIVATE RIGHT
## OF ACTION FOR CONSUMER FRAUDS ACT
## (IOWA CODE § 714H.1 *ET SEQ.*)

887.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

888.    Plaintiffs bring this Count on behalf of the Iowa Class.

889.    The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3.

890.    Ford is a "person" under Iowa Code § 714H.2(7).

891.    Plaintiffs and Class members are "consumers" as defined by Iowa Code § 714H.2(3), who purchased Shelbys.

892.    Pursuant to Iowa Code § 714H.5, Plaintiffs seek an order enjoining Ford's unfair and/or deceptive acts or practices; actual damages; and statutory damages up to three times the amount of actual damages awarded as a result of Ford's willful and wanton disregard for the rights and safety of others; attorneys' fees; and other such equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

## COUNT FORTY-NINE

## VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### (KAN. STAT. ANN. § 50-623 *ET SEQ.*)

893.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

894.     Plaintiffs bring this Count on behalf of the Kansas Class.

895.     The Kansas Consumer Protection Act states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a). Deceptive acts or practices include, but are not limited to, "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions," "whether or not any consumer has in fact been misled." Kan. Stat. Ann. § 50-626.

896.     Plaintiffs and Class members are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased Shelbys.

897.     The sale of Shelbys to Plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

898.     Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

899.     Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623 *et seq.*

## COUNT FIFTY

### VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
### (KY. REV. STAT. ANN. § 367.110 *ET SEQ.*)

900.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

901.     Plaintiffs bring this Count on behalf of the Kentucky Class.

902.     The Kentucky Consumer Protection Act makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." Ky. Rev. Stat. Ann. § 367.170(1).

903.     Ford, Plaintiffs, and Class members are "persons" within the meaning of Ky. Rev. Stat. Ann. § 367.110(1).

904.     Ford engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

905.     Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining Ford's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

## COUNT FIFTY-ONE

### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
### AND CONSUMER PROTECTION LAW
### (LA. REV. STAT. ANN. § 51:1401 *ET SEQ.*)

906.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

907.     Plaintiffs bring this Count on behalf of the Louisiana Class.

- 200 -

908.    The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana

CPL) makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La.

Rev. Stat. Ann. § 51:1405(A).

909.    Ford, Plaintiffs, and Class members are "persons" within the meaning of La. Rev.

Stat. Ann. § 51:1402(8).

910.    Plaintiffs and Class members are "consumers" within the meaning of La. Rev.

Stat. Ann. § 51:1402(1).

911.    Ford engaged in "trade" or "commerce" within the meaning of La. Rev. Stat.

Ann. § 51:1402(9).

912.    Pursuant to La. Rev. Stat. Ann. § 51:1409, Plaintiffs seek to recover actual

damages in an amount to be determined at trial; treble damages for knowing violations of the

Louisiana CPL; an order enjoining Ford's unfair, unlawful, and/or deceptive practices;

declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev.

Stat. Ann. § 51:1409.

## COUNT FIFTY-TWO

### VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### (ME. REV. STAT. ANN. TIT. 5, § 205-A *ET SEQ.*)

913.    Plaintiffs incorporate by reference all preceding allegations as though fully set

forth herein.

914.    Plaintiffs bring this Count on behalf of the Maine Class.

915.    The Maine Unfair Trade Practices Act makes unlawful "[u]nfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Me. Rev. Stat. Ann. tit. 5, § 207.

916.    Ford, Plaintiffs, and Class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. 5, § 206(2).

917.    Ford is engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. 5, § 206(3).

918.    Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213, Plaintiffs seek an order enjoining Ford's unfair and/or deceptive acts or practices.

919.    On May 15, 2017, Plaintiffs sent a letter complying with Me. Rev. Stat. Ann. tit. 5, § 213(1-A) to Ford. Because Ford failed to remedy its unlawful conduct within the requisite period, Plaintiffs seek all damages and relief to which they are entitled.

## COUNT FIFTY-THREE

## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT (MD. CODE ANN., COM. LAW § 13-101 *ET SEQ.*)

920.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

921.    Plaintiffs bring this Count on behalf of the Maryland Class.

922.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive"; "false or misleading representation[s] of fact which concern[] . . . [t]he reason of or the existence or amount of a price reduction"; and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302.

923.    Ford, Plaintiffs, and Class members are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

924.    Pursuant to Md. Code Ann., Com. Law § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT FIFTY-FOUR

## VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A)
### (MASS. GEN. LAWS CH. 93A, § 1 *ET SEQ.*)

925.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

926.    Plaintiffs bring this Count on behalf of the Massachusetts Class.

927.    Massachusetts law (the Massachusetts Act) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2.

928.    Ford, Plaintiffs, and Class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

929.    Ford engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

930.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs will seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each plaintiff. Because Ford's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, up to three times actual damages, but no less than two times actual damages.

