UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 17-21087-CIV-MORENO**

GEORGE TERSHAKOVEC, DIANA
TERSHAKOVEC, JACQUES RIMOKH,
HERBERT ALLEY, MICHAEL
DELAGARZA, ATTILA GONDAN, ERIC
KAMPERMAN, GREG ROBERTS,
RICHARD KOWALCHIK, TRAVIS MCRAE,
MICHAEL MCCURRY, MARK
HOCHSPRUNG, JOHN AUBREY, JOSE
CRUZ, ERIC EVANS, BYRON HARPER, and
TODD NEWTON, *individually and on behalf
of all others similarly situated*,

        Plaintiffs,

vs.

FORD MOTOR COMPANY,

        Defendant.

                          /

## ORDER GRANTING-IN-PART AND DENYING-IN-PART FORD'S MOTION TO DISMISS

I.    **Background**

     Plaintiffs, seeking to represent a class of purchasers of Defendant Ford's 2016 Shelby Mustang GT350, are "track enthusiasts." Each suggests they purchased their Shelby for use on public roads and on specialized closed tracks. Plaintiffs allege that Ford marketed and sold their vehicles for use on racetracks—as evidenced by Ford's information kits and brochures, the vehicles' track-focused features, promotion by Ford executives, press kits, and Ford-sponsored track events—and that Plaintiffs relied on this marketing in purchasing their vehicles.

Importantly, the *only* models at issue here are the 2016 Shelby GT350 Base and Technology Packages.[1]

The 2016 Ford Mustang Brochure, for instance, asserts that the Shelby GT350 is "race-tuned" and "powered by a 5.2L Ti-VCT V8 . . . to propel you into the winner's circle." D.E. 43 ¶ 316. Ford's media publication states that the "All-new Shelby GT350 Mustang is a thoroughbred capable of tackling the world's most challenging roads and racetracks." *Id.* at ¶ 318. Ford's press kit on "Innovative Engineering" features the "Transmission for Shelby Mustang developed with all-day track capability and high-rpm capability at the forefront." *Id.* at ¶ 320.

According to the Second Amended Complaint, the vehicles suffer from manufacturing and design defects that make them unsuitable and unsafe for track driving. Plaintiffs allege that the "Track-Ready" powertrain system is designed defectively in that it overheats prematurely and enters "Limp Mode" without providing any warning or communication to the driver. When the vehicles enter Limp Mode, they rapidly decelerate, and a driver can become disoriented and lose control, thereby increasing the risk of an accident. Unlike models from other years, Plaintiffs allege the 2016 Base and Technology Package vehicles are not equipped with differentials[2] or transmission[3] coolers that can resolve the overheating issue. In addition, they lack temperature sensors on the dashboard to monitor or adjust the temperatures of the transmission and differentials. Plaintiffs further allege that the Track-Ready powertrain system also contains a manufacturing defect because the extreme transmission and differential temperatures that the vehicles experience can cause other parts—*i.e.*, the transmission and

---

[1] Ford sold the 2016 Shelby with three trim levels: Base, Track Package, and Technology Package. D.E. 43 ¶ 332.

[2] A rear differential is a component in all vehicles designed to compensate for the difference in distance the inner wheels and outer wheels travel as a vehicle goes around a corner. *Id.* at ¶ 314.

[3] A transmission system takes the power generated by a vehicle's engine and applies the power to calibrate the speed and torque of the wheels. This is accomplished by shifting through gears. Higher gears increase the output speed and decrease torque and *vice versa*. *Id.* at ¶ 312.

clutch—to degrade prematurely. These defects allegedly impair the vehicles' safety, reliability, and operability. Plaintiffs argue that these defects are inherently dangerous—at a racetrack or on a public road—because the sudden deceleration increases the risk of collision.

Plaintiffs submit that Ford was aware of the defects while they continued to promote the vehicles as "Track-Ready." In addition, Plaintiffs submit that Ford admits that the 2016 models were not Track-Ready because subsequent models, regardless of trim level, all included a rear differential cooler and a transmission cooler. Plaintiffs' vehicles are covered by Ford's express limited warranty, which in relevant part provides "that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period." *Id.* at ¶ 355. "Ford also warranted that it would remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period." *Id.* In correspondence to existing owners of Shelby Mustangs, Ford recommended that for customers with "Base or Technology Package models . . . transmission and differential coolers [be] added." *Id.* at ¶ 359. However, Plaintiffs suggest that requiring them to install aftermarket transmission and differential coolers may void their warranties which state, "Aftermarket parts or components, sometimes installed by Ford Motor Company or an authorized Ford dealership, may not be covered by the New Vehicle Limited Warranty." *Id.* at ¶¶ 370-72.

Twenty-two named Plaintiffs, covering eleven states,[4] filed this suit, seeking to represent a nationwide class and numerous statewide classes of purchasers of the 2016 Shelby GT350 Base and Technology Packages. All Plaintiffs allege individual claims for state law breach of express and implied warranty, and individual claims under the Magnuson Moss Warranty Act based on the same alleged breaches. All Plaintiffs also allege individual claims based on the consumer

---

[4] Florida, Texas, Washington, Tennessee, Illinois, California, Missouri, New Jersey, Oregon, Pennsylvania, and New York. *See* D.E. 43 ¶¶ 6, 20, 26, 33, 36, 39, 42, 45, 48, 52, 66.

protection statutes of the states in which they reside, grounded on Ford's alleged misrepresentations regarding the track capabilities of the GT350 Base and Technology models, and on Ford's alleged failure to disclose information about Limp Mode. Plaintiffs also allege individual claims of fraudulent concealment and unjust enrichment based on the same alleged misrepresentations and omissions. Ford moves to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the following reasons, Ford's Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

II.     **Legal Standard**

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986). To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Detailed factual allegations are not required, but a pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action." *Twombly*, 550 U.S. at 555; *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004) ("To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those conclusions or face dismissal of their claims."). In short, the complaint must not merely allege misconduct, but must demonstrate that the pleader is "entitled to relief." *Iqbal*, 556 U.S. at 677-78.

III.    **Analysis**

The fifty-nine claims fall into two major categories: warranty claims and fraud claims. As an alternative to the contract-based warranty claims, Plaintiffs bring claims of unjust enrichment. The Court will address each in turn.

## A.    Fraud Claims

Ford submits that Plaintiffs' common law and statutory "fraud-based" claims[5] based on misrepresentation should be dismissed as Plaintiffs never identify the alleged misrepresentations to which they were exposed. Ford relies on the premise that the Second Amended Complaint does not allege that any of the Plaintiffs saw the representations made in Ford's publications. In Ford's estimation, the press releases and kits "were directed to members of the automotive media, not consumers." D.E. 50 at 10. Ford posits that only documents intended for consumers were (i) the brochure for the 2016 Mustang and (ii) the one-page document describing the five distinct GT350 models. *See* D.E. 43 ¶¶ 4, 331. Because none of the Plaintiffs allege to have seen those documents, Ford submits they cannot rely on them for their fraud-based claims.

