UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**CASE NO. 17-21087-CIV-MORENO/GOODMAN**

GEORGE TERSHAKOVEC, et al.,

     Plaintiffs,

v.

FORD MOTOR COMPANY,

     Defendant.

_____/

## <u>OMNIBUS REPORT AND RECOMMENDATIONS ON *DAUBERT* MOTIONS</u>

Both parties move to exclude each other's experts (or to limit expert testimony) under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiffs filed motions to exclude certain testimony and opinions of defense experts, Dr. David Harless and Dr. Serge Gregory. [ECF Nos. 165; 166]. Defendant Ford Motor Company ("Ford") filed responses in opposition [ECF Nos. 187; 188], and Plaintiffs filed replies [ECF Nos. 190; 191]. Ford filed a motion to exclude Plaintiffs' expert witnesses, Dr. Dahm and Dr. Honka. [ECF No. 147]. Plaintiffs filed a response in opposition [ECF No. 164], and Ford filed a reply [ECF No. 189]. United States District Judge Federico A. Moreno referred all matters relating to the *Daubert* motions to the Undersigned for a Report and Recommendations. [ECF No. 203].

For the reasons detailed below, the Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs' motion to exclude certain testimony and opinions of Dr. Harless; **grant in part** and **deny in part** Plaintiffs' motion to exclude certain testimony and opinions of Dr. Gregory; and **grant in part** and **deny in part** Ford's motion to exclude Plaintiffs' expert witnesses, Dr. Dahm and Dr. Honka.

Introductory Note:

Neither party requested a hearing on any of the three motions. All four experts who are subject to the motions have had their depositions taken, and the parties submitted excerpts from the experts' depositions or the entire transcripts. The motions have been amply briefed, with responses and replies to each of the three motions. The Undersigned will therefore issue the Report and Recommendations based on the motions, memoranda and exhibits.

A trial court's decision whether to hold such a *Daubert* hearing is committed to its sound discretion, *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005), and absent a request, the Undersigned concludes that no hearing is required. *Cf. id.* at 1108, 1114 (no abuse of discretion in failing to hold a hearing when not requested). Even when a hearing is requested, the court has discretion to deny the request, especially when the case is not a complicated one involving multiple expert witnesses. *E.g., United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001).

Although there are four expert witnesses at issue in this motion, their testimony is not particularly complicated, especially compared with those cases involving dueling medical evidence with technical jargon, when a hearing may be a fruitful exercise.

The Undersigned frequently issues Orders and Reports & Recommendations on *Daubert* challenges to expert witnesses without hearings. *See, e.g., Companhie Energitca Potiguar v. Caterpillar, Inc.*, No. 14-cv-2427 [ECF Nos. 396 & 412] (affirming and adopting in whole, over objections filed by both sides, a 91-page Omnibus Report & Recommendations, granting in part and denying in part, challenges to 12 experts in the case, which concerned a $13.8 million sale of 144 allegedly defective diesel generator sets sold to a Brazilian entity for use in Brazilian electrical power plants).

## I.    Background

Plaintiffs are purchasers of 2016 Shelby Mustang GT350 Base Model and Technology Package vehicles (the "Subject Vehicles"),[1] which Plaintiffs allege are defective because they "overheat[] prematurely and cannot be driven at sustained high speeds on a racetrack or on public roadways" (the "Defect"). [ECF No. 178, p. 23]. Plaintiffs allege that Ford knew about the Defect before the Subject Vehicles were sold, yet "failed to disclose this highly material fact and, instead, marketed the vehicles as 'track capable.'" *Id.* According to Plaintiffs, Ford marketed and sold the Base and Tech models as "track ready" but failed to disclose that the models were susceptible of

---

[1]    Plaintiffs have moved for class certification. [ECF No. 178].

overheating prematurely. *Id.* at p. 24. Plaintiffs claim that they "would not have bought, or [would have] paid less for, their Shelby[s] had they known the cars were not track capable." [ECF No. 178, pp. 26-27].

