UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 17-21087-CIV-MORENO**

GEORGE TERSHAKOVEC, DIANA
TERSHAKOVEC, JACQUES RIMOKH,
HERBERT ALLEY, MICHAEL
DELAGARZA, ATTILA GONDAN, ERIC
KAMPERMAN, GREG ROBERTS,
RICHARD KOWALCHIK, TRAVIS MCRAE,
MICHAEL MCCURRY, MARK
HOCHSPRUNG, JOHN AUBREY, JOSE
CRUZ, ERIC EVANS, BYRON HARPER, and
TODD NEWTON, individually and on behalf
of all others similarly situated,

        Plaintiffs,

vs.

FORD MOTOR COMPANY,

        Defendant.

_____/

## ORDER ON SUMMARY JUDGMENT AND CLASS CERTIFICATION

    THIS CAUSE came before the Court upon Ford's Motion for Summary Judgment and Plaintiffs' Motion for Class Certification.

    THE COURT has considered the motions, the responses, the replies, the supplemental briefing, oral argument, the pertinent portions of the record, and being otherwise fully advised in the premises, it is

    **ADJUDGED** that the motions are disposed of as follows:

    This Order **grants** Ford summary judgment on Plaintiffs' claims concerning the occurrence of Limp Mode on public roads, all of Plaintiff Cruz's claims, the express and implied warranty claims of Plaintiffs Roberts, Hochsprung, Kowalchik, and Porter, as well as the express

warranty claims of any class members who did not fulfill their presentment and notice obligations. It **denies** summary judgment on all other claims.

The Order also **certifies** nine state law classes and Magnuson-Moss classes in Texas and California under Rule 23(b)(3). The class is defined as "All persons who purchased a Class Vehicle from a Ford-authorized dealer or distributor located in [insert state here] before April 1, 2016."

## I.     Introduction

Plaintiffs are purchasers of Defendant Ford's Shelby GT350 Mustang car. The Shelby Mustang is a performance version of the standard Mustang. It is several cuts above both the base version of the Mustang and the Mustang GT (which has a V8 engine). Only true car enthusiasts opt for the Shelby GT350, and they do so mainly for its racing and track capabilities. In fact, the name "Shelby" comes from Carroll Shelby, a race car driver and designer for Ford in the mid-20th century. Indeed, Ford touted the Shelby as "an all-day track car that is also street legal."

Like any car, consumers had the option to customize it to their liking. This included choosing between five packages—the base package, technology package, track package, R package, and R technology package. **The two lowest packages, base and technology, did not come with transmission and differential coolers.** The coolers prevent the engine from overheating at consistently high rotations per minute, allowing the driver to drive faster for longer. In order to prevent overheating in the Shelbys without the coolers, Ford programmed the Base and Technology packages to rapidly decelerate when engine temperature got too high. Both parties refer to this as "Limp Mode." This was an intentional design choice. Originally, all Shelbys had the coolers, but Ford removed the coolers from the Base and Tech packages a few years before launch—allegedly to increase profit margins in their volume-leading Tech package.

Obviously, track driving is done at very fast speeds for a prolonged period. Plaintiffs allege that many of their vehicles unexpectedly entered Limp Mode, both on the track and the open road. The Shelbys are essentially unusable for sustained track driving—the main reason many Plaintiffs bought the car. Plaintiffs now bring a variety of claims under the statutory and common laws of several different states. To be brief, the Plaintiffs make two broad categories of complaint: 1) Ford advertised all Shelbys as track-capable, the advertising induced Plaintiffs to purchase the car, and then the car did not perform as advertised. 2) The consistent occurrence of limp mode is a breach of Ford's express and implied warranties. Finally, the named Plaintiffs ask this Court to certify a class.

## II.  Legal Standard

Fed. R. Civ. P. 56 provides, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). The existence of some factual disputes between litigants will not defeat an otherwise properly ground motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's

evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

## III.    False Advertising

Many of Plaintiffs' claims focus on Ford's marketing. There are claims under various state statutes prohibiting deceptive business practices, common law fraudulent concealment claims, and one claim for violation of California's false advertising law. In their summary judgment briefing, the parties do not discuss the differences between the various states' laws. Instead, Ford makes the general objection that its advertisements are not actionable because they are mere puffery.

Most of the facts are not disputed. Ford advertised the entire Shelby lineup "track-ready" and "track-capable." While not directly relevant to the puffery analysis, Ford knew race-track enthusiasts were the Shelbys target audience. In a track day invitation sent to all Shelby owners post-purchase, Ford's marketing manager wrote that the GT350 had "exceptional race track capabilities, we're sure that's one of the reasons you purchased your GT350—perhaps the main reason." There should be no doubt that Ford touted the Shelby lineup as designed for the track. Other advertising materials include phrases like "an all-day track car that's also street legal," "tested endlessly on the most challenging roads and tracks in the world," "we wanted to build the best possible Mustang for the places we most love to drive – challenging back roads with a variety of corners and elevation changes – and the track on weekends," and finally described the Mustang as "track-focused."

Rather than deny the obvious, Ford's two categories of responses argue that 1) their advertising is mere puffery, as evidenced by the fact that no one really agrees on what "track-capable" means and 2) Ford's advertising actually differentiated the Base and Tech models from the others because Ford lavished much more "track" praise on the higher end models and specifically warned consumers that Base and Tech models would need aftermarket coolers. *See* D.E. 140 at 3; D.E. 141-54.

## A. Mere Puffery

While true that each circuit and the various states will have their own slightly nuanced definition of puffery, puffery can be generally understood as "generalized, vague, nonquantifiable statements of corporate optimism." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015); *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019). Or, as Judge Learned Hand wrote, "[t]here are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity." *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918). One Multi-District Litigation judge considering puffery across several jurisdictions held that the "touchstone" of the puffery analysis is "the likelihood that reasonable consumers would rely on that representation." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1007 (N.D. Cal. 2018). Finally, "[w]hether a representation is mere puffery depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (internal citation and omitted) (Rakoff, J.).

Ford argues their "track-capable" claim and related advertising is puffery, and therefore non-actionable, because there are many definitions of "track" driving. Ford claims calling a Base

Shelby "track-ready" is vague, subjective, and unable to be objectively verified. At the summary judgment stage, this argument, much like the Mustangs' engines, blows smoke.

Ford further argues "track" could mean everything ranging from a drag race at a stoplight on Red Road to a 20-minute session doing laps on a racetrack. Some of the other "events" Ford cites include autocross, gymkhana, drag strip, roll racing, drift, and closed road. "Track Days," Ford says, are a *specific* event where the Base and Tech models of the Shelby GT350 struggle the most and often enter Limp Mode. According to Ford, "Track Day" has a specific meaning within the racing community; it does not simply refer to a day at the track. Ford further argues that there is not even one type of Track Day, some have sessions of 25-30 minutes, some have no defined sessions at all, some are on oval tracks, while some are on a road course. To prove its point, Ford cites to many different depositions of named Plaintiffs and its own employees which demonstrate that each person has their own idea of what qualifies as a car as being "track-capable" and that the term has no standard definition. For example, Plaintiff Cruz gave the amorphous definition that "track ready" vehicles have limits that exceed those of a "normal" vehicle. Plaintiff Gondan testified "I don't know what you mean by 'track.' There are drag strips, drag tracks. There are road courses. Autocross." Plaintiff Kelly agreed that "track capable can mean different things to different people." Plaintiff Evans said he needed the MagneRide suspension in order to take his car to the track, whereas Plaintiff Hochsprung said the MagneRide suspension was irrelevant.

But for Ford to prevail on the puffery argument at the summary judgment stage, it must convince this Court that no reasonable juror could find that Ford's advertisements claiming its Shelby Mustangs were "track-capable" or "track-ready" led a reasonable consumer to believe that he could do intense track driving without the car entering Limp Mode. That is a tall task.

Further, both state and federal courts hold that whether a statement is puffery is a question of fact, save for the unusual case where the answer is so clear it may be decided as a question of law. *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 626-27 (2018) (collecting cases).

Here, the facts are such that a reasonable consumer could rely on Ford's representations as conveyances of fact, rather than "general claims of superiority made by a salesman." *See Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982). A general claim of superiority, for example, may be something like "Built Ford Tough." Or perhaps a representation that is "not the sort of empirically verifiable statement that [could] be affirmatively disproven" would read "[i]t's inevitable… Mustangers have more fun."[1] *Next Century Communs. Corp. v. Ellis*, 318 F.3d 1023, 1028 (11th Cir. 2003). Those are, however, plainly not the sort of advertisements the Court is faced with today. In one press release, Ford touts the Shelby GT350s' transmission as "developed with all-day track capability and high-RPM capability at the forefront." This statement is specific—it focuses on the car's transmission—and it is empirically verifiable. Indeed, "all-day" is measured in time and "high-RPM" is literally measured in rotations per minute. Ford's argument that "it cannot be objectively verified whether any given GT350—or any other vehicle—is 'track ready' or 'track capable' or is a 'thoroughbred capable of tackling the world's most challenging roads and racetracks'" is ironic. Racing is an activity obsessed with metrics and objective verification—victory is often decided by tenths of a second and Ford relentlessly tests its performance vehicles so that they meet the expectations of their target customer, considered "gearheads." Internal Ford documents show the company believed, for the GT350 "performance is defined as track performance." Plaintiffs cite evidence

---

[1] https://www.designnews.com/automotive/classic-mustang-ads-take-us-back-dawn-pony-car-era/gallery?slide=5

showing that the Base/Tech Shelbys caught fire after being put through their paces by Ford Engineering, and afterwards, the engineering team informed the marketing team that it was concerned that the Base Shelby was not "track durable" nor "appropriate for track use." (D.E. 141 at 5). The bottom line is that if Ford itself believes "track capable" and similar claims are objective standards, it is certainly possible a reasonable juror may feel the same way.