931.    Plaintiffs also seek an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

932.     On May 15, 2017, Plaintiffs sent a letter complying with Mass. Gen. Laws ch. 93A, § 9(3) to Ford.

## COUNT FIFTY-FIVE

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903 *ET SEQ.*)

933.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

934.     Plaintiffs bring this Count on behalf of the Michigan Class.

935.     The Michigan Consumer Protection Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

936.     Plaintiffs and Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

937.     Ford is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

938.     Plaintiffs seek injunctive relief to enjoin Ford from continuing its unfair and deceptive acts; monetary relief against Ford measured as the greater of (a) actual damages in an

- 204 -

amount to be determined at trial and (b) statutory damages in the amount of $250 for each

plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich.

Comp. Laws § 445.911.

939.    Plaintiffs also seek punitive damages because Ford carried out despicable conduct

with willful and conscious disregard of the rights and safety of others. Ford misrepresented the

actual capability of the Shelbys' performance both on race track and under normal driving

conditions, as these vehicles were not Track-Ready or track-capable as promised. Ford also

concealed that the Shelbys can overheat and unexpectedly go into Limp Mode under both race

track and under normal conditions. Ford manipulated consumers and jeopardized the safety of

Shelby drivers and those around them, all for the sake of increasing revenue through higher

prices. Ford's egregious conduct warrants punitive damages.

## COUNT FIFTY-SIX

## VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (MINN. STAT. § 325F.68 *ET SEQ.*)

940.    Plaintiffs incorporate by reference all preceding allegations as though fully set

forth herein.

941.    Plaintiffs bring this Count on behalf of the Minnesota Class.

942.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits

"[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

misrepresentation, misleading statement or deceptive practice, with the intent that others rely

thereon in connection with the sale of any merchandise, whether or not any person has in fact

been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1).

943.    Each Shelby constitutes "merchandise" within the meaning of Minn. Stat.

§ 325F.68(2).

944.    Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

945.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Ford's acts show deliberate disregard for the rights or safety of others.

## COUNT FIFTY-SEVEN

## VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT
### (MINN. STAT. § 325D.43-48 *ET SEQ.*)

946.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

947.    Plaintiffs bring this Count on behalf of the Minnesota Class.

948.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." Minn. Stat. § 325D.44.

949.    Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

950.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Ford's acts show deliberate disregard for the rights or safety of others.

## COUNT FIFTY-EIGHT

## VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT
### (MISS. CODE ANN. § 75-24-1 *ET SEQ.*)

951.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

952.     Plaintiffs bring this Count on behalf of the Mississippi Class.

953.     The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." Miss. Code Ann. § 75-24-5(1). Unfair or deceptive practices include, but are not limited to, "[m]isrepresentations of fact concerning the reasons for, existence of, or amounts of price reductions." Miss. Code Ann. § 75-24-5(2).

954.     Plaintiffs seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

## COUNT FIFTY-NINE

## VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES
### AND CONSUMER PROTECTION ACT OF 1973
### (MONT. CODE ANN. § 30-14-101 *ET SEQ.*)

955.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

956.     Plaintiffs bring this Count on behalf of the Montana Class.

957.     The Montana Unfair Trade Practices and Consumer Protection Act makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

958.     Ford, Plaintiffs, and Class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

959.     Plaintiffs and Class members are "consumer[s]" under Mont. Code Ann. § 30-14-102(1).

960.     The sale of each Shelby at issue occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and Ford committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

961.     Because Ford's unlawful methods, acts, and practices have caused Plaintiffs to suffer an ascertainable loss of money and property, Plaintiffs seek from Ford: the greater of actual damages or $500; discretionary treble damages; and reasonable attorneys' fees.

962.     Plaintiffs additionally seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

## COUNT SIXTY

## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT (NEB. REV. STAT. § 59-1601 *ET SEQ.*)

963.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

964.     Plaintiffs bring this Count on behalf of the Nebraska Class.

965.     The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

966.     Ford, Plaintiffs, and Class members are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

967.     Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

- 208 -

968.   Because Ford's conduct caused injury to Plaintiffs' property through violations of the Nebraska CPA, Plaintiffs seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining Ford's unfair or deceptive acts and practices, costs of court, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

## COUNT SIXTY-ONE

## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*)

969.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

970.   Plaintiffs bring this Count on behalf of the Nevada Class.

971.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions"; "[k]nowingly makes any other false representation in a transaction"; "[f]ails to disclose a material fact in connection with the sale or lease of goods or services"; or "[m]akes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion." Nev. Rev. Stat. §§ 598.0915–598.0925.

972.     Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining Ford's deceptive acts or practices, costs of court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. Nev. Rev. Stat. § 41.600.

## COUNT SIXTY-TWO

## VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1 *ET SEQ.*)

973.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

974.     Plaintiffs bring this Count on behalf of the New Hampshire Class.

975.     The New Hampshire Consumer Protection Act ("New Hampshire CPA") prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including, "but . . . not limited to" "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions." N.H. Rev. Stat. Ann. § 358-A:2.