Furthermore, Ford submits that the fraud-based claims relying on an omission theory must be dismissed because there was no omission. In essence, Ford argues that the allegation that it failed to disclose the information about Limp Mode does not hold water because Plaintiffs simultaneously allege that information was disclosed. For example, Plaintiffs allege that "nowhere does Ford disclose . . . an explanation of what Limp Mode is or how it would manifest while driving." *Id.* at ¶ 330. Yet, in the same paragraph, Ford suggests that Plaintiffs' contradictorily allege that Ford apprised consumers that Shelbys are "equipped with electronic controls that, if required, reduces power and limits [Revolutions per Minute] in order to control powertrain temperatures." *Id.*

---

[5] Ford concedes that the Florida Deceptive and Unfair Trade Practices Act claim (Count 2) is not subject to dismissal based on this theory. D.E. 50 at 10.

Plaintiffs counter—for both theories of misrepresentation and omission—that they satisfy Federal Rule of Civil Procedure 9(b)'s pleading requirement. Indeed, claims that sound in fraud must satisfy Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake." *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1331 (S.D. Fla. 2016). The particularity requirement "alert[s] defendants to the precise misconduct with which they are charged and protect[s] defendants against spurious charges of immoral and fraudulent behavior." *Id.* (quoting *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008)). In the Second Amended Complaint, Plaintiffs refer to a myriad of alleged misrepresentations. *See, e.g.*, D.E. 43 ¶ 4 (noting that the GT350 is "track-ready" and "track-capable"); *id.* at ¶ 318 (noting that the GT350 is "capable of tackling the world's most challenging roads and racetracks"); *id.* at ¶ 320 (noting that the Tremec TR-3160 six-speed manual transmission in the GT350 "has been heavily revised . . . to cope with high engine speeds and the rigors of track duty, and to provide the kind of precision engagement, smoothness, and reduction in weight and rotating inertia demanded by Ford Performance").

Additionally, Plaintiffs indeed allege that they saw and relied upon the purportedly misrepresented marketing materials when purchasing their vehicles. *See, e.g., id.* at ¶ 16 ("The Tershakovec Plaintiffs selected and ultimately purchased their Shelby, in part, because [it] was represented to be Track-Ready . . . During their Shelby research, the Tershakovec Plaintiffs reviewed print and online advertisements . . . [that] stated how various components in all 2016 Shelbys were Track-Ready . . ."); *id.* at ¶ 18 (noting that the Tershakovec Plaintiffs allegedly reviewed the Ford website and spoke with Ford salespeople about their intent to use their Technology Model 2016 Shelby for track use and were not informed they would not be able to

do so); *id.* at ¶ 32 (noting that Plaintiff Aubrey reviewed print and online advertisements similar to those in the Second Amended Complaint and "selected and ultimately purchased his Shelby, in part, because [it] was represented to be Track-Ready . . ."); *id.* at ¶ 34 (alleging that Plaintiff Aubrey reviewed Ford's website and spoke with Ford salespeople about his intent to use his Base Model 2016 Shelby for occasional track use and was not informed that he was unable to do so); *id.* at ¶¶ 50, 52 (same for Plaintiff Harper); *id.* at ¶¶ 65, 67 (same for Plaintiff Kowalchik); *id.* at ¶¶ 80, 82 (same for the Larios Plaintiffs); *id.* at ¶¶ 97, 99 (same for Plaintiff Rimokh); *id.* at ¶¶ 113, 115 (same for Plaintiff Hochsprung); *id.* at ¶¶ 127, 129 (same for Plaintiff Porter); *id.* at ¶¶ 141, 143 (same for Plaintiff Roberts); *id.* at ¶¶ 156, 158 (same for Plaintiff Linn); *id.* at ¶¶ 170, 172 (same for the Kelly Plaintiffs); *id.* at ¶¶ 185, 187 (same for Plaintiff Long); *id.* at ¶¶ 200, 202 (same for Plaintiff Cruz); *id.* at ¶¶ 216, 218 (same for Plaintiff Gondan); *id.* at ¶¶ 232, 234 (same for Plaintiff Alley); *id.* at ¶¶ 247, 249 (same for Plaintiff Kamperman); *id.* at ¶¶ 262, 264 (same for Plaintiff McRae); *id.* at ¶¶ 278, 280 (same for Plaintiff Newton); *id.* at ¶¶ 295, 297 (same for Plaintiff Evans). Plaintiffs also allege that Ford's omissions—namely that the Base and Technology Models enter Limp Mode without warning the driver—should have been revealed in Ford's disclosures and marketing materials rather than marketing those models as "Track-Ready." *See id.* at ¶¶ 316-330. Whether Ford's notice that Shelbys are equipped with electronic controls that, if required, reduces power and limits speed in order to control powertrain temperatures, was sufficiently descriptive to give notice to prospective purchasers of Base and Technology Model Shelbys, and cure the alleged omission that Limp Mode could occur, is an issue for a later stage in this litigation. For now, Plaintiffs have satisfied Rule 12(b)(6).

Viewing the facts alleged in the Second Amended Complaint in the light most favorable to Plaintiffs, as the Court must at this stage, Plaintiffs have sufficiently satisfied Rule 9(b)'s

particularity requirement for the fraud-based claims because the Second Amended Complaint alleges that all named Plaintiffs, prior to purchasing their vehicles, reviewed print and online advertisements—similar to those included in the Second Amended Complaint—that assert the 2016 Shelbys were Track-Ready. Moreover, the marketing materials included in the Second Amended Complaint also contained photographs that depicted the 2016 Shelbys on racetracks. Plaintiffs further allege that they relied, in part, on Ford's representations that the 2016 Shelbys were Track-Ready, in purchasing their vehicles. Thus, accepting the well-pleaded facts as true, Plaintiffs satisfy Rule 12(b)(6) because they have sufficiently alleged a plausible entitlement to relief on the fraud-based claims. Accordingly, Ford's Motion is **DENIED** as to the common law and statutory fraud-based claims. Next, Ford argues, on a state-by-state basis, that some of the claims should be dismissed.

### 1. Count 2 – Florida Deceptive and Unfair Trade Practices Act

Ford argues that Count 2 under Florida's Deceptive and Unfair Trade Practices Act should be dismissed because Plaintiffs do not plausibly allege facts establishing that they paid a price premium as a result of any misrepresentation. Recovery under Florida's Deceptive and Unfair Trade Practices Act "depends on whether plaintiffs paid a price premium, not on whether plaintiffs actually relied on the illegal misrepresentation." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016). Plaintiffs counter that they sufficiently pled a price premium because they allege that the "track-ready dream" Ford promised "came at a premium price" as "Shelbys were sold tens of thousands of dollars above the list price—and double or triple the price of a regular Mustang GT." D.E. 43 ¶ 3. Plaintiffs further submit they "were willing to pay the premium to own such a distinct piece of automotive history and to realize their dream of owning a high-performance vehicle." *Id.* To boot, "Plaintiffs and Florida Class members who purchased Shelbys either would have paid less for their Shelbys or would have not purchased

them at all but for Ford's violations of [Florida's Deceptive and Unfair Trade Practices Act]." *Id.* at ¶ 411.

Thus, viewing the well-pleaded facts in the Second Amended Complaint in the light most favorable to Plaintiffs, as the Court must at this stage, Plaintiffs have sufficiently alleged that they paid a price premium as a result of the alleged misrepresentations, and that they would have paid less or not purchased their vehicles at all had they been aware of the alleged misrepresentations. Accordingly, Ford's Motion is **DENIED** as to Count 2.