Ford argues that the Subject Vehicles are not *defective*, but, rather, are versions of the GT350 that were not designed specifically for **all types** of track events. A "Track Day" is a more serious type of track event. [ECF No. 180, pp. 17-18]. Ford contends that, more than three years before a GT350 was delivered to a customer, it decided to offer four vehicle packages: Base, Technology, Track, and R5. *Id.* at p. 19. Ford describes the differences between the packages, as follows:

> The Base was the entry level version, the Technology package would offer the features necessary for comfortable street driving, such as audio systems, navigation, and heated seats, while the Track and R models would offer the features necessary for more serious track use, such as Recaro seats and transmission and differential coolers.

*Id.* According to Ford, "**all** GT350 packages were intended to have features designed to make them far more **track capable** than other street-legal sedans, including other Mustangs." *Id.* (emphasis added).

To support their case, Plaintiffs rely on the following expert witnesses (who are the subject of Ford's *Daubert* motion):

**Dr. Werner Dahm.** Plaintiffs retained Dr. Dahm as their engineering expert. [ECF No. 164, p. 7]. Based on his extensive background in mechanical and aerospace engineering, Dr. Dahm offered opinions related to the Shelbys' engineering and design.

Most notably, Dr. Dahm opines that, when subject to the well-known demands of track driving (or demanding driving on public roadways), "the Shelbys' powertrains are unable to reject enough heat, a failure attributable to Ford's crude engineering and deliberate design choices." *Id.*

**Dr. Elisabeth Honka**. Plaintiffs retained Dr. Honka as a marketing expert. Dr. Honka opines that Ford devised -- then successfully implemented -- a targeted marketing campaign, aimed at those who critically valued track performance, the central message of which was the Shelbys' track capability. *Id.*

In support of its defense, Ford relies on the following expert witnesses (who are the subject of Plaintiffs' motions to exclude certain testimony and opinions):

**Dr. David Harless.** Ford hired Dr. Harless as its economics expert. Ford asked Dr. Harless to build a depreciation model and to critique the findings of Plaintiffs' damages expert. [ECF No. 165, p. 1]. Dr. Harless opines that the Shelbys did not suffer "excessive or unusual" depreciation compared with cooler-equipped versions of the GT350, and he concludes that "the alleged defect did not adversely affect the value of the vehicles sold new or used." *Id.*

**Dr. Serge Gregory.** Ford hired Dr. Gregory as an engineering expert to provide opinions concerning defects (or the purported lack thereof) in the Subject Vehicles. [ECF No. 166, p. 3]. Dr. Gregory received a Ph.D. in mechanical engineering from the University of Michigan in 2012, and has worked at Exponent, a publicly traded consulting

firm, since 2013. *Id.* Dr. Gregory opines that the Subject Vehicles do not go into Powertrain

Protection Mode ("PPM") under normal driving conditions and, if a PPM is triggered,

the PPM does not cause the Subject Vehicles to be unsafe.

## II.     The *Daubert* Legal Standard

The admission of expert testimony is governed by Federal Rule of Evidence 702,

as explained and refined by the United States Supreme Court in *Daubert* and *Kumho Tire*

*Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are

charged with a gatekeeping function "to ensure that speculative, unreliable expert

testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253,

1256 (11th Cir. 2002). The district court has "broad discretion in determining whether to

admit or exclude expert testimony, and its decision will be disturbed on appeal only if it

is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993).

Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts
> of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry:

(1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be a "[s]cientific method; good grounds and appropriate validation." *U.S. v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

However, "[i]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *see also Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (citation omitted). Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n. 7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert,* 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla.

Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."). Furthermore, courts "must be careful not to conflate questions of *admissibility* of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *In re Trasylol*, 2010 WL 1489793, at \*7 (quoting *Quiet Tech*, 326 F.3d at 1341) (emphasis added).

## III.   Analysis[2]

The Undersigned **respectfully recommends** that Plaintiffs' Motion to Exclude Certain Testimony and Opinions of Dr. David Harless [ECF No. 165] be **granted**, Plaintiffs' Motion to Exclude Expert Testimony of Dr. Serge Gregory [ECF No. 166] be **granted in part** and **denied in part**, and Ford's Motion to Exclude Plaintiffs' Experts Dr. Dahm and Dr. Honka be **granted in part** and **denied in part** for the reasons discussed below.