## B. Deceptive Advertising

Ford attempts to elide the distinction between its puffery defense and its separate argument that its advertising, viewed as a whole, was not deceptive. While it is true that the Court must consider the allegedly misleading statements in context rather than in a vacuum, Ford's other statements about the higher-end Shelbys do not make its "track-capable" claims any more vague or subjective even though they may make Ford's advertising, as a whole, less deceptive. *See Marty v. Anheuser-Busch Companies, LLC*, 43 F. Supp. 3d 1333 (S.D. Fla. 2014) (finding single statement was not puffery after considering it in light of Defendant's entire advertising campaign).

The Court now turns to Ford's argument that its Shelby advertising was not deceptive, first, because it warned consumers that aftermarket coolers would be necessary for track days and, second, because it specified elsewhere in its advertising materials that certain non-Base and non-Technology models were the "track day specialists." Plaintiffs bring deceptive advertising claims under a variety of state laws, but the Defendants do not make state specific objections regarding what qualifies as deceptive. Florida's Deceptive and Unfair Trade Practices Act, for example, requires: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016). "To satisfy the first element, the plaintiff must show that 'the alleged practice was likely to deceive a consumer acting

reasonably in the same circumstances.'" *Id.* at 983–84. "In determining whether a representation is likely to mislead consumers acting reasonably, courts consider the net impression created." *F.T.C. v. RCA Credit Servs., LLC*, 727 F.Supp.2d 1320, 1329 (M.D. Fla. 2010). If the statements are "likely to mislead reasonable consumers," then it makes no difference if the statements are "technically or literally true." *F.T.C. v. Peoples Credit First, LLC*, 244 F. App'x 942, 944 (11th Cir. 2007). And how a reasonable consumer would interpret a term is an issue of fact. *Jankus v. Edge Inv'rs, L.P.*, 650 F. Supp. 2d 1248, 1258 (S.D. Fla. 2009). Here, it is plausible that a reasonable juror could find that a reasonable consumer would be misled by the "net impression" created by Ford's advertising.

Granted, Ford recommended that consumers add transmission and differential coolers to the Base and Technology models if they planned on "sustained high speeds or track day use." Complaint ¶ 359. However, Plaintiffs allege that this recommendation came on page 25 of the Supplemental Owner's Guide—a pamphlet only available in the glove box of the car one has already purchased. Ford disputes this and claims the Guide was available online, pre-purchase. Ford points to Plaintiff Kamperman's testimony that he viewed the language "over and over" as proof that Plaintiffs' knew about the need for coolers *before* purchase. But nowhere in the selected section does he say he viewed the Guide *pre-purchase*. Thus, a genuine dispute of material fact precludes summary judgment on this basis. Further, a Ford marketing employee told one customer that if he planned to use his Technology package Shelby on the racetrack for "sustained lap sessions, we would still recommend that you purchase coolers." Complaint ¶ 328. Notably, however, this statement was made to *one* consumer rather than the general consuming public.

Ford also points to the way in which it described the higher end "R" and "Track" packages as evidence its advertising was not deceptive. In various brochures made available to dealers and consumers before purchase, the R model was marketed as "the most track-ready" and recommended for "hardcore track use" while the Track model was touted as the "track-day specialist." In contrast, those same materials were silent on the Base and Technology models' track capabilities. But merely highlighting that the most expensive, souped-up Shelby models would be *more* track capable than the Base and Technology models does not cure the deception. With all due respect to American engineering, Plaintiffs surely knew a Ferrari would be better suited for intense track driving than the Base Shelby, but they were nonetheless entitled to rely on Ford's representation that its car was an "all-day track car."

Ford succinctly summarizes the false/deceptive advertising issue in its reply brief. It writes, "the statements at issue were made in a wide variety of contexts, some of which included pictures of vehicles on road courses and some that did not, some of which differentiated between models and some that did not, and some that specifically identified which models had coolers and noted that coolers were needed for 'trade day use,' and some that did not." (D.E. 167 at 6). Exactly. With such variable evidence, it cannot be said that there is no genuine dispute of material fact such that judgment for Ford would be appropriate.

## IV.    Subjective Knowledge

Ford then makes state-specific and plaintiff-specific arguments that certain Plaintiffs' subjective knowledge that their Base or Technology package Shelbys would go into Limp Mode after intense driving precludes their common-law and statutory fraud claims. Ford argues Oregon, Texas, Washington, Florida, and New York common law all require proof of reliance for a successful fraud claim. Additionally, Oregon, Texas, and Washington statutory fraud laws

require proof of reliance or proof that but-for the fraud, the injury would not have occurred. Further, Florida and New York statutory fraud laws do not require proof of reliance, Defendant says, but a Plaintiff cannot claim they were deceived if they subjectively knew the truth. Plaintiffs do not dispute most of Ford's characterizations of the relevant law. Now, the plaintiff-specific evidence.

### A. Plaintiff Long (Oregon)

Obviously, one cannot "rely" on fraudulent representations if one subjectively knows those representations to be false. Long saw a YouTube video of a car going into Limp Mode and some online comments to the same effect. He also called Ford customer service and they told him there was "no certain fix." However, when Long spoke to his contact at the local Ford dealer, he felt that he was being reassured that he would not have a problem with Limp Mode. Whether Long's subjective knowledge was such that he could not have relied on Ford's representations about the cars is a question of credibility best answered by a jury.

### B. Plaintiff Kamperman (Texas)

Kamperman plainly knew the difference between the Tech package and the other Shelbys. He said the "the track [package] would be able to withstand much longer periods at high speeds." But elsewhere in his testimony, Kamperman said he believed that the car he purchased was *also* track capable, albeit not to the same degree, "because it was listed on the same page with the other track ready cars. . . . it said 'this car can definitely be tracked.'" Kamperman certainly gives testimony that would have a finder of fact doubt whether he was truly deceived by Ford's advertising. But again, whether Kamperman's subjective knowledge was such that he could not have relied on Ford's representations about the cars is a question of credibility best answered by a jury.

### C. Plaintiff Evans (Washington)

Evans saw Internet forums were Tech package Shelbys were not performing well at the track. He also knew that the car did not have coolers. However, he also testified that he had an expectation that Ford would fix the Limp Mode problem before he took delivery. Based on this evidence, the Court cannot definitively say that there is no genuine dispute as to whether Evans could have relied on Ford's alleged misrepresentations. Thus, the Court **denies** summary judgment on the common law and statutory fraud claims under Oregon, Texas, and Washington law.

### D. Plaintiff Kowalchik (Florida)

Kowalchik knew that the Tech package did not have coolers, and he plainly testified that he would add them afterwards because a car is not "complete" without them. Although Kowalchik is a self-described "gearhead," he did not purchase the more track-ready car because he could not afford it. However, somewhat confusingly, Kowalchik also testified that "Nobody said you couldn't drive the car on a track. Nobody said, 'Oh, by the way, we put a dog of a transmission in it that's going to overheat if you get aggressive with it.'" And also, "Something was not as I had assumed it would be based upon all of Ford's advertisements." Once again, Kowalchik's testimony about how he is a car-expert and always planned to modify his lower-tier Mustang is not helpful to the Plaintiffs' case, but the testimony, on the whole, does not categorially rule out Kowalchik's reliance on Ford's advertisements. Thus, the Court denies summary judgment.

### E. Plaintiff Kelly (New York)

Kelly understood that his Tech package Shelby would only be suitable for short track days. But, importantly, Kelly testified that he thought "short track day" meant 20-30 minute

sessions. In other words, Kelly thought his car would be suited for what Ford considers a regular "track day." Thus, summary judgment is denied for any state law claims on the basis that Plaintiffs had subjective knowledge that Base and Tech package Shelbys would enter Limp Mode in certain driving conditions.

## V.    Objective Knowledge

Ford then argues that summary judgment on statutory fraud claims is required because no reasonable consumer under the circumstances could have been deceived. Ford cites case law holding that it must be *probable*, not merely possible, that a significant portion of the general public could be misled. Then it argues Plaintiffs who took delivery after February 2016 could not reasonably claim to be misled because of information and rumors available on Internet forums that the cars at issue could not do track days. Plainly, this argument is not a summary judgment winner. It certainly is genuinely disputed as to whether a Plaintiff was likely to be misled, and posts on Internet forums are not sufficient evidence to put the question beyond the debate of a jury.