976.     Ford, Plaintiffs, and Class members are "persons" under N.H. Rev. Stat. Ann. § 358-A:1.

977.     Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. Ann. § 358-A:1.

978.     Because Ford's willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining Ford's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. Rev. Stat. Ann. § 358-A:10.

## COUNT SIXTY-THREE

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*)

979.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

980.    Plaintiffs bring this Count on behalf of the New Jersey Class.

981.    The New Jersey Consumer Fraud Act makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." N.J. Stat. Ann. § 56:8-2.

982.    Ford, Plaintiffs, and Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

983.    Ford engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

984.    Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining Ford's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## COUNT SIXTY-FOUR

## VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. STAT. ANN. §§ 57-12-1 *ET SEQ.*)

985.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

986.    Plaintiffs bring this Count on behalf of the New Mexico Class.

987.    The New Mexico Unfair Trade Practices Act makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to, "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D).

988.    Ford, Plaintiffs, and Class members are "person[s]" under N.M. Stat. Ann. § 57-12-2.

989.    Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

990.    Because Ford's unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

## COUNT SIXTY-FIVE

## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW §§ 349-350
### (N.Y. GEN. BUS. LAW §§ 349-350)

991.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

992.    Plaintiffs bring this Count on behalf of the New York Class.

993.    The New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

994.    Plaintiffs and Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

995.    Ford is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

996.    Ford's deceptive acts and practices, which were intended to mislead consumers who purchased Shelbys, was conduct directed at consumers.

997.    Because Ford's willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining Ford's deceptive conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT SIXTY-SIX

## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1 *ET SEQ.*)

998.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

999.    Plaintiffs bring this Count on behalf of the North Carolina Class.

1000.   North Carolina's Unfair and Deceptive Acts and Practices Act (the North Carolina Act) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

1001.   Ford engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

- 213 -

1002.   Plaintiffs seek an order for treble their actual damages, an order enjoining Ford's unlawful acts, costs of court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

## COUNT SIXTY-SEVEN

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT (N.D. CENT. CODE § 51-15-02)

1003.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1004.   Plaintiffs bring this Count on behalf of the North Dakota Class.

1005.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise . . . ." N.D. Cent. Code § 51-15-02.

1006.   Ford, Plaintiffs, and Class members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

1007.   Ford's engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

1008.   Ford knowingly committed the conduct described above, and thus, under N.D. Cent. Code § 51-15-09, Ford is liable to Plaintiffs for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements. Plaintiffs further seek an order enjoining Ford's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

## COUNT SIXTY-EIGHT

## VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
## (OHIO REV. CODE ANN. § 1345.01 *ET SEQ.*)

1009.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1010.   Plaintiffs bring this Count on behalf of the Ohio Class.

1011.   Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing that "a specific price advantage exists, if it does not." Ohio Rev. Code Ann. § 1345.02.

1012.   Ford is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

1013.   Plaintiffs and Class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchase of a Shelby is a "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

1014.   As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Ford's deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09 *et seq.*

## COUNT SIXTY-NINE

## VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
## (OKLA. STAT. TIT. 15, § 751 *ET SEQ.*)

1015.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1016.   Plaintiffs bring this Count on behalf of the Oklahoma Class.

1017.   The Oklahoma Consumer Protection Act ("Oklahoma CPA") declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: making a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person"; "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers"; and making "false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction." Okla. Stat. tit. 15, §§ 752-753.

1018.   Plaintiffs and Class members are "persons" under Okla. Stat. tit. 15, § 752.

1019.   Ford is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

1020.   Each sale of a Shelby to Plaintiffs was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and Ford's actions as set forth herein occurred in the conduct of trade or commerce.

1021.   Plaintiffs further allege that Ford's malicious and deliberate conduct warrants an assessment of punitive damages because Ford carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result. Ford misrepresented the actual capability of the Shelbys' performance both on race track and under normal driving conditions, as these vehicles were not Track-Ready or track-capable as promised. Ford also concealed that the Shelbys can overheat and unexpectedly go into Limp Mode under both race track and under normal conditions. Ford manipulated

- 216 -

consumers and jeopardized the safety of Shelby drivers and those around them, all for the sake of increasing revenue through higher prices. Ford's egregious conduct warrants punitive damages.

1022.   Ford's conduct as alleged herein was unconscionable because (1) Ford, knowingly or had reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, Ford knew or had reason to know that price the consumers were charged grossly exceeded the price at which similar products were readily obtainable in similar transactions by like consumers; and (3) Ford knew or had reason to know that the transaction Ford induced the consumers to enter into was excessively one-sided in favor of Ford.

1023.   Because Ford's unconscionable conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under Okla. Stat. tit. 15, § 761.1. Plaintiffs further seek an order enjoining Ford's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT SEVENTY

## VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (OR. REV. STAT. §§ 646.605 *ET SEQ.*)

1024.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1025.   Plaintiffs bring this Count on behalf of the Oregon Class.