## 2.   Counts 25 and 26 – New Jersey Statutory and Common Law Fraud

Ford submits that Plaintiff Linn's common law and statutory fraud claims under New Jersey law should be dismissed because they are subsumed by, and precluded by, the New Jersey Products Liability Act. Linn counters that the New Jersey Products Liability Act is inapplicable here because the Act provides relief for "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J. Stat. § 2A:58C-1(b)(3). As defined in the Act, "'Harm' means (a) physical damage to property, other than the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from [these] type[s] of harm." *Id.* at §2A:58C(1)(b)(2). Linn does not allege facts that would include any definition of harm in (a)-(d) above.

Rather, Linn claims economic damages relating to the purchase of a Shelby that did not live up to the hype. *See* D.E. 43 ¶ 159. In interpreting the New Jersey Products Liability Act, federal courts have excluded economic damages from the definition of harm. *See, e.g., Estate of Knoster v. Ford Motor Co.*, 200 F. App'x 106, 116 (3rd Cir. 2006) ("[C]laims for 'physical damage . . . to the product itself' are not 'product liability action[s]' because the [Products

Liability Act] specifically excludes such damage from its definition of 'harm' . . . The [Products Liability Act] cannot subsume that which it explicitly excludes from coverage."); *Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543, 552 (D.N.J. 2013) ("While economic losses due to harm to the product itself are recoverable under the [Consumer Fraud Act], the [Products Liability Act] explicitly exempts such losses in its definition of harm."). Because Linn seeks to recover economic damages for allegedly overpaying for a defective Shelby, the statutory and common law fraud claims are not subsumed by the New Jersey Products Liability Act. Accordingly, Ford's Motion is **DENIED** as to Counts 25 and 26.

### 3. <u>Count 55 – Washington Consumer Protection Act</u>

Next, Ford argues that Plaintiff Evans's claim under the Washington Consumer Protection Act is barred because Ford's alleged failure to disclose safety defects is regulated by federal law. The Washington Consumer Protection Act expressly exempts "actions or transactions otherwise permitted, prohibited or regulated under the laws administered . . . under statutory authority of . . . the United States." Wash. Code § 19.86.170. Thus, Ford argues that disclosure of safety defects is expressly regulated by the National Highway Traffic Safety Act, 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6. However, 49 U.S.C. § 30103(d) states that a remedy under section 30118—the section Ford suggests preempts safety defects—"is in addition to other rights and remedies under other laws of the United States or a State," effectively permitting Washington's regulation that provides potential remedies to Evans. In fact, federal courts have sustained claims under Washington's Consumer Protections Act in the automotive safety context. *See In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801 (S.D. Ohio 2012) (finding that allegations that an automotive manufacturer knowingly failed to reveal to consumers that the vehicle's coolant system was not of a particular standard, quality or grade was deceptive under Washington's Consumer Protections Act); *Zwicker v. Gen. Motors Corp.*, 2007 WL 5309204, at

*5 (W.D. Wash. July 26, 2007) (finding that allegation that General Motors was allegedly aware of and concealed the "systematic failure" of installing faulty speedometers could sustain the requisite unfair or deceptive act under Washington's Consumer Protection Act). Accordingly, Ford's Motion is **DENIED** as to Count 55.

## B.     Express Warranty and Magnusson-Moss Claims[6]

Ford argues that Plaintiffs' express warranty claims must be dismissed because they do not allege a failure or malfunction in normal use caused by a manufacturing defect. Plaintiffs identify Ford's New Vehicle Limited Warranty as the basis for their express warranty claims. The New Vehicle Limited Warranty provides:

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if . . . your Ford Shelby is properly operated and maintained, and . . . was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your Shelby that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.
>
> This warranty does not mean that each Ford vehicle is defect free. *Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs.* For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy and such defects that result in vehicle part malfunction or failure during the warranty period.

D.E. 43 ¶ 355 (emphasis in original).

Specifically, Ford submits that ten[7] of the twenty-two named Plaintiffs do not allege that they experienced a failure or malfunction of any kind, on or off the track, and thus, they have no

---

[6] "[A] Magnusson-Moss Warranty Act claim only exists if a valid breach of warranty claim is also stated." *Melton v. Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1304 (S.D. Fla. 2017) (Moreno, J.) (citing *Bailey v. Monaco Coach Corp.*, 168 F. App'x 893, 894 n.1 (11th Cir. 2006)). Consequently, the Court will not address Plaintiffs' Magnusson-Moss claim (Count 1) separately.

express warranty claim. Seven[8] Plaintiffs allege that that their vehicles went into Limp Mode while they were using their vehicles on the track. The remaining five[9] Plaintiffs allege they experienced Limp Mode on public highways, but because they do not allege that this occurred during normal use of the vehicles, Ford submits that the express warranty claims of all Plaintiffs must be dismissed because the New Vehicle Limited Warranty promises that malfunctioning parts will be repaired or replaced if they fail during "normal use." D.E. 43 ¶ 355. Ford suggests that Limp Mode is not a malfunction or failure, but is, in effect, a safety feature operating as intended, as the GT350 models are specifically designed to enter Limp Mode (*i.e.*, reduce power and speed) when necessary to control heat and prevent damage from excessive heat. Even assuming that some Plaintiffs experienced a failure or malfunction in normal use, Ford further argues that the warranty requires that the failure or malfunction be caused by a "manufacturing defect," and even if Limp Mode is a "defect," it is a design defect, and the express warranty does not apply to design defects.

At this stage, the Court is not prepared to differentiate between manufacturing and design defects. Thus, the Court will look to each Plaintiffs' express warranty claim to determine if they adequately state a claim for breach of said warranty. Ford's first contention that all express warranty claims must be dismissed because Plaintiffs do not allege that they used their vehicles during "normal use" has no merit. Expecting each Plaintiff to regurgitate that he or she used their vehicle under "normal" conditions would ostensibly seem conclusory and devoid of any factual underpinning. The issue that follows is whether a manifestation of the alleged breach of the New Vehicle Limited Warranty is necessary to state a claim.

---

[7] Plaintiffs George Tershakovec, Diana Tershakovec, Harper, Kowalchik, Alley, Kamperman, Evans, Hochsprung, Roberts, and Linn. D.E. 43 ¶¶ 13-28, 47-76, 110-123, 138-166, 229-258, 292-306.

[8] Plaintiffs Aubrey, Newton, Gondan, Porter, Stephen Kelly, Jill Kelly, and Rimokh. D.E. 43 ¶¶ 36, 101, 131, 174, 220, 283.

[9] Plaintiffs Ernesto Larios, Shaunti Yanik-Larios, McRae, Cruz, and Long. D.E. 43 ¶¶ 85, 189, 204, 266.

Twelve of twenty-two Plaintiffs allege that their vehicles went into Limp Mode on either a track or a public roadway, thus, those twelve Plaintiffs plausibly allege an entitlement to relief, because the alleged breach manifested itself when the car entered Limp Mode. As to the ten Plaintiffs that do not allege they experienced a failure or malfunction of any kind—on or off the track—the Court must determine whether each state requires a manifestation of the alleged defect, or whether the knowledge that their vehicles would enter Limp Mode is sufficient to sustain a claim for breach of express warranty.