>    a. **The Undersigned recommends that Judge Moreno grant Plaintiffs' Motion to Exclude Certain Testimony and Opinions of Dr. David Harless.**

Ford hired Dr. Harless, who holds a Ph. D. in economics and is a professor of economics at the Virginia Commonwealth University School of Business in Richmond,

---

[2]    Both parties violated Local Rule 7.1, which requires a party to first confer with the opposing party before filing a motion and to also include a certificate of conferral with the motion. But Judge Moreno has referred these motions to me for substantive rulings and is expecting an analysis, rather than an assessment-free view that the motions could be stricken for the clear-cut rule violations. Moreover, neither side has complained about the opponent's rule transgression. Under these circumstances, I will provide a Report and Recommendations that addresses the merits of the motions.

Virginia, to determine (1) whether there was any evidence of diminished value of the Subject Vehicles; (2) whether the used vehicle prices of the Subject Vehicles are consistent with Plaintiffs' allegations; and (3) whether there was any economic damage or loss due to the alleged Defect that was common to all members of the proposed class. [ECF No. 180-17, p. 1].

Plaintiffs seek to exclude Dr. Harless's opinion that "the alleged defect did not adversely affect the value of the vehicles sold new or used." [ECF No. 165, pp. 6-7]. Plaintiffs contend that the assumptions, methodology, and data on which Dr. Harless relies to reach his opinion are "shot through with fatal shortcomings, rendering his opinions arbitrary and ultimately unhelpful to the trier of fact." *Id.* at pp. 2-3. Thus, Plaintiffs argue that the Court should exclude Dr. Harless's proposed testimony regarding his depreciation model and his opinion that the Subject Vehicles have not suffered from diminished value, and strike the correlating portions of Dr. Harless's original report and the entirety of Dr. Harless's rebuttal report.

*Daubert's* reliability prong sets out four guideposts that a district court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique

has been generally accepted in the proper scientific community. *See McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004).

Dr. Harless's depreciation model uses the prices of used 2016 Ford Shelby GT350 models with coolers as counterfactuals to predict the prices of the Subject Vehicles. [ECF No. 165-1, p. 29]. Dr. Harless, however, offers no data, testing, or theoretical argument to validate his assumption that the prices of used 2016 Ford Shelby GT350 models with coolers could predict the counterfactual prices of the Subject Vehicles. Without this validation, Dr. Harless's methodology cannot be tested and is, therefore, inherently unreliable. *See Rink*, 400 F.3d at 1292 (finding that whether methodology can be tested or has known rate of error can be used to ascertain reliability under *Daubert*).

Furthermore, there were simply too few vehicle sales and disclosures about the Defect for Dr. Harless to assume market-wide knowledge of the Defect.

Ford never recalled the Shelbys or publicly acknowledged the existence of the Defect. Without a recall or public acknowledgment, there was no reference point by which to measure the effect that knowledge of the Defect had on consumers. Without this data, Dr. Harless could not justify his assumption that knowledge of the Defect impacted used vehicle pricing.

Dr. Harless's initial report did not disclose that the regional National Automobile Dealers Association ("NADA") price data on which he relied was based on a miniscule number of actual sales. [ECF No. 165, pp. 9-10]. As set forth in Table 2 of the Expert

Rebuttal Report of H. Sanford Weisberg, only two 2016 Base models and no R-base models were sold at auction in Florida, Georgia, or the Southeast region in the 46 months between January 2016 and September 2019, which in turn means that the number of non-auction sales in Florida, Georgia, or the Southeast region was likely to be approximately eight for Base models and less than eight for R-base models. [ECF No. 165-4, p. 8].[3]

Dr. Harless responds to this criticism by obtaining additional NADA data from other regions. Because these nationwide valuations "were identical in each month in each region" between December 2016 and March 2020, Dr. Harless concludes that "[t]he valuations of the different configurations of the GT350 reported in the Southeastern edition of the NADA [guide] . . . reflected sales nationwide." [ECF No. 187-1, p. 12]. But, as noted by Dr. Weisberg, Dr. Harless fails to disclose that even nationwide Shelby sales were vanishingly small: *only 42 2016 Base models and 7 R-base vehicles were sold at auction in North America between January 2016 to September 2019, which in turn indicates that the total number of nonauction sales was approximately 168 for Base models and 28 for R-base models.* [ECF No. 190, p. 11].