## VI.    Omission Claims

Next, Ford argues that summary judgment on the Plaintiffs' statutory and common-law *omission* claims is required. The omission claims allege that Ford concealed that Limp Mode would occur on **public roadways under normal driving conditions**.[2] Ford moves for summary judgment and argues that first, Ford's actual knowledge of the defect must be proven and second, it had no such knowledge of any occurrence of Limp Mode on public roads at the time Plaintiffs purchased their vehicles.

---

[2] Notably, this claim is NOT about Limp Mode occurring while Plaintiffs drove their cars on the track or in more aggressive ways.

The evidence Plaintiffs offer as proof that Ford had knowledge that Limp Mode would occur on public roads under normal driving conditions is easily summarized. It includes testimony by a Ford Performance parts manager that he was aware of a consumer report that Limp Mode occurred on a public road, a 2014 internal email from Ford's Chief Functional Engineer warning not to send cars without coolers to Germany (likely due to the manner of driving on the autobahn), and the subsequent remedial measure of Ford adding standard coolers in later model years.

Statutory and common-law fraud by omission standards vary slightly from state to state—some require actual knowledge, and in some states, "should have known" is sufficient. Of all the evidence in this case, it is telling that there is only one internal email that mentions Limp Mode on public roads; and even then, the email merely relays a *single*, unverified consumer report with no other diagnostic information. The Court is unconvinced that this is sufficient evidence such that any reasonable juror could find that Ford had knowledge that the Base and Tech Shelbys would go into Limp Mode under normal driving conditions. Plaintiffs only cite three cases where consumer complaints supported a finding of corporate knowledge, and all three of those cases were at the motion to dismiss stage. Several courts in the Ninth Circuit have held that consumer complaints suffice to establish knowledge, but only if there are an unusual number of complaints such that the manufacturer would be on notice of the problem. *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1026 (9th Cir. 2017). In this district, Judge Ruiz recently considered a claim on similar facts and concluded

> There is certainly no hard-and-fast rule on how many consumer complaints a plaintiff must show to sufficiently plead a defendant's knowledge; perhaps 12 examples could provide a sufficient factual assertion in the proper case. But here, not only is it a very small number relative to the "hundreds of thousands" of vehicles that supposedly have this defect, but, like the plaintiffs in *Espineli*, Plaintiffs have offered no context as to how many complaints are normal such that someone could infer they were more than a "blip on [Defendants'] radar."

*Timothy Lewis, Teresa Massa, Linda Gazie, Steven Wallach, Ana Schwartz, Joseph Monopoli, James Fitzpatrick, & Synthia Praglin, on behalf of themselves & all others similarly situated, Plaintiffs, v. Mercedes-Benz USA, LLC, Daimler AG & Grammer AG, Defendants.*, No. 19-CIV-81220-RAR, 2021 WL 1216897 (S.D. Fla. Mar. 30, 2021) (internal citations omitted). Judge Ruiz ultimately dismissed the claim. This Court grants summary judgment on these claims. Just as unverified internet reports could not give consumers objective knowledge of Limp Mode, they are not sufficient to impute to Ford Management actual knowledge of Limp Mode occurring on public roads.

## VII.    Breach of Express Warranty

Ford next asks for summary judgment on Plaintiffs' various state law claims that Ford breached the express warranty. Ford's broadest argument is that Ford never breached the warranty because Limp Mode is a *safety feature*, not a malfunction, failure, or defect. The New Vehicle Limited Warranty promises that if your

> "Ford was properly operated and maintained, and was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that **malfunction or fail during normal use** during the applicable coverage period **due to a manufacturing defect** in factory-supplied materials or factory workmanship. This warranty does not mean that each Ford vehicle is defect free. **Defects may be unintentionally introduced into vehicles during the design** and manufacturing processes and such defects could result in the need for repairs." (emphasis added).

Plaintiffs argue that the "malfunction" here is the premature overheating of the engine caused by the lack of coolers (i.e., the "defect"). Defendant responds that first, premature overheating is not a malfunction—it is a designed safety feature; second, Ford argues, even if premature overheating could be considered a malfunction, it never occurred in Plaintiffs' vehicles precisely because of Limp Mode.

The Court is not convinced by the second argument. Plaintiffs describe the malfunction as premature overheating, but this is essentially synonymous with Limp Mode. Plaintiffs' breach of warranty argument is best rephrased as "my car was defective because it did not have the necessary coolers to go really fast for a long time." And because the evidence shows this was a deliberate design choice by Ford, it can be described as an alleged *design* defect, as opposed to a *manufacturing* defect. So, the two questions become: 1) Does the New Vehicle Limited Warranty cover design defects? And 2) Can a "safety feature" that **performed as intended** qualify as a design defect?

## A. Warranty Interpretation

The first question first. Judge Dimitrouleas concluded that the same warranty language here covered design defects in a 2014 suit against Ford. *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1232 (S.D. Fla. 2014) ("[T]to the extent that the language is ambiguous regarding whether design defects are covered, that ambiguity is construed against Ford, the drafter."). The Ninth Circuit found design defects were covered, as well, noting "Ford's express warranty is not simply a 'materials and workmanship' warranty, as it references defects that are introduced during the 'design' process. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224–25 (9th Cir. 2015). Courts that do *not* find design defects to be covered by express warranties are generally presented with warranty language that only covers "materials and workmanship." *See, e.g.*, *Bruce Martin Const., Inc. v. CTB, Inc.*, 735 F.3d 750 (8th Cir. 2013). The warranty *here* covers design defects that may be "unintentionally" introduced. In the other cases cited, the *design* was (of course) intentional, but the *consequences* were unintentional. Here, both the design and its consequences were intentional—Limp Mode worked just the way Ford wanted it

to. So to decide whether this Warranty covers design defects, perhaps it is best to consider the second question: Whether it is even *possible* on facts like these.

Can Limp Mode even be considered a design defect if it worked as expected? The answer here varies by state and is fact intensive. For example, in Florida, "the definition of design defect is in a state of flux." *In re Standard Jury Instructions in Civil Cases—Report No. 09–10 (Prods. Liab.)*, 91 So. 3d 785, 789 (Fla. 2012) (Pariente, J., concurring). Courts commonly use at least one of the following three "tests" to determine whether a product is defectively designed: (1) the consumer expectation test; (2) the risk utility test; and (3) the reasonable alternative design test. *Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1270 (S.D. Fla. 2020) (Ruiz, J.). A product is defectively designed under the consumer expectation test if "the product fails to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer." *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1338-39 (M.D. Fla. 2015); Restatement (Second) of Torts § 402A. Should a jury find that the Base or Tech GT350's did not perform as safely as an ordinary consumer would expect, then it is possible that Plaintiffs may recover for breach of warranty. At that point, it would be unnecessary to address Florida's other tests. On the other hand, a jury could find that a design defect does not exist under applicable state law and Ford does not breach its warranty merely because a consumer was misled by allegedly false advertising. Plaintiffs do not seek to certify express warranty classes, and the state law variations can be dealt with at trial through the appropriate jury instructions and verdict forms.

### B. Presentment and Notice

Ford has two other arguments as to why summary judgment must be granted on the breach of warranty claims, even if the warranty covers design defects and Limp Mode is indeed

found to be a design defect. First, Ford argues that some Plaintiffs never experienced Limp Mode and so the alleged defect never manifested. Second, some Plaintiffs failed to present their vehicles to Ford for repair and thus did not comply with the terms of the warranty.

Plaintiffs argue that even if some Plaintiffs did not experience Limp Mode, its occurrence is a virtual certainty. This Court previously denied Ford's motion to dismiss on the manifestation/virtual certainty issue after thoroughly reviewing the relevant state law. *Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2018 WL 3405245 at *6-9 (S.D. Fla. July 12, 2018). Although Ford argues this time is different because "the evidence now conclusively rebuts" the contention that Limp Mode is a virtual certainty, it is fundamentally inconsistent for Ford to argue on one page of its briefing that Limp Mode was a conscious and well-executed design choice and then argue on another page that Limp Mode may never occur. Even if Ford's argument were logically consistent, the evidence is inconclusive as to whether Limp Mode is a virtual certainty. Summary judgment in favor of Ford is inappropriate on that basis.

Next, Ford correctly notes there are two "notice" issues that Plaintiffs conflate. Presentment and notice of breach are separate. Presentment is a contractual obligation under the warranty, while the obligation of pre-suit notice of breach stems from UCC § 2-607 as adopted in Illinois, Missouri, and Florida. With respect to presentment under the warranty, Plaintiffs argue that Ford Headquarters waived the requirement that Plaintiffs present their cars to the dealership for service by instructing all Ford dealers to let customers know Limp Mode is normal and to refer them to the Supplemental Owner's Guide for instructions on aftermarket coolers. The implication is that Ford Headquarters' message to all dealers was a form of anticipatory repudiation, which occurs when the obligor commits a voluntary and affirmative act that makes it "actually or apparently impossible for him to perform." Restatement (Second) of Contracts §

250, cmt. c. However, this argument fails—Ford did not repudiate its obligations under the warranty.

It is clear that a service bulletin from Ford to its network of dealers that advises the dealers that Limp Mode is normal and refers customers to the owner's guide does not make it impossible for Ford to perform its obligation—in fact, it instructs dealers on *exactly how* to perform their obligation. Unfortunately for Plaintiffs, the dealers' performance of their obligation means turning customers away without a solution, but the Court will not excuse Plaintiffs' presentment under the warranty merely because that presentment would be futile. Thus, summary judgment is granted in favor of Ford on the breach of express warranty claims by Plaintiffs who did not present their vehicles to Ford for repair.