1026.   The Oregon Unfair Trade Practices Act prohibits a person from, in the course of the person's business, doing any of the following: "[m]ak[ing] false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions";

- 217 -

"[m]ak[ing] false or misleading representations of fact concerning the offering price or, or the person's cost for . . . goods"; or "[e]ngag[ing] in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

1027.   Ford is a person within the meaning of Or. Rev. Stat. § 646.605(4).

1028.   The Shelbys at issue are "goods" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

1029.   Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Plaintiffs are also entitled to punitive damages because Ford engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## COUNT SEVENTY-ONE

### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (R.I. GEN. LAWS § 6-13.1 *ET SEQ.*)

1030.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1031.   Plaintiffs bring this Count on behalf of the Rhode Island Class.

1032.   Rhode Island's Unfair Trade Practices and Consumer Protection Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "[e]ngaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "[e]ngaging in any act or practice that is unfair or deceptive to the consumer"; and "[u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen. Laws § 6-13.1-1(6).

- 218 -

1033.   Ford, Plaintiffs, and Class members are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

1034.   Ford were engaged in "trade" and "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

1035.   Plaintiffs purchased Shelbys primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws § 6-13.1-5.2(a).

1036.   Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a). Plaintiffs also seek punitive damages at the discretion of the Court.

## COUNT SEVENTY-TWO

## VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10 *ET SEQ.*)

1037.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1038.   Plaintiffs bring this Count on behalf of the South Carolina Class.

1039.   The South Carolina Unfair Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code Ann. § 39-5-20(a).

1040.   Ford is a "person" under S.C. Code Ann. § 39-5-10.

1041.   Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs seek monetary relief to recover their economic losses. Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

1042.   Plaintiffs further allege that Ford's malicious and deliberate conduct warrants an assessment of punitive damages because Ford carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust

hardship as a result. Ford misrepresented the actual capability of the Shelbys' performance both on race track and under normal driving conditions, as these vehicles were not Track-Ready or track-capable as promised. Ford also concealed that the Shelbys can overheat and unexpectedly go into Limp Mode under both race track and under normal conditions. Ford manipulated consumers and jeopardized the safety of Shelby drivers and those around them, all for the sake of increasing revenue through higher prices. Ford's egregious conduct warrants punitive damages.

1043.   Plaintiffs further seek an order enjoining Ford's unfair or deceptive acts or practices.

## COUNT SEVENTY-THREE

## VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW (S.D. CODIFIED LAWS § 37-24-6)

1044.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1045.   Plaintiffs bring this Count on behalf of the South Dakota Class.

1046.   The South Dakota Deceptive Trade Practices and Consumer Protection Law prohibits deceptive acts or practices, which include "[k]nowingly act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby"; and "advertising price reductions without . . . including in the advertisement the specific basis for the claim of a price reduction or [o]ffering the merchandise for sale at the higher price from which the reduction is taken for at least seven consecutive business days during the sixty-day period prior to the advertisement." S.D. Codified Laws §§ 37-24-6(1), 37-24-31.

- 220 -

1047.   Under S.D. Codified Laws § 37-24-31, Plaintiffs are entitled to a recovery of their actual damages suffered as a result of Ford's acts and practices.

## COUNT SEVENTY-FOUR

## VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*)

1048.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1049.   Plaintiffs bring this Count on behalf of the Utah Class.

1050.   The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not." Utah Code Ann. § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. Utah Code Ann. § 13-11-5.

1051.   Ford knew, or had reason to know, that consumers would rely on Ford's representations about the Shelbys being Track-Ready or track-capable and marketed the Shelbys as such, thereby commanding a higher price due to such representations. Ford also knew that the omissions about the Shelbys entering Limp Mode under both race track conditions and normal driving conditions would negatively impact the price and, as such, chose not to disclose this information to consumers. Ford therefore engaged in an unconscionable act within the meaning of Utah Code Ann. § 13-11-5.

1052.   Pursuant to Utah Code Ann. § 13-11-4, Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

- 221 -

## COUNT SEVENTY-FIVE

### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
### (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)

1053.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1054.   Plaintiffs bring this Count on behalf of the Vermont Class.

1055.   The Vermont Consumer Fraud Act makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce . . . ." Vt. Stat. Ann. tit. 9, § 2453(a).

1056.   Ford were sellers within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

1057.   Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

## COUNT SEVENTY-SIX

### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### (VA. CODE ANN. §§ 59.1-196 *ET SEQ.*)

1058.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1059.   Plaintiffs bring this Count on behalf of the Virginia Class.

1060.   The Virginia Consumer Protection Act lists prohibited "practices" which include: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.

- 222 -

1061.   Ford is a "supplier" under Va. Code Ann. § 59.1-198.

1062.   Ford's advertisements of the Shelbys was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

1063.   Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff. Because Ford's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

1064.   Plaintiffs also seek an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204 *et seq.*

## COUNT SEVENTY-SEVEN

## VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101 *ET SEQ.*)

1065.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1066.   Plaintiffs bring this Count on behalf of the West Virginia Class.