### 1. Count 4 – Florida Law (Fla. Stat. § 672.313)

Plaintiffs George and Diana Tershakovec, Byron Harper, and Richard Kowalchik allege breach of express warranty under Florida law. To state a claim for breach of express warranty under Florida law, a complaint must allege: (1) the sale of goods; (2) the express warranty; (3) breach of that warranty; (4) notice to seller of the breach; and (5) the injuries sustained by the buyer as a result of the breach of the express warranty. *Felice v. Invicta Watch Co. of Am., Inc.*, No. 16-CV-62772-RLR, 2017 WL 3336715, at *5 (S.D. Fla. Aug. 4, 2017). Importantly, Florida law is not clear whether the alleged defect is manifested when the owner encounters Limp Mode or when the vehicle comes off the assembly line. *See James v. Yamaha Motor Corp.*, No. 15-23750-CIV, 2016 WL 3083378, at *9 (S.D. Fla. May 31, 2016) (finding that "the possibility of future injury is not merely hypothetical . . . [t]o the contrary . . . the possibility of future injury is a virtual certainty, as the engines will have to be repaired again and again."); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 535 (S.D. Fla. 2015) ("[I]f a jury believes Plaintiff's evidence, it could find that the alleged defect was manifested when the [vehicle] came off the assembly line, regardless of whether [] every putative class member has [experienced the alleged defect]."). Indeed, this Court has ruled that it is premature to dismiss claims at the motion to dismiss stage because of a plaintiff's failure to encounter the alleged defect. *In re Takata*, 193 F.

Supp. 3d at 1335 ("If Takata had installed grenades in its airbags that may or may not explode on impact a court would not require an explosion to demonstrate manifestation of a defect."). Accordingly, the Court finds that, at this stage, even though these Florida Plaintiffs did not experience Limp Mode, the alleged breach of express warranty could have manifested itself when their vehicles were assembled. Indeed, the possibility of encountering Limp Mode—as alleged—was not hypothetical, but a virtual certainty.

Ford also claims that Plaintiffs failed to give adequate notice as required by Florida Statute 672.607(3)(a), which requires that "[t]he the buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Plaintiffs claim they notified Ford of their intent to pursue statutory fraud and breach of warranty claims in a letter sent by their counsel on March 21, 2017. *See* D.E. 43 ¶¶ 615, 676, 1011. Florida courts recognize "that notice is required to be given to the seller, not the manufacturer, under Florida law." *PB Prop. Mgmt., Inc. v. Goodman Mfg. Co., L.P.*, Case No. 3:12-CV-1366-HES-JBT, 2014 WL 12640371, at *1 (M.D. Fla. Aug. 14, 2014); see also *Fed. Ins. Co. v. Lazzara Yachts of N. Am., Inc.*, Case No. 8:09-cv-607, 2010 WL 1223126, at *5 (M.D. Fla. Mar. 25, 2010) (holding that "the plain language of the statute therefore does not require notice to a manufacturer").

The Tershakovecs, Harper, and Kowalchik submit that they provided Ford with notice of their intent to pursue breach of warranty claims. Their notice, however, is unreasonably tardy and does not comply with Florida law, because it was given on March 21, 2017—the eve of the original Complaint's filing on March 22, 2017. *See Lamb v. Graco Children's Prod. Inc.*, No. 4:11CV477-RH/WCS, 2012 WL 128719633, at *2 (N.D. Fla. Jan. 24, 2012) ("[T]he point of the notice requirement is to allow the warrantor an opportunity to cure the problem rather than

defend a lawsuit."). One day's notice does not provide Ford with the opportunity to analyze and cure the defect. Here, as required by statute, two Plaintiffs complied with Florida law by notifying Ford—notwithstanding whether it was to the dealer or manufacturer. *See* D.E. 43 ¶ 21 ("Tershakovec Plaintiffs contacted Ford to express their concerns and seek relief"); *id.* at ¶ 55 ("In the summer of 2016, Mr. Harper called Ford several times and exchanged emails to express his concerns and seek relief."). However, "each putative class member would have to show that he or she gave the defendant notice within a reasonable time." *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 642 (S.D. Fla. 2008) (applying Florida law to a breach of express warranty claim). Thus, the Tershakovecs and Harper seemingly complied with the notice requirement. On the other hand, Kowalchik does not allege that he notified Ford of his intent to sue. The Parties did not address whether Kowalchik's failure to allege notice, as required by Florida law, would require dismissal of Count 4 in its entirety. At this stage, Ford's Motion is **DENIED** as to Count 4 but notes that "[t]he determination of whether or not a seller of goods has received adequate notice of an alleged defect is a highly individualized inquiry" that may impact class certification. *Hummel v. Tamko Bldg. Prods., Inc.*, 303 F. Supp. 3d 1288 (M.D. Fla. 2017); *see also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1238 (11th Cir. 2015) (reversing a district court's grant of class certification for classifying the issue of notice in a breach of warranty claim as a "common question").

### 2. Count 52 – Texas Law (Tex. Bus. & Com. Code §2.313)

Plaintiffs Herbert Alley and Eric Kamperman allege breach of express warranty under Texas law. Ford claims that their notice is insufficient because it must be given to the manufacturer and the Second Amended Complaint alleges that it was given to the dealer. *See, e.g.*, D.E. 43 ¶ 252 ("Approximately two months after purchase, Mr. Kamperman returned to the dealer to raise his concerns and seek relief."). To establish a breach of express warranty, a buyer

must show: (1) an affirmation or promise made by the seller to the buyer; 2) that such affirmation or promise was part of the basis for the bargain, *e.g.*, that the buyer relied on such affirmation or promise in making the purchase; 3) that the goods failed to comply with the affirmation or promise; 4) that there was financial injury; and 5) that the failure to comply was the proximate cause of the financial injury to the buyer. *Barragan v. Gen. Motors LLC*, No. 4:14-CV-93-DAE, 2015 WL 5734842, at *9 (W.D. Tex. Sept. 30, 2015) (quoting *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 202 (5th Cir. 1987)); *see also* Tex. Bus. & Com. Code § 2.313.

Section 2.607(c)(1) of the Texas Business and Commerce Code provides that "[w]here a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]" "The purpose of this requirement is to give the seller an opportunity to inspect the product to determine whether it was defective and to allow the seller an opportunity to cure the breach, if any." *Elmazouni v. Mylan, Inc.*, 220 F. Supp. 3d 736, 746 (N.D. Tex. 2016). Whether notice must be given to the manufacturer or a seller is a question that divides Texas courts. *Compare Wilcox v. Hillcrest Mem'l Park of Dallas*, 696 S.W.2d 423, 424-25 (Tex. App. -Dallas 1988) (holding that section 2.607(c)(1) required a buyer to notify a remote manufacturer or be barred from recovery); *with Vintage Homes, Inc. v. Coldiron*, 585 S.W.2d 886, 888 (Tex. Civ. App. -El Paso 1979) (holding that "the notice requirement of section 2.607 applies only as between a buyer and his immediate seller."); *accord U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194 (Tex. App. 2003) (noting that the Texas Supreme Court has yet to decide the split amongst the lower courts). Here, Kamperman "returned to the dealer to raise his concerns and seek relief" about "two months after purchase." D.E. 43 ¶ 252. Plaintiff McRae "contacted Ken Stopel Ford to express his concerns and request relief." *Id.* at ¶ 267. Because Texas law does not require that

the buyer notify the manufacturer of the alleged defect to satisfy the pre-suit notice requirement, Kamperman and McRae's notice to their respective dealers is sufficient to survive Ford's Motion.