As explained by Dr. Weisberg, a fundamental problem with Dr. Harless's theory remains. "[T]here are simply too few Shelby sales for the NADA data to be a reliable proxy for real world used sales prices in this case." *Id.*

---

[3]     Dr. Weisberg is the Emeritus Professor of Statistics at the University of Minnesota. He earned a Ph.D. in statistics from Harvard University in 1973.

Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts. *See Daubert*, 509 U.S. at 591. There is no fit where a large analytical leap must be made between the facts and the opinion. *See McDowell*, 392 F.3d at 1299. As such, Dr. Harless's opinion is inadmissible *ipse dixit. See id.* at 1300 ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions . . . .").

For the reasons explained above, the Undersigned finds that Dr. Harless used unreliable assumptions, methodology, and data to measure and evaluate the Subject Vehicles' value. His offered testimony will not be helpful to the trier of fact. Accordingly, I **respectfully recommend** that Plaintiffs' Motion to Exclude Certain Testimony and Opinions of Dr. Harless be **granted**.

> **b.** **The Undersigned recommends that Judge Moreno deny in part, and grant in part, Plaintiffs' Motion to Exclude Certain Testimony and Opinions of Dr. Gregory [ECF No. 166].**

Ford retained Dr. Gregory, a mechanical engineer, to provide expert testimony regarding the performance and safety of the Subject Vehicles. Plaintiffs have moved to exclude: (1) Dr. Gregory's testimony that he drove approximately 760 miles on public roads without going into a PPM; (2) Dr. Gregory's claim that the Subject Vehicles are "track capable," based on his calculation that an average lap time increases by only 3% when the PPM is activated; and (3) Dr. Gregory's opinion that the Subject Vehicles are not unsafe when a PPM is engaged.

As explained below, the Undersigned agrees that Dr. Gregory's opinions relating to his 759 miles of street driving should not be admitted because he did not employ a reliable methodology to support his testimony. But the Undersigned finds that the arguments concerning Dr. Gregory's opinions about the track capability and safety of the Subject Vehicles go to the weight of his testimony and are better addressed by Plaintiffs during cross-examination.

### i.    Dr. Gregory's unrecorded street driving is inadmissible.

Dr. Gregory has admitted that during his 759 miles of unrecorded street driving, he did not (1) take any notes; (2) track route locations, the dates (or times) of driving, speed, RPMs, the temperature, the weather, or any other data; (3) draft a test protocol; or (4) otherwise apply any type of methodology. [ECF No. 188, p. 12]. In fact, in Dr. Gregory's rebuttal report, he disavows his reliance on this driving as a basis for his opinions, explaining that it is at best "secondary" to his proposed testimony:

> My opinions are primarily based on my experience and data that was recorded for street drives (with data files), and track files (with data files). The 700+ miles of transport and scouting drives are secondary to my opinions, and they provided me with experience of everyday driving in the GT350. In these several hundred miles of street driving I performed I didn't naturally experience any PTLP modes. If these 700+ miles were not included in my analysis, the opinions set forth in my November Report would not change.

[ECF No. 191, p. 5].

The Undersigned finds that Dr. Gregory's methodologies on the issue of whether he experienced a PPM during his 759 miles of "transport & scouting" driving are

unreliable and/or nonexistent. To the extent that Dr. Gregory even employed a methodology during this driving, there is nothing against which that methodology could be compared to determine whether it was reliable or even scientific in nature. *See Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 877 (11th Cir. 2020). Indeed, Plaintiffs have complained that it is "impossible for them to replicate or even understand his work." [ECF No. 191, p. 4]. Accordingly, the Undersigned **respectfully recommends** that Plaintiffs' request that Dr. Gregory be prohibited from testifying that he did not experience a PPM during his 759 miles of "transport & scouting" driving be **granted**.