### C. Plaintiffs Roberts, Hochsprung, Kowalchik, and Porter

Finally, Ford seeks summary judgment for the express and implied breach of warranty for three plaintiffs—Roberts (Missouri), Hochsprung (Illinois), and Kowalchik (Florida)—who failed to give pre-suit notice, and one plaintiff—Porter (Illinois)—who allegedly contacted a Ford *dealer* but not Ford Motor Company as is required by law. Under Section 2-607 of the Uniform Commercial Code, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Plaintiffs concede that Roberts, Hochsprung, and Kowalchik did not notify Ford that they considered Ford to have breached its warranty but argue that Ford waived the notice requirement. As noted above, Ford has not waived the notice requirement. Thus, Ford is granted summary judgment on Roberts, Hochsprung, and Kowalchik's express and implied warranty claims.

Summary judgment is also granted on Porter's express and implied breach of warranty claims even though Illinois law provides two exceptions to the notice requirement: "when (1) the seller has actual knowledge of the defect of the particular product  or (2) the seller is deemed to have been reasonably notified by the filing of the buyer's complaint alleging breach of UCC warranty." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 492 (1996) (internal citation omitted). There is no doubt Ford had actual knowledge that Limp Mode occurred in the Base and Tech GT350's—Ford designed them that way. But the seller's "generalized knowledge about the safety concerns of third parties is insufficient to fulfill plaintiffs' UCC notice requirement." *Id.* In other words, under Illinois law, the seller must be on notice that *this particular product* is troublesome rather than merely knowing that the Shelby GT350 Base and Tech models *in general* have had some Limp Mode issues. The Illinois Supreme Court cited Judge Learned Hand's interpretation of §2-607: "The notice of the breach required is **not** of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of *buyer's claim* that they constitute a breach." *American Mf'g Co. v. United States Shipping Bd. Emergency Fleet Corp.*, 7 F.2d 565, 566 (2d Cir. 1925) (emphasis in *Connick*). Even though Ford knew that Limp Mode existed in every car, Ford did not know that Porter wanted his car remedied. *See Anthony v. Country Life Mf'g, LLC.*, 70 Fed. Appx. 379, 383–84 (7th Cir. 2003) (nutrition bar manufacturer did not have actual notice of plaintiff's claim that its bars contained substances not approved by the Food and Drug Administration, even though manufacturer was aware of ingredients in bars, because plaintiff failed to notify defendant of the claimed breach of implied warranty of merchantability prior to filing suit (citing *Connick*)).

Of course, any Plaintiff on whose state law warranty claims summary judgment was granted to Ford should also have their Magnuson-Moss Warranty Act claims dismissed because a valid state law claim is a prerequisite to the federal claim.

## VIII.   Unjust Enrichment

Ford argues Plaintiffs' unjust enrichment claims should be dismissed because 1) the parties' relationship is governed by an express contract and 2) because the Plaintiffs' have an adequate remedy at law. The Court denies summary judgment on these equitable claims and will deal with them at trial.

## IX.   Economic Loss Rule

Ford seeks summary judgment on the common law fraud claims under Missouri, Texas, and New Jersey law because Plaintiffs' claims are barred by the economic loss rule. Put simply, the economic loss rule precludes tort recovery for economic harms based on a duty arising from a contractual relationship. However, the rule slightly varies from state to state and there are certain exceptions.

The chief exception is that tort claims may survive the economic loss rule when the claim is for fraud, i.e., Plaintiff was harmed even before the contract was signed. Both parties agree on the law in Texas and New Jersey—when Defendant had no intention of performing its obligation under the contract, Plaintiffs' fraud claim survives the economic loss rule. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998); *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557 (D.N.J. 2002). The parties dispute, however, whether Ford had any intention of performing the contract at the time it was made. There is clearly a factual dispute as to whether Ford knew that the Base and Tech package Shelby GT350's were Track Day capable. If Ford indeed knew that the lack of a cooler would be

fatal to the track performance Plaintiffs expected, a fraud claim would be well-founded and it would survive the economic loss rule because Ford never intended to deliver the quality of car for which Plaintiffs signed up. Thus, summary judgment is denied on the Texas and New Jersey tort claims.

Missouri law is more complicated. "A fraud claim *independent of the contract* is actionable, but it must be based upon a misrepresentation that was *outside of or collateral to the contract,* such as many claims of fraudulent inducement." *AKA Distrib. Co. v. Whirlpool Corp.,* 137 F.3d 1083, 1086 (8th Cir. 1998). To decide whether a fraud claim is independent of a contract claim under the economic loss doctrine, a court should look at (1) whether the subject matter of the alleged misrepresentations was incorporated into the parties' contract and (2) whether the plaintiff suffered additional damages outside the contract as a result of the alleged fraud. *Compass Bank v. Eager Rd. Assocs., LLC,* 922 F. Supp. 2d 818, 827 (E.D. Mo. 2013). Additionally, "the fraudulent inducement exception is subject to a widely recognized limitation that where the fraudulent misrepresentation concerns the quality, character, or safety of the goods sold, the economic loss doctrine bars the fraud claim because it is substantially redundant with warranty claims." *Flynn v. CTB, Inc.,* No. 1:12CV68 SNLJ, 2015 WL 5692299 (E.D. Mo. Sept. 28, 2015).

Of course, the fraud here clearly concerns the quality of the goods sold. However, other Missouri courts have disagreed with the *Flynn* court. A Western District of Missouri judge held that something can be *both* concerning the quality of goods sold and necessarily separate from the contract because the conduct was *prior* to formation of the contract. *Patterson Oil Co. v. Verifone, Inc.,* No. 2:15-CV-4089, 2015 WL 6149594, at *8 (W.D. Mo. Oct. 19, 2015) ("Claims about the quality of goods sold may therefore fall within the fraudulent inducement exception if

they are nevertheless independent of the contract formed."). A court in this district considered the Missouri economic loss rule in *Wilson v. Volkswagen Grp. of Am., Inc.*, No. 17-23033-CIV, 2018 WL 4623539 (S.D. Fla. Sept. 26, 2018) and agreed with the *Patterson Oil* court. There, he held that Plaintiffs' fraud claims could survive despite the *Flynn* case. However, the *Flynn* court better applies the principles articulated by the Eighth Circuit. In *Dannix Painting, LLC v. Sherwin–Williams Co.,* 732 F.3d 902 (8th Cir. 2013), the Eighth Circuit stated:

> Where there are well-developed contractual remedies, such as the remedies that the [U.C.C.] (in force in all U.S. states) provides for breach of warranty of the quality, fitness, or specifications of goods, there is no need to provide tort remedies for misrepresentation. The tort remedies would duplicate the contract remedies, adding unnecessary complexity to the law. Worse, the provision of these duplicative tort remedies would undermine contact law.

*Dannix,* 732 F.3d at 908. Here, the warranty claim would provide the exact same damages as the tort remedy, running afoul of the logic behind the "quality of goods" exception described above. An example of fraudulent inducement that would survive Missouri's economic loss rule may be if Ford told potential customers that Dale Earnhardt Jr.'s favorite car was a Ford Mustang when that simply was not true. That claim does not concern the quality or safety of the car, but nonetheless may have enticed a buyer. However, because the fraud at issue here was about an alleged design defect covered by the warranty, the Court grants summary judgment to Ford on the Missouri fraud claims because they are barred by the state's economic loss rule.

## X.     Plaintiff Cruz's Standing

Plaintiff Cruz, who asserts Pennsylvania state law claims, filed for Chapter 7 bankruptcy in March 2017. On May 16, 2017 he joined this lawsuit. And on June 12, 2017 his debts were discharged. "A pre-petition cause of action is the property of the Chapter 7 bankruptcy estate, and only the trustee in bankruptcy has standing to pursue it." *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004). Failure to list an interest on a bankruptcy schedule leaves that

interest in the bankruptcy estate. *Id.* Ford argues that because Plaintiff Cruz did not list his claims against Ford, only the bankruptcy estate has standing to pursue those claims—not Mr. Cruz. Cruz argues that he only discovered that he had a claim *after* filing his bankruptcy petition.[3] Under Pennsylvania law, Cruz says, accrual of the statute of limitations may be tolled "when a plaintiff is unable, despite the exercise of due diligence, to know of the injury or its cause." *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir. 2006) (cleaned up).

However, the Eleventh Circuit has explicitly separated the statute of limitations issue from accrual of the claim. "A cause of action can accrue for ownership purposes before the statute of limitations for that cause of action has begun to run." *In re Alvarez*, 224 F.3d 1273, 1277 n.7 (11th Cir. 2000) (quoting *State Farm Life Ins. Co. v. Swift* (*In re Swift*), 129 F.3d 792, 798 (5th Cir. 1997)).[4] Thus, even if the *statute of limitations* was tolled due to Cruz's debatable lack of knowledge, the claims still belonged to him at the time his bankruptcy petition were discharged. Summary judgment is granted to Ford on Plaintiff Cruz's claims. Because the Court grants summary judgment on all of Cruz's claims due to lack of standing, it does not address Ford's argument that Cruz cannot pursue his implied warranty claim under New York law because he was not in privity with Ford. Although, it appears Ford has the better argument there, too.