1067.   The Ford is a "person" under W. Va. Code § 46A-1-102(31).

1068.   Plaintiffs are "consumers" as defined by W. Va. Code §§ 46A-1-102(12) and 46A-6-102(2), who purchased a Shelby.

1069.   Ford engaged in trade or commerce as defined by W. Va. Code § 46A-6-102(6).

1070.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." W. Va. Code § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include:

(I) Advertising goods or services with intent not to sell them as advertised; . . .

(K) Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;

(L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;

(N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.

W. Va. Code § 46A-6-102(7).

1071.   Pursuant to W. Va. Code § 46A-6-106, Plaintiffs seek monetary relief against the Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

1072.   Plaintiffs also seek punitive damages against the Ford because they carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiffs to cruel and unjust hardship as a result.

1073. Plaintiffs further seek an order enjoining the Ford's unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorney's fees under W. Va. Code § 46A-5-101 *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

1074. On May 15, 2017, Plaintiffs sent a letter complying with W. Va. Code § 46A-6-106(b) to Ford. Because Ford failed to remedy its unlawful conduct within the requisite period, Plaintiffs seek all damages and relief to which they are entitled.

## COUNT SEVENTY-EIGHT

## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (WIS. STAT. § 110.18)

1075. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1076. Plaintiffs bring this Count on behalf of the Wisconsin Class.

1077. The Wisconsin Deceptive Trade Practices Act prohibits a "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

1078. Ford is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

1079. Plaintiffs and Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiffs purchased Shelbys.

1080. Plaintiffs are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because Ford's conduct was committed knowingly and/or intentionally, Plaintiffs are entitled to treble damages.

1081. Plaintiffs also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

## COUNT SEVENTY-NINE

## VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### (WYO. STAT. §§ 40-12-105 *ET SEQ.*)

1082.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1083.   Plaintiffs bring this Count on behalf of the Wyoming Class.

1084.   Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiffs seek monetary relief against the Ford measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming Consumer Protection Act.

1085.   On May 15, 2017, Plaintiffs sent a letter complying with Wyo. Stat. § 45-12-109 to Ford. If Ford fails to remedy its unlawful conduct, Plaintiffs will seek all damages and relief to which Plaintiffs are entitled.

1086.   Pursuant to applicable state statutes, Plaintiffs will mail a copy of this action to the Attorney General's office for the states of Connecticut, Illinois, Louisiana, Missouri, New Jersey, Oregon, Texas, Utah, and Washington.

## X.    UNJUST ENRICHMENT CLAIMS

## COUNT EIGHTY

## UNJUST ENRICHMENT
### (BASED ON ALABAMA LAW)

1087.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1088.   Plaintiffs bring this Count on behalf of the Alabama Class.

1089.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has

knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1090.   Ford has voluntarily accepted and retained this benefit.

1091.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1092.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT EIGHTY-ONE

## UNJUST ENRICHMENT
## (BASED ON ALASKA LAW)

1093.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1094.   Plaintiffs bring this Count on behalf of the Alaska Class.

1095.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1096.   Ford has voluntarily accepted and retained this benefit.

1097.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1098.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT EIGHTY-TWO

### UNJUST ENRICHMENT
### (BASED ON ARIZONA LAW)

1099.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1100.   Plaintiffs bring this Count on behalf of the Arizona Class.

1101.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1102.   Ford has voluntarily accepted and retained this benefit.

1103.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1104.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT EIGHTY-THREE

### UNJUST ENRICHMENT
### (BASED ON ARKANSAS LAW)

1105.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1106.   Plaintiffs bring this Count on behalf of the Arkansas Class.

1107.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1108.   Ford has voluntarily accepted and retained this benefit.

1109.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1110.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT EIGHTY-FOUR

### UNJUST ENRICHMENT
### (BASED ON COLORADO LAW)

1111.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1112.   Plaintiffs bring this Count on behalf of the Colorado Class.

1113.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1114.   Ford has voluntarily accepted and retained this benefit.

1115.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1116.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**COUNT EIGHTY-FIVE**

**UNJUST ENRICHMENT**
**(BASED ON CONNECTICUT LAW)**

1117.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1118.   Plaintiffs bring this Count on behalf of the Connecticut Class.

1119.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1120.   Ford has voluntarily accepted and retained this benefit.

1121.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1122.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

- 230 -

## COUNT EIGHTY-SIX

### UNJUST ENRICHMENT
### (BASED ON DELAWARE LAW)

1123.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1124.   Plaintiffs bring this Count on behalf of the Delaware Class.

1125.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1126.   Ford has voluntarily accepted and retained this benefit.

1127.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1128.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT EIGHTY-SEVEN

### UNJUST ENRICHMENT
### (BASED ON GEORGIA LAW)

1129.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1130.   Plaintiffs bring this Count on behalf of the Georgia Class.

1131.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has

- 231 -

knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1132.   Ford has voluntarily accepted and retained this benefit.