With regard to the lack of Limp Mode manifestation, in Texas, it must be "inevitable" that the alleged defect will manifest itself. *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 855 (Tex. App. 2005) ("To cause redressable injuries in the breach of the implied warranty of merchantability context, a 'defect' must either have manifested during the product's normal use or such manifestation must be inevitable when the defective feature of the product is used . . ."). Kamperman and Alley—the only Texas Plaintiffs who did not experience Limp Mode—would inevitably have encountered Limp Mode had they attempted to use their vehicles on a track as intended to do upon purchase. *See* D.E. 43 ¶ 236 ("After learning about the safety implications inherent with a Shelby going into Limp Mode, Mr. Alley decided not to take his Shelby to the track."); *id.* at ¶ 251 ("After learning about the safety implications inherent with a Shelby going into Limp Mode, Mr. Kamperman cancelled his pre-existing reservation to participate in a track day . . ."). Accordingly, Ford's Motion is **DENIED** as to Count 52.

### 3. Count 57 – Washington Law (RCW § 62A.2-313)

Plaintiff Evans alleges breach of express warranty under Washington law. An express warranty is any affirmation of fact or promise made by the seller to the buyer relating to the good and becoming the basis of the bargain. *Cox v. Lewiston Grain Growers, Inc.*, 86 Wash. App. 357, 370, 936 P.2d 1191, 1198 (1997). Ford does not argue—and cites to no authority—for the proposition that Count 57 should be dismissed because Washington law requires that Limp Mode manifested itself to Evans before he filed suit. Indeed, Evans alleges—and Ford does not dispute—that Ford's New Vehicle Limited Warranty was warranted for his particular vehicle.

Thus, the question is only whether the warranty applies and to what extent. Accordingly, Ford's Motion is **DENIED** as to Count 57 because Evans sufficiently states a claim.

### 4.    Count 17 – Illinois Law (810 ILCS 5/2-313)

Plaintiff Hochsprung alleges breach of express warranty under Illinois law. Ford cites no authority for the proposition that Illinois law requires that an alleged defect manifest itself before a Plaintiff can seek relief for breach of warranty. In any event, the Court finds that the possibility of encountering Limp Mode—as alleged—was not hypothetical, but a virtual certainty. This, however, may be an issue better addressed at class certification. *See Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010); *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990 at *63 (N.D. Ill. Mar. 31, 2017). Accordingly, Ford's Motion is **DENIED** as to Count 17.

### 5.    Count 22 – Missouri Law (Mo. Stat. § 400.2-313.1)

Plaintiff Roberts alleges breach of express warranty under Missouri law. Ford cites no authority for the proposition that Missouri law requires that an alleged defect manifest itself before a Plaintiff can seek relief for breach of warranty. Nonetheless, Missouri law appears to require that a plaintiff experience the defect to certify a class under a breach of express warranty theory. *See Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 87 (Mo. Ct. App. 2011) (reversing trial court's class certification where "great majority of the putative class members have not actually experienced [the defect]"). The *Hope* court relied heavily on decisions from the Eighth Circuit Court of Appeals. *See O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009) ("It is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own.") (quoting *Briehl v. General Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999)). "Where . . . a product performs

satisfactorily and never exhibits an alleged defect, no cause of action lies." *Briehl*, 172 F.3d at 628, Because neither *O'Neil* nor *Briehl* were decisions based on Missouri law, the Court is unpersuaded that the clear weight of authority in Missouri requires a manifestation of the defect before a plaintiff can state a claim. *Hope* was not grounded on failure to state a claim, but rather on class certification. Accordingly, Ford's Motion is **DENIED** as to Count 22. The Court will revisit this issue at a later stage.

### 6.   Count 27 – New Jersey Law (N.J. Stat. § 12A:2-313)

Plaintiff Linn alleges breach of express warranty under New Jersey law. Again, Ford cites no authority for the proposition that New Jersey law requires that an alleged defect manifest itself before a Plaintiff can seek relief for breach of warranty. New Jersey law is unclear whether a manifestation of the defect before a plaintiff can state a claim. *See Yost v. Gen. Motors. Corp.*, 651 F. Supp. 656 (D.N.J. 1986) (holding that design defect "likely to cause" major damage did not state a claim). Thus, because New Jersey courts—the experts of New Jersey law—have not addressed the issue, Ford's Motion is **DENIED** as to Count 27.

### C.   Implied Warranty Claims

To state a claim for breach of the implied warranty of merchantability, a consumer must demonstrate that a good sold by a merchant is "fit for the ordinary purposes for which such goods are used." U.C.C. § 2-314(2)(c). Plaintiffs allege that Ford breached this warranty because their vehicles are "unfit for their ordinary purpose of driving on public roadways" as they "unexpectedly [go] into Limp Mode." *See e.g.*, D.E. 43 ¶ 460. Ford argues that most Plaintiffs have driven and continue to drive their vehicles on public roadways with no issues, and therefore, there is no claim for breach of implied warranty of merchantability. As an initial matter, other than in their discussion of privity, the Parties do not expressly analyze the implied

warranty of merchantability claim under the substantive law of each of the relevant states, but rather engage in a general discussion of the law of the implied warranty of merchantability and the Uniform Commercial Code. Thus, the Court will tailor its discussion to the law of the Uniform Commercial Code. Here, the gravamen of the allegations in the Second Amended Complaint is that Ford falsely marketed Plaintiffs' vehicles as Track-Ready and knew about the alleged Limp Mode defect, despite continuing to promote their vehicles as capable of being used or raced on a racetrack. Thus, the question is whether this class of vehicles was "fit for the ordinary purpose" of using them on a racetrack, as advertised by Ford. U.C.C. § 2-314(2)(c). The answer surely must be no, because the Court must accept Plaintiffs' well-pleaded allegations as true, and draw all reasonable inferences therefrom. Ford relies on authority that is distinguishable here. *See, e.g., Chiarelli v. Nissan N. Am, Inc.*, No. 14-CV-4327 NGG, VVP, 2015 WL 5686507, at *8 (E.D.N.Y. Sept. 25, 2015) (finding no breach of implied warranty for an allegedly defective timing chain system where vehicles were used for tens of thousands of miles without issue); *Szymczak v. Nissan N. Am., Inc.*, No. 10-CV-7493 (VB), 2011 WL 7095432, at *11 (S.D.N.Y. Dec. 16, 2011) (dismissing breach of implied warranty claim for an allegedly defective radiator where vehicles did not make it to the 100,000 mile mark without manifestation of the defect); *Sheris v. Nissan N. Am., Inc.*, No. 07-CV-2516 (WHW), 2008 WL 2354908, at *6 (D.N.J. June 3, 2008) (dismissing implied warranty of merchantability claim for allegedly defective brake pads because the vehicle was fit for its "ordinary purpose of providing transportation for its owner").