### ii.    Dr. Gregory's "average lap time" results are admissible.

Dr. Gregory opines that the Subject Vehicles are "track capable" because, even when the PPM is engaged, it increases lap times by only 3%. Plaintiffs argue that Dr. Gregory's average lap times are "speculative at best" because Dr. Gregory improperly excluded lap times from three laps in which the professional driver slowed down. Plaintiffs argue that had all lap times been averaged, the post-PPM times would have been 10% longer. Dr. Gregory opines that his calculations are accurate because he appropriately included all laps in which the driver was using the full performance of the vehicle -- which was the purpose of the analysis -- and omitted cool down laps and laps where the driver backed off the throttle (i.e., laps where the vehicle was not being driven to its full capabilities).

Plaintiffs' criticisms affect the weight to be accorded to Dr. Gregory's testimony by the jury and are not controlling on whether the Court should exclude the opinion testimony as part of its limited gatekeeping role. *See Rosenfeld v. Oceana Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ("It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."). Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (internal quotation omitted). That is why "identification of [] flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech.*, 326 F.3d at 1345. "Indeed, in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Id.* Accordingly, the Undersigned **respectfully recommends** that Plaintiffs' request to exclude any testimony relating to Dr. Gregory's 3% average lap time calculation be **denied**.

> i.   **Dr. Gregory's conclusions regarding the safety of the Subject Vehicles are admissible.**

Dr. Gregory's remaining safety opinions, including that the GT350 can be safely and easily handled and that no abrupt deceleration is experienced if a PPM is triggered while driving on the street or the track, satisfy the *Daubert* standard.

First, Dr. Gregory is qualified to testify regarding these topics. Dr. Gregory received a bachelor's degree from Carnegie Mellon University and a master's degree and

Ph.D. in Mechanical Engineering from the University of Michigan. [ECF No. 188, p. 20]. His coursework at the University of Michigan and Carnegie Mellon University included Automotive Engineering, Vehicle Control Systems, and Internal Combustion Lab. *Id.* He also received education and training in Traffic Crash Reconstruction for the Forensic Engineer from Northwestern University. *Id.* The work for this course included: Vehicle Behavior in Collisions; Human Factors; Time-Distance Analysis; Basic Equations of Motion; Driver strategy and tactics; and real-world case studies. *Id.* Dr. Gregory is a member of the American Society of Michigan Engineers and the Society of Automotive Engineers. *Id.*

Upon receiving his bachelor's degree, Dr. Gregory worked as a Stress Lab Engineer for Chrysler Automotive and, as part of that job, ran and tested computer models of cars and analyzed the results for component and full vehicle tests. *Id.* This included analyzing data from instrumented vehicles and physical analysis of vehicle components after track testing. *Id*. He also monitored vehicle tests at the proving ground. *Id.* Since 2013, he has worked for Exponent, a technical consulting firm. *Id.* His automotive experience includes integrating drive systems in autonomous vehicles, durability testing on a variety of automotive components, analyzing vehicle safety systems, testing components for recall implementation and effectiveness, and designing and building formula race cars, including suspension and steering components. *Id.*

He has also performed accident reconstruction, vehicle inspection, and CAD analysis of vehicle structures, and he investigated automatic transmissions for the root cause of limp mode. *Id.* Plaintiffs' complaint that Dr. Gregory lacks specific training in human factors or safety analysis [ECF No. 191, p. 13] goes to the weight of Dr. Gregory's testimony and may be raised during cross-examination.

Second, Dr. Gregory uses reliable methodologies in determining the safety implications of a reduction of power while driving on a track or in power mode. Applying primarily his expertise and experience, Dr. Gregory opines on the effect limp mode has on vehicle safety. *Id.* at p. 21. The Undersigned does not find persuasive Plaintiffs' argument that Dr. Gregory's testimony is not supported by a reliable methodology because he is not a human-factors engineer. [ECF No. 191, p. 14]. Dr. Gregory's lengthy list of reference materials used in preparing his report, including his own inspection of the Subject Vehicles, reflects that he did conduct his own investigation of the facts in formulating his opinions. *See* ECF No. 180-54, pp. 134-35.

Third, Dr. Gregory's testimony is helpful in assisting the jury in determining the facts at issue -- what safety systems are in place for high-performance automobiles and whether those systems were put in place by Ford -- which are outside the realm of common knowledge. *See Rink*, 400 F.3d at 1291-92.