XI.     **Plaintiff Long—Time Bar**

---

[3] Ford heavily disputes this and points to Cruz's testimony that he experienced Limp Mode in 2016.

[4] The Ninth Circuit has also distinguished claim accrual from the statute of limitations. *Goldstein v. Stahl (In re Goldstein)*, 526 B.R. 13, 21-22 (B.A.P. 9th Cir. 2015) ("It is important, however, to distinguish principles of accrual from principles of discovery and tolling, which may cause the statute of limitations to begin to run after accrual has occurred for purposes of ownership in a bankruptcy proceeding.") (internal citation omitted).

Ford argues Plaintiff Long's Oregon Unfair Trade Practices Act claim is time barred because it has a one-year statute of limitations, Long knew that his car was defective *before* he even took delivery in 2016 and did not file his claim until February 2018. Plaintiffs counter that 1) whether Long knew of the defect is a question for the jury and 2) even if he knew about it, his claim is timely under the relation back doctrine. As discussed above in the "subjective knowledge" section, there is not sufficient evidence to say there is no genuine dispute as to whether Long knew about Limp Mode before taking delivery/filing his suit. Thus, whether Long's claim is time-barred is a question best left for trial.

## XII.    Class Certification

Plaintiffs' seek to certify a Rule 23(b)(3) class that spans eleven states, has approximately 1,700 members, and values each of their damages at approximately $9,000. The certification dispute centers around predominance. It is clear (and Ford even concedes) that the Rule 23(a) factors are met here. But Ford argues that common questions do not predominate over individual ones, and thus, certification under 23(b)(3) must be denied.

First, an overview of how the Plaintiffs propose the class should be structured. The Plaintiffs propose three alternatives class structures.

1) **Individual State Classes**: 11 classes comprised of California, Florida, Illinois, Missouri, New Jersey, New York, Oregon, Pennsylvania, Tennessee, Texas, and Washington residents.

2) **Bellwether State Classes**:  California, Florida, and Missouri Classes would go to trial as a bellwether.

3) **State Law Groupings**: The Plaintiffs would break the classes into types of law— Consumer Protection, Fraudulent Concealment (common law), Implied Warranty, Unjust

Enrichment Classes. Then, there would be three or four subclasses under each class to account for the variations in state law.

> a. For example, the Plaintiffs propose splitting the "Consumer Protection Acts" class into (i) the Unfair and Deceptive Conduct Consumer Protection class to pursue claims under statutes that prohibit unfair/deceptive conduct—nine states (ii) Omissions Consumer Protection class to pursue claims under statutes that prohibit omissions of material fact—two states (iii) and Unconscionable Acts or Practices Consumer Protection class that prohibits unconscionable conduct—two states.

Even though having eleven proposed state law classes within a single class action is unusual, it is the superior method among those Plaintiff proposes. Eleven different classes within one case looks more like a Multi-District Litigation than a standard class action—indeed, most class actions certify at most, three or four different state law classes. Of course, the Plaintiffs structured their class this way to avoid the choice of law issues concomitant with a proposed *nationwide* class (an issue that would almost certainly defeat predominance). Typically, manageability is a concern when there are variations in state law *within* a class, but here, the Plaintiffs have made the classes small enough that the law that applies to each class is uniform. But there still may be manageability problems at a hypothetical trial.

As explained more fully below, only *some* state classes are right for certification. Further, only *some* categories of claims can be certified—namely the common law and statutory fraud claims, whereas the warranty and unjust enrichment claims will be swamped by individual questions. Thus, the Court believes a potential trial with multiple verdict forms that tick through the elements of the nine certified state class' statutory and common law fraud claims is manageable.

**A. Choice of Law**

Before discussing the specifics of Rule 23, the Court must clarify the choice of law issues presented in the parties' class certification briefing. The Plaintiffs define their state law classes as "All persons in the State of XYZ who purchased a Class Vehicle from a Ford-authorized dealer or distributor." That is both a little too vague and incorrect as a matter of law. As Defendant points out, Florida's choice of law rules require that Plaintiffs' claims are governed by the laws of the states where the vehicles were purchased, not where the owners ride. *In re: Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2016 WL 6072406 (S.D. Fla. Oct. 14, 2016). Plaintiffs argue that this case is factually distinct and the law of the state where the Plaintiff resides governs. The Court disagrees. As it noted in *In re: Takata*, in Florida, absent special circumstances, the state where the injury occurred would . . . be the decisive consideration in determining the applicable choice of law. *Pysca Panama, S.A. v. Tensar Earth Techs., Inc.,* 625 F. Supp. 2d 1198, 1220 (S.D. Fla. 2008) (cleaned up). And again, as the Court has previously ruled, the injury occurs where the car is sold.

Plaintiffs understand this choice of law decision leaves them without named class representatives in New Jersey and Pennsylvania—they ask the Court to substitute other class members as representatives. Although the Court has the power to do so, it declines to exercise that power at this stage in a case originally filed in 2017.

**B. Rule 23(a)**

A plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable. *Little v. T–Mobile USA, Inc.,* 691 F.3d 1302, 1304 (11th Cir. 2012). The Court finds the classes are clearly defined and it is administratively simple to identify class members thanks to Ford's recordkeeping. Parties seeking class action

certification must also satisfy the four requirements of Federal Rule of Civil Procedure 23(a), commonly referred to as numerosity, commonality, typicality, and adequacy of representation. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997). Parties moving for class certification bear the burden of establishing each element of Rule 23(a). *London v. Wal–Mart Stores,* 340 F.3d 1246, 1253 (11th Cir. 2003). If the party seeking class certification fails to demonstrate any requirement, the case may not continue as a class action. *Jones v. Roy,* 202 F.R.D. 658, 662 (M.D. Ala. 2001). Specifically, the four requirements of Rule 23(a) are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

As mentioned in this Order's introduction, the Court tweaks the class definition Plaintiffs propose. Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)."). To restate, the class shall be defined as "All persons who purchased a Class Vehicle from a Ford-authorized dealer or distributor located in [insert state here] before April 1, 2016." The Court understands that, after its choice of law and class certification holdings in this Order, class counsel may need an opportunity to amend its named plaintiffs in order to substitute in the proper parties. To the extent Plaintiffs make such a request (*not* a request to add *new* named plaintiffs), it will be granted.

1. Numerosity

Plaintiffs claim that there are 1,668 class vehicles. Granted, the Court does not ultimately certify all states, but surely over 1,000 putative plaintiffs satisfies the Eleventh Circuit's rule that

"generally less than twenty-one [class members] is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (alteration added) (citing 3B Moore's Federal Practice ¶ 23.05[1] at n.7 (1978)).

## 2. Commonality

For purposes of [commonality], "even a single common question will do." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977 (11th Cir. 2016) (citing *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)). A question is common if answering it resolves "an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Surely commonality is satisfied. For example, if the answer to the common question "was Ford's advertising mere puffery?" is "yes", all of Plaintiffs' fraud claims will fail.

## 3. Typicality

The typicality test is not demanding. *In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 630, 642 (S.D. Fla. 2015). Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality test centers on "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named class plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataprods. Corp.,* 976 F.2d 497, 508 (9th Cir. 1992). Although similar to commonality in that it concentrates on the "nexus" between class members and their designated representative, typicality differs from commonality in that it focuses on the class representative's individual characteristics in comparison to those of the proposed class. *Piazza v. EBSCO Indus. Co.,* 273 F.3d 1341, 1346 (11th Cir. 2001); *Prado–Steiman v. Bush,* 221 F.3d 1266, 1269 (11th Cir. 2000). Typicality is

satisfied where the named plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied,* 470 U.S. 1004 (1985).

Here, class representatives and absent class members complain of the same injury allegedly caused by the same course of conduct by Ford. Ford's only specific typicality objection is to Plaintiff Cruz, on whose claims the Court has already granted summary judgment to Ford. Ford's general objection that its unique defenses against some named plaintiffs is insufficient to defeat typicality, particularly when all named plaintiffs' "claims share the same essential characteristics as the claims of the class at large." *Bruhl v. Price Waterhousecoopers Int'l*, 257 F.R.D. 684, 690 (S.D. Fla. 2008) (Marra, J.). Ford's arguments are better directed at the adequacy and predominance tests.

4. <u>Adequate Representation</u>

The purpose of the adequacy requirement is to "protect the legal rights of absent class members." *Lyons v. Georgia–Pacific Corp. Salaried Employees Ret. Plan,* 221 F.3d 1235, 1253 (11th Cir. 2000). Adequacy of representation is primarily based on "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the . . . class" and "whether plaintiffs have interests antagonistic to those of the rest of the class." *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 726 (11th Cir. 1987). This inquiry requires the Court to consider both whether there are any inter-class conflicts and whether class counsel and named plaintiffs will prosecute the case with zeal. *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181 (11th Cir. 2003).