1133.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1134.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**COUNT EIGHTY-EIGHT**

**UNJUST ENRICHMENT**
**(BASED ON HAWAII LAW)**

1135.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1136.   Plaintiffs bring this Count on behalf of the Hawaii Class.

1137.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1138.   Ford has voluntarily accepted and retained this benefit.

1139.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

- 232 -

1140.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT EIGHTY-NINE

### UNJUST ENRICHMENT
### (BASED ON IDAHO LAW)

1141.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1142.   Plaintiffs bring this Count on behalf of the Idaho Class.

1143.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1144.   Ford has voluntarily accepted and retained this benefit.

1145.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1146.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT NINETY

### UNJUST ENRICHMENT
### (BASED ON INDIANA LAW)

1147.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1148.   Plaintiffs bring this Count on behalf of the Indiana Class.

1149.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1150.   Ford has voluntarily accepted and retained this benefit.

1151.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1152.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

### COUNT NINETY-ONE

### UNJUST ENRICHMENT
### (BASED ON IOWA LAW)

1153.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1154.   Plaintiffs bring this Count on behalf of the Iowa Class.

1155.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1156.   Ford has voluntarily accepted and retained this benefit.

1157.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1158.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT NINETY-TWO

### UNJUST ENRICHMENT
### (BASED ON KANSAS LAW)

1159.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1160.   Plaintiffs bring this Count on behalf of the Kansas Class.

1161.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1162.   Ford has voluntarily accepted and retained this benefit.

1163.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1164.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT NINETY-THREE

### UNJUST ENRICHMENT
### (BASED ON KENTUCKY LAW)

1165.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1166.   Plaintiffs bring this Count on behalf of the Kentucky Class.

1167.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1168.   Ford has voluntarily accepted and retained this benefit.

1169.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1170.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT NINETY-FOUR

### UNJUST ENRICHMENT
### (BASED ON LOUISIANA LAW)

1171.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1172.   Plaintiffs bring this Count on behalf of the Louisiana Class.

1173.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has

- 236 -

knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1174.   Ford has voluntarily accepted and retained this benefit.

1175.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1176.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**COUNT NINETY-FIVE**

**UNJUST ENRICHMENT**
**(BASED ON MAINE LAW)**

1177.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1178.   Plaintiffs bring this Count on behalf of the Maine Class.

1179.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1180.   Ford has voluntarily accepted and retained this benefit.

1181.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

- 237 -

1182.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT NINETY-SIX

### UNJUST ENRICHMENT
### (BASED ON MARYLAND LAW)

1183.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1184.   Plaintiffs bring this Count on behalf of the Maryland Class.

1185.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1186.   Ford has voluntarily accepted and retained this benefit.

1187.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1188.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT NINETY-SEVEN

### UNJUST ENRICHMENT
### (BASED ON MASSACHUSETTS LAW)

1189.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

010678-11 958612 V1

1190.   Plaintiffs bring this Count on behalf of the Massachusetts Class.

1191.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1192.   Ford has voluntarily accepted and retained this benefit.

1193.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1194.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT NINETY-EIGHT

### UNJUST ENRICHMENT
### (BASED ON MICHIGAN LAW)

1195.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1196.   Plaintiffs bring this Count on behalf of the Michigan Class.

1197.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1198.   Ford has voluntarily accepted and retained this benefit.

1199.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1200.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT NINETY-NINE

### UNJUST ENRICHMENT
### (BASED ON MINNESOTA LAW)

1201.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1202.   Plaintiffs bring this Count on behalf of the Minnesota Class.

1203.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1204.   Ford has voluntarily accepted and retained this benefit.

1205.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1206.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

- 240 -

### COUNT ONE HUNDRED

### UNJUST ENRICHMENT
### (BASED ON MISSISSIPPI LAW)

1207.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1208.   Plaintiffs bring this Count on behalf of the Mississippi Class.

1209.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1210.   Ford has voluntarily accepted and retained this benefit.

1211.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1212.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

### COUNT ONE HUNDRED ONE

### UNJUST ENRICHMENT
### (BASED ON MONTANA LAW)

1213.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1214.   Plaintiffs bring this Count on behalf of the Montana Class.

1215.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has

- 241 -

knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1216.   Ford has voluntarily accepted and retained this benefit.

1217.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1218.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED TWO

### UNJUST ENRICHMENT
### (BASED ON NEBRASKA LAW)

1219.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1220.   Plaintiffs bring this Count on behalf of the Nebraska Class.

1221.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1222.   Ford has voluntarily accepted and retained this benefit.

1223.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1224.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED THREE

### UNJUST ENRICHMENT
### (BASED ON NEVADA LAW)

1225.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1226.   Plaintiffs bring this Count on behalf of the Nevada Class.

1227.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1228.   Ford has voluntarily accepted and retained this benefit.

1229.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1230.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED FOUR

### UNJUST ENRICHMENT
### (BASED ON NEW HAMPSHIRE LAW)

1231.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1232.   Plaintiffs bring this Count on behalf of the New Hampshire Class.