In the cases cited by Ford, the plaintiffs did not experience a manifestation of the purported defect during the warranty period. Furthermore, the alleged defect did not hinder the allegedly primary purpose the plaintiffs purchased their vehicles. For instance, the plaintiffs did

not allege that they purchased their vehicles because of the timing chain system, radiator, or brake pads. Whereas here, Plaintiffs are a group of self-proclaimed "track enthusiasts," that maintain the Limp Mode defect interferes with the primary purpose of purchasing their 2016 Shelby Mustang GT350s. Indeed, Plaintiffs allege that Limp Mode occurs not only in a track environment, D.E. 43 ¶ 337, but also on a busy, public roadway, *id.* at ¶¶ 86, 189, 204, 266. According to Plaintiffs, this presents safety concerns due to the material differences in speed, vehicle type, and the skill set of drivers on public roadways, as compared to drivers on closed racetracks. *Id.* at ¶ 340. Plaintiffs further allege that when Limp Mode occurs, they are forced to pull their vehicles over to the side of the road or highway and wait for the vehicle to cool down, which hampers the reliability and operability of the vehicles, and makes them unfit for their ordinary purpose of driving on public roadways. Thus, because the Second Amended Complaint plausibly alleges that the vehicles were not fit for the ordinary purpose of being used on a public roadway or a racetrack, Ford's Motion is **DENIED** as to the implied warranty of merchantability claims generally. Nonetheless, the Court will revisit this issue at a later stage with the benefit of a more robust record.

Ford also argues, on a state-by-state basis, that the implied warranty claims of the Florida (Count 5), California (Count 11), Illinois (Count 18), New York (Count 33), Oregon (Count 38), Tennessee (Count 48), and Washington (Count 58) Plaintiffs must be dismissed because they do not allege vertical privity with Ford as required by each states' laws.[10] Plaintiffs withdraw Counts 18[11] and 48 under Illinois and Tennessee law, respectively, but argue that privity, or an

---

[10] This argument applies to the Uniform Commercial Code implied warranty claims of Plaintiffs George and Diana Tershakovec, Aubrey, Harper, Kowalchik, Evans, Gondan, Hochsprung, Porter, Stephen and Jill Kelly, Long, Larios, Yanik-Larios, and Rimokh. However, Ford concedes it does not apply to the California Song-Beverly Act implied warranty claim (Count 13) asserted by Plaintiffs Larios, Yanik-Larios, and Rimokh, because privity is not a requirement for that claim.

[11] In their Response in Opposition (D.E. 55) to Ford's Motion to Dismiss, Plaintiffs "withdraw Counts 5 and 48 under Illinois and Tennessee law." *See* D.E. 55 at 21 n.15. It appears as if Plaintiffs intended to withdraw

exception to the privity requirement, is adequately pled under the laws of Florida, California, New York, Oregon, and Washington.

### 1.    Count 5 – Florida Law (Fla. Stat. § 672.313)

In Count 5, the Florida Plaintiffs allege that Ford impliedly warranted that the subject vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used, and were not otherwise injurious to customers. Specifically, the Florida Plaintiffs maintain that their vehicles are defective in that their Track-Ready powertrain systems overheat and cause their vehicles to unexpectedly enter Limp Mode, which impairs the safety, reliability, and operability of the vehicles. Ford argues that the Court must dismiss this claim on the ground that the Florida Plaintiffs cannot recover on a breach of implied warranty claim under Florida law, because they were not in privity with Ford, as they purchased their vehicles from authorized Ford dealerships, not from Ford directly.   The Florida Plaintiffs rely on *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233 (S.D. Fla. 2014) (Dimitrouleas, J.), to argue that the third-party beneficiary exception applies in this case. In *Sanchez*, Judge Dimitrouleas found that third-party beneficiary status applied because the plaintiff pled that she purchased a Ford vehicle from a dealer who was an agent of Ford, and that the plaintiff was the intended consumer of the vehicle. *Id.* at 1234. "The dealers were not intended to be the ultimate consumers of the subject vehicles, and have no rights under the warranty agreements provided by Ford. Ford's warranties were designed for and intended to benefit the consumers only." *Sanchez*, 52 F. Supp. 3d at 1234 (quoting the complaint).

---

Count 18 instead of Count 5, because Plaintiffs do not make any argument in opposition under Illinois law (Count 18), but instead argue that an exception to the privity requirement is met under Florida law (Count 5). Accordingly, the Court will construe Plaintiffs' concession as withdrawing Counts 18 and 48.

Here, the Florida Plaintiffs claim that the third-party beneficiary exception applies because they purchased their vehicles from authorized Ford dealers. *See, e.g.*, D.E. 43 ¶ 14 ("[T]he Tershakovec Plaintiffs purchased a 2016 Shelby Mustang with Technology Package from Maxwell Ford, an authorized Ford dealer located in Austin, Texas."); *id.* at ¶ 30 (same for Plaintiff Aubrey). *Cf. Leon v. Cont'l AG*, 301 F. Supp. 3d 1203 (S.D. Fla. 2014) (Williams, J.) (refusing to apply the third-party beneficiary exception where "[p]laintiffs offer no facts about the persons or entities from whom they obtained their Mercedes Benz vehicles"). Plaintiffs further submit that the dealers were not intended to be the ultimate consumers. *See* D.E. 43 ¶ 392. The Court notes, however, that it previously dismissed a Florida implied warranty claim against an automaker defendant. *See In re Takata*, 193 F. Supp. 3d at 1346. Thus, consistent with its prior ruling in *Takata*, the Court finds that Florida law requires privity for an implied warranty claim. Ford is an automotive distributor, not a dealer. The Florida Plaintiffs could not have purchased their vehicles from Ford. Thus, the Florida Plaintiffs lack privity with Ford and the implied warranty claim must fail. *See Mesa v. BMW of N. Am., LLC*, 904 So. 2d 450, 458 (Fla. 3d DCA 2005) ("Under Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity."); *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1321 (S.D. Fla. 2009) ("Florida law requires privity of contract to sustain a breach of implied warranty claim."). Accordingly, Ford's Motion is **GRANTED** as to Count 5.

### 2. Count 11 – California Law (Cal. Comm. Code § 2314)

Ford argues that the Court must dismiss Count 11 because the California Plaintiffs cannot recover on a breach of implied warranty claim under California law due to a lack of privity with Ford, as they purchased their vehicles from authorized Ford dealerships, not from Ford directly. "Although courts applying California law regarding the third-party beneficiary exception to the

vertical privity requirement of implied warranty claims have come to differing conclusions, the clear weight of authority compels a conclusion that where plaintiffs successfully plead third-party beneficiary status, they successfully plead a breach of implied warranty claim." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales, Practices, and Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1184 (C.D. Cal. 2010). Here, the California Plaintiffs have pled that they purchased vehicles from a network of dealers authorized by Ford. *See* D.E. 43 ¶¶ 78 and 95. Like the Plaintiffs in *In re Toyota*, the California Plaintiffs allege they were the intended consumers and the dealers have no rights under the warranty agreements. *See Id.* at ¶ 392. Therefore, the California Plaintiffs' breach of implied warranty claim is not precluded by a lack of vertical privity and Ford's Motion is **DENIED** as to Count 11.