Thus, Dr. Gregory may provide relevant safety opinions, including that the GT350 can be safely and easily handled and that no abrupt deceleration is experienced if a PPM

is triggered while driving on the street or the track. Plaintiffs' criticisms of Dr. Gregory's testimony may be explored on cross-examination. Therefore, the Undersigned **respectfully recommends** that the Plaintiffs' request to exclude Dr. Gregory's conclusions regarding the safety of the Subject Vehicles be **denied**.

      c.    **The Undersigned recommends that Judge Moreno grant in part and deny in part Ford's Motion to Exclude Plaintiffs' Experts Dr. Dahm and Dr. Honka. [ECF No. 147].**

Plaintiffs have retained Dr. Dahm, a mechanical and aerospace engineer, to offer opinions regarding the Subject Vehicles' engineering and design, including his opinion that "when subject to the well-known demands of track driving (or demanding driving on public roadways), the [Subject Vehicles'] powertrains are unable to reject enough heat, a failure attributable to Ford's crude engineering and deliberate design choices." [ECF No. 164, p. 8]. Plaintiffs retained Dr. Honka, a marketing expert, to offer her testimony regarding Ford's marketing plan. She opines that Ford targeted "those who critically valued track performance, and whose central message was the Shelbys' track capability." [ECF No. 164, p. 8].

Ford argues that Dr. Dahm's and Dr. Honka's testimony and opinions should be excluded for various reasons. First, Ford argues that their opinions do not assist the trier of fact because "they are playing the role of Plaintiffs' advocate in their presentation of the facts and invade the province of the jury." [ECF No. 147, p. 2]. Second, Ford contends that Dr. Dahm's and Dr. Honka's testimony and opinions are not the products of reliable

methodologies and are not based on sufficient data or analysis. *Id.*  Third, Ford asserts that both experts lack necessary qualifications to provide their proffered opinions. *Id.* Lastly, Ford opposes Dr. Dahm's and Dr. Honka's testimony and opinions because they are "unfairly prejudicial and should be excluded pursuant to FRE 403." *Id.*

As explained below, the Undersigned agrees that Dr. Dahm's opinions are inadmissible and should be excluded in their entirety. But the Undersigned finds that Dr. Honka is qualified to testify and that Plaintiffs' arguments regarding Dr. Honka's testimony and opinions go to the weight of her testimony, which may be raised during cross-examination. Finally, the Undersigned finds that Dr. Honka's testimony and opinions are not unfairly prejudicial in violation of FRE 403.

>    i.    **The Undersigned finds that Judge Moreno should exclude Dr. Dahm from being an expert in this case.**

Dr. Dahm's testimony does not satisfy *Daubert b*ecause (1) Dr. Dahm does not have the experience or background necessary to qualify as an expert in this case; (2) Dr. Dahm's testimony is not supported by sufficient facts or reliable methodology because it is based on an incorrect premise and because he did not do any of his own testing or inspections of the subject vehicles; and (3) Dr. Dahm's opinions, including those relating to alleged safety risks, will not benefit the jury.

Plaintiffs argue that Dr. Dahm's engineering and project management experience, combined with his experience applying accepted principles and methods of heat transfer and thermal management, make him qualified to opine on Ford's design process that

allegedly created the Defect at issue in this case, the track capability of the Subject Vehicles, and the repairs to the Subject Vehicles' powertrain thermal management system. They say he should be permitted to opine on the factors that are necessary for the Subject Vehicles to perform to the standard that Ford devised and marketed. [ECF No. 164, p. 14].

But *aerospace* engineers have been found unqualified to offer testimony relating to *automotive* design issues. *See Motsinger v. Hyundai Motor Am.*, No. 94-CV-00694, 1997 U.S. Dist. LEXIS 6230, at *7-9 (M.D.N.C. Mar. 12, 1997). In *Motsinger*, the plaintiff proposed to support her allegations of a design defect with the testimony of three expert witnesses. *See id.* at *6. None of the experts were automotive engineers, but the plaintiff argued that they were fully capable of testifying about automotive defects because "many of the engineering principles are the same in a car as they are in an airplane." *Id.* at *7. The district court rejected the plaintiff's argument, stating that the "proffered experts simply have no experience relevant to the case at issue, and are unable to testify with any degree of certainty as to the design defect theories employed by [the plaintiff]." *Id.* at *8-9.