First, this case does not present classic concerns about inter-class conflicts that threaten the absent class members' right to adequate representation. Unlike in *Amchem Products, Inc. v.*

*Windsor*, 521 U.S. 591 (1997) or *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999), all class members would be entitled to the same recovery if they prevail on their substantive claims. No one class member is harmed by the success of another. *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410 (3d Cir. 2016), *as amended* (May 2, 2016) (finding no fundamental conflicts of interest in Rule 23(b)(3) class where structural protections helped to align interests of present and future claimants). No such structural provisions are necessary here, where all class members share the interest of maximizing present monetary recovery. *See Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997) ("If the Plaintiffs succeed, the benefits will inure to all class members. Where the named plaintiffs in a class action are seeking the same type of relief for themselves as they seek for class members, the adequacy of representation requirement of Rule 23(a)(4) of the Federal Rules of civil Procedure is satisfied."). Nor is this a case where some particularly high-dollar claims are being diluted by virtue of being lumped in with less valuable ones. Indeed, if not for class certification, it is likely that no plaintiff would find it economically viable to pursue a claim. Second, Ford raises no issue nor does the Court believe there to be any issue with class counsel's ability to represent the class.

Finally, Ford also rests a portion of its adequacy argument on the possibility their unique defenses against class representatives forcing those representatives to devote significant energy and resources on their own cases at the expense of the class as a whole. *Ross v. Bank S., N.A.*, 837 F.2d 980 (11th Cir.), *reh'g granted and opinion vacated sub nom. Ross v. Bank S., N.A. (Three Cases)*, 848 F.2d 1132 (11th Cir. 1988), and *on reh'g*, 885 F.2d 723 (11th Cir. 1989) ("The existence of even an arguable defense can vitiate the adequacy of representation if it will distract the named plaintiff's attention from the issues common to the class."). Although Ford's point is well-taken, it does not defeat adequacy of representation for a few reasons. First, *Ross*

and its progeny are securities fraud cases. These cases are unique in the sense that often (particularly after the passage of the Private Securities Litigation Reform Act of 1995) the named plaintiff is a large institutional investor that could have some of its other business interests threatened by a large recovery against the defendant against whom it is litigating. Second, the "unique defense," here, reliance and knowledge, is so central to all class members' claims that the time and resources named plaintiffs spend on the issue would actually help prove all class members' case.[5] As shown in the parties' briefing papers, Plaintiffs argue that, based on Ford's advertisements and disclosures (or lack thereof), it was actually impossible for any class member to have known the truth. That argument—if true—benefits all class members. Lastly, the Court is reluctant to decline to certify a class on the basis of "unique defenses" when the Court, earlier in this opinion, thoroughly considered and decided not to grant the Defendant summary judgment on the basis of those same defenses. It would be a perverse result to dash all class members' chances of recovery in the name of protecting them from a highly uncertain threat.

### C. Rule 23(b)(3)

In addition to meeting the four requirements of Rule 23(a), parties seeking class certification must prove that the action is maintainable under one of the three subsections of Rule 23(b). *Amchem Prods.,* 521 U.S. at 614. Plaintiffs seek class certification under Rule 23(b)(3), which is appropriate when (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individuals members," and when (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

---

[5] In some cases where the Court found unique defenses defeated adequate representation, the defenses were unrelated to the merits of the case. *See, e.g.*, *Kline v. Wolf,* 88 F.R.D. 696, 699–700 (S.D.N.Y.1981) (finding that named plaintiff's claim was atypical because of a credibility problem).

1. Predominance

Rule 23(b)(3)'s predominance requirement is "more demanding" than the commonality requirement of Rule 23(a). *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). It "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem,* 521 U.S. at 623, by "ask[ing] whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Thus, the predominance inquiry

> calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Id.* (quoting 2 Newberg on Class Actions § 4:50 at 196-97 (5th ed. 2012)). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to individual class members. . . ." *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005) (footnotes omitted)).

Here, the individual issue of each class member's knowledge of the truth about his car threatens to swamp the common questions about Ford's conduct. Ford argues that at least 6 of the 19 named plaintiffs subjectively knew the truth about the GT 350's—namely, that they could not perform on the track like Ford advertised that they could. As a result, Ford says, Plaintiffs cannot maintain a successful statutory or common law fraud claim. How could a buyer have "relied" on the misrepresentation or how could the misrepresentation have "caused" damages

when the Plaintiff bought the car *despite* knowing the truth? Thus, the question is: What is the implication of an "actual, subjective knowledge" defense on the predominance of common issues?

Plaintiffs have two responses: First, that knowledge is irrelevant. They say that materiality, reliance, and causation, three elements of some of the statutory consumer protection and fraudulent concealment claims, can be proven on a class wide basis with reference to an objective consumer standard. Plaintiffs cite case law that shows, in some states, that a Plaintiff can prove those elements in their case-in-chief with reference to an "objective consumer." In this sense, common issues predominate because "the addition or subtraction of any of the plaintiffs to or from the class [does not] have a substantial effect on the substance or quantity of evidence offered." *Klay v. Humana, Inc.,* 382 F.3d 1241, 1255 (11th Cir. 2004). Plaintiffs do not have to affirmatively prove the *absence* of their knowledge of the truth about the cars as an element of their causes of action. In fact, the Eleventh Circuit held in *Klay* that, in certain cases, circumstantial evidence common to the entire class could be used to prove reliance. *Id.* at 1259; *see Rowe v. Bankers Life & Cas. Co.*, No. 09-CV-491, 2012 WL 1068754 at *10-12 (N.D. Ill. Mar. 29, 2012) (collecting cases courts were willing to infer reliance and causation on a class-wide basis). In other words, if the reasonable consumer would have relied on Ford's representations and omissions, Plaintiffs can still succeed even if *this particular class member* did not.

And second, Plaintiffs also argue that the classes should be certified because it was factually impossible for a plaintiff to have known the truth about the Base and Tech package cars, rendering reliance and causation a non-issue. The deposition excerpts Ford highlights in its summary judgment briefing show that some named Plaintiffs knew there were differences

between the various GT350 trim levels. Plaintiff Kowalchik testified that he always planned to add after-market coolers and that he was a "gearhead." Some others noted they had seen YouTube videos or read Internet forums about a Limp Mode rumor. But those excerpts do *not* show two things: First, that the Plaintiffs knew that the lack of coolers specifically meant the Base and Tech GT350's were incapable of Track Days, and second, that any of the additional information Plaintiffs knew came from Ford itself. This is a crucial point—although Ford shows that the disclaimers about the Base and Tech GT350's Track Day performance were available in the Supplemental Owner's Guide and that the Guide was available in the glovebox upon delivery, Ford is unable to point to any record evidence that convinces the Court it was available *prior to purchase*. Ford claims the Guide was available online, but as Plaintiffs note, Ford gives no specifics about *when* the document was posted and not one of the 25 named Plaintiffs referenced the Guide in their deposition testimony. This means class members could not have learned the truth—from Ford—until sometime in April 2016. Whether their knowledge was sufficient to conclude they knew their cars could not complete a Track Day without entering Limp Mode is a jury question, but surely a reasonable consumer cannot have been expected to search the Internet for unverified reports of problems she did not know existed. *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1097 (N.D. Cal. 2007) ("But GM is alleged to have *known* a lot more about the defective speedometers, including information unavailable to the public. Many customers would not have performed an Internet search before beginning a car search. Nor were they required to do so.").

Case law from federal courts from across the country demonstrate that a presumption of causation and reliance is only appropriate in some states and in some fact patterns. One such case is when a Defendant's representations to the entire class were uniform. However, after Judge

Dow in *Row v. Bankers Life & Cas. Co.*, cited above, noted that class-wide proof could be used for causation and reliance in such a scenario, he explained the limitations of that approach when "there is more than one logical explanation for the plaintiff's participation in the transaction or conduct at issue." *Id.* at *11 (internal quotations and citation omitted). Another Northern District of Illinois Court aptly illustrated the different scenarios. In Scenario A, a court allowed class-wide proof of reliance when it certified a class of plaintiffs who claimed they were misled by a volleyball club when they purchased lessons from the club because the club did not disclose its owner had been accused of rape and sexual abuse. *Mullen v. GLV, Inc.*, 330 F.R.D. 155 (N.D. Ill. 2019). In Scenario B, a court held plaintiffs could *not* use class-wide proof of reliance when de-certifying a class that claimed they were misled by Coca-Cola because the corporation did not disclose that its fountain diet coke had more artificial ingredients than its bottled diet coke. *Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006). Common-sense makes all the difference, the *Mullen* court held. Reasonable parents would not knowingly send their child to camp with an adult who had a history of rape and abuse. On the other hand, a reasonable consumer may well purchase one product over another despite a misleading advertisement, whether because of a difference in taste, price, or other considerations. *Mullen*, 330 F.R.D. at 166.