1233.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1234.   Ford has voluntarily accepted and retained this benefit.

1235.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1236.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED FIVE

### UNJUST ENRICHMENT
### (BASED ON NEW JERSEY LAW)

1237.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1238.   Plaintiffs bring this Count on behalf of the New Jersey Class.

1239.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1240.   Ford has voluntarily accepted and retained this benefit.

1241.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1242.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**COUNT ONE HUNDRED SIX**

**UNJUST ENRICHMENT**
**(BASED ON NEW MEXICO LAW)**

1243.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1244.   Plaintiffs bring this Count on behalf of the New Mexico Class.

1245.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1246.   Ford has voluntarily accepted and retained this benefit.

1247.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1248.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED SEVEN

### UNJUST ENRICHMENT
### (BASED ON NEW YORK LAW)

1249.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1250.   Plaintiffs bring this Count on behalf of the New York Class.

1251.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1252.   Ford has voluntarily accepted and retained this benefit.

1253.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1254.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED EIGHT

### UNJUST ENRICHMENT
### (BASED ON NORTH CAROLINA LAW)

1255.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1256.   Plaintiffs bring this Count on behalf of the North Carolina Class.

1257.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has

knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1258.   Ford has voluntarily accepted and retained this benefit.

1259.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1260.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED NINE

### UNJUST ENRICHMENT
### (BASED ON NORTH DAKOTA LAW)

1261.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1262.   Plaintiffs bring this Count on behalf of the North Dakota Class.

1263.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1264.   Ford has voluntarily accepted and retained this benefit.

1265.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1266.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED TEN

### UNJUST ENRICHMENT
### (BASED ON OHIO LAW)

1267.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1268.   Plaintiffs bring this Count on behalf of the Ohio Class.

1269.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1270.   Ford has voluntarily accepted and retained this benefit.

1271.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1272.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED ELEVEN

### UNJUST ENRICHMENT
### (BASED ON OKLAHOMA LAW)

1273.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1274.   Plaintiffs bring this Count on behalf of the Oklahoma Class.

1275.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1276.   Ford has voluntarily accepted and retained this benefit.

1277.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1278.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED TWELVE

### UNJUST ENRICHMENT
### (BASED ON OREGON LAW)

1279.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1280.   Plaintiffs bring this Count on behalf of the Oregon Class.

1281.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1282.   Ford has voluntarily accepted and retained this benefit.

1283.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1284.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**COUNT ONE HUNDRED THIRTEEN**

**UNJUST ENRICHMENT**
**(BASED ON RHODE ISLAND LAW)**

1285.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1286.   Plaintiffs bring this Count on behalf of the Rhode Island Class.

1287.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1288.   Ford has voluntarily accepted and retained this benefit.

1289.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1290.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED FOURTEEN

### UNJUST ENRICHMENT
### (BASED ON SOUTH CAROLINA LAW)

1291.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1292.   Plaintiffs bring this Count on behalf of the South Carolina Class.

1293.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1294.   Ford has voluntarily accepted and retained this benefit.

1295.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1296.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED FIFTEEN

### UNJUST ENRICHMENT
### (BASED ON SOUTH DAKOTA LAW)

1297.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1298.   Plaintiffs bring this Count on behalf of the South Dakota Class.

1299.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has

- 251 -

knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1300.   Ford has voluntarily accepted and retained this benefit.

1301.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1302.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED SIXTEEN

### UNJUST ENRICHMENT
### (BASED ON UTAH LAW)

1303.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1304.   Plaintiffs bring this Count on behalf of the Utah Class.

1305.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1306.   Ford has voluntarily accepted and retained this benefit.

1307.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1308.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED SEVENTEEN

### UNJUST ENRICHMENT
### (BASED ON VERMONT LAW)

1309.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1310.   Plaintiffs bring this Count on behalf of the Vermont Class.

1311.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1312.   Ford has voluntarily accepted and retained this benefit.

1313.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1314.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED EIGHTEEN

### UNJUST ENRICHMENT
### (BASED ON VIRGINIA LAW)

1315.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

- 253 -

1316.   Plaintiffs bring this Count on behalf of the Virginia Class.

1317.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1318.   Ford has voluntarily accepted and retained this benefit.

1319.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1320.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED NINETEEN

### UNJUST ENRICHMENT
### (BASED ON WEST VIRGINIA LAW)

1321.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1322.   Plaintiffs bring this Count on behalf of the West Virginia Class.

1323.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1324.   Ford has voluntarily accepted and retained this benefit.

010678-11 958612 V1

1325.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1326.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**COUNT ONE HUNDRED TWENTY**

**UNJUST ENRICHMENT**
**(BASED ON WISCONSIN LAW)**

1327.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1328.   Plaintiffs bring this Count on behalf of the Wisconsin Class.

1329.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1330.   Ford has voluntarily accepted and retained this benefit.