### 3. Count 33 – New York Law (N.Y. U.C.C. Law § 2-315)

Ford argues that the Court must dismiss Count 33 because the New York Plaintiffs cannot recover on a breach of implied warranty claim under New York law due to a lack of privity with Ford, as they purchased their vehicles from authorized Ford dealerships, not from Ford directly. Plaintiffs rely on *Hubbard v. Gen. Motors Corp.*, where the court permitted a plaintiff to proceed at the motion to dismiss stage without vertical privity on an implied warranty claim for economic damages because an allegedly defective braking system was a "source of danger." 1996 WL 274018, at *5 (S.D.N.Y. 1996) (citing *Goldberg v. Kollsmanm Instrument Corp.*, 12 N.Y.2d 432, 436-37 (1963)) (finding an exception to the general rule that a purchaser cannot recover mere economic loss against a manufacturer under a theory of breach of implied warranty where an article is of such a character that when used for the purpose for which it is made "it is likely to be a source of danger . . . if not properly designed and fashioned, *the manufacturer as well as the vendor* is liable . . . to the persons whose use is contemplated."));

*see also Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 541 (D. Md. 2011) (applying the "thing of danger" exception under New York law where Ford vehicles allegedly suddenly, without warning, lost the ability to maintain speed or accelerate). Ford aptly notes that, "[I]n the more than 50 years since *Goldberg* . . . no New York state court has adopted *Hubbard's* 'thing of danger' exception or followed a similar approach in purely economic loss cases." *Dixon v. Ford Motor Co.*, No. 14-CV-6135 JMA ARL, 2015 WL 6437612, at *5 (E.D.N.Y. Sept. 30, 2015). Indeed, New York state courts have rejected economic loss claims based on a lack of privity in situations where the product at issue was clearly dangerous. *See Adirondack Combustion Techs., Inc. v. Unicontrol, Inc.*, 17 A.D.3d 825, 793 N.Y.S.2d 576 (N.Y.App. Div. 3d Dep't 2005) (dismissing cause of action for breach of implied warranty against manufacturer of a boiler where there was no claim for personal injuries); *Ofsowitz v. Georgie Boy Mfg., Inc.*, 231 A.D.2d 858, 647 N.Y.S.2d 887 (N.Y.App. Div. 4th Dep't 1996) (dismissing cause of action for breach of implied warranty against a manufacturer of a motor home after motor home caught fire when there were no allegations of personal injury). The Court is unpersuaded that New York law permits the "thing of danger" exception in economic loss cases. In fact, the clear weight of authority from New York state courts—which this Court gives great weight and credence as experts of New York law—compels the conclusion that the exception does not apply in economic loss cases. Accordingly, Ford's Motion is **GRANTED** as to Count 33.

### 4.    Count 38 – Oregon Law (Or. Stat. § 72.3140)

Ford argues that the Court must dismiss Count 38 because Plaintiff Long cannot recover on a breach of implied warranty claim under Oregon law due to a lack of privity with Ford, as he purchased the vehicles from an authorized Ford dealership, not from Ford directly. *See Davis v. Homasote Co.*, 281 Or. 383, 574 P.2d 1116, 1117-18 (1978) (holding that privity of contract was

lacking, and therefore no implied warranty existed, where the consumer plaintiff sued the manufacturer for economic loss) (*en banc*); *see also Hupp Corp. v. Metered Washer Serv.*, 256 Or. 245, 247 472 P.2d 816 (1970) (stating that the requirement of privity of contract is "the law of this state," in economic loss cases). Long relies on Oregon Statute 72.8020 that states every manufacturer of consumer goods gives an implied warranty of merchantability for any good sold at retail in the state. Ford argues that because Count 38 is based on Oregon's version of the Uniform Commercial Code—section 72.3140—not Oregon's Consumer Warranty Act, section 72.8010, *et seq.*, reliance on the protections provided in section 72.8020 is foreclosed. For the following reasons, the Court finds that dismissal of Count 38 is warranted.

In *Clark v. Ford Motor Co.*, 46 Or. App. 521, 524, 612 P.2d 316, 319 (1980), the Oregon Court of Appeals explained that "[t]he Consumer Warranty Act, ORS 72.8010 *et seq.*, . . . provides additional protection for purchasers of consumer goods beyond that provided by the Uniform Commercial Code as enacted in this state." (Italics added). The Consumer Warranty Act specifically includes new motor vehicles "used or bought for use primarily for personal family or household purposes." *Id.* at 319 n.8 (citing Or. Stat. § 72.8010(1)). However, *Clark* is not dispositive, much less particularly helpful in this context, because it only speaks to the overlap between Oregon's version of the Uniform Commercial Code and the Consumer Warranty Act. Thus, the question is whether Oregon courts require privity of contract between consumers like Long and manufacturers like Ford. Several Oregon courts and courts applying Oregon law have decided **similar** issues. For instance, in *Price v. Gatlin*, 241 Or. 315, 405 P.2d 502 (1965), the Oregon Supreme Court held that a purchaser of a defective tractor could not hold the wholesaler (not the manufacturer) strictly liable for economic losses, because the plaintiff had no contract with the wholesaler. In *State ex re. Western Seed Prod. Corp. v. Campbell*, 250

Or. 262, 265, 442 P.2d 215, 217 (1968), the plaintiffs sought to recover lost profits for a seed-caused crop loss from the producer of the seed, who sold to the plaintiff's local supplier, based on a breach of implied warranty. The Oregon Supreme Court, in dismissing the plaintiffs' claim for lack of privity, held that the damage was "essentially the same" as in *Price* because "the "plaintiffs lost the profits they expected to derive from the normal sugar-beet crop. *See also Simonsen v. Ford Motor Co.*, 196 Or. App. 460, 479, 102 P.3d 710, 721 (2004) (dismissing implied warranty claim where the plaintiff was not in privity with Ford because she purchased the vehicle from the original owner). Thus, taken together, *Davis, Price, Western Seed, and Hupp*, suggest that there is no exception to the privity requirement under Oregon law. Accordingly, Ford's Motion is **GRANTED** as to Count 38.

### 5.   Count 58 – Washington Law (Wash. Code § 62A-314)

Ford argues that the Court must dismiss Count 58 because Plaintiff Evans cannot recover on a breach of implied warranty claim under Washington law due to a lack of privity with Ford, as he purchased his vehicle from authorized Ford dealership, not from Ford directly. Evans maintains that Washington law provides a third-party beneficiary exception to the privity requirement. Indeed, Washington law recognizes such an exception. *See Tex Enterprises, Inc. v. Brockway Standard, Inc.*, 149 Wash. 2d 204, 210, 66 P.3d 625, 628 (2003) (noting that in *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wash. 2d 334, 344, 831 P.2d 724 (1992), the Supreme Court of Washington "carved a third-party beneficiary exception out of the general rule that a vertical non-privity plaintiff cannot recover from a remote manufacturer for breach of implied warranty."). However, a plaintiff "can demonstrate that [he or she is a] third-party beneficiar[y] where a manufacturer knew a purchaser's identity, knew the purchaser's purpose for purchasing the manufacturer's product, knew a purchaser's requirements

for the product, delivered the product, and/or attempted repairs on the product in question." *Lohr v. Nissan N. Am., Inc.*, No. C16-1023RSM, 2017 WL 1037555, at *7 (W.D. Wash. Mar. 17, 2017) (citing *Touchet Valley*, 831 P.2d at 730)). This is generally known as the "sum of the interaction" test, to "determine whether the manufacturer was sufficiently involved in the transaction with the remote purchaser to warrant enforcement of an implied warranty." *Id.* (quoting *Babb v. Regal Marine Indus., Inc.*, 2015 WL 786857, at *3, 186 Wash. App. 1003 (Wash. App. Feb. 24, 2015)).