The reasoning and decision reached in *Motsinger* hold true in the instant case. Dr. Dahm, despite his expertise in aerospace engineering and thermal management technology, lacks a reliable foundation to express his opinions regarding the Subject Vehicles' capabilities under track or public road conditions that are central issues to this case. Plaintiffs failed to convince the Undersigned that Dr. Dahm's experience with

aircraft engineering principles qualifies him to testify about automotive defects. Dr. Dahm's inexperience with track driving and track capabilities of automobiles raises unanswered questions regarding the competency of Dr. Dahm's testimony or his ability to testify with any degree of certainty as to the automotive design defects alleged by Plaintiffs. Therefore, I find that Dr. Dahm should be precluded from offering expert testimony at trial.

Even if he is qualified to testify, Dr. Dahm did not employ sufficiently reliable methodology to reach his conclusions. Plaintiffs acknowledge, as they must, that Dr. Dahm did not do any of his own testing or inspections of the subject vehicles but contend that he need not have done so because he relied on Ford's testing. But Plaintiffs have not shown how Dr. Dahm used Ford's testing to reach his opinions regarding differential damage or the Subject Vehicles' alleged tendency to experience a PPM on public roads. Further, Plaintiffs present a model that Dr. Dahm created for assessing vehicle transmission temperatures; yet, as previously stated, Dr. Dahm lacks the automotive experience to produce a reliable model.

Finally, the prejudicial effect of allowing Dr. Dahm to offer expert opinions regarding what amounts to little more than speculations would far outweigh any probative value of his testimony. *See* Fed. R. Evid. 403, 702. Accordingly, the Undersigned **respectfully recommends** that Ford's motion to exclude Dr. Dahm from providing testimony in this case be **granted**.

ii.   **Ford's motion to exclude Plaintiffs' expert Dr. Honka should be denied**.

Plaintiffs retained Dr. Honka as a marketing expert to provide opinions regarding Ford's marketing strategy, tactics, and execution for the 2015-2016 Shelby GT350s, specifically with respect to any themes in Ford's marketing of the Subject Vehicles. Dr. Honka is currently an assistant professor of marketing at the University of California Los Angeles Anderson School of Management. [ECF No. 164, p. 24]. She has a Ph.D. in marketing and an MBA from the University of Chicago Booth School of Business. [ECF No. 164, p. 24]. Dr. Honka's areas of academic expertise include consumer shopping behavior, advertising, and digital entertainment; she has published in leading marketing and economics journals and serves on the editorial review boards for two leading marketing journals. *Id.*

In her report, Dr. Honka offers five opinions: (1) that Ford's materials are consistent with a "target segment marketing campaign" aimed at "performance enthusiasts"; (2) that Ford's marketing strategy was premised on track capability being a highly material attribute to this group; (3) that performance enthusiasts were willing to pay a premium for a track-capable car that could withstand a commercial track day; (4) that Ford undertook an integrated marketing communications approach to create a common and consistent marketing campaign that touted the track capability of all Shelby variants; and (5) that Ford succeeded in communicating the common message to performance enthusiasts that all variants of the Shelby GT350 were track capable. *Id.*

Without challenging Dr. Honka's credentials, qualifications, or experience, Ford argues that Dr. Honka is an improper expert because Dr. Honka will testify, based solely on Ford's internal documents, as to her subjective "opinions" regarding Ford's positioning all variants of the Shelby GT350 as capable of completing four to five 20-30 minutes sessions on a track. Ford argues that Dr. Honka's opinions are matters on which the jury can undertake on its own. [ECF No. 147, pp. 19-20]. Further, Ford argues that calling Dr. Honka is improper because all the information Plaintiffs seek to elicit -- information about Ford's brand positioning strategies for the Shelby GT350 -- is available through Ford's marketing material, which the jury can review themselves. Ford also argues that Dr. Honka seeks to offer nothing more than what Plaintiffs' lawyers can argue in closing arguments, and, almost as an aside, that allowing Dr. Honka to testify to matters that are not beyond the understanding of the average lay person would be unfairly prejudicial in violation of *Daubert*.