Even though common sense dictates this case is more akin to Scenario B because Plaintiffs could have purchased their GT350 for myriad reasons including, for example, in Plaintiff Kamperman's case, "because I was not going to need a car that required the capability to run for extended periods of time at high speeds,"[6] it is also true that Ford's representations to Plaintiffs were uniform and the evidence appears to show that no class member could possibly

---

[6] Plaintiffs cite Ford's expert Dr. Nauhaus for the statistic that 70% of "performance enthusiasts" at the time of purchase intended to use their vehicle for road course track days

have known from Ford that the car was ill-equipped to complete a Track Day. In this particular predominance inquiry, the Court finds that the more relevant considerations are Ford's uniform course of conduct and the dearth of evidence pointing to individual reliance issues that stem from Ford's communications. To the extent such individual issues appear later in the litigation, the Court can resolve them then. *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ("Many courts faced with similar circumstances have certified class status with the expectation that individual questions concerning fraudulent concealment can be resolved at a later damages phase.").

The Court is also cognizant that, beyond the Plaintiffs' challenge in proving their case-in-chief, Ford will also present affirmative defenses that may be unique to each class member. Ford will seek to introduce deposition testimony of the Plaintiff who said, for example, "I was starting to learn about the car not performing as I expected." *See Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) ("If the defendant has non-frivolous defenses to liability that are unique to individual class members, any common questions may well be submerged by individual ones. This principle emerges clearly from our case law and that of other circuits."). Individual issues are a threat to predominance even when they come up in affirmative defenses. *Id.* at 1177. ("The risk of voluminous and individualized extrinsic proof runs particularly high where a defendant raises substantial affirmative defenses to breach."). But of course, in close cases like this one, there is Eleventh Circuit precedent that points in the opposite direction. "The general rule, regularly repeated by courts in many circuits, is that courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016) (cleaned up). These

competing authorities highlight that class certification in the face of affirmative defenses is a matter of degree—and here, the individual affirmative defense of a lack of reliance is not significant or complex enough to defeat predominance in the face of the Defendant's common course of conduct. This case is more like *Brown* than *Sacred Heart Health Sys.* —in the latter case, the contracts between Plaintiffs and Defendant were materially different. *Sacred Heart Health Sys., Inc.*, 601 F.3d at 1171. The Court estimated there were approximately 33 unique variations. In other words, neither the Plaintiffs' nor Defendants' conduct was common. *Brown*, on the other hand, involved a consumer product—a washing machine—that was uniformly marketed and sold to Plaintiffs. In holding that the affirmative defense of misuse did not necessarily defeat predominance in the class' warranty claims, Chief Judge Pryor wrote that affirmative defenses on narrow issues such as misuse (or, in this case, a plaintiff's knowledge) are often easy to resolve and district courts have several tools to manage them. *Brown*, 817 F.3d at 1241.

2. Predominance and Damages

Finally, Rule 23(b)(3) also requires that any model supporting a plaintiff's damages be consistent with its theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). In short, this requirement ensures that the damages are capable of determination via classwide proof—just like the theory of liability. *Id.* Here, Plaintiffs rely on their expert, Ted Stockton, to propose that class members should recover $8,982.99—a "market-based measure of what would be required to restore the consumer to the originally negotiated state of utility." Pl. Mot. for Class Certification at 43. Stockton arrives at this number, roughly, by estimating the cost of adding the necessary coolers to the Base and Tech GT350's. Defendant seizes on Plaintiffs' description of these damages as a "benefit of the bargain" theory and argues not all of the

statutory and common law fraud laws in the various states in which the Plaintiffs seek certification provide for recovery under such a theory. Florida's statutory fraud law permits recovery under either benefit of the bargain theory of for "out-of-pocket" damages, for instance, but the other states, such as California, permit only out-of-pocket damages. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 983 (9th Cir. 2015). Out-of-pocket damages measure the difference between what a plaintiff paid and what the plaintiff would have paid but for the misconduct. And as noted above, benefit of the bargain damages measure the difference between what a plaintiff received and the market value of the product if it performed as promised.

Translated from legalese to the facts of this case, recovery on a benefit of the bargain theory means the class members recover the difference between the value of the car as-is and the market value of a Base or Tech GT350 that could complete a Track Day without Limp Mode; recovery on an out of pocket theory means the class members recover the difference between what they paid for their cars and what they would have paid had they known they would enter Limp Mode when attempting to complete a Track Day. According to Ford, the mismatch between the various bases for liability and what they describe as the Plaintiffs' 'benefit of the bargain' damages theory is fatal to class certification under *Comcast Corp*.

But it is unclear whether the *Comcast* Court's specific concerns apply outside of the antitrust context. Surely it is universally true in 23(b)(3) class actions that damages must be susceptible to classwide measurement such that individual issues do not predominate over common questions. *Comcast*, 569 U.S. at 35. But some courts have limited *Comcast* to "where multiple theories of liability exist, those theories create separable anticompetitive effects, and the combined effects can result in aggregated damages." *In re VHS of Michigan, Inc.*, 601 F. App'x

342, 344 (6th Cir. 2015). "Where there is no chance of aggregated damages attributable to rejected liability theories, the Supreme Court's concerns do not apply." *Id.*; *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 42–43 (2013) ("The Court's ruling is good for this day and case only. In the mine run of cases, it remains the "black letter rule" that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members.") (Ginsburg and Breyer, JJ., dissenting).

Defendants rightly point out multiple legal theories of liability exist here, but those multiple theories of liability do not create "separable effects" that, when combined, result in aggregated damages. In *Comcast*, the Plaintiffs' damages were not consistent with their theory of liability because substantive antitrust law requires that a "private plaintiff identify the economic rationale for a business practice's illegality under the antitrust laws and show that its harm flows from whatever it is that makes the practice unlawful." 2A P. Areeda, H. Hovenkamp, R. Blair, & C. Durrance, Antitrust Law ¶ 391a, p. 320 (3d ed. 2007). In other words, antitrust law requires a plaintiff to specifically explain which effect of a defendant's conduct makes the conduct unlawful and calculate the damages attributable only to that isolated impact. The fraud laws at issue in this class action impose no such requirement. Although different *types* of damages are available for violations of Florida's fraud laws versus California's fraud laws, the harm that the plaintiffs suffer due to violations of those different laws is the same—Ford's alleged fraud caused them to overpay for their vehicles. On the other hand, again, the harm suffered by antitrust plaintiffs by each different antitrust impact is *legally separable and distinct* and requires a damages calculation tied to its theory of liability. Thus, because the Plaintiffs suffer the same harm because of the violation of any state's fraud law, Mr. Stockton's damages model is sufficiently connected to the Plaintiffs' theories of liability. The model calculates how much a

class member "overpaid" for his vehicle due to Ford's misrepresentations and omissions, it "is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*," and thus satisfies Rule 23(b). *Comcast*, 569 U.S. at 38.

Even if *Comcast*'s concerns apply here, Plaintiffs meet its test because Stockton's calculation matches *both* theories of liability. If one had to devise a damages model for either of those theories of liability independently, Stockton's model would be applicable to the class a whole and would accurately measure either benefit of the bargain or out of pocket damages.

Thus, if the Court is going to deny Ford summary judgment on whether their advertising was misleading and agrees with Plaintiffs that the advertising was uniformly targeted to all putative class members, then it would be logically inconsistent to deny certification on the grounds that Plaintiffs may not use class-wide proof to win a presumption of reliance and causation. The Court will certify the state classes where state law does not prohibit such a presumption, discussed in more detail below.

3. <u>Superiority</u>

The predominance inquiry narrowly tilts in favor of certification and the superiority analysis helps push it over the edge. There are four non-exhaustive factors a court should consider in assessing whether a class action is superior to individual litigation: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action. *Klay*, 382 F.3d at 1269 (citing Fed. R. Civ. P. 23(b)(3)).

Even if some class members have slightly stronger claims than others (perhaps because it is crystal clear that they relied on no source other than Ford's representations), their interest in going it alone is outweighed by the fact that their recovery of at most $9,000 will be dwarfed by their litigation costs. Relatedly, no class members are currently going it alone so the second factor is satisfied as well. And further, Plaintiffs correctly point out that it is desirable to concentrate the litigation in this Court due to the Court's familiarity with the factual and legal issues—this would conserve judicial as well as litigant resources such that the claims can be resolved on the merits rather than devolving into a war of attrition. *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 989 (11th Cir. 2016). Finally, as noted above, manageability is a concern due to numerous state law classes and the possibility of individual affirmative defenses. However, "[t]his concern will rarely, if ever, be in itself sufficient to prevent certification of a class." *Klay*, 382 F.3d at 1272. If these potential manageability issues worsen and eventually threaten to derail the case, the Court always has the option to exercise its powers under Fed. R. Civ. P. Rule 23(d)(1). The class action device exists "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) (cleaned up). And because those solo actions may also seem de minimis to a regulator, the class action also serves to deter or discipline bad actors where there would otherwise be no government intervention. *See generally* Brian T. Fitzpatrick, The Conservative Case for Class Actions (2019).

## D. State-by-State Decisions on Certification

Now the Court turns to a state-by-state analysis (both statutory and common law) to determine which state classes can be certified.

1. <u>California</u>

A California class can be certified for both statutory and common law fraud claims because state law does not require an individualized showing of reliance in either case. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015); *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993 (N.D. Cal. 2020) (holding that a Court may assume reliance when the alleged omission is "plausibly material"); *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1147 (N.D. Cal. 2010) ("Courts have recognized that this element, which is often phrased in terms of reliance or causation, may be presumed in the case of a material fraudulent omission.") (internal citation and quotations omitted).