1331.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1332.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT ONE HUNDRED TWENTY-ONE

## UNJUST ENRICHMENT
## (BASED ON WYOMING LAW)

1333.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1334.   Plaintiffs bring this Count on behalf of the Wyoming Class.

1335.   Ford has benefitted from and been enriched by the conduct alleged herein. Ford has generated substantial revenue from the unlawful conduct described herein. Ford has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

1336.   Ford has voluntarily accepted and retained this benefit.

1337.   The circumstances, as described herein, are such that it would be inequitable for Ford to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

1338.   Plaintiffs and the other Class members are entitled to the amount of Ford's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## XI.   EXPRESS WARRANTY CLAIMS

## COUNT ONE HUNDRED TWENTY-TWO

## VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT
## FOR BREACH OF EXPRESS WARRANTIES
## (CAL. CIV. CODE §§ 1791.2 & 1793.2(D))

1339.   Plaintiff Rimokh ("Plaintiff" for purposes of this Claim) incorporates by reference all preceding allegations as though fully set forth herein.

1340.   Plaintiff brings this Count on behalf of the California Class.

1341.   Plaintiff and the other Class members who purchased the Shelbys in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

1342.   The Shelbys are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

1343.   Ford is a "manufacturer" of the Shelbys within the meaning of Cal. Civ. Code § 1791(j).

1344.   Plaintiff and the other Class members bought new motor vehicles manufactured by Ford.

1345.   Ford made express warranties to Plaintiff and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

1346.   In its Limited Warranty, Ford expressly warranted that it would repair or replace defects introduced into vehicles during the design and manufacturing processes. The uniform language below appears in all 2016 Ford Mustang Warranty Guides:[34]

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if . . . your Ford Shelby is properly operated and maintained, and . . . was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your Shelby that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.
>
> This warranty does not mean that each Ford vehicle is defect free. ***Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs.*** For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy any such

---

[34] Ford, *2016 Model Year Ford Warranty Guide* (Oct. 2015), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2016-Car-Lt-Truck-Warranty-version-3_frdwa_EN-US_10_2015.pdf, at p. 14 (emphasis added).

defects that result in vehicle part malfunction or failure during the warranty period.

1347.   As set forth above in detail, Ford breached it warranties by selling Shelbys that are inherently defective and not repairing or replacing those defects. The defects in the Shelbys' Track-Ready powertrain systems leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode thereby creating a safety hazard on race tracks and public roadways. These defects were and continue to be covered by Ford's express warranties, and these defects substantially impair the use, value, and safety of Ford's Shelbys to reasonable consumers like Plaintiff and the other Class members.

1348.   Plaintiff notified Ford and/or its agents of the need for repairs prior to starting this lawsuit.

1349.   Ford did not promptly replace or buy back the Shelbys of Plaintiff and the other Class members.

1350.   As a result of Ford's breach of its express warranties, Plaintiff and the other Class members received goods whose dangerous condition substantially impairs their value to Plaintiff and the other Class members. Plaintiff and the other Class members have been damaged as a result of the diminished value of Ford's products, the products' malfunctioning, and the nonuse of their Shelbys.

1351.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Shelbys or the overpayment or diminution in value of their Shelbys.

1352.   Pursuant to Cal. Civ. Code § 1794, Plaintiff and the other Class members are entitled to costs and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide and State Classes, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A.      Certification of the proposed Nationwide Class and State Law Classes, including appointment of Plaintiffs' counsel as Class Counsel;

B.      An order temporarily and permanently enjoining Ford from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this First Amended Complaint;

C.      Injunctive relief in the form of a recall or free replacement program;

D.      Injunctive relief in the form of a buy back;

E.      Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

F.      An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

G.      An award of costs and attorneys' fees; and

H.      Such other or further relief as may be appropriate.


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

010678-11 958612 V1

Dated: May 16, 2017

GROSSMAN ROTH YAFFA COHEN

By: */s/ Stuart Z. Grossman*
Stuart Z. Grossman
Florida Bar No. 156113
Rachel Furst
Florida Bar No. 45155
2525 Ponce de Leon, Suite 1150
Coral Gables, FL 33134
Telephone: (888) 296-1681
Facsimile: (305) 285-1668
Email: szg@grossmanroth.com
Email: rwf@grossmanroth.com


HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman (*pro hac vice*)
Catherine Y.N. Gannon (*pro hac vice*)

1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: catherineg@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

010678-11 958612 V1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the Court's

CMECF system on May 16, 2017, on all counsel or parties of record listed below.

By: */s/ Rachel Wagner Furst*
       Rachel Wagner Furst
       Florida Bar No. 45155

COLE, SCOTT & KISSANE, P.A.
HENRY SALAS
henry.salas@csklegal.com
BRIAN DOMINGUEZ
brian.dominguez@csklegal.com

Cole, Scott & Kissane Building
9150 So. Dadeland Boulevard, Suite 1400
Miami, Florida 33156
Telephone: 305-350-5367
Facsimile: 305-373-2294

*Attorneys for Defendant Ford Motor Company*