Here, Evans pled that he was the intended third-party beneficiary of the contract between Ford and the dealer who sold him the vehicle, D.E. 43 ¶ 1109, but did not adequately allege that he was the intended third-party beneficiary of implied warranties Ford made to said dealership. Evans does not support his allegation with facts about his direct interactions with Ford, much less that Ford knew of his identity or his purpose of purchasing the vehicle. Thus, because Evans has failed to allege sufficient factual matter to allow the court to draw the reasonable inference that he is a third-party beneficiary of the implied warranty Ford allegedly made to the dealer who sold him his vehicle, Ford's Motion is **GRANTED** as to Count 58.

### 6. Count 13 – Song-Beverly Act (Cal. Civ. Code §§ 1791.1 & 1792)

Ford argues that Plaintiff Rimokh's Song-Beverly Consumer Warranty Act and related Magnusson Moss Warranty Act claims must be dismissed because his vehicle was not purchased in California. Plaintiffs concede that Count 13 should be dismissed.[12] Accordingly, Ford's Motion is **GRANTED** and Count 13 is dismissed as to Plaintiff Rimokh only.

---

[12] In his Response in Opposition (D.E. 55) to Ford's Motion to Dismiss, "Plaintiff Rimokh withdraws Count 12, his Song-Beverly claim for implied warranty." D.E. 55 at 23 n.16. It appears as if Plaintiff Rimokh intended to withdraw Count 13, rather than Count 12, because Count 12 is the Song-Beverly claim for breach of **express warranty** and Ford clearly moved to dismiss Count 13, the **implied warranty** claim. Accordingly, the Court will construe Plaintiffs' concession as withdrawing Count 13.

## D.  Unjust Enrichment Claims

Finally, Ford moves to dismiss the unjust enrichment claims. Ford argues, *inter alia*, that all of the unjust enrichment claims should be dismissed because a cause of action for unjust enrichment cannot exist where the parties' relationship is governed by an express contract and where Plaintiffs have an adequate legal remedy. In Florida, the elements of a claim for unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff; (2) the appreciation by the defendant of such benefit; and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof. *Aceto Corp v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1287 (S.D. Fla. 2013). In the other states, the elements are similar.[13]

---

[13] In Illinois, "to state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 137 Ill. Dec. 19, 545 N.E.2d 672, 679 (1989). In Texas:

> A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage. Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits. Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain. Unjust enrichment characterizes the result or failure to make restitution of benefits received under such circumstances as to give rise to implied or quasi-contract to repay. It has also been said that recovery under unjust enrichment is an equitable right and is not dependent on the existence of a wrong.

> *Villareal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.-San Antonio 2004, pet. denied) (internal citations, quotes, and brackets removed).

In Washington, "[u]njust enrichment is a method of recovery for the value of [a] benefit retained, absent any contractual relationship, because notions of fairness and justice require it." *Young v. Young*, 164 Wash. 2d 477, 191 P.3d 1258, 1262 (2008). In Missouri, to state a claim for unjust enrichment, the petition must set forth facts demonstrating: (1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; (3) that it would be unjust to allow the defendant to retain the benefit. *Gerke v. City of Kansas City*, 493 S.W.3d 433, 438 (Mo. Ct. App. 2016) (quotations omitted). Under New Jersey law, to state a claim for unjust enrichment, a plaintiff must allege that (1) at plaintiffs expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it. *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 330 (D.N.J. 2014) (quotations and citations omitted). In California, to state a claim for unjust enrichment, Plaintiff must allege receipt of a benefit and unjust retention of the benefit at the expense of another. *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 852 (N.D. Cal. 2012) (quotations and citation omitted). To state a claim for unjust enrichment under New York law, a plaintiff must show that (i) the defendant

Ford argues that an express contract and adequate legal remedy, in the form of their express warranty, exists covering the same matter as the unjust enrichment claim: the purported defects in Plaintiffs' vehicles, and neither party disputes the existence of the warranty contract. *See In re Takata*, 193 F. Supp. 3d at 1344 (S.D. Fla. 2016) ("An unjust enrichment claim can exist only if the subject matter of that claim is not covered by a valid and enforceable contract." (internal quotations and citations omitted)). However, Ford's primary argument, *supra*, is that the express warranty does not apply in this case. To boot, Plaintiffs allege that the "contract remedy is insufficient to make Plaintiffs . . . whole." D.E. 43 ¶ 446. Thus, at this stage, Plaintiffs may maintain an unjust enrichment claim in the alternative to their breach of express warranty claim. *See, e.g., Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1227-28 (S.D. Fla. 2013); Federal Rules of Civil Procedure 8(a) and 8(d)(2) (permitting pleading in the alternative). Moreover, the Second Amended Complaint includes all the elements of unjust enrichment by claiming that the vehicles have a diminished value, and thus Ford has reaped profits in excess of what should have been earned for the sale of its allegedly defective 2016 Shelby GT350 Base and Technology Packages. Because unjust enrichment is available only when there is no adequate remedy at law, and the Court has declined to dismiss the express warranty claims at the motion to dismiss stage, the Court will determine at a later time whether Plaintiffs' remedy at

---

was enriched, (ii) at the plaintiff's expense, and (iii) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (2011) (citation omitted). In Oregon, to state a claim for unjust enrichment, a party must establish: (1) a benefit conferred, (2) awareness by the recipient that he or she has received the benefit, and (3) that it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it. *Unigestion Holding, S.A. v. UPM Tech., Inc.*, 160 F. Supp. 3d 1214, 1230 (D. Or. 2016) (quotations and citations omitted). In Pennsylvania, to state a claim for unjust enrichment under Pennsylvania law, the plaintiff must allege that (1) he conferred a benefit on the defendant, (2) the defendant knew of the benefit and accepted or retained it, and (3) it would be inequitable to allow the defendant to keep the benefit without paying for it. *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016) (citation omitted). To state a claim for unjust enrichment under Tennessee law, a plaintiff must establish (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof. *City of Goodlettsville, TN v. Priceline.com, Inc.*, 605 F. Supp. 2d 982, 998 (M.D. Tenn. 2009) (quotations and citation omitted).

law is adequate. Accordingly, because the issue of whether the express warranty applies in this case is still in dispute, Ford's Motion is **DENIED** as to the unjust enrichment claims.

IV.     **CONCLUSION**

For the foregoing reasons, it is hereby

**ADJUDGED** that Ford's Motion to Dismiss **(D.E. 50)** is **GRANTED-IN-PART** and **DENIED-IN-PART** as follows:

- Count 13 is **DISMISSED** as to Plaintiff Rimokh only;

- Counts 18 and 48 are **DISMISSED** as withdrawn;

- Counts 5, 33, 38, and 58 are **DISMISSED WITH PREJUDICE** in full; and

- Ford's Motion to Dismiss the remaining counts is **DENIED**.

It is further

**ADJUDGED** that Ford shall file an answer no later than **Friday, August 10, 2018**.


DONE AND ORDERED in Chambers at Miami, Florida, this ____ of July 2018.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record