In response, Plaintiffs argue that Dr. Honka's testimony easily satisfies the first two *Daubert* factors, namely, that Dr. Honka is qualified and that the underlying validity of Dr. Honka's content analysis methodology is reliable, neither of which Ford earnestly disputes. Lastly, Plaintiffs argue that Dr. Honka's testimony will help the jury understand the subtlety-applied psychological techniques that companies use to market their products and that for all these reasons, Dr. Honka's testimony is admissible. The Undersigned agrees.

There is no doubt that Dr. Honka's opinion that Ford marketed all Shelby trim levels as "track capable" represents a fairly nuanced deviation from what Ford argues is a conclusion that is "based on nothing more than Dr. Honka's experience and training in marketing," which Ford deems "ipse dixit." [ECF No. 147, p. 20]. For example, Dr. Honka states in her expert report that Ford crafted a targeted, consistent messaging campaign aimed at performance enthusiasts -- a central tenant of which was the "importance of the track and track capability" -- and executed this campaign by relentlessly using track-related references and images. [ECF No. 164, p. 24]. Yet, Ford fails to explain why (or how) Dr. Honka's application of the well-established marketing concept of "integrated marketing communications" was flawed.

When an issue before the court pertains to the effect of a marketing or advertising campaign on a potential consumer, courts regularly permit expert testimony to aid the jury on the precise topic of marketing strategies. For example, in *Schwab v. Philip Morris USA, Inc.*, No. CV 04-1945, 2005 U.S. Dist. LEXIS 21610, at *11-13 (E.D.N.Y. Sept. 29, 2005), one of the issues was the design and intent of the tobacco industry in promoting "light" or "low tar" cigarettes. *Id.* at *12. The court denied the defendants' motion to preclude expert testimony from a marketing expert, whom the court noted was qualified. *Id.* at *12-13. Further, and of particular relevance to the present case, the court noted that "[a]dvertising methodologies are esoteric; the average juror could be helped by an explanation of how they work and were used by defendants." *Id.* at *13.

Because this is a case concerning allegations of false and misleading advertising, expert testimony regarding advertising, marketing and brand positioning adequately "fits" the issues at hand. Dr. Honka's education, experience, analytical techniques and expert report comply with all elements of *Daubert* and Rule 702 of the Federal Rules of Evidence. Accordingly, Ford's motion to exclude Dr. Honka's testimony should be **denied**.

## IV.    Conclusion

The Undersigned **respectfully recommends** that Judge Moreno **grant** Plaintiffs' motion to exclude certain testimony and opinions of Dr. Harless; **grant in part** and **deny in part** Plaintiffs' motion to exclude certain testimony and opinions of Dr. Gregory; and **grant in part** and **deny in part** Ford's motion to exclude Plaintiffs' expert witnesses, Dr. Dahm and Dr. Honka.

## V.    Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Court. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of

justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).[4]

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on May 12, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Federico A. Moreno
All Counsel of Record

---

[4] It is well established that "district courts are entitled to broad discretion in managing pretrial discovery matters." *Perez v. Miami-Dade Cnty.*, 297 F.3d 1255, 1263 (11th Cir. 2002) (emphasis added); *see also Holladay v. Royal Caribbean Cruises, Ltd.*, 334 F.R.D. 628, 630 (S.D. Fla. 2020).

If Judge Moreno were to adopt and affirm this Report and Recommendations in its entirety, then his Order, if challenged on appeal, would be subject to the abuse of discretion standard. *See, e.g., United States v. Henderson*, 409 F.3d 1293 (11th Cir. 2005) (holding that the district court did not abuse its discretion when it adopted the magistrate judge's report and recommendation excluding proffered polygrapher's expert opinion testimony).

The mere fact that a reviewing court may decide the issue "differently is not sufficient to overturn a decision when there are two permissible views of the issue." *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co. Inc.*, No. 12-CV-81397, 2015 WL 11921411, at *1 (S.D. Fla. July 6, 2015) (denying objections to magistrate judge's discovery order) (internal quotation omitted). *See generally Am. Family Mut. Ins. Co. v. Roth*, No. 05-C-3839, 2010 WL 3397362, at *2 (N.D. Ill. Aug. 25, 2010) (internal citations omitted) ("Indeed, on virtually identical facts, two decision makers can arrive at opposite conclusions, both of which constitute appropriate exercises of discretion.").