2. Florida

A Florida class can be certified on the Florida Deceptive and Unfair Trade Practices claim, but not on the Florida common law claims. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (holding a similar class can be certified under Florida Deceptive and Unfair Trade Practices Act). However, Plaintiffs' Florida common claims should be dismissed under the economic loss rule. Even though Defendant did not make this argument in its summary judgment motion, it is clearly governed by this Court's previous decisions. *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090 (S.D. Fla. 2019) (dismissing fraudulent concealment claims under Florida economic loss rule); *In re Takata Airbag Prod, Liab. Litig.*, 193 F. Supp. 3d 1324 (S.D. Fla. 2016) (same).

3. Illinois

An Illinois class can be certified for both statutory and common law fraud claims. *Cannon v. Nationwide Acceptance Corp.*, No. 96 C 1136, 1997 WL 779086, at *3 (N.D. Ill. Dec. 12, 1997) ("Individual reliance need not be shown for claims brought under Racketeer Influenced and Corrupt Organizations Act and the Illinois Consumer Fraud Act."). *See supra.*

4. <u>Missouri</u>

Defendants are entitled to summary judgment on Plaintiff's Missouri common law claims due to the Economic Loss rule. However, a Missouri Merchandising Practices Act class can be certified. *Glen v. Fairway Indep. Mortg. Corp.*, 265 F.R.D. 474, 481 (E.D. Mo. 2010), *order clarified,* No. 4:08CV730 RWS, 2010 WL 891621 (E.D. Mo. Mar. 8, 2010) ("Because the class claim is based upon a promise given to all putative class members in a form contract and can be proven with common evidence, individualized inquires are not necessary and do not defeat class certification.").

5. <u>New Jersey</u>

Pursuant to the Court's choice of law analysis, the New Jersey class has no named plaintiff and therefore cannot be certified.

6. <u>New York</u>

A New York class can be certified for both statutory and common law fraud claims. Defendants concede that New York's consumer fraud statute does not require proof of individual reliance. *See Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir. 2005) ("A private action brought under § 349 does not require proof of actual reliance"). And although reliance is an element of fraudulent concealment under New York law, it does not defeat predominance. *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 520 (S.D.N.Y. 1996) ("Courts have overwhelmingly held that, even when the issue of fraudulent concealment involves both common and individual questions, the common question of whether Defendants successfully concealed the existence of the alleged conspiracy predominates over any individual questions regarding the knowledge or diligence of individual plaintiffs.").

7. Oregon

Plaintiffs do not seek a statutory class, but a common law fraud class can be certified. *Wieber v. FedEx Ground Package Sys., Inc.*, 220 P.3d 68, 78 (Ore. 2009) ("Direct evidence of reliance in support of a fraud claim is not required; a plaintiff may prevail on a showing that a reasonable inference of reliance can be drawn from the facts in evidence.").

8. Pennsylvania

No class can be certified under Pennsylvania law because there is no named Plaintiff. All of Plaintiff Cruz's were dismissed for lack of standing.

9. Tennessee

The named Plaintiff can bring his statutory claim, but not on behalf of the class. *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090 (S.D. Fla. 2019). However, a fraudulent concealment class can be certified. *Bearden v. Honeywell Int'l Inc.*, 720 F. Supp. 2d 932 (M.D. Tenn. 2010) (holding that the mere possibility, without further evidence, of individual reliance issues will not defeat predominance).

10. Texas

Plaintiffs do not seek a common law class, and although reliance is an element of the statutory claim, "[t]his does not mean, of course, that reliance or other elements of their causes of action cannot be proved class-wide with evidence generally applicable to all class members; class-wide proof is possible when class-wide evidence exists. *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2002). Thus, a Texas statutory class can be certified.

11. Washington

Both statutory and common law classes can be certified. *Vernon v. Qwest Commc'ns Int'l, Inc.*, 643 F. Supp. 2d 1256, 1268 (W.D. Wash. 2009) ("Washington courts do not require a plaintiff to allege individual reliance on Defendants' conduct, particularly where the non-disclosure of a material fact is alleged."). While the Court has not found Washington case law directly addressing a presumption of reliance in common law fraudulent concealment cases, the Supreme Court of Washington has expressly approved a rebuttable presumption of reliance in omission cases because "it is virtually impossible to prove reliance in cases alleging nondisclosure of material facts." *Morris v. Int'l Yogurt Co.*, 107 Wash. 2d 314, 328 (1986).

### E. Remaining Certification Decisions on Unjust Enrichment and Warranty Claims

But not all claims can be certified—individual questions are a larger barrier to some claims than they are to others. For example, the predominance requirement posts a unique barrier to Plaintiffs' request to certify their unjust enrichment claims. Unjust enrichment "is a fact-intensive inquiry that focuses on the totality of the circumstances, not just defendant's conduct." *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 422 F. Supp. 3d 194, 232 (D.D.C. 2019). Further, while the nominal elements of an unjust enrichment claim are materially similar in each state, the specific contours of what is "unjust" varies. *See Id.* at 232-33 (collecting cases); *see also Lilly v. Ford Motor Co.*, No. 00 C 7372, 2002 WL 507126 (N.D. Ill. Apr. 3, 2002) ("Unjust enrichment is an equitable doctrine. There would be individual questions as to whether a particular class member is subject to equitable defenses."). The Eleventh Circuit has spoken clearly on this issue. "Before it can grant relief on this equitable claim, a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist. Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts, including ours, have found unjust

enrichment claims inappropriate for class action treatment." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009).

Next, the Court addresses the Plaintiffs' request for class certification of their implied warranty claims in California, New Jersey, Missouri, Pennsylvania, and Texas.[7] As noted above, New Jersey and Pennsylvania classes cannot be certified because there are no class representatives. A Missouri class also cannot be certified because the Court granted summary judgment on both class representatives' implied warranty claims.[8] That leaves California and Texas. Ford argues that the question of whether an individual plaintiff gave sufficient notice is an individual one that defeats predominance. Plaintiffs note that only four named class members failed to give notice—none of those Plaintiffs were in the Texas or California classes.   It is true that notice is an individual issue. But it is a simple one. The predominance inquiry is not determined by simply counting the number of individual questions versus common ones—a Court must consider their relative importance. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013). Here, the simply question of notice can be determined, if necessary, by a claims administrator while the big question of whether the product was defective at the time it was sold is a common one. Thus, the Court finds the California and Texas implied warranty classes can be certified, along with the Magnuson-Moss classes.

**XIII.   Conclusion**

---

[7] Plaintiffs do not seek an express warranty class.

[8] In its class certification briefing, Defendant appears to concede that Missouri does not require a plaintiff to prove notice of breach. But in the preceding sentence, Defendant cites the Missouri statute that reads "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Mo. Rev. Stat. § 400.2-607(3)(a). Yet, the Defendant sought summary judgment against a Missouri Plaintiff's warranty claims for failure to give notice of breach. The Court will follow Missouri law.

The iconic Ford Mustang made an indelible pony-shaped mark on American car culture. Through product placement in James Bond movies and racing partnerships with figures like Carroll Shelby, Ford has spent half a century cultivating an aura of performance and adventure. But these Plaintiffs allege, to Lee Iacocca's chagrin, that their cars are more like Pintos than Mustangs. The thrust of Plaintiffs' claims is that Ford billed *all* of their GT350 Mustangs as race cars capable of all-day track performance with the knowledge and expectation that performance enthusiasts would buy them on that basis. In reality, Plaintiffs say, the Base and Technology package versions of the cars were intentionally designed without coolers in order to inflate Ford's profits margins. As a result, the Base and Tech cars could not complete a full "Track Day" without going into "Limp Mode." There are so many fact-intensive questions, including: Did Ford's advertising really communicate what Plaintiffs allege? And did Plaintiffs know, or should they have known, the cars they were purchasing did not have coolers? Therefore, the Court declines to settle the majority of these claims at the summary judgment stage. However, Ford is granted summary judgment on Plaintiffs' claims concerning the occurrence of Limp Mode on public roads, all of Plaintiff Cruz's claims, the express and implied warranty claims of Plaintiffs Roberts, Hochsprung, Kowalchik, and Porter, as well as the express warranty claims of any class members who did not fulfill their presentment and notice obligations.

The class certification decision was closer than the summary judgment decision. Ford raises the valid concern that Plaintiffs cannot prove elements of their claims, such as reliance, on a classwide basis and the valid concern that it will seek to raise unique affirmative defenses for each class member. But Plaintiffs have done enough to show that these facts permit presumptions of reliance and that Ford's evidence of potential affirmative defenses is not strong enough to defeat the predominance of common issues. Requiring *every* issue to be common

would defeat the utility of the class action device. Thus, with the class definition set out by the Court above, the Court certifies statutory and common law fraud classes in California, Florida, Illinois, New York, and Washington; statutory fraud classes in Missouri and Texas; common law fraud classes in Oregon and Tennessee; and implied warranty and Magnuson-Moss classes in California and Texas. Grossman, Roth, Yaffa, and Cohen and Hagens Berman are appointed as class counsel and are directed to give absent class members appropriate notice under Rule 23.

DONE AND ORDERED in Chambers at Miami, Florida, this 1st of July 2021.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record